**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| ASSOCIATION OF AMERICAN PUBLISHERS, INC., <br><br>     455 Massachusetts Avenue, NW <br>     Washington, DC 20001, <br><br>                   Plaintiff, <br> v. <br><br> BRIAN E. FROSH, in his official capacity as Attorney General of the State of Maryland, <br><br>     200 St. Paul Place <br>     Baltimore, MD 21202, <br><br>                  Defendant. | Civil Action No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The Association of American Publishers, Inc. ("AAP"), by and through its undersigned counsel, hereby brings this action to enjoin enforcement of extraordinary new legislation from the State of Maryland that distorts the free marketplace and contravenes federal law. In support of its Complaint, AAP alleges as set forth below.

## NATURE OF THE CASE

1.      AAP is the national trade association for the U.S. publishing industry, which publishes some of the most acclaimed fiction, nonfiction, children's books, education materials, and scholarly works in the world. The industry's varied publishing houses—both commercial and nonprofit entities across the country—contribute mightily to the modern creative economy. To do so, they invest considerable resources and make incalculable marketplace-based decisions, relying on the uniform and unambiguous authority of the U.S. Copyright Act.

2.      American publishers serve hundreds of millions of readers each year in both local and global communities, and, for more than two centuries, have been an essential catalyst for democracy and the distribution of knowledge. Yet the vitality of the publishing industry cannot be taken for granted. It requires, and has always required, publishers to make decisions about the timing, pricing, and formats of their books, and to balance the various, competing, and ever-evolving business models for distribution, access, and enjoyment. This is the way all content businesses endure and serve the public interest, whether they invest in books, music, movies, or newspapers.

3.      AAP brings this action to prevent an unauthorized, unprecedented, and unjustified encroachment by a state into federally protected intellectual property rights and the creative and financial investments that such rights represent. The State of Maryland has enacted legislation, Md. Code, Educ. §§ 23-701, 23-702 (hereinafter, the "Maryland Act"), that requires publishers to distribute ebooks, audiobooks, and other digital literary works to public libraries in Maryland, as well as controls the timing and terms for doing so. The Maryland Act thus commandeers the rights of publishers and authors, in direct contravention of federal copyright law.

4.      The authority of the U.S. Congress—not state legislatures—to prescribe the scope of rights for copyrighted works is enshrined in Article I of the United States Constitution. The Constitution explicitly empowers Congress to enact a system of exclusive rights by which authors will be incentivized to create, disseminate, and be compensated for their writings. Today, Title 17 of the United States Code codifies a lengthy and complex statute of exclusive rights, remedies, exceptions, and limitations that govern the reproduction, distribution, public display, public performance, and transmission of creative works, including over the Internet (the "Copyright Act" or "copyright law"). Congress has enacted and amended these provisions over

the years as necessary in its expert judgement, following extensive and transparent deliberations with affected stakeholders—including libraries—and in keeping with the many trade and treaty obligations of the United States that pertain to the treatment and protection of creative works across borders.

5.      Set to go into effect on January 1, 2022, the Maryland Act is a frontal attack on these federal rights and those who depend upon them to make a living. The state law seeks to establish a right by public libraries to demand limitless digital copies of literary works, on terms the State of Maryland deems "reasonable," and other artificial advantages that contravene federal law and the free marketplace.

6.      The Maryland Act supplants the fundamental authority of publishers and authors to determine whether, on what terms, and in which markets and channels they will distribute their literary works. It interferes with marketplace-based decisions that, pursuant to federal copyright law, are the responsibility and prerogative of copyright owners to determine, and which directly affect both the short-term success and long-term promise of books and the additional creative properties they may spark. The Maryland Act will take these decisions out of the hands of copyright owners, and instead impose an unprecedented state-level compulsory licensing scheme.

7.      The Maryland Act would put one set of beneficiaries of the copyright system— libraries—in positions of unprecedented control, empowering them to direct and diminish the copyright owners who create and own the intellectual property in demand. The Maryland Act ignores that libraries have always had to make careful choices in serving patrons and using taxpayer money. Libraries have never had unfettered rights to every literary work upon demand, nor have they had the authority to set terms that subvert publishers' commercial recoupments and

profits, as would be the case under the Maryland Act. Libraries play a critical but carefully prescribed role within a broader copyright value chain—a chain that necessarily begins with authors and is fueled by the publishing houses to whom the authors entrust their copyrights.

8.     The Maryland Act is preempted as a matter of law. The Maryland Act conflicts with a long-established, carefully balanced, and complex federal legal framework enacted by Congress to govern the protection and disposition of copyrighted works in the United States and, through international treaties, beyond U.S. borders. The Maryland Act overrides publishers' exclusive rights under federal copyright law, in violation of both express and conflict preemption principles, as well as the Commerce and Due Process Clauses of the United States Constitution.

9.     This lawsuit is necessary to address the Maryland Act's threat to the copyright marketplace and everyone who makes that marketplace possible. It does not, however, reflect lack of interest on the part of publishers in supporting their library partners. Indeed, the United States has an extensive and hugely successful public lending library enterprise, by which patrons have access to millions of ebook and audiobook titles, at the same time those titles are available through booksellers and digital platforms. Most publishers already make their full digital catalogs available to public libraries in Maryland and elsewhere. As a result, in addition to print checkouts, libraries in Maryland already boast many millions of digital checkouts per year, far exceeding their reach during the nineteenth and twentieth centuries. As publishing has grown, so too have libraries.

