**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| ASSOCIATION OF AMERICAN PUBLISHERS, INC., | |
| 455 Massachusetts Avenue, NW Washington, DC 20001, | |
| Plaintiff, | |
| v. | Civil Action No. 1:21-cv-03133-DLB |
| BRIAN E. FROSH, in his official capacity as Attorney General of the State of Maryland, | |
| 200 St. Paul Place Baltimore, MD 21202, | |
| Defendant. | |

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 2

    I.      AAP and the U.S. Publishing Industry ................................................................ 2

    II.     The United States Copyright Act .......................................................................... 3

    III.    The Maryland Act ................................................................................................ 6

ARGUMENT ...................................................................................................................... 11

    I.      AAP is Likely to Succeed on the Merits of its Federal Preemption Claims......... 11

           A.      The Maryland Act Conflicts with Federal Copyright Law. ..................... 13

           B.      The Maryland Act Is Expressly Preempted by the Copyright Act. .......... 17

    II.     Publishers Are Likely to Suffer Irreparable Harm in the Absence of an
           Injunction. ......................................................................................................... 23

    III.    The Balance of Equities Favors an Injunction. .................................................... 26

    IV.    Enjoining the Maryland Act Will Serve the Public Interest. ................................ 27

CONCLUSION ................................................................................................................... 28

## TABLE OF AUTHORITIES

Cases

*Advance Magazine Publishers, Inc. v. Leach*, 466 F. Supp. 2d 628 (D. Md. 2006).................... 27

*Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751 (4th Cir. 2018) .................................. 13

*Air Evac EMS, Inc. v. Dodrill*, No. 2:21-CV-00310, 2021 WL 2877603
    (S.D.W. Va. July 8, 2021)................................................................................ 25, 26

*All. for Telecommunications Indus. Sols., Inc. v. Hall*, No. CIV. CCB-05-440,
    2007 WL 3224589 (D. Md. Sept. 27, 2007) ............................................................ 22

*Amazon.com, Inc. v. WDC Holdings LLC*, No. 20-1743, 2021 WL 3878403
    (4th Cir. Aug. 31, 2021)............................................................................. 11

*Anderson v. Sara Lee Corp.*, 508 F.3d 181 (4th Cir. 2007).................................... 12, 13

*Baltimore Gas & Elec. Co. v. United States*, 133 F. Supp. 2d 721 (D. Md. 2001) ..................... 17

*Brantley v. Epic Games, Inc.*, 463 F. Supp. 3d 616 (D. Md. 2020)....................................... 18, 22

*Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184 (4th Cir. 2013) ............................................ 26

*Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532 (4th Cir. 2007)........................ 24

*Close v. Sotheby's, Inc.*, 894 F.3d 1061 (9th Cir. 2018)......................................................... 21, 22

*Cromwell v. Certified Forensic Loan Auditors*, No. 17-CV-02429-DMR, 2019 WL 1095837
    (N.D. Cal. Jan. 10, 2019) .............................................................................. 19

*Disney Enterprises, Inc. v. Delane*, 446 F. Supp. 2d 402 (D. Md. 2006).................................... 27

*EMI Apr. Music, Inc. v. Garland Enterprises, LLC*, No. CIV.A. DKC 11-3352, 2012 WL
    1986529 (D. Md. June 1, 2012) .................................................................... 27

*EMI Apr. Music, Inc. v. White*, 618 F. Supp. 2d 497 (E.D. Va. 2009)………...………………..25

*English v. General Elec. Co.*, 496 U.S. 72 (1990)...................................................................... 13

*EQT Prod. Co. v. Wender*, No. 2:16-CV-00290, 2016 WL 8261728
    (S.D.W. Va. Jan. 20, 2016)................................................................................. 28

*Goldstein v. California*, 412 U.S. 546 (1973)............................................................................. 14

*Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985) ............................ 28

*Hillsborough Cty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707 (1985) .................... 11, 12

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330
  (4th Cir. 2021)..................................................................................... 23, 26, 27

*League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224 (4th Cir. 2014) ................... 27

*Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 888 F. Supp. 2d 691
  (D. Md. 2012) ..................................................................................... 24

*Moore v. Lightstorm Ent.*, No. CIV.A. RWT-11-3644, 2013 WL 4052813
  (D. Md. Aug. 9, 2013) ......................................................................... 17

*Nat'l City Bank of IN v. Turnbaugh*, 463 F.3d 325 (4th Cir. 2006).............................................. 13

*Nat'l City Bank of Indiana v. Turnbaugh*, 367 F. Supp. 2d 805 (D. Md. 2005).................... 25, 27

*Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249 (4th Cir. 2003).............................................. 26

*Norfolk S. Ry Co. v. City of Alexandria*, 608 F.3d 150 (4th Cir. 2010) ....................................... 13

*OpenRisk, LLC, v. Microstrategy Servs. Corp.*, 876 F.3d 518
  (4th Cir. 2017)...................................................................................12, 18, 19, 21, 22

*Orson, Inc. v. Miramax Film Corp.*, 189 F.3d 377 (3d Cir. 1999) ...................................... *passim*

*Pacific Gas & Elec. Co. v. State Energy Res. Conservation and Dev. Comm'n*, 461 U.S. 190
  (1983)..................................................................................................... 17

*Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180 (4th Cir. 2007)......................................... 13

*Rosciszewski v. Arete Assocs., Inc.*, 1 F.3d 225 (4th Cir. 1993) .................................................. 22

*Rutledge v. High Point Reg'l Health Sys.*, 558 F. Supp. 2d 611 (M.D.N.C. 2008)...................... 18

*Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225 (1964)............................................................. 12

*Sola Elec. Co. v. Jefferson Elec. Co.*, 317 U.S. 172 (1942).......................................................... 12

*Splitfish AG v. Bannco Corp.*, 727 F. Supp. 2d 461 (E.D. Va. 2010).......................................... 24

*Stewart v. Abend*, 495 U.S. 207 (1990)............................................................................... 4, 5, 15

*Storer Cable Commc'ns v. City of Montgomery, Ala.*, 806 F. Supp. 1518
  (M.D. Ala. 1992)............................................................................... 16, 17

*Thomas v. Artino*, 723 F. Supp. 2d 822 (D. Md. 2010) ............................................................... 22

*Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292
  (4th Cir. 2012)..................................................................................... 18

*United States ex rel. Berge v. Bd. of Trs.*, 104 F. 3d 1453 (4th Cir. 1997) ............................ 12, 18

*United States v. Ferrara*, No. CIV.A. 92-2869(NHJ), 1993 WL 405477
   (D.D.C. Feb. 8, 1993) ........................................................................................... 23

*United States v. South Carolina*, 720 F.3d 518 (4th Cir. 2013) ........................................ 13, 17, 25

*United States v. South Carolina*, 840 F. Supp. 2d 898 (D.S.C. 2011) ........................................ 25

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................................ 11

Statutes and Rules

17 U.S.C. §§ 101 *et seq*. ................................................................................................ *passim*

17 U.S.C. § 102(a) ........................................................................................................ 19

17 U.S.C. § 106 ............................................................................................................. *passim*

17 U.S.C. § 107 ........................................................................................................... 5

17 U.S.C. § 108 ........................................................................................................... 6

17 U.S.C. § 115 ........................................................................................................... 5

17 U.S.C. § 301(a) ....................................................................................... 12, 18, 21, 23

Fed. R. Civ. P. 65 ........................................................................................................ 2

Md. Code, Com. Law § 13-408 ................................................................................ 20

Md. Code, Com. Law § 13-411 ................................................................................ 16

Md. Code, Educ. § 23-701 ....................................................................................... *passim*

Md. Code, Educ. § 23-702 ....................................................................................... *passim*

U.S. Const. art. I, § 8, cl. 8 ...................................................................................... 4

U.S. Const. art. VI, cl. 2 .......................................................................................... 12

Other Authorities

1 Nimmer on Copyright § 1.14 (2021) ........................................................................... 19

## <u>PRELIMINARY STATEMENT</u>

The State of Maryland has enacted new legislation that conflicts with the United States Copyright Act and violates federal preemption principles. Set to go into effect on January 1, 2022, this new law creates a state-level compulsory licensing scheme for literary works published in digital formats. It is imperative that this law be enjoined and that states stay out of Congress's domain.

