IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ASSOCIATION OF AMERICAN PUBLISHERS, INC.,<br><br>    455 Massachusetts Avenue, NW<br>    Washington, DC 20001,<br><br>                            Plaintiff,<br>v.<br><br>BRIAN E. FROSH, in his official capacity as Attorney General of the State of Maryland,<br><br>    200 St. Paul Place<br>    Baltimore, MD 21202,<br><br>                            Defendant. | Civil Action No. 1:21-cv-03133-DLB |

**DECLARATION OF MARIA A. PALLANTE IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to 28 U.S.C. § 1746, I, Maria A. Pallante, declare as follows:

1. I am the President and Chief Executive Officer of the Plaintiff, the Association of American Publishers, Inc. ("AAP"). I submit this declaration in support of Plaintiff's Motion for a Preliminary Injunction. I have personal knowledge of the facts set forth in this declaration.

**Background**

2. AAP is the national trade association and principal public policy advocate for publishing houses in the United States. Our membership includes more than 130 large, small, nonprofit, and commercial houses in the education, scholarly, and consumer publishing sectors. Some of our members have served national and international markets since the 19th century, while others have entered the industry more recently to the particular benefit of local or regional communities.

3. AAP's members invest in, publish, distribute, and otherwise make publicly available some of the most acclaimed fiction, nonfiction, children's books, education materials, and scholarly works in the world. Their authors include Nobel Laureates, as well as winners of the Pulitzer Prize, National Book Award, Newbery Medal, Caldecott Medal, Man Booker Prize, and Grammy Awards for spoken works, among many other honors.

4. As global innovators, publishers are constantly developing new literary works and new business models to meet the demands of both library and retail channels. They also distribute older titles—some of them among the most iconic literature ever authored—delivering them to library, retail, and education customers in a wide variety of formats, including ebooks, audiobooks (both physical and downloaded), hardcover, paperback, and interactive platforms. Most if not all of our members publish literary works in digital formats. At the same time, print formats (paper) remain far more popular among readers of books.

5. AAP is deeply focused on issues that affect the Copyright Act, 17 U.S.C. § 101, *et seq.*, for it is the sum and detail of this statute that provide the economic incentives and legal confidence by which publishers of all sizes seek to acquire and disseminate original works of authorship to the public. In turn, our members promote democratic discourse, human empowerment, scientific progress, and political accountability.

6. As AAP's President and CEO, I lead the organization's public policy, education, and litigation efforts, including before regulatory agencies, legislatures, and the courts. My team and I work closely with AAP's membership to protect and advance a balanced legal framework that incentivizes the publication of creative expression and the dissemination of knowledge, including, especially, a viable twenty-first century Copyright Act that has meaningful exclusive rights, calibrated exceptions and limitations, and effective enforcement and remedies.

7. I have practiced copyright law for three decades, including more than five years as United States Register of Copyrights from 2011 to 2016. As the Nation's public copyright attorney, I directed the Copyright Office and the public administration of the Copyright Act, including the federal registration of copyright interests and the documentation of copyright transactions, both of which provide evidentiary weight under federal law as to the validity and lawful chain of title for exclusive rights. My team and I were statutory advisors to both lawmakers and executive branch agencies during an unusually active period in which the House Judiciary Committee reviewed the entire Copyright Act through public hearings and stakeholder meetings. As Register, I delivered multi-year, public studies to both the House and Senate on gaps in the law and emerging legal issues; supported the Department of Justice on legal questions pertaining to copyright litigation; represented the United States on treaty and diplomatic delegations pertaining to intergovernmental copyright obligations; and promulgated regulations governing both legal and technical developments with input from authors, publishers, producers, libraries, technology companies, and other stakeholder groups.

