IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ASSOCIATION OF AMERICAN PUBLISHERS, INC.,<br><br>455 Massachusetts Avenue, NW<br>Washington, DC 20001,<br><br>         Plaintiff,<br>v.<br><br>BRIAN E. FROSH, in his official capacity as Attorney General of the State of Maryland,<br><br>200 St. Paul Place<br>Baltimore, MD 21202,<br><br>         Defendant. | Civil Action No. 1:21-cv-03133-DLB |

**DECLARATION OF THE AUTHORS GUILD IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to 28 U.S.C. § 1746, I, Mary Rasenberger, declare as follows:

1. I am the current CEO of the Authors Guild, and its educational and charitable arm, the Authors Guild Foundation. I am submitting this statement on behalf of the Authors Guild in support of the Plaintiff's action challenging Md. Code, Educ. §§ 23-701, 23-702 (the "Maryland Act"). I have personal knowledge of the facts set forth in this declaration.

**Background**

2. The Authors Guild is the oldest and largest U.S. organization for professional writers in the United States. The Authors Guild's 12,000 plus members include published writers of all genres, including historians, biographers, academicians, journalists, and other writers of nonfiction and fiction. Its members' work covers important issues in history, biography, science, politics, medicine, business, and other areas; they are frequent contributors to the most influential

and well-respected publications in every field. The Authors Guild defends and promotes the rights of all authors to write without interference or threat, and to receive fair compensation for that work. It advocates for writers on issues of copyright—a right enshrined in Article 1 of the United States Constitution that grants authors the right to own and profit from their work in recognition of the value their work brings to society and the understanding that authors need to have the right to demand payment for their work to keep writing.

3. The members of the Authors Guild rely on enforceable copyrights to protect their work and to maintain a robust publishing ecosystem that provides them with the financial ability to continue to write for the public good. As such, members of the Authors Guild have a strong interest in protecting the exclusive rights to license their works to whom they choose on the terms they choose as the Constitution and the federal copyright law provide.

4. As CEO of the Authors Guild and the Authors Guild Foundation, I lead the organizations' operations, member services, public policy, and education agenda. Working with my team, I represent the organizations' positions and interests before federal agencies, legislatures, and the courts.

5. I have over thirty years of experience practicing copyright law in both the private and public sectors and now in the not-for-profit sector. From 2002 to 2008, I worked for the U.S. Copyright Office and Library of Congress as senior policy advisor and then as program director for the National Digital Preservation Program. In this role, I led and managed a joint Library of Congress and U.S. Copyright Office study group on Section 108 of the Copyright Act, which provides limited exceptions to copyright for libraries and archives. I worked with nineteen prominent copyright lawyers and scholars to study 17 U.S.C. § 108 over a period of three years, culminating in the publication of an exhaustive 132-page report detailing the purposes of Section

108, analyzing its requirements, and recommending how the statute could be updated to ensure the balanced and proper application of the narrow exceptions to new digital technologies.

6. Immediately prior to coming to the Guild, I was a partner at the entertainment law firm Cowan, DeBaets, Abrahams & Sheppard, and previously Counsel at Skadden Arps, where I counseled and litigated on behalf of publishing, media, entertainment, and internet companies, as well as authors and other creators, in all areas of copyright and related rights.

7. I speak, write, and lecture frequently on copyright law and authors' rights; and serve on the Council of the American Bar Association's Intellectual Property Section; as an Advisor to the Executive Committee of the Copyright Society of the USA; as an Adviser to the American Law Institute's Restatement of Law, Copyright; and as a trustee of the Copyright Alliance. I have taught copyright law courses at Columbia Law School and Fordham Law School and have spoken and written frequently on issues relating to copyright law.

8. I was raised in Bethesda, Maryland and have a deep personal bond to the State of Maryland. As someone who has spent over three decades in copyright law, I am astonished that any state—much less my home state of Maryland—would enact a law that so blatantly conflicts with federal law and the exclusive legislative authority of the U.S. Congress as provided by the Constitution and the U.S. Copyright Act, all without consulting with the authors and publishers impacted by it.

### The Maryland Act's Compulsory Licensing Scheme

9. Section 106 of the Copyright Act enumerates six exclusive rights—the rights to reproduce, create derivative works, distribute, publicly display, perform, and transmit (in the case of audio works). Deciding when, how, and who gets to exercise these rights in a

copyrightable work is the sole prerogative of the copyright owner, who, in the first instance (excluding works made for hire) is the author.

10. These six exclusive rights undergird the structure of the whole creative economy and industries built around that economy, from music to film and photography to book publishing. The "exclusivity" guaranteed to authors under the Copyright Act is a material consideration in copyright transactions and integral to the valuation of a work; it drives the creation of new works by ensuring renumeration for the creator, and fuels investment in the work by studios, publishers, and producers for their further distribution and exploitation.