10.     The legislative history of the Maryland Act makes clear that the state law was not adopted to address a failure by the publishing industry to provide literary works in digital format to libraries for lending to patrons. There already is a robust market for ebook and audiobook distribution between publishers and libraries. The Maryland Act's legislative history and public

statements by state legislators and public officials reveal that the Maryland Act arises primarily from concerns regarding Amazon, which is not an AAP member. Yet state-level policy concerns about Amazon's distribution practices relating to books it publishes independently do not justify intrusive legislation that harms publishing houses of all sizes and specialties. Moreover, the Maryland Act is not limited to the publishing houses of the United States; any foreign publisher transacting in the state will be subject to its reach, creating serious questions of treaty compliance and international reciprocity.

11.     For all these reasons, and as described further below, AAP seeks (1) an order declaring the Maryland Act void and unenforceable because it is preempted by federal law and unconstitutional, and (2) a preliminary and permanent injunction enjoining enforcement of the Maryland Act.

## PARTIES

12.     AAP is the national trade association for book, research journal, and education publishers in the United States. AAP is a 501(c)(6) not-for-profit corporation organized and existing under the laws of the State of New York, with its principal office at 455 Massachusetts Avenue, NW, Washington, DC 20001.

13.     AAP litigates this action on behalf of its members. AAP represents the leading consumer, educational, professional, and scholarly publishers in the United States and counts more than 120 publishers across the country as its members. AAP's members include large and small trade and consumer publishers, university presses, independent publishers, education publishers, and publishers of research journals. Together, these publishers invest in and produce a valuable array of literature, children's books, history, political books, and countless other genres that are indispensable to public discourse and personal enrichment; critically acclaimed

course materials that prepare students to lead and contribute to an increasingly complex world; and academic books and research journals that advance thousands of disciplines across medicine, science, and the humanities. AAP's members publish books in every format—from traditional hardcover and paperback books to ebooks, audiobooks, and other digital literary works—across a wide range of subjects.

14.     AAP represents its members on matters of law and policy, advocating for outcomes that incentivize the publication of creative expression, professional content, and learning solutions and that enable publishers to effectively enforce their intellectual property rights. Among AAP's most critical priorities is ensuring the viability of the United States' more than 200-year-old copyright framework that encourages publishers to invest in and distribute a great variety of books to the public.

15.     AAP has associational standing to bring this suit on behalf of its member-publishers. AAP's members would have standing to individually challenge the Maryland Act. The statute would require publishers under threat of state sanction to make certain distributions of their digital literary works. This directly interferes with publishers' reliance on uniform federal copyright principles and statutory provisions, from which they make a variety of complex, marketplace-based decisions on whether and in what manner to invest in authors, publish books in a variety of formats, and exercise their exclusive rights under copyright law.

16.     Challenging the Maryland Act is germane to AAP's mission, which includes, among other things, representing and advocating for its members with respect to matters of law and policy that affect the health and vitality of the publishing industry and its ability to serve the public interest.

17.     AAP is not seeking monetary relief in this action, but rather only declaratory and injunctive relief for the benefit of all publishers equally. Accordingly, the claims and relief sought do not require proof specific to particular AAP members, and AAP members' individual participation is not required.

18.     Defendant Brian E. Frosh is Attorney General of the State of Maryland, with his principal office at 200 St. Paul Place, Baltimore, MD 21202. Defendant is sued in his official capacity. As Attorney General of the State of Maryland, Defendant is charged with enforcing the Maryland Act. The Maryland Act, in § 23-702(d), provides that Defendant may exercise his enforcement powers pursuant to Md. Code, Com. Law § 13-401 *et seq.* The Maryland Act empowers Defendant to seek, *inter alia*, injunctive relief and criminal penalties to enforce the statute. *See* Md. Code, Com. Law §§ 13-406, 13-411.

## JURISDICTION

19.     This case arises under the United States Constitution and presents a federal question within this Court's jurisdiction under Article III of the Constitution, 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. §§ 1983 and 1988. AAP's claims seek to invalidate the Maryland Act as preempted by federal law and as unconstitutional.

20.     The Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. The Court has the authority to award costs and attorneys' fees to AAP under 42 U.S.C. § 1988 and 17 U.S.C. § 505.

21.     This Court's jurisdiction is properly exercised over Defendant in his official capacity, *Ex parte Young*, 209 U.S. 123 (1908), as AAP is seeking declaratory and injunctive relief.

22.     There is an actual controversy of sufficient immediacy and concreteness relating to the legal rights and duties of AAP's members to warrant relief under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202. The harm to AAP's members as a direct result of the Maryland Act and threatened actions of Defendant is sufficiently real and imminent to warrant the issuance of a conclusive declaratory judgment and prospective injunctive relief. This action presents an actual justifiable controversy that is ripe and concrete because on January 1, 2022, the Maryland Act will take effect, and AAP's members will then become subject to the risk of liability, as described more fully below.

23.     This Court's immediate review of the Maryland Act's preemption by federal law and unconstitutionality is necessary to prevent an imminent violation of AAP's members' fundamental rights.

24.     Under these circumstances, judicial intervention is warranted to resolve a genuine case or controversy within the meaning of Article III of the United States Constitution regarding the constitutionality and legality of the Maryland Act.

25.     A declaration that the Maryland Act is preempted by federal law and unconstitutional, and an injunction preventing its enforcement, would definitively resolve that controversy for the parties.