The Maryland statute, Md. Code, Educ. §§ 23-701, 23-702 (hereinafter, the "Maryland Act"), broadly compels publishers to disseminate hundreds of thousands of literary works to public libraries, on pricing and other terms to be dictated and enforced by the State of Maryland. In so doing, the Maryland Act takes away the fundamental authority of publishers and their authors to determine whether, on what terms, and in which markets and channels they direct their works. It interferes with complicated marketplace-based decisions that, under the U.S. Copyright Act, codified at 17 U.S.C. §§ 101 *et seq.* (hereinafter, the "Copyright Act"), are the responsibility and prerogative of copyright owners.

The United States Constitution authorizes the U.S. Congress to prescribe to authors the exclusive rights to their writings for limited times, for the ultimate benefit of the public. Acting pursuant to this constitutional directive, Congress has enacted a comprehensive federal system of exclusive rights, remedies, exceptions, and limitations, embodied in the Copyright Act. The Copyright Act not only encourages authors to create a vast variety of literary works, it also incentivizes authors to disseminate these works to the public by transferring or licensing their exclusive rights to publishers for the promise of financial rewards.

Publishers in the United States disseminate some of the most acclaimed fiction, nonfiction, children's books, education materials, and scholarly works in the world. Publishers invest considerable resources and make incalculable marketplace-based decisions to promote and

sustain their literary catalogs, relying on the uniform and unambiguous authority of the Copyright Act. Publishers already support libraries with literary works as ebooks and audiobooks. Digital circulation via libraries is thriving across the country, including in Maryland.

In any event, the Maryland Act directly conflicts with the long-established, carefully balanced, and complex federal legal framework that Congress has enacted and that forms the cornerstone of the U.S. publishing industry. To sustain the vitality of the publishing industry, publishers must make decisions about the timing, pricing, and formats of their books, and balance the various, competing, and ever-evolving business models for distribution, access, and enjoyment. This is the way all content businesses endure and serve the public interest, whether they invest in books, music, movies, or newspapers.

Publishers' rights under the Copyright Act must be preserved, without interference from the State of Maryland. For the reasons described below, and in the accompanying declarations by Maria A. Pallante, President and Chief Executive Officer of the Association of American Publishers, Inc. ("AAP"), and Mary Rasenberger, Chief Executive Officer of the Authors Guild, AAP more than meets the standard for preliminary injunctive relief under Fed. R. Civ. P. 65.[1]

## BACKGROUND

### I.    AAP and the U.S. Publishing Industry

The Association of American Publishers is the national trade association for the U.S. publishing industry. With approximately 130 total members, AAP represents the leading

---

[1] For purposes of efficiency and in an effort to streamline the issues before the Court, AAP moves for a preliminary injunction on its conflict and express preemption claims only. In its Complaint, AAP asserts other claims—for violations of the Commerce and Due Process Clauses of the United States Constitution—that likewise require that the Maryland Act be declared void and unenforceable and be enjoined. *See* Compl. ¶¶ 94-110 (Dec. 9, 2021), Dkt. 1. AAP reserves its rights with respect to all claims asserted in its Complaint.

consumer, educational, professional, and scholarly publishers in the United States. These varied publishing houses—both commercial and nonprofit entities across the country—contribute mightily to the modern creative economy. American publishers serve hundreds of millions of readers each year in both local and global communities, and, for more than two centuries, have been an essential catalyst for democracy and the distribution of knowledge. *See* Decl. of Maria A. Pallante ¶¶ 2-4, 9-10 (Dec. 16, 2021) ("Pallante Decl.").

AAP represents its members on matters of law and public policy, advocating for outcomes that incentivize the publication of creative expression, professional content, and learning solutions and that enable publishers to effectively enforce their intellectual property rights. Among AAP's most critical priorities is ensuring the viability of the United States' more than 200-year-old framework of federal copyright law that encourages publishers to invest in and distribute a great variety of books to the public. *See* Pallante Decl. ¶¶ 5-6.

Publishers' exclusive rights under the Copyright Act are at the core of what they do. Publishers obtain exclusive copyright licenses or transfers from authors for, among other things, the rights to publish and distribute original works of authorship in a variety of print, ebook, and audiobook editions, as well as certain rights to exercise and/or share in derivative works such as literary sequels, foreign translations, movie adaptations, and more. Publishers, in turn, exercise the exclusive rights entrusted to them by selling, licensing, and otherwise contracting with a wide range of brick-and-mortar bookstores, online retailers, public lending libraries, school, academic, and special interest libraries, big-box stores, and other distributors for the benefit of readers of all ages. *See* Pallante Decl. ¶¶ 10, 12, 19.

## II.     The United States Copyright Act

The authority of the U.S. Congress to control the scope of exclusive rights under copyright, including reproduction and distribution, is centrally enshrined in the Copyright Clause

3

of the United States Constitution. The Copyright Clause provides that "Congress shall have

Power . . . To promote the Progress of Science and useful Arts, by securing for limited Times to

Authors and Inventors the exclusive Right to their respective Writings and Discoveries . . . ."

U.S. Const. art. I, § 8, cl. 8.

Pursuant to this constitutional grant of authority, Congress has enacted a series of federal

copyright statutes, culminating with the 1976 Copyright Act, 17 U.S.C. §§ 101 *et seq.*, that, *inter*

*alia*, define and protect the rights of copyright owners. One of the fundamental changes made by

the 1976 Copyright Act was the adoption of a single federal copyright system to definitively

supersede the shadow vestiges of common law and state copyrights that created confusion for the

courts and marketplace alike. Congress determined that a national, uniform copyright law

"would greatly improve the operation of the copyright law and would be much more effective in

carrying out the basic constitutional aims of uniformity and the promotion of writing and

scholarship." Ex. 1 to Decl. of Ever M. Hess (Dec. 16, 2021) ("Hess Decl."), H.R. Rep. No. 94-

1476 at 129 (1976).

The Copyright Act grants copyright owners certain exclusive rights. In particular, the

Copyright Act provides that "the owner of copyright . . . has the exclusive rights to do and to

authorize" others to reproduce and distribute works, prepare derivative works, and publicly

display works, among other rights, subject to the Act's carefully prescribed limitations. 17

U.S.C. § 106. Pursuant to the Copyright Act, copyright owners have the authority to exercise

these exclusive rights and to authorize others to do so. *Id.* Importantly, copyright owners have

the prerogative to **refrain** from exercising their rights or authorizing others to do so—for

example, by declining to distribute their works. *See, e.g.*, *Stewart v. Abend*, 495 U.S. 207, 229

4

(1990) ("[T]his Court has held that a copyright owner has the capacity arbitrarily to refuse to license one who seeks to exploit the work.").