8. I serve on various national legal committees and have delivered and published numerous lectures in the field, including the Horace S. Manges Lecture at Columbia University, and the Robert W. Kastenmeier Lecture at the University of Wisconsin. From 2007 to 2011, I served as Deputy General Counsel of the Copyright Office, and as its principal for Policy and International Affairs. Before this, I was in private practice, including eight years as in-house counsel for the nonprofit Guggenheim art museums, archives, and foundation in New York.

## **Publishing and Copyright**

9. Today, more than two centuries after the Framers crafted and adopted the Constitution's Copyright Clause in 1787 and the first Congress enacted the first Copyright Act in

1790—for books, maps, and charts—American publishers are an essential part of a vast, vibrant, and valuable creative economy that facilitates rapid and, frequently, borderless transactions for the enjoyment of books, music, film, television, and software.

10. The nation's core copyright industries, of which publishing forms an integral part, serve as a vital component of the national economy. The American creative economy— including publishing and a robust market for library lending of ebooks and audiobooks—is made possible by, and is built upon, the longstanding, carefully-balanced, and comprehensive set of rights, remedies, exceptions, and limitations set forth in the U.S. Copyright Act. The Copyright Act sets forth exclusive rights guaranteed to the owner of a copyright, *see* 17 U.S.C. § 106, as well as limitations and exceptions to those federally granted rights, including certain exceptions for libraries, *see* 17 U.S.C. § 108. Congress enacted the current, underlying statute in 1976, and has amended it cautiously since then in its expert judgment, following extensive deliberations that almost always include multi-year studies and hearings.

11. The Copyright Act also enumerates what are known as compulsory licenses, which, as a matter of law, allow certain uses of certain types of works on certain terms and payment of a regulated fee. Compulsory licenses are extraordinarily rare. They interfere with the free marketplace and intrude upon the scope of a copyright owner's exclusive rights. Congress has enacted compulsory licenses for copyrighted works only in a limited number of narrow, carefully prescribed instances. None of the compulsory licenses in the Copyright Act involve literary works. Moreover, because copyright commerce is always shifting, Congress reviews compulsory licenses to consider whether and when to phase them out. *See*, *e.g.*, U.S. Copyright Office Analysis and Recommendations Regarding the Section 119 Compulsory License, pg. 5, June 3, 2019 (responding to Congress and recommending it let the section 119

license expire), https://www.copyright.gov/laws/hearings/views-concerning-section-119-compulsory-license.pdf.

12. The business of publishing is replete with risks: it requires publishers to make decisions about whether and on what terms to acquire a literary work, as well as to the timing, pricing, and formats of their books. Publishers must also balance numerous competing business channels in the marketplace, involving, for example, brick-and-mortar bookstores; on-line retailers; public lending libraries; school, academic, and special interest libraries; big-box stores; and other distributors. These marketplace-based decisions directly affect both the short-term success and long-term promise of books. Moreover, to keep pace with the various and sometimes competing needs of their authors, partners, and customers, as well as changing technologies, publishers must constantly innovate. They are always seeking out ways to support authors, promote books, and reach readers.

13. Library markets are longstanding and well-developed for both paper copies and digital copies, including ebooks and audiobooks. While publishers may use wholesale intermediaries to help supply hardcover and paperback books to libraries, they deliver ebooks and digital audiobooks through entities known as "library aggregators," which, in turn, work with libraries and their patrons to host platforms that faciliate and track the lending of these digital works.

14. As publishing has expanded to new formats and business models, so too has the reach of public libraries. When a library signs up with an aggregator, patrons of that library have the opportunity to read or listen to ebook and audiobook copies of potentially thousands of literary works from their computers or other devices during the period of the loan. Library ebook and audiobook lending is thriving today.