11. The Maryland Act is a limitation on the federally granted exclusive rights of copyright owners. By requiring that publishers—broadly defined—"offer to license the electronic book to public libraries in the state on reasonable terms," the Maryland Act creates a state-level compulsory licensing scheme in contravention of Congress's authority under the United States Constitution to enact legislation governing copyrights.

12. Proponents of the Maryland Act have argued that libraries' lack of access to electronic texts indicates market failure. Yet, they cite no examples of this market failure other than two atypical cases: Amazon's withholding its imprints from libraries, and Macmillan's proposal to limit licenses of new ebooks to one copy per library for the first eight weeks after publication—an idea Macmillan quickly dropped when libraries protested. The law thus portends to fix a non-existent problem—except with respect to a single company, Amazon. Whatever the legislature's motivation, the Maryland Act conflicts with the exclusive rights under Section 106 of the Copyright Act and Congress's decisions on where (or where not) to create exceptions, limitations, and compulsory licenses. As described below, the consequences are significant.

### Impact on Authors

13. The Maryland Act unfairly targets authors, especially the growing numbers of those who self-publish their books. It makes no distinction between a large publisher and distributor like Amazon and small and micro publishers or authors and internet writers who act as their own publisher, and it expects compliance from individuals and micro publishers in the same manner as it does from large, multinational corporations. Rather, the law defines "publisher" as any "person in the business of manufacturing, promulgating, and selling books, journals, magazines, newspapers, or other literary productions," which sweeps within its ambit thousands of self-published writers and writers who publish their works online.

14. Individual authors and online writers will often lack the sophistication, resources, and access to the technologies necessary to execute library licensing on whatever terms Maryland determines are "reasonable." Publishers license ebooks and audiobooks through "library aggregators," who, in turn, give access to the ebooks and audiobooks to library patrons through dedicated platforms. Individual authors and bloggers typically do not have direct access to these services. Unlike publishers, individual self-published authors publish a very limited number of books per year, so even if they could get access to the services, the cost would not be justified.

15. The Maryland Act creates a wholly impractical obligation on the Authors Guild's 12,000 author members and thousands of other authors around the country to track and comply with distant state regulations simply for communicating their thoughts and ideas. The federal copyright system was created to remove precisely the sorts of burdens on copyright owners of tracking and complying with multitudinous state laws that Maryland and other states are attempting to levy.

16. By compelling authors to disseminate their works, including on state-regulated pricing and other terms, the Maryland Act creates a compulsory license and prejudices the rights of authors under copyright. As Plaintiff's complaint points out, "Publishers invest heavily in the creation and promotion of their authors and their works . . . [and] rely on their copyrights to protect these investments." If publishers are prevented from reasonably protecting their investments, they cannot fund the creation of new books or market books effectively. As a result, authors' advances under new contracts will suffer, as will their royalty incomes from published books because of the impact on sales. New and diverse authors, who already face a steep ramp in the industry, will be less likely to be published, as publishers may seek to offset the negative impact on their investments by passing over less marketable books for those that have a bigger audience.

17. Proponents of the Maryland Act harbor a myopic view of "public interest" as it relates to copyright, perceiving it to be all about libraries' ability to distribute literary works in digital format. They ignore that the copyright system was created to incentivize authors to write and publish works that ultimately benefit the public. A robust copyright system ensures that talented voices representing all of the many lived experiences in this diverse, populous country will be available to the public. Every limitation on the rights that comprise that system reduces the potential return of investment for all publishers, large and small, and therefor limits the diversity and quality of what gets published and read, which in turn diminishes our ability to have a healthy democracy. Our Founders put copyright law in the Constitution because they understood just how essential a market-based publishing economy is to a functioning democracy—where authors from all walks of life are able to spend time learning and perfecting their craft and writing with the promise of an unrestricted market in to which they can sell their

work. If authors and publishers cannot earn returns of their investments, new and diverse books that are vital to our democracy don't get written, and the space for ideas shrinks.

### Conclusion

18.     The Authors Guild is sympathetic to Maryland's desire to ensure that its residents have access to ebooks and audiobooks. But that does not justify a law that breaches the bounds of constitutionality, interferes with the marketplace of ideas, and subjects thousands of individual, self-published authors who cannot manage distribution and licensing at scale to legal penalties. The prevailing practice in the publishing industry is, and always has been, to expand digital distribution to libraries. The practices of one actor in the industry (Amazon) should not gloss over the long and enduring history of authors' and publishers' support for libraries, and they certainly should not result in extreme consequences for the entire industry.

*     *     *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on December 15, 2021

Mary E. Rasenberger