## **VENUE**

26.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1)-(2). Defendant is sued in his official capacity, and his official place of business is located within this District. The events giving rise to AAP's claims, including the enactment of the Maryland Act, occurred in this District.

## GENERAL ALLEGATIONS

### The Importance of Copyright

27.     Copyright empowers creativity and innovation to the ultimate benefit of the public. Today, copyright is as critical in the modern marketplace as it was when the Framers first adopted the Copyright Clause in Article 1, Section 8, Clause 8 of the United States Constitution in 1787 with an eye to the future potential of the United States. Copyright fosters the creation and dissemination of a wide variety of literary works, by providing the economic incentive for authors and publishers to invest creatively, intellectually, and financially.

28.     Federal copyright law forms the cornerstone of the United States' vital publishing industry. A healthy and independent publishing industry, in turn, supports the nation's political, intellectual, and cultural systems. It is no overstatement to say that the free operation of the publishing industry in a nation cannot be separated from the free exercise of democracy, a tenet that is as true for the United States as it is for other countries.

29.     Federal copyright enables authors, scientists, educators, and others to produce the books, articles, educational materials, and other literary works that define our culture, support our democracy, educate our youth, and enhance our daily lives. It allows publishers to create, market, and distribute a wide array of high-quality books, journals, and educational materials that support a well-informed public and enrich American culture.

30.     Federal copyright promotes the creation and dissemination of these works by granting copyright owners, including authors and publishers, certain exclusive rights in their works. These rights stem directly from the United States Constitution. That the U.S. Congress alone has the authority to prescribe the scope of exclusive rights under copyright, including the reproduction and distribution of copyrighted works, is well-established.

31.     One of the fundamental changes made by the 1976 Copyright Act was the adoption of a single federal system of copyright to definitively supersede a dual system that involved a dated panoply of state laws and created confusion for the courts and marketplace alike. In this signature Act, the U.S. Congress determined that a national, uniform copyright law "would greatly improve the operation of the copyright law and would be much more effective in carrying out the basic constitutional aims of uniformity and the promotion of writing and scholarship." H.R. Rep. 94-1476 at 129 (1976). In doing so, Congress recognized the immeasurable value of authorship and copyright commerce to United States ingenuity, international trade, and the public interest.

**The Maryland Act and its Threat to Copyright**

32.     The Maryland statute follows the lobbying efforts of a few library groups to fundamentally rewrite U.S. copyright law and profoundly disrupt the vital and delicate publishing ecosystem. The Maryland Act will be the first such state law to go into effect, but some other states—including New York, Rhode Island, and Massachusetts—are likewise in the process of either adopting or considering copycat legislation. These state intrusions into copyright are rushed and ill-conceived. They disregard that copyright law is exclusively the domain of the U.S. Congress. Further, at the expense of authors, publishers, booksellers, and readers, they ignore that the public interest comprises much more than just libraries.

33.     The Maryland Act is an impermissible and unconstitutional overreach into federal copyright law. The legislation is part of an unjustified effort to divert copyright policy away from the U.S. Congress to state assemblies, at the expense of longstanding incentives and protections that are the foundation of our creative economy.

34.     In May 2021, the Maryland state legislature passed the Maryland Act for the

stated "purpose of requiring a publisher who offers to license an electronic literary product to the

public to also offer to license the electronic literary product to public libraries in the State on

reasonable terms that would enable public libraries to provide library users with access to the

electronic literary product." 2021 Md. Laws Ch. 411 (H.B. 518).

35.     The Maryland Act added two sections, §§ 23-701 and 23-702, to the Education

article of the Code of Maryland, under the subtitle "Electronic Literary Product Licenses." A true

and correct copy of the Maryland Act is attached hereto as Exhibit A.

36.      The Maryland Act provides, in relevant part, as follows:

(a) Subject to subsections (b) and (c) of this section, ***a publisher who offers to
license an electronic literary product to the public also shall offer to license the
electronic literary product to public libraries in the State*** on reasonable terms
that would enable public libraries to provide library users with access to the
electronic literary product.

(b) The terms of a license under subsection (a) of this section may include:

> (1) A limitation on the number of users a public library may
> simultaneously allow to access an electronic literary product;

> (2) A limitation on the number of days a public library may allow a user to
> access an electronic literary product; and

> (3) The use of technological protection measures that would prevent a user
> from:

>> (i) Maintaining access to an electronic literary product beyond the
>> access period specified in the license; and

>> (ii) Allowing other users to access an electronic literary product.

(c) The terms of a license under subsection (a) of this section may not include a
limitation on the number of electronic literary product licenses a public library
may purchase on the same date the electronic literary product license is made
available to the public.

(d) A violation of this subtitle shall constitute an unfair, abusive, or deceptive
trade practice and is subject to enforcement in accordance with Title 13, Subtitle 4
of the Commercial Law Article.

Md. Code, Educ. § 23-702 (effective Jan. 1, 2022) (emphasis added).

37.     The Maryland legislature enacted the pending law with little regard for the authors and publishers that will be impacted by the law or the numerous, serious issues these groups raised upon learning of the radical new legislation. Authors and publishers alike informed the Maryland legislature of considerable preemption and constitutional concerns, including through detailed testimony submitted by AAP and the Authors Guild in opposition to the Maryland Act, but those concerns were cast aside.

38.     If allowed to go into effect, and enforced, the Maryland Act will violate publishers' rights and undermine federal copyright law in numerous ways.