To balance the competing equities that the federal legislature is singularly positioned to consider, Congress has also prescribed certain exceptions and limitations for the benefit of both commercial and noncommercial users of creative works. *See, e.g.*, 17 U.S.C. § 107. Only on rare occasions has Congress deemed it appropriate to grant compulsory—also known as statutory— licenses, recognizing that such compulsory licensing is an extraordinary exception to the rule that copyright businesses should be free to invest, innovate, and develop without artificial constraints. *See, e.g.*, 17 U.S.C. § 115. Moreover, because copyright commerce is always shifting, Congress reviews compulsory licenses to consider whether and when to phase them out. *See* Pallante Decl. ¶¶ 10-11.

Congress has ***never*** granted compulsory licenses for literary works, whether for copies of those works in digital format or otherwise. *See generally* 17 U.S.C. §§ 101 *et seq.* Prior to adopting the 1976 Copyright Act, Congress considered the concept of a limited compulsory license for nondramatic literary works (and other works) in the context of public broadcasting. *See* Ex. 1 to Hess Decl., H.R. Rep. No. 94-1476 at 119. Ultimately, however, Congress rejected that idea, recognizing that literary works are a poor fit for compulsory licensing schemes. *See id.* In the nearly 50 years since, Congress has never been moved to create a compulsory license for literary works, in any context, whether for libraries or others, notwithstanding the active role of both the U.S. House of Representatives and Senate in legislating Internet provisions to facilitate commerce and innovation. To the contrary, Congress has been vocally interested in ensuring that U.S. copyright markets remain robust and competitive.

Congress has, however, created certain special provisions for libraries that enable them to reproduce and distribute certain copyrighted works without permission on a limited basis, for the specific noncommercial purposes of preservation, replacement, and research by patrons. *See* 17 U.S.C. § 108. Moreover, the Copyright Office has for the past two decades considered proposals to amend and update § 108 of the Copyright Act. Notably, none of the exceptions under § 108 or, for that matter, elsewhere in the Copyright Act, include compulsory licenses of literary works to libraries—in digital format or otherwise.

The U.S. Supreme Court has recognized that the public welfare is best served by respecting the scope of copyright owners' rights under the Copyright Act. For instance, in *Eldred v. Ashcroft*, the Court explained that "encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors," that "the incentive to profit from the exploitation of copyrights will redound to the public benefit by resulting in the proliferation of knowledge," and that "copyright law serves public ends by providing individuals with an incentive to pursue private ones." 537 U.S. 186, 212 n.18 (2003). The Copyright Act's interrelated provisions governing exclusive rights, remedies, limitations, and exceptions represent a complete and balanced legal framework that, in Congress's view, best achieves these objectives. *See* Pallante Decl. ¶¶ 17, 25-26.

## III.   <u>The Maryland Act</u>

In May 2021, the Maryland state legislature passed the Maryland Act for the stated "purpose of requiring a publisher who offers to license an electronic literary product to the public to also offer to license the electronic literary product to public libraries in the State on reasonable terms that would enable public libraries to provide library users with access to the electronic literary product." Ex. 2 to Hess Decl., 2021 Md. Laws Ch. 411 (H.B. 518).

The Maryland Act added two sections, §§ 23-701 and 23-702, to the Education article of the Code of Maryland, under the subtitle "Electronic Literary Product Licenses." Set to go into effect on January 1, 2022, the Maryland Act provides, in relevant part, as follows:

(a) Subject to subsections (b) and (c) of this section, ***a publisher who offers to license an electronic literary product to the public also shall offer to license the electronic literary product to public libraries in the State*** on reasonable terms that would enable public libraries to provide library users with access to the electronic literary product.

(b) The terms of a license under subsection (a) of this section may include:

(1) A limitation on the number of users a public library may simultaneously allow to access an electronic literary product;

(2) A limitation on the number of days a public library may allow a user to access an electronic literary product; and

(3) The use of technological protection measures that would prevent a user from:

(i) Maintaining access to an electronic literary product beyond the access period specified in the license; and

(ii) Allowing other users to access an electronic literary product.

(c) The terms of a license under subsection (a) of this section may not include a limitation on the number of electronic literary product licenses a public library may purchase on the same date the electronic literary product license is made available to the public.

(d) A violation of this subtitle shall constitute an unfair, abusive, or deceptive trade practice and is subject to enforcement in accordance with Title 13, Subtitle 4 of the Commercial Law Article.

Ex. 3 to Hess Decl., Md. Code, Educ. § 23-702 (effective Jan. 1, 2022) (emphasis added).

Thus, within the State of Maryland, the Maryland Act will require publishers to disseminate their literary works in digital formats to public libraries, for free and immediate provision to their patrons, whenever publishers offer to license them to others. The Maryland Act will force reproductions, distributions, and public displays of the copyrighted works, under 17 U.S.C. §§ 106(1), (3), and (5), because all of these exclusive rights will be implicated as the

works make their way from point A (publishers and their online partners) to point B (libraries and library patrons' computers and other electronic devices). With respect to streamed audiobooks and audiovisual formats, the Maryland Act further implicates exclusive public performance rights under 17 U.S.C. §§ 106(4) and (6).

The Maryland Act's reach is incredibly broad. The "electronic literary products" covered by the state law are not widgets. To the contrary, this language encompasses a vast and varying array of fiction, nonfiction, children's books, education materials, scholarly works, and other works. Moreover, the definition of "electronic literary products" covered by the Act includes any conceivable "text document that has been converted into or published in a digital format that is read on a computer, tablet, smart phone, or other electronic device" or "audio recording of a text document, read out loud in a format that is listened to on a computer, tablet, smart phone, or other electronic device." Md. Code, Educ. § 23-701(b). In other words, the Maryland Act covers digital versions of not just books, but also magazines, newspapers, blogs, and a whole host of other texts that may be published, viewed, or listened to on electronic devices like computers or smart phones. The state law applies regardless of the date the digital work was published.

The definition of "publisher" under the Maryland Act is also broad. It is not limited to publishers of "electronic literary products," but sweeps into its coverage any "person in the business of manufacturing, promulgating, and selling books, audio books, journals, magazines, newspapers, or other literary productions, including those in digital form, that consist of text, imagery, audio recordings, or any combination of text, image, and audio recording." Md. Code, Educ. § 23-701(c). The Maryland Act will thus impact not only the book, journal, newspaper, magazine, and other media publishing industries, but also a whole range of businesses that manufacture and sell digital literary content to readers, including ebook and audiobook retailers,

aggregators, and digital delivery services. The state law applies regardless of the publisher's size or location.

While it is clear that the Maryland Act strips publishers of their exclusive rights under the Copyright Act, the Maryland state law also leaves much unclear. For instance, the Maryland Act mandates that any related terms be "reasonable," Md. Code, Educ. § 23-702(a), while leaving what is "reasonable" largely undefined. Does Maryland view as unreasonable a pricing term that reflects the fact that libraries, unlike individual consumers, may circulate their digital copies to dozens of patrons? Does Maryland view as unreasonable a limitation on how many times a library can circulate digital copies of that item? As to these questions, those behind the Maryland Act are already in disagreement.[2] These and other unanswered questions will inevitably be decided as the State of Maryland brings enforcement actions and private litigants sue publishers under the state law.