15. In 2020, more than 100 public library systems exceeded one million digital checkouts on the ebook lending platform of a library aggregator named OverDrive. *See* **Exhibit 1** (OverDrive, 102 library systems surpass one million digital checkouts (Jan. 11, 2021)). That included Maryland's Digital eLibrary Consortium, which alone had over four million digital checkouts. *Id.* In total, 430 million ebooks were borrowed globally through the OverDrive platform in 2020. *Id.*

16. In 2021, 129 library systems are on track to surpass the one million digital checkout threshold on OverDrive, breaking last year's all-time record. *See* **Exhibit 2** (OverDrive, Digital library reading is on pace for another record-breaking year (July 9, 2021)). Total digital circulation on OverDrive is on pace to exceed half a billion digital checkouts in 2021, reflecting major growth for libraries of all sizes. *Id.*

## The Maryland Act

17. Copyright is governed by federal law. A copyright owner's copyright interests can only be granted or restricted by Congress. A core tenet of the Copyright Act is that it sets forth a uniform national system, without state interference.

18. Nonetheless, Md. Code, Educ. §§ 23-701, 23-702 (hereinafter, the "Maryland Act") recasts a great diversity of past, current, and future titles—novels, biographies, poetry, children's books, political history, scholarship, course materials, and scores of other creative works—as commodities to be regulated by the state of Maryland. They are not. They are invaluable works of authorship and free expression that are protected by a supreme, lengthy, and uniform Copyright Act.

19. Literary works are one of the types of works protected under the Copyright Act, *see* 17 U.S.C. § 102(a)(1), vesting in the author a suite of exclusive rights regarding the

6

reproduction, distribution, public display, and public performance of her work, *see* 17 U.S.C. § 106. Sometimes, publishers may be authors within the definition of the law, because in some instances, for certain kinds of works, copyright interests vest directly with corporations. But it is most commonly the case that publishers acquire their copyright ownership from individual authors through a chain of title designed to promote and disseminate works of creative expression to the public. Here, Maryland Act implicates and devalues the very rights that authors have entrusted and conveyed to publishers.

20. The Maryland Act whittles away the exercise and control of a publisher's copyright interests that are so clearly protected by the Copyright Act. It will cause irreparable harm to publishing houses of all sizes and sectors across the United States, including the many consumer, education, and scholarly publishers—commercial as well as nonprofit businesses—that comprise AAP's membership. It will also harm the public interest more broadly.

21. The Maryland Act is a single-state compulsory license, not enacted by Congress and strikingly at odds with the objectives and operation of a borderless copyright economy. Under the Maryland Act, when a publisher provides its literary works as ebooks or audiobooks at retail, the state of Maryland can force the publisher to authorize additional reproductions, distributions, public displays and other uses that implicate the Copyright Act.

22. The Maryland Act will undermine the ability of publishers to rely upon the uniform authority of the U.S. Copyright Act while faciliating rapid copyright transactions in the modern copyright marketplace; it will therefore undermine their ability to make legal and business decisions in the normal course of their operations. The state law will sow confusion in both local and global publishing markets by subjecting both American and foreign copyright owners to a shadow copyright act solely for Maryland public library transactions. It will deprive

publishers of the full revenue potential of their copyright interests—revenue that serves as the foundation for future works they may invest in and future authors they may support. The Maryland Act will devalue the literary holdings of publishers during the term of statutory copyright protection that is prescribed by Congress.

23. Copyright transactions occur in a national or international context. The Maryland Act will force publishers to navigate copyright transactions under a cloud of substantial uncertainty as to their application in Maryland. The Maryland Act's vagueness on what terms are "reasonable" or not will leave publishers unclear as to what terms are permissible and whether terms of existing licenses need to change. To avoid this result, the publisher could make the decision to publish in print form only, though that does not benefit authors, publishers, or readers. These problems would compound exponentially if a patchwork of state-level compulsory licenses arise, replacing the single federal copyright system that numerous Congresses have already recognized as being in the best interest of the United States.