39.     The Maryland Act will force publishers to disseminate ebooks, audiobooks, and other digital literary works to public libraries in Maryland, whenever publishers distribute those works to anyone else—regardless of the fact that federal law protects publishers' exclusive right to decide whether and to whom they will distribute their works.

40.     In further disregard to publishers' rights under federal copyright law, the Maryland Act mandates that publishers disseminate their digital literary works to Maryland public libraries immediately and in an unlimited quantity and that any related terms be "reasonable." The Maryland Act leaves what is "reasonable" largely undefined but that will inevitably be decided by the State of Maryland in enforcing the law. Likewise, the Maryland Act does not lay out what libraries qualify as "public libraries in the State."

41.     In other words, the Maryland Act implements a compulsory licensing scheme in the State of Maryland for the distribution of digital literary works. The legislation replaces a varied and valuable existing set of marketplace-based decisions as to distribution of copyrighted works with a one-time decision akin to "first publication." After that initial offering, the

Maryland Act deprives publishers of control over the reproduction, distribution, public display, and public performance of their works, taking away exclusive rights that they hold under copyright law for the entirety of the copyright term. The Maryland legislature has instead handed those rights over to public libraries in Maryland, empowering the libraries to obtain any digital literary works that they want, for provision to their patrons, so long as they stay within certain terms set by Maryland and pay an undefined "reasonable" price that Maryland will regulate. Under Maryland's scheme, public libraries—not copyright owners—will control the decision as to whether, when, and how to distribute copyright owners' digital literary works. The Maryland Act's compulsory licensing system will diminish the value of the same books and intellectual property that libraries claim to so prize. The Maryland Act represents an unauthorized taking of copyrights grounded in the United States Constitution and protected by federal copyright law.

42.     The Maryland Act's potential reach is extraordinarily broad. The types of "electronic literary products" covered by the Act are not limited to just ebooks or audiobooks, but encompass any conceivable "text document that has been converted into or published in a digital format that is read on a computer, tablet, smart phone, or other electronic device" or "audio recording of a text document, read out loud in a format that is listened to on a computer, tablet, smart phone, or other electronic device." Md. Code, Educ. § 23-701(b). In other words, the Maryland Act covers digital versions of not just books, but also magazines, newspapers, blogs, and a whole host of other texts that may be published, viewed, or listened to on electronic devices like computers or smart phones.

43.     The definition of "publisher" under the Maryland Act is remarkably broad. That definition is not limited to publishers of "electronic literary products," but instead sweeps into its coverage any "person in the business of manufacturing, promulgating, and selling books, audio

books, journals, magazines, newspapers, or other literary productions, including those in digital form, that consist of text, imagery, audio recordings, or any combination of text, image, and audio recording." Md. Code, Educ. § 23-701(c). The Maryland Act will thus impact not only the book, journal, newspaper, magazine, and other media publishing industries, but also a whole range of businesses that manufacture and sell digital literary content to readers, including ebook and audiobook retailers, aggregators, and digital delivery services. It applies equally to American and foreign copyright owners doing business in the state, raising additional serious questions pertaining to the devaluing of intellectual property and due process.

44.     Publishers will face the risk of severe civil and criminal liability under the Maryland Act. Under § 23-702(d) of the statute, Defendant, in his capacity as Attorney General of the State of Maryland, may exercise his enforcement powers under Md. Code, Com. Law § 13-401 *et seq.* The Maryland Act will therefore empower Defendant to seek injunctive relief to compel publishers to comply with the compulsory licensing requirements of the state law and to seek criminal penalties against noncompliant publishers—including imprisonment of up to one year. *See* Md. Code, Com. Law §§ 13-406, 13-411. The Maryland Act will also allow suits for damages by any persons allegedly aggrieved by publishers' failure to grant statutorily mandated licenses. *See* Md. Code, Com. Law § 13-408. Remarkably, the Maryland Act subjects publishers to civil and criminal liability for attempting to exercise their exclusive rights in the very manner envisioned by the federal statute. *See* 17 U.S.C. § 106.

45.     In short, the Maryland Act will bring to bear the considerable coercive powers of the State of Maryland to unilaterally force publishers to disseminate their digital literary works to Maryland libraries, on an unlimited basis and on terms dictated by the State of Maryland, whenever publishers disseminate those works to anyone else, anywhere else. The Maryland

Act's requirements are in flagrant violation of the authority granted to publishers by federal law to decide whether and on what terms to make their works available in order to achieve the full benefit and promise of the Copyright Act.

### The Protection of Copyright Under Federal Law

46.     The authority of the U.S. Congress to control the scope of exclusive rights under copyright, including reproduction and distribution, is centrally enshrined in the Copyright Clause of the United States Constitution. The Copyright Clause provides that "Congress shall have Power . . . To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries . . . ." U.S. Const. art. I, § 8, cl. 8.

47.     Pursuant to this constitutional grant of authority, Congress has enacted a series of federal copyright statutes, culminating with the 1976 Copyright Act, 17 U.S.C. §§ 101 *et seq.*, that, *inter alia*, define and protect the rights of copyright owners.

48.     The U.S. Supreme Court has repeatedly affirmed that it is the domain of Congress to determine the overall scope and balance of copyright law, as set forth in the Copyright Act. *See, e.g.*, *Eldred v. Ashcroft*, 537 U.S. 186, 212 (2003) ("stress[ing]" that "it is generally for Congress, not the courts, to decide how best to pursue the Copyright Clause's objectives," and that it is not the role of the courts "to alter the delicate balance Congress has labored to achieve" (citations omitted)); *id.* at 222 ("[T]he Copyright Clause empowers Congress to determine the intellectual property regimes that, overall, in that body's judgment, will serve the ends of the Clause. . . . The wisdom of Congress' action . . . is not within [the courts'] province to second-guess.").