Further, the Maryland Act leaves unresolved what qualifies as a "public librar[y] in the State." Md. Code, Educ. § 23-702(a). Can anyone call themselves a public library? Within the meaning of the Maryland Act, are public libraries determined based on who they serve, how they are funded, or some other metric? Is there some restriction that public libraries serve only those

---

[2] *Compare* Library Futures, *Statement on the Association of American Publishers Suit Against the State of Maryland* (Dec. 9, 2021), https://www.libraryfutures.net/post/statement-on-the-aap-lawsuit (contending it is unreasonable that "libraries must continually re-buy their collections over and over or risk having their titles disappear from their collections after the licenses expire or stop being offered"), *with* Maryland Library Association, *A Maryland Library Association Statement on Maryland's Digital Content Law* (July 14, 2021), https://www.mdlib.org/files/docs/press/statement.pdf ("'Reasonable terms' could include a limitation on the number of times a library could lend a digital copy, based on the number of times a library typically could lend a copy of a work in a physical format before replacing it due to damage or deterioration.").

in Maryland? Must a public library have a physical location in Maryland? None of these questions is answered in the Maryland Act.

These important questions linger in part because the Maryland state legislature passed the law without any formal factfinding and with little opportunity for input from the authors and publishers that will be impacted by the law. Authors and publishers informed the Maryland legislature of considerable preemption and constitutional concerns, including through detailed testimony submitted by AAP and the Authors Guild in opposition to the Maryland Act. *See* Ex. 4 to Hess Decl., AAP Testimony in Opposition to S.B. 432 (Mar. 24, 2021); Ex. 5 to Hess Decl., Authors Guild Testimony in Opposition to S.B. 432 (Mar. 22, 2021). But the legislature swiftly passed the law.

The Maryland Act was adopted despite the fact that the United States has an extensive and hugely successful public lending library enterprise, by which patrons have access to millions of ebook and audiobook titles, at the same time those titles are available through booksellers and digital platforms. Indeed, most publishers already make their full digital catalogs available to public libraries in Maryland and elsewhere. As a result, in addition to print checkouts, libraries in Maryland already boast many millions of digital checkouts per year. *See* Pallante Decl. ¶¶ 13-16, 24; *see also* Decl. of Mary E. Rasenberger ¶ 12 (Dec. 15, 2021) ("Rasenberger Decl.").

The same month the Maryland Act was passed, U.S. Senator Thom Tillis, Ranking Member of the Senate Judiciary Committee Subcommittee on Intellectual Property, wrote a letter to Shira Perlmutter, Register of Copyrights and Director of the U.S. Copyright Office, inquiring as to the legality of the Maryland Act and similar proposed legislation in other states. Ex. 6 to Hess Decl., Sen. Tillis Letter at 1 (May 26, 2021). Senator Tillis asked the Copyright Office to analyze whether federal law preempted the "compulsory license" required by the Maryland Act,

"in light of what appear to be clear preemption rules that situate copyright law exclusively at the federal level." *Id.* at 1-2. Subsequently, the Copyright Office analyzed the preemption of the Maryland Act and similar proposed state laws and concluded that "the state laws at issue are likely to be found preempted." Ex. 7 to Hess Decl., Dir. Perlmutter Letter at 9 (Aug. 31, 2021).[3]

## ARGUMENT

The Maryland Act is preempted by the federal Copyright Act. Preliminary injunctive relief is warranted where the moving party can show: (1) a likelihood of success on the merits; (2) a likelihood of "irreparable harm in the absence of preliminary relief"; (3) that the balance of equities tips in the moving party's favor; and (4) that "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "[T]he Supreme Court has long endorsed preliminary injunctions to preserve the status quo pending final determination of the questions raised in cases that state a cause of action for equitable relief." *Amazon.com, Inc. v. WDC Holdings LLC*, No. 20-1743, 2021 WL 3878403, at *4 (4th Cir. Aug. 31, 2021) (citation and internal quotations omitted). Because AAP more than meets the standard for preliminary injunctive relief here, the only appropriate outcome is that the Maryland Act be enjoined.

## I.  AAP is Likely to Succeed on the Merits of its Federal Preemption Claims.

AAP is likely to succeed in showing that the Maryland Act is preempted by the Copyright Act. "It is a familiar and well-established principle that the Supremacy Clause [of the United States Constitution] invalidates state laws that interfere with, or are contrary to, federal law." *Hillsborough Cty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 712 (1985) (citation

---

[3] *See also id.* at 9 ("[W]e believe the [U.S. Court of Appeals for the Third Circuit's] reasoning [in *Orson, Inc. v. Miramax Film Corp.*, 189 F.3d 377 (3d Cir. 1999)] is sufficiently sound that a court considering the state legislation at issue would likely find it preempted under a conflict preemption analysis.").

and internal quotation marks omitted). The Supremacy Clause provides that the "Constitution, and the laws of the United States which shall be made in pursuance thereof . . ., shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding." U.S. Const. art. VI, cl. 2. Accordingly, the Fourth Circuit has recognized the "longstanding principle[]" that "federal statutes and regulations properly enacted and promulgated can nullify conflicting state or local actions." *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 191 (4th Cir. 2007) (citation and internal quotation marks omitted).

The Copyright Act, "like other laws of the United States enacted pursuant to cons[t]itutional authority, [is] the supreme law of the land." *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 229 (1964). "When state law touches upon the area of these federal statutes, it is 'familiar doctrine' that the federal policy 'may not be set at naught, or its benefits denied' by the state law." *Id.* (quoting *Sola Elec. Co. v. Jefferson Elec. Co.*, 317 U.S. 172, 173 (1942)). The Fourth Circuit has recognized that "[f]ederal Copyright Act preemption is 'broad and absolute.'" *OpenRisk, LLC, v. Microstrategy Servs. Corp.*, 876 F.3d 518, 523 (4th Cir. 2017) (quoting *United States ex rel. Berge v. Bd. of Trs.*, 104 F. 3d 1453, 1464 (4th Cir. 1997)).

The Maryland Act violates the protections that Congress established in the Copyright Act. The Maryland Act implements a state-law compulsory licensing scheme that deprives copyright holders of their ability to decide whether to exercise their exclusive rights that, undeniably, are granted solely to them under the Copyright Act.

The Maryland Act should be enjoined from enforcement because it is preempted on at least two separate, independent grounds: (1) the state law conflicts with the Copyright Act; and (2) the state law is expressly preempted by § 301 of the Copyright Act. Where, as here, state

laws are preempted by federal law, courts in the Fourth Circuit do not hesitate to enjoin these laws.[4]

A.   **The Maryland Act Conflicts with Federal Copyright Law.**

The Maryland Act is preempted because it conflicts with the Copyright Act. Conflict preemption occurs when a state law "actually conflicts with federal law," such as when "it is impossible to comply with both state and federal law" or "the state law stands as an obstacle to the accomplishment of the full purposes and objectives of federal law." *Sara Lee*, 508 F.3d at 191-92 (citation and internal quotation marks omitted).