24. Both the legislative history and larger public discussion concerning the Maryland Act appear to accept, as they must, that most publishers have elected to make their digital catalogs immediately available to public libraries. That voluntary practice reflects their respect for libraries. Instead, the Maryland Act's legislative history and public statements by state legislators and public officials reveal discontent with Amazon, which has at times refused to distribute to libraries the ebooks and audiobooks that it publishes under its own imprint. *See* Kathleen M. Dumais, Testimony in Support of House Bill 518 (introducing the proposed Maryland Act and citing Amazon and Audible's current practices as an impediment to libraries). Amazon is not an AAP member.

25. The state of Maryland has no more authority to compel distribution of a novel by creating involuntary licenses than it does to divest the latest feature film of value by requiring movie studios to provide libraries with digital licenses immediately after release, while retail customers are streaming it at the virtual box office. Instead, the Copyright Act grants these decisions to the copyright owner by granting a suite of exclusive rights to be exercised and transferred in the marketplace, and it provides a comprehensive legal framework that judiciously balances public and private equities.

26. Congress has unambiguously determined that the Copyright Act governs the disposition of literary works to the public, including through ebooks, audiobooks and other innovative formats and that this federal system is in the best interest of the public.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on December 16, 2021

_____
Maria A. Pallante

# EXHIBIT 1

# Blog Post

Home  >  Library  >  102 library systems surpass one million digital che…



## 102 library systems surpass one million digital checkouts

January 11, 2021                                         FEATURED, FEATURED POST - LIBRARY BLOG, LIBRARY

**By: Adam Sockel, Integrated Marketing Specialist**

2020 saw a record number of readers turn to their public libraries' digital collections of ebooks and audiobooks, seeking information and entertainment they could enjoy safely at home. These new library patrons, and the millions more who have used OverDrive and Libby for years, led to **a record 102 library systems surpassing one million digital checkouts globally**. This includes **29 library systems hitting this milestone for the first time**. In total, a remarkable **430 million digital books were borrowed globally across all OverDrive platforms**.

Readers around the world discovered, rediscovered, and strengthened their relationship with libraries as a way to stay connected to their community while safely entertaining themselves and family. Reading has always been a form of escapism and one readers have continued to seek out during the COVID-19 pandemic. Community and global reading programs helped readers safely engage in conversations. Libraries (and schools) around the world consistently promoted their digital collections and online events as an essential way to access books both for enjoyment and education.

## Digital checkout records set both globally and locally

**Browse blog and media articles**

*Public Library Training*



*K-12 Library Training*





In addition to a worldwide record-setting year, **there were also three library systems who surpassed seven million checkouts** individually, a number previously unreached. In fact, **Toronto Public Library became the first library ever to hit eight million checkouts** in a calendar year. Below you can see the complete list of library systems who joined the million circulation club in 2020.

**8 million checkouts**
Toronto Public Library

**7 million checkouts**
Los Angeles Public Library
King County Library System

**6 million checkouts**
Wisconsin Public Library Consortium
National Library Board Singapore
The Ohio Digital Library

**5 million checkouts**
New York Public Library
Greater Phoenix Digital Library

**4 million checkouts**
Tennessee READS
Digital Downloads Collaboration
Multnomah County Library (OR)
Seattle Public Library
Maryland's Digital Library
Hennepin County Library

**3 million checkouts**
CLEVNET (OH)
Beehive Library Consortium
Harris County Public Library (TX)
Calgary Public Library
Mid-Continent Public Library
San Diego County Library
Ontario Library Service Consortium
Cincinnati & Hamilton County Public Library
San Francisco Public Library
LA County Library

**2 million checkouts**
North Carolina Digital Library
Sno-Isle Libraries
Auckland Libraries
Boston Public Library
Livebrary.com
Sacramento Public Library
Brooklyn Public Library
Cuyahoga County Public Library
Kentucky Libraries Unbound
Carnegie Library of Pittsburgh

Minuteman Library Network
Midwest Collaborative for Library Services
San Antonio Public Library
Metropolitan Library System
Digital Library of Illinois
Pikes Peak Library District
Fairfax County Public Library
Las Vegas-Clark County Library District
Denver Public Library
Oregon Digital Library Consortium
St. Louis County Library
Hillsborough County Public Library Cooperative
Edmonton Public Library
Bridges
Washington County Cooperative Library Services
Austin Public Library