49.     The Copyright Act grants copyright owners certain exclusive rights. In particular, the Copyright Act provides that "the owner of copyright . . . has the exclusive rights to do and to authorize" others to reproduce and distribute works, prepare derivative works, and display works, among other rights. 17 U.S.C. § 106. Pursuant to the Copyright Act, copyright owners have the authority to exercise these exclusive rights and to authorize others to do so.

50.     Moreover, some twenty-five years ago, the United States and hundreds of other countries addressed the specific question of protecting copyright interests arising from digital technologies by adhering to a pair of binding instruments known as the WIPO Internet Treaties. These treaties, which the United States duly affirmed through a combination of existing law and the 1998 Digital Millennium Copyright Act, make clear that the copyright owner has the exclusive right to authorize the digital dissemination or transmission of a creative work, including in new and innovative formats and irrespective of whether the customer is in a bookstore, library, or the comfort of their own home. Intergovernmental leaders paved the way for the very innovations that led to ebooks and audiobooks, and which will, no doubt, lead to future exciting formats made possible by a free market.

51.     The U.S. Supreme Court has recognized that the public welfare is best served by respecting the scope of copyright owners' rights under the Copyright Act. *See, e.g.*, *Eldred*, 537 U.S. at 212 n.18 (explaining that "encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors," that "the incentive to profit from the exploitation of copyrights will redound to the public benefit by resulting in the proliferation of knowledge," and that "copyright law serves public ends by providing individuals with an incentive to pursue private ones" (citations omitted)).

52.     Federal copyright law gives copyright owners the discretion and latitude to determine how they will exercise their exclusive rights—including in deciding whether to grant licenses for the distribution of their works and under what terms. The discretion secured by these rights enables publishers, who bear the costs and risks of bringing new works to the public, to exercise their judgment in determining how to distribute those works, and to experiment, innovate, and explore new business models in the marketplace.

53.     Importantly, copyright owners have the prerogative to refrain from exercising their rights or authorizing others to do so—for example, by declining to distribute their works for any number of reasons. That right has been repeatedly recognized by the U.S. Supreme Court. *See, e.g.*, *Stewart v. Abend*, 495 U.S. 207, 229 (1990) ("[T]his Court has held that a copyright owner has the capacity arbitrarily to refuse to license one who seeks to exploit the work.").

54.     Federal authority over copyright is especially critical given the evolution of copyright commerce since 1976 and the nature of copyright transactions in the digital age. As a practical matter, transactions for ebooks, audiobooks, and other digital literary works are rapid and do not start and stop at Maryland's border. By aggressively interfering in the disposition of digital formats, the Maryland Act threatens the operation of a complex and borderless copyright economy, and subjects publishers and authors who otherwise comply with both the protections and limitations of federal copyright law to state regulations that will disrupt and confound creative businesses in the twenty-first century.

55.     The U.S. Congress has exercised its constitutional authority over copyright to enact certain exceptions and limitations. Only on rare occasions has Congress deemed it appropriate to grant compulsory—also known as statutory—licenses, recognizing that such

compulsory licensing is an extraordinary exception to the rule that copyright businesses should be free to invest and innovate without artificial constraints.

56.     Congress has never granted compulsory licenses for literary works, whether for copies of those works in digital format or otherwise. In the lead-up to the adoption of the 1976 Copyright Act, Congress considered whether to institute limited compulsory licenses for nondramatic literary works (and other works) in the context of public broadcasting. Ultimately, however, Congress rejected that idea, recognizing that literary works are a poor fit for compulsory licensing schemes. In the nearly 50 years since, Congress has never created a compulsory license for digital literary works, whether for libraries or others. To the contrary, Congress has been vocally interested in ensuring that U.S. copyright markets remain robust and competitive.

57.     Congress has, however, created for libraries certain exceptions to infringement, enabling them to reproduce and distribute certain copyrighted works without permission on a limited basis, for the specific purposes of preservation, replacement, and research. Moreover, the Copyright Office has for the past two decades considered proposals to amend and update § 108 of the Copyright Act, and many of those proposals have publisher support. Notably, none of the current or proposed exceptions under § 108 or elsewhere in the Copyright Act would permit libraries any special commercial entitlement or accommodation even close to the sort created by the Maryland Act.

58.     Nonetheless, with the Maryland Act, the State of Maryland attempts to commandeer Congress's sole authority and enact compulsory licensing on the state level. Maryland cannot through a state-law compulsory licensing scheme circumvent Congress's authority and copyright owners' federal rights.

### The Importance of Copyright to Publishing in the United States

59.     The system of federal copyright protection forms the bedrock of the vital publishing industry in the United States today.

60.     Under this legal framework, publishers obtain exclusive copyright licenses or transfers from authors for, among other things, the rights to publish and distribute original works of authorship in a variety of print, ebook, and audiobook editions, as well as certain rights to exercise and/or share in derivative works such as literary sequels, foreign translations, movie adaptations, and more. Publishers, in turn, exercise the exclusive rights entrusted to them by selling, licensing, and otherwise contracting with a wide range of libraries, booksellers, and intermediaries for the benefit of readers of all ages. In this way, publishers and authors fulfill the copyright bargain envisioned by the Framers.