Here, the Maryland Act directly conflicts with federal law because it strips away the exclusive rights guaranteed to publishers under the federal Copyright Act. In disregard of these federally guaranteed rights, the Maryland Act implements a state-level compulsory licensing scheme, requiring publishers to involuntarily provide copies of their works to Maryland public libraries on terms dictated by the State of Maryland. *See* Pallante Decl. ¶¶ 20-21, 25. The Maryland Act thereby conflicts with the long-established, carefully balanced, and complex

---

[4] *See, e.g., Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 768-70 (4th Cir. 2018) (affirming injunction against West Virginia state law regulating air ambulance companies, as preempted by federal Airline Deregulation Act); *United States v. South Carolina*, 720 F.3d 518, 532-33 (4th Cir. 2013) (affirming preliminary injunction against South Carolina state immigration law provisions, as preempted by federal immigration law and regulations); *Norfolk S. Ry Co. v. City of Alexandria*, 608 F.3d 150, 160-62 (4th Cir. 2010) (affirming injunction against Virginia city haul ordinance, as preempted by federal Interstate Commerce Commission Termination Act); *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 197 (4th Cir. 2007) (affirming injunction against Maryland state law regulating employers' provision of healthcare benefits, as preempted by federal Employee Retirement Income Security Act); *Nat'l City Bank of IN v. Turnbaugh*, 463 F.3d 325, 330 (4th Cir. 2006) (affirming permanent injunction against Maryland state law regarding mortgage lending, as preempted by federal National Bank Act and regulations).

As courts have noted, the categories of preemption—express, conflict, and field—often overlap. *See Orson, Inc. v. Miramax Film Corp.*, 189 F.3d 377, 382 (3d Cir. 1999) (citing *English v. General Elec. Co.*, 496 U.S. 72, 79 n.5 (1990)).

federal legal framework of rights and limitations enacted by Congress to govern the protection and disposition of copyrighted works.

The Maryland Act makes it impossible for publishers to both exercise their federally protected right to decide whether to distribute or refrain from distributing their copyrighted works, on the one hand, and comply with the state law's compulsory licensing scheme, on the other. Publishers cannot be forced to abandon their federally guaranteed rights under the Copyright Act in order to comply with the Maryland Act's involuntary licensing requirements. Where a state law "conflicts with the Copyright Act's grant to the copyright holder of an exclusive right to distribute and license a work, [] it therefore follows that it is preempted." *Orson*, 189 F.3d at 386; *cf. Goldstein v. California*, 412 U.S. 546, 559 (1973) (recognizing that "a conflict would develop if a State attempted to protect that which Congress intended to be free from restraint or to free that which Congress had protected").

The Maryland Act directly interferes with the objectives of the Copyright Act to vest copyright owners—including publishers—with exclusive rights. Where a state law "stands as an obstacle to the federally created exclusive rights given to a copyright holder, namely, the exclusive right to distribute the copyrighted work," it is "preempted by the federal Copyright Act." *Orson*, 189 F.3d at 386-87 (internal quotation marks omitted).

In *Orson, Inc. v. Miramax Film Corp.*, the U.S. Court of Appeals for the Third Circuit applied these same principles and held that the Copyright Act preempted an equivalent state-law mandatory licensing scheme. 189 F.3d at 381-387. Given that the present case involves the same core factual and legal issues, the Third Circuit's reasoning applies with particular force here.

In *Orson*, the Third Circuit addressed the legality of a Pennsylvania state law that required any movie distributor that chose to enter into an exclusive "first run" licensing

14

agreement with one movie theater to expand its distribution of the movie after 42 days by licensing to other movie theaters. *Id.* at 379. In other words, just like the Maryland Act, the Pennsylvania state law required copyright owners who had made the initial decision to license their copyrighted works to certain parties to then enter into compulsory licenses with other parties on terms mandated by the state.

In a thorough and well-reasoned *en banc* opinion, the Third Circuit held that the state law in *Orson* was preempted. The court first recognized that § 106 of the Copyright Act grants copyright owners certain exclusive rights, including the right to distribute their copyrighted works and to authorize others to distribute those works. *Id.* at 379 (quoting 17 U.S.C. § 106). At the same time, the court emphasized "[t]hat a copyright encompasses the right to ***refuse*** to license," *id.* at 385 (emphasis added), noting that the U.S. Supreme Court had "reiterated" that copyright owners have "the capacity arbitrarily to refuse to license one who seeks to exploit the work," *id.* (quoting *Abend*, 495 U.S. at 228-29).

Moving on to the question of preemption, the Third Circuit in *Orson* recognized that, "[i]f the [state law] directly regulates a right that is protected by federal copyright law, it must, of necessity, be preempted under conflict preemption principles." *Id.* at 385. In other words, where a state law "impose[s] on copyright holders, contrary to their exclusive rights under § 106, an obligation to distribute and make available other copies of the work following their initial decision to publish and distribute copies of the copyrighted item," it conflicts with federal law and is preempted. *Id.* at 386. As the court explained, it is a "fundamental principle" that "the state ***may not mandate distribution and reproduction*** of a copyrighted work in the face of the exclusive rights to distribution granted under § 106." *Id.* at 386 (emphasis added).

The Third Circuit concluded that there was no doubt that the Pennsylvania state law was preempted. Given that the state law "require[d] the distributor to expand its distribution after forty-two days by licensing another exhibitor in the same geographic area, even if such expansion is involuntary and uneconomic," the court reached the "ineluctable conclusion that the [state law] cannot stand because it prohibits the copyright holder from exercising rights protected by the Copyright Act." *Id.* at 385.

The Maryland Act is preempted for the same reasons. Just like the Pennsylvania state law in *Orson*, the Maryland Act "would impose on copyright holders, contrary to their exclusive rights under § 106, an obligation to distribute and make available other copies of the work following their initial decision to publish and distribute copies of the copyrighted item." *See id.* at 386. Just like the Pennsylvania state law, the Maryland Act would impermissibly require publishers to "expand [the] distribution" of their works, "even if such expansion is involuntary and uneconomic." *See id.* at 385. Because the State of Maryland cannot "direct a copyright holder to distribute and license against its will or interests," the Maryland Act is preempted by federal law. *See id.* at 386.

That publishers may face civil and criminal liability under the Maryland Act simply for exercising their right under the Copyright Act to decline to distribute their copyrighted work further underscores that the state law is preempted. *See* Md. Code, Educ. § 23-702(d); Md. Code, Com. Law §13-411 (imposing a fine not exceeding $1,000 or imprisonment not exceeding one year or both, in addition to civil penalties). "[T]he potential for liability under the [state law] for the copyright holder's exercise of its federal rights . . . illustrates the conflict created by the [state law]." *Orson*, 189 F.3d at 385; *see also, e.g.*, *Storer Cable Commc'ns v. City of Montgomery, Ala.*, 806 F. Supp. 1518, 1536 (M.D. Ala. 1992) ("If [a state law] creates liability for a copyright

holder and a licensee simply because the copyright holder granted an exclusive license to exhibit her work, then the [state law] cannot stand under the copyright laws.").

The Fourth Circuit and district courts within the Fourth Circuit have likewise found state laws that conflict with federal laws to be preempted for similar reasons. *See, e.g.*, *South Carolina*, 720 F.3d at 531-32 (affirming conflict preemption of South Carolina state immigration law because, *inter alia*, the state law would "create an obstacle to the smooth functioning of federal immigration law, improperly place in the hands of state officials the nation's immigration policy, and strip federal officials of the authority and discretion necessary in managing foreign affairs"); *Baltimore Gas & Elec. Co. v. United States*, 133 F. Supp. 2d 721, 746 (D. Md. 2001) (holding that state public utility law precluding competition in procurement was preempted by federal law mandating competitive bidding).

In sum, because the Maryland Act forces publishers to provide their digital literary works to Maryland libraries on terms mandated by the state, in violation of publishers' exclusive rights under the Copyright Act, the Maryland Act irreconcilably conflicts with the federal copyright system and is preempted.