## 1 million checkouts

Wake County Public Libraries
Nashville Public Library
Santa Clara County Library
Chicago Public Library
Broward County Library
Indianapolis Public Library
Salt Lake County Library Services
Ottawa Public Library
CW MARS
Washington Anytime Library
Pierce County Library System
Orange County Library System
The Free Library of Philadelphia
Nassau Digital Doorway
South Australia Public Library Services
British Columbia Libraries
Lee County Library System
Vancouver Public Library
New Hampshire State Library
Charlotte Mecklenburg Library
OC Public Libraries
Montgomery County Public Libraries
Saskatchewan Library Consortium
District of Columbia Public Library
Buffalo & Erie County Public Library
Houston Area Digital Media Catalog
Fort Vancouver Regional Library District
Contra Costa County Library
Missouri Libraries 2Go
Arapahoe Library District
Hamilton Public Library

Timberland Regional Library
Ocean State Libraries eZone
Pima County Public Library
Bergen County Cooperative Library System
Halifax Public Libraries
OK Virtual Library
Hawaii State Public Library System
Douglas County Libraries
Mississauga Library System
Download Destination
MontanaLibrary2Go
NC Kids Digital Library
Westchester Library System
NorthNet Library System
Camellia Net Digital Catalog
San Jose Public Library
Northern California Digital Library
downloadLibrary
Peninsula Library System
Henrico County Public Library
eLibrary NJ

**Tags In**

**DIGITAL LIBRARY**    **LIBBY**

 SHARE           **1870** / 2087  

# EXHIBIT 2

# Blog Post

Home  >  Library  >  Digital library reading is on pace for another record-breakin





**Browse blog and media articles**

*Public Library Training*

*K-12 Library Training*





## Digital library reading is on pace for another record-breaking year

July 9, 2021                                                                 FEATURED, FEATURED POST - LIBRARY BLOG, LIBRARY

**By: Adam Sockel, Integrated Marketing Specialist**

*129 public library systems on pace to surpass one million digital checkouts in 2021*

2021 is shaping up to be an incredible year for reading as more public library systems than ever are set to eclipse one million digital checkouts on the OverDrive platform. Thanks to library staff and their dedication to meeting community demand for digital books and promotion of apps like Libby, ebooks and audiobooks' popularity continues increasing with readers of all ages. This year is on pace to break the all-time record, set in 2020. See last year's list.

**Total 2021 digital circulation for OverDrive library and school partners is on track to exceed half a billion checkouts**, showing major growth for libraries of all sizes. Public libraries around the world are seeing double-digit growth in their digital checkouts with Toronto Public Library leading the way, having already surpassed five million checkouts this year.

## What is everyone reading?

Popular 2020 releases have maintained their popularity into 2021 with titles such as *The Midnight Library* by Matt Haig, *A Promised Land* by former President Barack Obama, and *The Invisible Life of Addie LaRue* by V.E. Schwab. New releases from this year are also topping the charts: *The Four Winds* by Kristin Hannah, *The Last Thing He Told Me* by Laura Dave, and *Project Hail Mary* by Andy Weir are all being

borrowed in massive numbers. Readers are also discovering page-to-screen titles like Leigh Bardugo's *Shadow and Bone* and Jessica Bruder's *Nomadland* after their onscreen adaptations entered the cultural zeitgeist

As physical libraries and bookstores open up, it's clear that demand for digital reading isn't slowing down. Readers, by and large, read multiple formats meaning that many people will engage with physical as well as digital content. Libraries increased spending on digital content in 2020 due to the COVID-19 pandemic and it appears that users gained through digital books are continuing to discover and enjoy content through their local public library anytime, anywhere.

**Tags In**

**DIGITAL LIBRARY**

SHARE   **1983** / 2087