61.     Among other things, the discretion secured by these rights affords publishers with the ability to balance best sellers with less commercially successful books and backlist titles in any given year based on business considerations. The limited number of commercially successful books provides the financial foundation that allows publishers to offer a much larger number of authors the opportunity to reach the public with their thoughts and creative expression and to attempt to build a readership for future success. It is therefore critical to the wellbeing of the marketplace that publishers, in cooperation with their authors, retain the freedom to determine the timing, channels, formats, and terms of distribution that in their judgment offer the best opportunity for the success of each individual author's work, and for the publisher as a whole. This is precisely the kind of business flexibility that copyright law anticipates and secures.

62.     Operating under these principles, the U.S. publishing industry today serves as a vital component of the national economy. The nation's core copyright industries—of which

publishing forms an integral part—add more than \$1.5 trillion in annual value to U.S. gross domestic product, accounting for 7.41% of the U.S. economy. Robert Stoner & Jessica Dutra, COPYRIGHT INDUSTRIES IN THE U.S. ECONOMY: THE 2020 REPORT at 4. In 2020 alone, the U.S. book publishing industry generated \$25.71 billion in sales. 2020 AAP STATSHOT REPORT. The U.S. publishing industry also supports an extensive network of American businesses and hundreds of thousands of jobs. As of January 2021, an estimated 765,000 people worked in various publishing industries in the United States. Amy Watson, *Total employment in U.S. publishing industries from January 2001 to January 2021* (Mar. 17, 2021).

63.     In addition to forming an integral part of the national economy, U.S. publishers also play an essential role in the educational system—publishing education materials and enabling the exchange of ideas through the written word.

64.     To preserve and grow these important roles and contributions by U.S. publishers, copyright law must be meaningfully and appropriately enforced. Publishers invest heavily in the creation and promotion of their authors and their works, as well as in building their reputations as public-focused businesses. In turn, publishers rely on their copyrights to protect these investments and sustain the industry that is at once both delicate and invaluable.

65.     Libraries play an important role in the publishing ecosystem by promoting literacy and connecting readers to books, as publishers have always recognized. Publishers compete vigorously with one another to craft ever-more innovative and responsive relationships and agreements with libraries, just as they do with retail partners. As part of those efforts, publishers must weigh and calibrate transactions between commercial and noncommercial customers and between print and digital formats.

66.     An industry as vibrant and innovative as publishing is always developing, and publishing houses, like all businesses, must balance many factors when determining business strategies. These strategies necessarily take into account the differences across formats and consumption. Although ebooks and audiobooks have become popular in recent years, demand for such digital content ebbs and flows with consumer interest and has not, in any event, supplanted the continuing demand for physical books. Nor does it provide a crystal ball into book formats that are not yet invented or publishing markets that are not yet developed.

67.     Publishers may address evolving demands for ebooks and audiobooks in a number of different ways, such as by engaging in consumer transactions to license digital formats directly to readers, making digital content available through ebook and audiobook retailers, and working with aggregators that authorize libraries to distribute digital content to library patrons. Unlike transactions with consumers that allow personal use without further distribution, the arrangements with libraries involve further circulation to the library's patrons.

68.     As the popularity of digital literary works has grown, the prevailing practice in the U.S. publishing industry has been to expand distribution of these works to libraries and foster their growth. Today, there is a robust market for ebook and audiobook distribution between publishers and libraries. Despite the aggressive overreach of the Maryland Act, the legislation is in many ways redundant as to voluntary market practices: most publishers, including all of AAP's largest members, already make their full digital catalogs—a vast array of fiction and nonfiction works—available to public libraries. That includes making ebooks and audiobooks available for public lending on the same day they are released commercially. There are a range of digital lending platforms and services available to libraries, such as OverDrive and Hoopla.

69.     During the COVID-19 pandemic, while facing significant challenges to their own businesses, publishers across every sector voluntarily made the availability of digital content more flexible than ever for libraries, including by adjusting a variety of terms to ensure greater access to digital works.

70.     As a result, library ebook and audiobook lending is thriving today. For more than a decade, libraries have posted robust growth in digital lending, and that trend has continued during the COVID-19 pandemic. In 2020, more than 100 public library systems exceeded 1 million digital checkouts on the OverDrive ebook lending platform alone. OverDrive, *102 library systems surpass one million digital checkouts* (Jan. 11, 2021). That included Maryland's Digital eLibrary Consortium and Montgomery County Public Libraries, with over 4 million and 1 million digital checkouts, respectively. *Id.* In total, 430 million ebooks were borrowed globally through the OverDrive platform in 2020. *Id.* This year, 129 library systems are on track to surpass the 1 million digital checkout threshold on OverDrive, breaking last year's all-time record. OverDrive, *Digital library reading is on pace for another record-breaking year* (July 9, 2021). Total digital circulation on OverDrive is on pace to exceed half a billion digital checkouts in 2021, reflecting major growth for libraries of all sizes. *Id.*

71.     The Maryland Act is not a reasoned response to any broad concerns in the digital market. To the contrary, it appears that the state law is motivated by discontent with a single technology company that has at times refused to distribute to libraries the ebooks and audiobooks that it publishes. The Maryland Act's legislative history and public statements by state legislators and public officials reveal some very specific concerns about this company, Amazon, which is not an AAP member. (To be clear, in this context Amazon is acting as its own publishing house, not a retail platform for other publishers.) For example, the Sponsor Statements for both the

Maryland House and Senate Bills, H.B. 518 and S.B. 432, single out Amazon (and its subsidiary Audible) for refusing to license over 20,000 ebook and audiobook titles to libraries. However, there is no contention that publishers more broadly are failing libraries. Nor is there any question that the marketplace for library ebooks and audiobooks is flourishing. Indeed, publishing houses are leaders in supporting and distributing copyrighted works to America's public libraries. The Maryland legislature's attack on one creative industry, one market model, and one format is unjustified.