### B.   The Maryland Act Is Expressly Preempted by the Copyright Act.

Separately, the Maryland Act is also expressly preempted by the Copyright Act. For this second, independent reason, the state law is barred by preemption and should be enjoined.

Express preemption is found when Congress states its intention to preempt state laws "in express terms." *Pacific Gas & Elec. Co. v. State Energy Res. Conservation and Dev. Comm'n*, 461 U.S. 190, 203 (1983). In adopting the 1976 Copyright Act, "Congress evinced a clear intent that federal copyright laws preempt equivalent state law claims." *Moore v. Lightstorm Ent.*, No. CIV.A. RWT-11-3644, 2013 WL 4052813, at *1 (D. Md. Aug. 9, 2013).

Specifically, Congress included an express preemption clause in § 301(a) of the

Copyright Act:

> [A]ll legal or equitable rights that are equivalent to any of the exclusive rights
> within the general scope of copyright as specified by section 106 in works of
> authorship that are fixed in a tangible medium of expression and come within the
> subject matter of copyright as specified by sections 102 and 103 . . . are governed
> exclusively by this title.

17 U.S.C. § 301(a). Section 301(a) also states that "no person is entitled to any such right or

equivalent right in any such work under the common law or statutes of any State." *Id.* The

legislative history of the Copyright Act likewise reflects that "the intention of Section 301 is

to preempt and abolish any rights under common law and state statutes that are equivalent

to copyright and extend to works within the Federal Copyright Law." Ex. 1 to Hess Decl., H.R.

Rep. No. 94-1476 at 130.

Accordingly, "[t]he Copyright Act expressly preempts a broad array of other claims."

*Brantley v. Epic Games, Inc.*, 463 F. Supp. 3d 616, 621 (D. Md. 2020). As the Fourth Circuit has

noted, "[t]he scope of section 301(a) is extensive, such that the 'shadow actually cast by the

[Copyright] Act's preemption is notably broader than the wing of its protection.'" *Rutledge v.*

*High Point Reg'l Health Sys.*, 558 F. Supp. 2d 611, 617 (M.D.N.C. 2008) (quoting *Berge*, 104

F.3d at 1463). The "broad preemptive scope" of § 301(a) "insure[s] that the enforcement of these

rights remains solely within the federal domain." *Tire Eng'g & Distrib., LLC v. Shandong*

*Linglong Rubber Co.*, 682 F.3d 292, 309 (4th Cir. 2012) (internal citations and quotation marks

omitted). The Fourth Circuit has further emphasized that, "[w]here Congress has struck the

balance between the free flow of ideas in the public domain, on the one hand, and the protection

of certain forms of intellectual property, on the other, § 301 ensures that states may not upset that

balance by offering protection that the Copyright Act does not." *OpenRisk*, 876 F.3d at 523.

Courts in the Fourth Circuit apply a two-prong test to determine whether a state law is expressly preempted under § 301 of the Copyright Act. First, the work covered by the state law must be "within the scope of the subject-matter of copyright as specified in 17 U.S.C. §§ 102, 103" and, second, assuming it is, the state law will be preempted if it covers rights that are "equivalent to those protected by federal copyright" under 17 U.S.C. § 106. *Id.* (citations and internal quotation marks omitted).

Here, because the Maryland Act meets both prongs of this test, the state law is expressly preempted.

First, the works covered by the Maryland Act—literary works in digital formats, such as ebooks and audiobooks, Md. Code, Educ. § 23-701(b)—are clearly within the scope of the subject matter of copyright, as they constitute original works of authorship fixed in a tangible medium of expression, 17 U.S.C. §102(a). Numerous courts have reached the same conclusion. *See, e.g.*, *Cromwell v. Certified Forensic Loan Auditors*, No. 17-CV-02429-DMR, 2019 WL 1095837, at *11 (N.D. Cal. Jan. 10, 2019), *report and recommendation adopted*, No. C 17-02429 SBA, 2019 WL 2181969 (N.D. Cal. Feb. 12, 2019) (dismissing negligence claim as preempted where claim alleged defendant "published a copyrighted eBook on its website, which is wholly within the subject matter of the Copyright Act").

Second, the Maryland Act concerns rights equivalent to the exclusive rights contained in the Copyright Act. "A state law is [expressly] preempted whether it 'creates, grants or destroys' rights that are 'equivalent' to the exclusive rights of copyright." 1 Nimmer on Copyright § 1.14 (2021) (citation omitted); *see also OpenRisk*, 876 F.3d at 523. "Chief among those federal-law 'exclusive rights' are the rights 'to reproduce' and to 'distribute copies . . . of the copyrighted work.'" *Id.* at 524 (quoting 17 U.S.C. §§ 106(1), (3)).

19

Here, the Maryland Act will both create and destroy rights equivalent to those guaranteed under the Copyright Act.

Most importantly, the Maryland Act supplants publishers' exclusive rights under the Copyright Act to decide how, to whom, and in what formats they will disseminate copies of their works. Instead, the Maryland Act will bring to bear the considerable coercive powers of the State of Maryland to unilaterally force publishers to disseminate their literary works to Maryland public libraries, on terms and timing dictated by the State of Maryland.

At the same time, the Maryland Act will also create new rights equivalent to those under the Copyright Act. For one, the Maryland Act will create an entirely new right vesting in Maryland public libraries—at the expense of publishers' exclusive rights under the Copyright Act—to obtain unlimited, on-demand licenses to publishers' literary works in digital format, and distribute those works to their patrons, as soon as publishers license those works in digital format to anyone else, anywhere else. The state law also grants the State of Maryland—at the expense of the federal government's authority—an extraordinary new right to implement and police a compulsory copyright licensing scheme at the state level. That includes empowering the Attorney General of the State of Maryland to seek injunctive relief and criminal penalties to enforce the state-law licensing requirements. *See* Md. Code, Educ. § 23-702(d). Additionally, the Maryland Act grants ***anyone*** allegedly aggrieved by publishers' failure to issue the newly mandated licenses the right to bring a private lawsuit against publishers for damages and attorneys' fees. *See id.*; Md. Code, Com. Law § 13-408. In other words, the state law will create

20

a private right of action for persons outside of the copyright transaction, in direct conflict with the exclusive rights, enforcement, and remedies in the Copyright Act.[5]

At its core, the Maryland Act "fundamentally reshapes the contours of federal copyright law's existing distribution right" and other exclusive rights. *Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1071 (9th Cir. 2018). It strips publishers of their federally protected right to decide whether and when to disseminate their works, and hands those decisions over to Maryland libraries and the State of Maryland.

The U.S. Court of Appeals for the Ninth Circuit's decision in *Close v. Sotheby's*— holding that a California state law was expressly preempted on similar grounds—is instructive. *See id.* at 1070-72. The California state law at issue required any seller of a work of fine art to withhold 5 percent of the sales price and pay it to the artist. *Id.* at 1066. In applying the two-prong express preemption test, the Ninth Circuit held that there was "no doubt" under the first prong that works of fine art "fall within the subject matter of copyright." *Id.* at 1069. As to the second prong, the court recognized that the state law and federal copyright law each "concern[ed] the distribution of copies of artwork and define[d] artists' right (or lack thereof) to payment on downstream sales of those copies," *id.* at 1070, and that the state law "both expand[ed] and restrict[ed] the federal distribution right," *id.* at 1071. Consequently, the Ninth Circuit concluded that the state law ran "counter to § 301(a), which precludes 'all legal or

---

[5] Nor is there any "extra element" sufficient to save the Maryland Act from express preemption. *See OpenRisk*, 876 F.3d at 525-26 ("Only when an extra element changes the nature of the [state law] action so that it is ***qualitatively different*** from a copyright infringement claim is preemption avoided." (emphasis added) (citations and internal quotation marks omitted)). Because any claim brought under the Maryland Act would arise from the same exclusive rights guaranteed by the Copyright Act, there is no extra element here and the state law is preempted. *See id.* at 527.

equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright,' even if they are not precisely within the contemplation of the Copyright Act." *Id.*

Here, because the Maryland Act similarly "restricts the federal distribution right" of publishers and "expands" the rights of others, *see id.* at 1071, the state law is expressly preempted for the same reasons as in *Close*.