72.     Regardless of its impetus, the impact of the State of Maryland's intrusion on copyright and the digital distribution marketplace—and the harm to publishers in particular—will be significant and far-reaching. The Maryland Act threatens to fundamentally reshape how publishers distribute their works and how the marketplaces for ebooks and audiobooks operate, both within and outside Maryland. In enacting and enforcing the statute, the State of Maryland will interfere with business decisions that are the responsibility and prerogative of publishers and their authors to determine pursuant to federal copyright law, which will have negative consequences on publishing in both the short and long terms. The Maryland Act disregards authors and publishers' rights to determine under what terms, and in which markets and channels, they will distribute their literary works. Markets vary widely, and many different factors are considered when authors and publishers decide how their works will be distributed. To take these decisions out of the hands of copyright holders and place them in the hands of the State of Maryland will usurp copyright owners' federally protected rights, in contravention of both the Copyright Act and the United States Constitution.

73.     AAP has no adequate remedy at law other than the judicial relief sought here. The failure to temporarily and permanently enjoin the implementation and enforcement of the

Maryland Act will irreparably harm AAP and its members by violating their statutory and constitutional rights. If the Maryland Act is not enjoined, AAP members will no longer be able to balance and make marketplace-based decisions as to the exercise of their exclusive rights under copyright law. Instead, the Maryland Act puts AAP members in an untenable position. They can abdicate their exclusive rights under federal copyright law, in favor of state-mandated distributions of their copyrighted works, on state-mandated terms, and on state-regulated pricing, or, in the alternative, they can cease distributing such digital content altogether or risk severe civil and criminal liability under Maryland state law.

74.     Accordingly, AAP seeks declaratory and injunctive relief against enforcement of the Maryland Act on the grounds that the law is preempted by federal law and that the law violates the Dormant Commerce Clause and Due Process Clauses of the United States Constitution.

## FIRST CAUSE OF ACTION
### (Express Preemption Under the U.S. Copyright Act and/or the Supremacy Clause of the U.S. Constitution)

75.     AAP repeats and re-alleges the foregoing paragraphs set forth above as if fully and separately set forth herein.

76.     The Supremacy Clause of the United States Constitution sets forth that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . ., shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

77.     The Maryland Act is expressly preempted under the Copyright Act. Express preemption arises when Congress states an intention to preempt state law.

78.     The Copyright Act contains an express preemption provision that provides, in relevant part, that "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103 . . . are governed exclusively by this title. . . . [N]o person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State." 17 U.S.C. § 301(a).

79.     The works published by AAP's members, including as ebooks and audiobooks, are original works of authorship within the scope and subject matter of copyright.

80.     The Maryland Act creates, grants, and/or takes away rights equivalent to the exclusive rights granted under § 106 of the Copyright Act. Among other things, the Maryland Act compels publishers to distribute ebooks, audiobooks, and other digital literary works, on terms set by the State of Maryland, and takes away publishers' rights to decide when, how, to whom, and in what formats they will distribute their works, and whether to decline to distribute their works altogether. The Maryland Act will also create a new right by allowing suits for damages by any persons allegedly aggrieved by publishers' failure to adhere to certain statutorily mandated distributions. *See* Md. Code, Com. Law § 13-408.

81.     There is no extra element present in the Maryland Act that would render the rights covered by the statute nonequivalent to the rights granted under § 106 of the Copyright Act.

82.     Unless it is enjoined, the Maryland Act will operate to unlawfully deprive AAP's members of federally protected rights under the Copyright Act.

83.     For these and other reasons, the Maryland Act is expressly preempted by federal law.

## SECOND CAUSE OF ACTION
### (Conflict Preemption Under the U.S. Copyright Act and/or the
### Supremacy Clause of the U.S. Constitution)

84.     AAP repeats and re-alleges the foregoing paragraphs set forth above as if fully

and separately set forth herein.

85.     The Supremacy Clause of the United States Constitution sets forth that the

"Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . .,

shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any

Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art.

VI, cl. 2.

86.     The Maryland Act is federally preempted under conflict preemption principles.

Under the Supremacy Clause of the United States Constitution, state laws that interfere with, or

are contrary to, federal law are preempted and have no force or effect.

87.     The Maryland Act conflicts with federal law. The Maryland Act and federal

copyright law are irreconcilable.

88.     The works published by AAP's members, including as ebooks and audiobooks,

are original works of authorship within the scope and subject matter of copyright.

89.     The Maryland Act conflicts with federal law because it stands as an obstacle to

the accomplishment and execution of the full purposes and objectives of Congress in enacting

the Copyright Act.

90.     The Maryland Act prohibits conduct that federal copyright law permits, including

the federally protected right to refrain from exercising an exclusive right under the Copyright

Act. Courts have routinely recognized copyright owners' authority to exercise discretion to

license—or not license—to whomever they choose and to define the scope or limits of such

licenses in a manner that they deem appropriate, subject only to the push and pull of customer demands, negotiations, and accommodations that are at the center of both our free markets and innovation.