The Fourth Circuit and other courts in this district have repeatedly found state law claims grounded in exclusive rights under the Copyright Act to be expressly preempted. *See, e.g.*, *OpenRisk*, 876 F.3d at 527 (where "core" of plaintiff's state-law conversion and computer fraud claims "remain[ed] the unauthorized copying and transfer of its data," state law claims were "equivalent to a copyright infringement action and thus preempted"); *Rosciszewski v. Arete Assocs., Inc.*, 1 F.3d 225, 230 (4th Cir. 1993) (where "the protection of computer programs from unauthorized copying granted under" Virginia state law was "equivalent to the exclusive right of the copyright owner to reproduce a copyrighted work under the Copyright Act," state law claim was preempted); *Brantley*, 463 F. Supp. at 626-27 (D. Md. 2020) (where plaintiffs' state law right of privacy/publicity, unfair competition, and unjust enrichment claims did not seek to vindicate any rights "other than reproduction, performance, distribution, or display" rights guaranteed by Copyright Act, state law claims were preempted (citation omitted)); *Thomas v. Artino*, 723 F. Supp. 2d 822, 835 (D. Md. 2010) (where "[p]laintiff does not contend that [d]efendant was enriched by anything other than his unauthorized reproduction and creation of derivative works from [p]laintiff's" works, "[p]laintiff's unjust enrichment claim is not qualitatively different from a copyright infringement claim and consequently is preempted by Section 301"); *All. for Telecommunications Indus. Sols., Inc. v. Hall*, No. CIV. CCB-05-440, 2007 WL 3224589, at *11 (D. Md. Sept. 27, 2007) ("[T]o the extent that the claim for

conversion of the [work] is grounded in any modification, copying or distribution of the [work] that [defendants] may have done, it is preempted by the Copyright Act . . . .").

For the same reasons, the Maryland Act is barred by the Copyright Act's express preemption of "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright." 17 U.S.C. § 301(a).

*      *      *

For the reasons set forth above, AAP is likely to succeed in showing that the Maryland Act is preempted by the Copyright Act, under both conflict and express preemption. AAP's likely success on either one of these two independent preemption grounds is sufficient to warrant entry of a preliminary injunction.

## II.   Publishers Are Likely to Suffer Irreparable Harm in the Absence of an Injunction.

Unless a preliminary injunction is entered, publishers are likely to suffer irreparable and immediate harm, in numerous ways. *See, e.g.*, Pallante Decl. ¶¶ 20-24.

Given that AAP has shown a likelihood of success on its preemption claims—based on the Maryland Act's violation of the Supremacy Clause—that constitutional violation alone is sufficient to demonstrate irreparable harm here. The Fourth Circuit has recognized that, where "there is a likely constitutional violation, the irreparable harm factor is satisfied." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021); *see also United States v. Ferrara*, No. CIV.A. 92-2869(NHJ), 1993 WL 405477, at *1 (D.D.C. Feb. 8, 1993) (accepting argument that a "[v]iolation [of] the Supremacy Clause . . . alone constitutes irreparable harm").

Likewise, the Maryland Act's compulsory licensing scheme will force publishers to abdicate their exclusive rights under the Copyright Act, in favor of state-mandated distributions of their copyrighted works, on state-dictated terms, and on state-regulated pricing. *See* Pallante

23

Decl. ¶¶ 20-21. By "depriv[ing] the copyright holder of intangible exclusive rights to control the means and methods by which its work will be seen by the public" in this manner, the state law will cause publishers irreparable injury. *See Splitfish AG v. Bannco Corp.*, 727 F. Supp. 2d 461, 467 (E.D. Va. 2010) (internal citation and quotation marks omitted).[6]

Although no further injury is needed, the Maryland Act's requirements would also inflict significant and far-reaching practical harms on publishers. Unless the Maryland Act is enjoined, publishers will be faced with an impossible choice under the conflicting federal and state laws: they will be forced to either abandon their exclusive rights under the Copyright Act and involuntarily submit to Maryland's state-level compulsory licensing scheme, continue to exercise their federally protected rights at the risk of severe civil and criminal penalties under the state law, or cease distributing their works altogether.

Submitting to the Maryland Act's compulsory licensing requirements will cause publishers irreparable harm. The Maryland Act interferes with business decisions that are the responsibility and prerogative of publishers and their authors to determine pursuant to the Copyright Act—such as whether to distribute specific works and the terms of such distributions, including timing, quantity, and price. To take these decisions out of the hands of copyright holders, and instead force them to enter into licensing agreements on involuntary and uneconomic terms mandated by the State of Maryland, will irreparably harm publishers, their businesses, and the value of their works. *See* Pallante Decl. ¶¶ 20-22. Maryland's compulsory

---

[6] *See also Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 544 (4th Cir. 2007) ("Irreparable injury often derives from the nature of copyright violations, which deprive the copyright holder of intangible exclusive rights."); *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 888 F. Supp. 2d 691, 712 (D. Md. 2012), *modified on clarification*, 904 F. Supp. 2d 530 (D. Md. 2012), *and aff'd*, 722 F.3d 591 (4th Cir. 2013) (finding plaintiff "demonstrated that its loss of exclusive control over its copyrighted content is likely to lead to irreparable harm").

licensing will undermine consumer demand for these works through other channels in ways that cannot be undone.[7] Given the vagueness of the Maryland Act's requirements, publishers will be unable to avoid the uncertainty that they may face penalties for disseminating ebooks or audiobooks, and the state law will create a chilling effect on the development and adoption of innovative new licensing models. *See* Pallante Decl. ¶ 23; Rasenberger Decl. ¶¶ 13, 17.

Conversely, publishers will also be irreparably harmed if they continue to exercise their exclusive rights under the Copyright Act and become subject to civil or criminal liability under the Maryland Act, including up to one year's imprisonment, for doing so. Nor should publishers be forced to cease disseminating their works altogether as a result of these conflicting laws.

In enacting a national, uniform copyright law in the 1976 Copyright Act, Congress sought to avoid precisely these types of conflicts, but the Maryland Act subjects publishers to a state-level compulsory licensing scheme that competes and conflicts with federal copyright law, creating a "chaotic situation" that will irreparably harm publishers.[8]

For all of these reasons, publishers will suffer irreparable and immediate harm unless the Maryland Act is enjoined. *See, e.g.*, *Air Evac EMS, Inc. v. Dodrill*, No. 2:21-CV-00310, 2021

---

[7] *Cf. EMI Apr. Music, Inc. v. White*, 618 F. Supp. 2d 497, 510 (E.D. Va. 2009) (finding irreparable injury from performance of songs given that "[o]nce a song has been played and heard, it is difficult to conceive of how such harm can be remedied . . . such performances cannot be taken back").