91.     The Maryland Act conflicts with Congress's intention to vest publishers as copyright owners with exclusive rights. The Maryland Act imposes on publishers, contrary to their exclusive rights under the Copyright Act, an obligation to disseminate their digital literary works to Maryland state libraries, and to do so on particular terms, even if doing so is involuntary and uneconomic.

92.     Unless it is enjoined, the Maryland Act will operate to unlawfully deprive AAP's members of federally protected rights under the Copyright Act.

93.     For these and other reasons, the Maryland Act is conflict preempted by federal law.

## THIRD CAUSE OF ACTION
### (Violation of the Dormant Commerce Clause of the U.S. Constitution)

94.     AAP repeats and re-alleges the foregoing paragraphs set forth above as if fully and separately set forth herein.

95.     The Commerce Clause of the United States Constitution entrusts the regulation of commerce "among the several States" to the federal government. *See* U.S. Const. art. I, § 8, cl. 3. Accordingly, an individual state may not usurp this authority of the federal government by unilaterally regulating interstate commerce.

96.     Although the Commerce Clause speaks literally only to the powers of Congress, it is well-settled that the Commerce Clause has a dormant aspect as well, namely, one that serves as a substantive restriction on state regulation of interstate commerce.

97. The dormant implication of the Commerce Clause prohibits state regulation that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace.

98. The Maryland Act regulates commerce that takes place wholly outside of the State of Maryland, by forcing all publishers who distribute an ebook, audiobook, or other digital literary work to the public—no matter where the publishers are located or in what markets the publishers offer such licenses—to distribute the work to Maryland public libraries and on "reasonable terms," which cannot include any limitation on the number of licenses. Publishers outside of Maryland must comply with the Maryland state law or risk the force of an injunction and criminal prosecution.

99. The Maryland Act unreasonably and unduly burdens interstate and foreign commerce by seeking to compel publishers outside of Maryland to enter into commercial transactions in Maryland.

100. The Maryland Act also carries the risk of subjecting publishers' interstate licensing transactions to inconsistent regulations, including if other states were to adopt similar or conflicting legislation.

101. Unless it is enjoined, the Maryland Act will operate to unconstitutionally burden interstate commerce and effect extraterritorial regulation in violation of the Commerce Clause.

102. For these and other reasons, the Maryland Act violates the Commerce Clause of the United States Constitution.

## FOURTH CAUSE OF ACTION
### (Violation of the Due Process Clauses of the
### Fifth and Fourteenth Amendments to the U.S. Constitution)

103.    AAP repeats and re-alleges the foregoing paragraphs set forth above as if fully and separately set forth herein.

104.    The United States Constitution guarantees all persons the right to due process. *See* U.S. Const. amend. V. The Fifth Amendment's guarantee of due process applies to state governments through the Fourteenth Amendment. *See* U.S. Const. amend. XIV.

105.    The Maryland Act is unconstitutionally vague and overbroad and fails to provide a person of ordinary intelligence fair notice of what is prohibited and/or required under the statute.

106.    The Maryland Act compels publishers to distribute ebooks, audiobooks, and other digital products to public libraries in Maryland and to do so on "reasonable terms." But the statute does not sufficiently define what terms may or may not be reasonable and is therefore impermissibly vague. Because the Maryland Act does not make clear what pricing or other terms will or will not be deemed "reasonable" by the State of Maryland in enforcing the statute, the Maryland Act does not provide publishers fair notice of what is prohibited and required under the statute. Likewise, the Maryland Act also fails to provide fair notice because it does not sufficiently define what libraries qualify as "public libraries in the State."

107.    The Maryland Act sets nebulous standards for enforcement that encourage arbitrary and discriminatory enforcement of the law.

108.    Particularly given that the Maryland Act provides for criminal penalties, a higher degree of specificity is required because the consequences of imprecision are severe.

109.    Unless it is enjoined, the Maryland Act will operate to unlawfully deprive AAP's members of their fundamental due process rights.

110.    For these and other reasons, the Maryland Act violates the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution.

### PRAYER FOR RELIEF

WHEREFORE, AAP respectfully requests that the Court:

1.    Declare that the Maryland Act, Md. Code, Educ. §§ 23-701 and 23-702, is invalid and preempted by the U.S. Copyright Act and the Supremacy Clause of the United States Constitution, and is unconstitutional under the Dormant Commerce Clause and Due Process Clauses of the United States Constitution;

2.    Preliminarily and permanently enjoin Defendant, Defendant's officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with Defendant from enforcing the Maryland Act, Md. Code, Educ. §§ 23-701 and 23-702;

3.    Award AAP its reasonable costs and attorneys' fees, pursuant to 42 U.S.C. § 1988 and 17 U.S.C. § 505; and

4.    Grant AAP such other and further relief as the Court deems just and proper.

Dated: December 9, 2021                          Respectfully submitted,

                                                 /s/ Scott A. Zebrak
                                                 Scott A. Zebrak (17741)
                                                 Matthew J. Oppenheim (22256)
                                                 Nicholas C. Hailey
                                                 Carly A. Kessler
                                                 Ever M. Hess
                                                 **OPPENHEIM + ZEBRAK, LLP**
                                                 4530 Wisconsin Avenue, NW, 5th Floor
                                                 Washington, DC 20016

Phone: (202) 480-2999
scott@oandzlaw.com
matt@oandzlaw.com
nick@oandzlaw.com
carly@oandzlaw.com
ever@oandzlaw.com

*Attorneys for Plaintiff Association of
American Publishers, Inc.*