[8] *See, e.g.*, *United States v. South Carolina*, 840 F. Supp. 2d 898, 925 (D.S.C. 2011), *modified in part*, 906 F. Supp. 2d 463 (D.S.C. 2012), *aff'd*, 720 F.3d 518 (4th Cir. 2013) (finding irreparable injury where "conflict between state and federal law would disrupt the federal enforcement scheme and create a potentially chaotic situation in which previously civil enforcement matters would be criminalized under the [state law] scheme"); *see also South Carolina*, 720 F.3d at 533 (recognizing that "the likelihood of chaos resulting from South Carolina enforcing its separate immigration regime is apparent"); *Nat'l City Bank of Indiana v. Turnbaugh*, 367 F. Supp. 2d 805, 821 (D. Md. 2005), *aff'd sub nom. Nat'l City Bank of IN v. Turnbaugh*, 463 F.3d 325 (4th Cir. 2006) (finding "it is clear that the plaintiffs will suffer irreparable harm to their business and their federally authorized banking activities if they are forced to comply with the conflicting Maryland laws").

WL 2877603, at *11 (S.D.W. Va. July 8, 2021) (finding that plaintiff would suffer irreparable

harm if state law were allowed to go into effect, where plaintiff "may be subject to fines; forced

to spend time, money, and resources to comply with the new requirements and regulations under

[state law] that may later be struck down [as preempted or otherwise unenforceable], or may

ultimately be forced to close its doors entirely").

III.    **The Balance of Equities Favors an Injunction.**

The balance of equities favors enjoining the Maryland Act. On the one hand, the State of

Maryland will in no way be harmed by a preliminary injunction here. "[Fourth Circuit] precedent

counsels that a state is ***in no way harmed*** by issuance of a preliminary injunction which prevents

the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is

***improved*** by such an injunction." *Leaders of a Beautiful Struggle*, 2 F.4th at 346 (emphasis

added) (quoting *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013)); *see

also Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (holding that a public

school defendant was "in no way harmed by issuance of a preliminary injunction which prevents

it from enforcing a regulation, which, on this record, is likely to be found unconstitutional"). The

State of Maryland has no legitimate interest in enforcing a state law likely to be preempted.

By comparison, AAP and its members are likely to suffer substantial harm if the

Maryland Act is not enjoined, as described above. *See* Sec. II. Enjoining enforcement of the state

law will simply "maintain[] the status quo and prevent[] irreparable harm to both [plaintiff] and

the public during the pendency of this lawsuit." *See Dodrill*, 2021 WL 2877603, at *11.

Therefore, the balance of equities clearly tips in favor of an injunction. *See, e.g.*, *id.*

(finding that "the balance of equities and the public interest both favor preliminary injunctive

relief," where the "[state] will not be harmed by a potential delay" resulting from an injunction

of a state law, but if the state law is not enjoined and "it is later determined that [the law] is fully

preempted by [federal law]—then [p]laintiff and the public will be irreparably harmed").

IV.   **Enjoining the Maryland Act Will Serve the Public Interest.**

Lastly, entering a preliminary injunction will serve the public interest. "[T]he public

interest will [] be served by enjoining the enforcement of invalid provisions of state law."

*Turnbaugh*, 367 F. Supp. 2d at 822. Likewise, it is "well-established that the public interest

favors protecting constitutional rights." *Leaders of a Beautiful Struggle*, 2 F.4th at 346; *see also*

*League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 248 (4th Cir. 2014)

(recognizing that the public interest is served by entry of an injunction necessary to "uphold[]

constitutional rights"). As discussed above, the Maryland Act is preempted pursuant to the

Supremacy Clause of the United States Constitution.

Similarly, the public welfare is best served by respecting the scope of copyright owners'

rights under the Copyright Act. *See, e.g.*, *Eldred*, 537 U.S. at 212 n.18; *see also* Pallante Decl. ¶¶

25-26; Rasenberger Decl. ¶¶ 13-18 (outlining the negative impact of the Maryland Act on

authors and the public). Indeed, "[s]ince Congress has elected to grant certain exclusive rights to

the owner of a copyright in a protected work, it is virtually axiomatic that the public interest can

only be served by upholding copyright protections and, correspondingly, preventing the

misappropriation of the skills, creative energies, and resources which are invested in the

protected work." *Advance Magazine Publishers, Inc. v. Leach*, 466 F. Supp. 2d 628, 638 (D. Md.

2006).[9]

---

[9] *See also EMI Apr. Music, Inc. v. Garland Enterprises, LLC*, No. CIV.A. DKC 11-3352, 2012
WL 1986529, at *5 (D. Md. June 1, 2012) ("[T]he public interest is clearly served by requiring
companies to comply with copyright laws."); *Disney Enterprises, Inc. v. Delane*, 446 F. Supp. 2d
402, 408 (D. Md. 2006) ("[T]here is greater public benefit in securing the integrity of [p]laintiffs'

Proponents of the Maryland Act are mistaken in arguing that replacing the exclusive rights of publishers and authors with a state-imposed compulsory licensing and pricing scheme will serve the public interest, simply because it will provide members of the public with greater, immediate access to more literary works. While those justifications may be superficially appealing, they are not dissimilar from arguments rejected by the Supreme Court in *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985). In *Harper*, the Supreme Court emphasized that copyright is not an obstacle to the public interest but the very "engine of free expression." *Id.* at 558. The Court recognized that the public interest is served not merely by amplifying access to creative works indiscriminately, but by respecting the right of publishers to determine when, how, and through whom to disseminate their works over time. *See id.*

For all of these reasons, enjoining the Maryland Act—which is preempted by federal law and which violates publishers' rights guaranteed by the Copyright Act—will serve the public interest here. *See, e.g.*, *EQT Prod. Co. v. Wender*, No. 2:16-CV-00290, 2016 WL 8261728, at \*2 (S.D.W. Va. Jan. 20, 2016) (finding that "[i]t is also in the public interest that [plaintiff] and [others] in a similar position as [plaintiff] should not be at risk of prosecution or other enforcement action under an Ordinance that is likely to be deemed invalid on one or more grounds," including federal preemption).

## CONCLUSION

For the foregoing reasons, AAP is likely to succeed in showing that the Maryland Act is preempted by federal law, under conflict and/or preemption principles; AAP and its members

---

copyrights than in allowing [defendant] to make [p]laintiffs' copyrighted material available to the public.").

28

will likely suffer irreparable harm unless the state law is enjoined; and the balance of equities

and public interest each favor an injunction. Accordingly, the Maryland Act should be enjoined.

Dated: December 16, 2021                          Respectfully submitted,

                                                  */s/ Scott A. Zebrak*
                                                  Scott A. Zebrak (17741)
                                                  Matthew J. Oppenheim (22256)
                                                  Nicholas C. Hailey
                                                  Carly A. Kessler
                                                  Ever M. Hess
                                                  **OPPENHEIM + ZEBRAK, LLP**
                                                  4530 Wisconsin Avenue, NW, 5th Floor
                                                  Washington, DC 20016
                                                  Phone: (202) 480-2999
                                                  scott@oandzlaw.com
                                                  matt@oandzlaw.com
                                                  nick@oandzlaw.com
                                                  carly@oandzlaw.com
                                                  ever@oandzlaw.com

                                                  *Attorneys for Plaintiff Association of*
                                                  *American Publishers, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 16, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notice of such filing to all counsel of record entitled to service.

*/s/ Scott A. Zebrak*
Scott A. Zebrak (17741)
