**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| ASSOCIATION OF AMERICAN PUBLISHERS, INC., <br><br>     455 Massachusetts Avenue, NW <br>     Washington, DC 20001, <br><br>                       Plaintiff, <br><br> v. <br><br> BRIAN E. FROSH, in his official capacity as Attorney General of the State of Maryland, <br><br>     200 St. Paul Place <br>     Baltimore, MD 21202, <br><br>                     Defendant. | Civil Action No. 1:21-cv-03133-DLB |

**DECLARATION OF EVER M. HESS IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

I, Ever M. Hess, hereby declare as follows:

1.      I am an attorney at Oppenheim + Zebrak, LLP and I am counsel for Plaintiff, the Association of American Publishers, Inc., in the above-captioned case.

2.      I submit this declaration in support of Plaintiff's Motion for Preliminary Injunction filed contemporaneously herewith.

3.      Attached hereto as **Exhibit 1** is a true and correct copy of a portion of House Report No. 94-1476 dated September 3, 1976.

4.      Attached hereto as **Exhibit 2** is a true and correct copy of 2021 Md. Laws Ch. 411 (H.B. 518).

5.      Attached hereto as **Exhibit 3** is a true and correct copy of Md. Code, Educ. §§ 23-701 and 23-702 (the "Maryland Act").

6.       Attached hereto as **Exhibit 4** is a true and correct copy of the Association of American Publishers, Inc.'s testimony in opposition to S.B. 432 dated March 24, 2021.

7.       Attached hereto as **Exhibit 5** is a true and correct copy of the Authors Guild's testimony in opposition to S.B. 432 dated March 22, 2021.

8.       Attached hereto as **Exhibit 6** is a true and correct copy of U.S. Senator Thom Tillis's letter to Shira Perlmutter, Register of Copyrights and Director of the U.S. Copyright Office, dated May 26, 2021.

9.       Attached hereto as **Exhibit 7** is a true and correct copy of Director Shira Perlmutter's letter to U.S. Senator Thom Tillis dated August 31, 2021.

10.       Attached hereto as **Exhibit 8** is a true and correct copy of Kathleen M. Dumais's testimony in support of H.B. 518 dated February 5, 2021.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on December 16, 2021, in Washington, District of Columbia.


*/s/ Ever M. Hess*              
Ever M. Hess

*Counsel for Plaintiff Association*
*of American Publishers, Inc.*

# EXHIBIT 1

H.R. REP. 94-1476, H.R. Rep. No. 1476, 94TH Cong., 2ND
Sess. 1976, 1976 U.S.C.C.A.N. 5659, 1976 WL 14045 (Leg.Hist.)
**5659 P.L. 94-553, COPYRIGHTS ACT
Senate Report (Judiciary Committee) No. 94-473,
Nov. 20, 1975 (To accompany S. 22)
House Report (Judiciary Committee) No. 94-1476,
Sept. 3, 1976 (To accompany S. 22)
House Conference Report No. 94-1733,
Sept. 29, 1976 (To accompany S. 22)
Cong. Record Vol. 122 (1976)
DATES OF CONSIDERATION AND PASSAGE
Senate February 19, September 30, 1976
House September 22, 30, 1976
The House Report and the House Conference Report are set out.

(CONSULT NOTE FOLLOWING TEXT FOR INFORMATION ABOUT OMITTED
MATERIAL. EACH COMMITTEE REPORT IS A SEPARATE DOCUMENT ON WESTLAW.)

# HOUSE REPORT NO. 94-1476

Sept. 3, 1976

**\*1**  The Committee on the Judiciary, to whom was referred the bill (S. 22) for the general revision of the copyright law, title 17 of the United States Code, and for other purposes, having considered the **\*\*5660** same, report favorably thereon with an amendment in the nature of a substitute and recommend that the bill as amended do pass.

\* \* \* \*

**\*47**  PURPOSE

The purpose of the proposed legislation, as amended, is to provide for a general revision of the United States Copyright Law, title 17 of the United States Code.

STATEMENT

The first copyright law of the United States was enacted by the First Congress in 1790, in exercise of the constitutional power 'To promote the Progress of Science and useful Arts, by securing the limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries ' (U.S. Constitution, Art. I, sec. 8. Comprehensive revisions were enacted, at intervals of about 40 years, in 1831, 1870, and 1909. The present copyright law, title 17 of the United States Code, is basically the same as the act of 1909.

Since that time significant changes in technology have affected the operation of the copyright law. Motion pictures and sound recordings had just made their appearance in 1909, and radio and television were still in the early stages of their development. During the past half century a wide range of new techniques for capturing and communicating printed matter, visual images, and recorded sounds have come into use, and the increasing use of information storage and retrieval devices, communications satellites, and laser technology promises even greater changes in the near future. The technical advances have generated new industries and new methods for the reproduction and dissemination of copyrighted works, and the business relations between authors and users have evolved new patterns.

30 days of execution. Under clause (2) of section 118(b), the agreements may be negotiated 'at any time'-- whether before, during, or after determinations by the Commission.

Under section 118(c), the procedures for the Commission's establishing such rates and terms are to be repeated in the last half of 1982 and every five years thereafter.

Establishment of reasonable terms and rates

In establishing reasonable terms and rates for public broadcasting use of the specified works, the Commission, under clause (b)(1) of section 118, is to consider proposals timely submitted to it, as well as 'any other relevant information', including that put forward for its consideration 'by any interested party.'

The Committee does not intend that owners of copyrighted material be required to subsidize public broadcasting. It is intended that the  **5734  Commission assure a fair return to copyright owners without unfairly burdening public broadcasters. Section 118(b)(3) provides that 'the Commission may consider the rates for comparable circumstances under voluntary license agreements.' The Commission is also expected to consider both the general public interest in encouraging the growth and development of public broadcasting, and the 'promotion of science and the useful arts' through the encouragement of musical and artistic creation.

The Committee anticipates that the 'terms' established by the Commission shall include provisions as to acceptable methods of payment of royalties by public broadcasting entities to copyright owners. For example, where the whereabouts of the copyright owners may not be readily known, the terms should specify the nature of the obligation of the public broadcasting entity to locate the owner, or to set aside or otherwise assure payment of appropriate royalties, should he or she appear and make a claim. Section 118(b)(3) requires the Commission 'to establish requirements by which copyright owners may receive reasonable notice of the use of their works.' The Committee intends that these requirements shall not impose undue hardships on public broadcasting entities and, in the above illustration, shall provide for the specific termination of any period during which the public broadcasting entity is required to set aside payments. It is expected that, in some cases, especially in the area of pictorial, graphic, and sculptural works, the whereabouts of the owners of copyright may not be known and they may never appear to claim payment of royalties.

 *119  The Commission is also to establish record keeping requirements for public broadcasting entities in order to facilitate the identification, calculation, allocation and payment of claims and royalties.

Works affected

Under sections 118(b) and (e) of the Committee's amendment, the establishment of rates and terms by the Copyright Royalty Commission pertains only to the use of published nondramatic musical works, and published pictorial, graphic, and sculptural works. As under the Senate bill, rights in plays, operas, ballet and other stage presentations, motion pictures, and other audiovisual works are not affected.

Section 118(f) is intended to make clear that this section does not permit unauthorized use, beyond the limits of section 107, of individual frames from a filmstrip or any other portion of any audiovisual work. Additionally, the application of this section to pictorial, graphic, and sculptural works does not extend to the production of transmission programs drawn to any substantial extent from a compilation of such works.

The Committee also concluded that the performance of nondramatic literary works should not be subject to Commission determination. It was particularly concerned that a compulsory license for literary works would result in loss of control by authors over the use of their work in violation of basic principles of artistic and creative freedom. It is recognized that copyright

not only provides compensation to authors, but also protection as to how and where their works are used. The Committee was assured by representatives of authors and publishers that licensing arrangements for readings from their books, poems, and other works on public broadcasting programs for reasonable compensation and under reasonable safeguards for authors' rights  **5735  could be worked out in private negotiation. The Committee strongly urges the parties to work toward mutually acceptable licenses; to facilitate their negotiations and aid in the possible establishment of clearance mechanisms and rates, the Committee's amendment provides the parties, in section 118(e)(1), with an appropriately limited exemption from the anti-trust laws.

The Committee has also provided, in paragraph (2) of clause (e), that on January 3, 1980, the Register of Copyrights, after consultation with the interested parties, shall submit a report to Congress on the extent to which voluntary licensing arrangements have been reached with respect to public broadcasting use of nondramatic literary works, and present legislative or other recommendations, if warranted.

The use or copyrighted sound recordings in educational television and radio programs distributed by or through public broadcasting entities is governed by section 114 and is discussed in connection with that section.

Activities affected

Section 118(d) specifies the activities which may be engaged in by public broadcasting entities under terms and rates established by the Commission. These include the performance or display of published nondramatic musical works, and of published pictorial graphic, and sculptural works, in the course of transmissions by noncommercial educational broadcast stations; and the production, reproduction, and distribution of transmission programs including such works by nonprofit organizations for the purpose of such transmissions. It is the intent of the Committee that 'interconnection' activities serving as a technical adjunct to such transmissions, such as the use of satellites or microwave equipment, be included within the specified activities.

Paragraph 3 of clause (d) also includes the reproduction, simultaneously with transmission, of public broadcasting programs by governmental bodies or nonprofit institutions, and the performance or display of the contents of the reproduction under the conditions of section 110(1). However, the reproduction so made must be destroyed at the end of seven days from the transmission.

This limited provision for unauthorized simultaneous or off-the-air reproduction is limited to nondramatic musical works and pictorial graphic and sculptural works included in public broadcasting transmissions. It does not extend to other works included in the transmissions, or to the entire transmission program.

 *120  It is the intent of the Committee that schools be permitted to engage in off-the-air reproduction to the extent and under the conditions provided in 118(d)(3); however, in the event a public broadcasting station or producer makes the reproduction and distributes a copy to the school, the station or producer will not be held liable for the school's failure to destroy the reproduction, provided it has given notice of the requirement of destruction. In such a case the school itself, although it did not engage in the act of reproduction, is deemed an infringer fully subject to the remedies provided in Chapter 5 of the Act. The establishment of standards for adequate notice under this provision should be considered by the Commission.

Section 118(f) makes it clear that the rights of performance and other activities specified in subsection (d) do not extend to the unauthorized dramatization of a nondramatic musical work.

**5736  SECTION 201. OWNERSHIP OF COPYRIGHT

Initial ownership

### SECTION 204, 205. EXECUTION AND RECORDATION OF TRANSFERS

Section 204 is a somewhat broadened and liberalized counterpart of sections 28 and 29 of the present statute. Under subsection (a), a transfer of copyright ownership (other than the one brought about by operation of law) is valid only if there exists an instrument of conveyance, or alternatively a 'note or memorandum of the transfer,' which is in writing and signed by the copyright owner 'or such owner's duly authorized agent.' Subsection (b) makes clear that a notarial or consular acknowledgment is not essential to the validity of any transfer, whether executed in the United States or abroad. However, the subsection would liberalize the conditions under which certificates of acknowledgment of documents executed abroad are to be accorded prima facie weight, and would give the same weight to domestic acknowledgments under appropriate circumstances.

The recording and priority provisions of section 205 are intended to clear up a number of uncertainties arising from sections 30 and 31 of the present law and to make them more effective and practical in operation. Any 'document pertaining to a copyright' may be recorded under subsection (a) if it 'bears that actual signature of the person who executed it,' or if it is appropriately certified as a true copy. However, subsection (c) makes clear that the recorded document will give constructive notice of its contents only if two conditions are met: (1) the document or attached material specifically identifies the work to which it pertains so that a reasonable search under the title or registration number would reveal it, and (2) registration has been made for the work. Moreover, even though the Register of Copyrights may be compelled to accept for recordation documents that on their face appear self-serving or colorable, the Register should take care that their nature is not concealed from the public in the Copyright Office's indexing and search reports.

  **\*129**  The provisions of subsection (d), requiring recordation of transfers as a prerequisite to the institution of an infringement suit, represent a desirable change in the law. The one- and three-month grace periods provided in subsection (e) are a reasonable compromise between those who want a longer hiatus and those who argue that any grace period makes it impossible for a bona fide transferee to rely on the record at any particular time.

Under subsection (f) of section 205, a nonexclusive license in writing and signed, whether recorded or not, would be valid against a later transfer, and would also prevail as against a prior unrecorded transfer if taken in good faith and without notice. Objections were raised by motion picture producers, particularly to the provision allowing unrecorded nonexclusive licenses to prevail over subsequent transfers, on the ground that a nonexclusive license can have drastic effects on **\*\*5745**  the value of a copyright. On the other hand, the impracticalities and burdens that would accompany any requirement of recordation of nonexclusive licenses outweigh the limited advantages of a statutory recordation system for them.

### SECTION 301. FEDERAL PREEMPTION OF RIGHTS EQUIVALENT TO COPYRIGHT

#### Single Federal system

Section 301, one of the bedrock provisions of the bill, would accomplish a fundamental and significant change in the present law. Instead of a dual system of 'common law copyright' for unpublished works and statutory copyright for published works, which has been the system in effect in the United States since the first copyright statute in 1790, the bill adopts a single system of Federal statutory copyright from creation. Under section 301 a work would obtain statutory protection as soon as it is 'created' or, as that term is defined in section 101, when it is 'fixed in a copy or phonorecord for the first time. ' Common law copyright protection for works coming within the scope of the statute would be abrogated, and the concept of publication would lose its all-embracing importance as a dividing line between common law and statutory protection and between both of these forms of legal protection and the public domain.

By substituting a single Federal system for the present anachronistic, uncertain, impractical, and highly complicated dual system, the bill would greatly improve the operation of the copyright law and would be much more effective in carrying out the basic constitutional aims of uniformity and the promotion of writing and scholarship. The main arguments in favor of a single Federal system can be summarized as follows:

1. One of the fundamental purposes behind the copyright clause of the Constitution, as shown in Madison's comments in The Federalist, was to promote national uniformity and to avoid the practical difficulties of determining and enforcing an author's rights under the differing laws and in the separate courts of the various States. Today, when the methods for dissemination of an author's work are incomparably broader and faster than they were in 1789, national uniformity in copyright protection is even more essential than it was then to carry out the constitutional intent.

2. 'Publication,' perhaps the most important single concept under the present law, also represents its most serious defect. **\*130**  Although at one time, when works were disseminated almost exclusively through printed copies, 'publication' could serve as a practical dividing line between common law and statutory protection, this is no longer true. With the development of the 20th-century communications revolution, the concept of publication has become increasingly artificial and obscure. To cope with the legal consequences of an established concept that has lost much of its meaning and justification, the courts have given 'publication' a number of diverse interpretations, some of them radically different. Not unexpectedly, the results in individual cases have become unpredictable and often unfair. A single Federal system would help to clear up this chaotic situation.

**\*\*5746**  3. Enactment of section 301 would also implement the 'limited times' provision of the Constitution, which has become distorted under the traditional concept of 'publication.' Common law protection in 'unpublished ' works is now perpetual, no matter how widely they may be disseminated by means other than 'publication'; the bill would place a time limit on the duration of exclusive rights in them. The provision would also aid scholarship and the dissemination of historical materials by making unpublished, undisseminated manuscripts available for publication after a reasonable period.

4. Adoption of a uniform national copyright system would greatly improve international dealings in copyrighted material. No other country has anything like our present dual system. In an era when copyrighted works can be disseminated instantaneously to every country on the globe, the need for effective international copyright relations, and the concomitant need for national uniformity, assume ever greater importance.

Under section 301, the statute would apply to all works created after its effective date, whether or not they are ever published or disseminated. With respect to works created before the effective date of the statute and still under common law protection, section 303 of the statute would provide protection from that date on, and would guarantee a minimum period of statutory copyright.

Preemption of State law

The intention of section 301 is to preempt and abolish any rights under the common law or statutes of a State that are equivalent to copyright and that extend to works coming within the scope of the Federal copyright law. The declaration of this principle in section 301 is intended to be stated in the clearest and most unequivocal language possible, so as to foreclose any conceivable misinterpretation of its unqualified intention that Congress shall act preemptively, and to avoid the development of any vague borderline areas between State and Federal protection.

Under section 301(a) all 'legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 are governed exclusively by the Federal copyright statute if the works involved are 'works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103.' All corresponding State laws, whether common law or statutory, are preempted and abrogated. Regardless of when the work was created  **\*131**  and whether it is published or unpublished, disseminated or undisseminated, in the public domain or copyrighted under the Federal statute, the States cannot offer it protection equivalent to copyright. Section 1338 of title 28, United States Code, also makes clear that any action involving rights under the Federal copyright law would come within the exclusive jurisdiction of the Federal courts. The preemptive effect of section 301 is limited to State laws; as stated expressly in subsection (d) of section 301, there is no intention to deal with the question of whether Congress can or should

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

offer the equivalent of copyright protection under some constitutional provision other than the patent-copyright clause of article 1, section 8.

**\*\*5747**  As long as a work fits within one of the general subject matter categories of sections 102 and 103, the bill prevents the States from protecting it even if it fails to achieve Federal statutory copyright because it is too minimal or lacking in originality to qualify, or because it has fallen into the public domain. On the other hand, section 301(b) explicitly preserves common law copyright protection for one important class of works: works that have not been 'fixed in any tangible medium of expression. ' Examples would include choreography that has never been filmed or notated, an extemporaneous speech, 'original works of authorship' communicated solely through conversations or live broadcasts, and a dramatic sketch or musical composition improvised or developed from memory and without being recorded or written down. As mentioned above in connection with section 102, unfixed works are not included in the specified 'subject matter of copyright.' They are therefore not affected by the preemption of section 301, and would continue to be subject to protection under State statute or common law until fixed in tangible form.

The preemption of rights under State law is complete with respect to any work coming within the scope of the bill, even though the scope of exclusive rights given the work under the bill is narrower than the scope of common law rights in the work might have been.

Representatives of printers, while not opposed to the principle of section 301, expressed concern about its potential impact on protection of preliminary advertising copy and layouts prepared by printers. They argued that this material is frequently 'pirated' by competitors, and that it would be a substantial burden if, in order to obtain full protection, the printer would have to make registrations and bear the expense and bother of suing in Federal rather than State courts. On the other hand, these practical problems are essentially procedural rather than substantive, and the proposal for a special exemption to preserve common law rights equivalent to copyright in unpublished advertising material cannot be justified. Moreover, subsection (b), discussed below, will preserve other legal grounds on which the printers can protect themselves against 'pirates' under State laws.

In a general way subsection (b) of sectio4 301 represents the obverse of subsection (a). It sets out, in broad terms and without necessarily being exhaustive, some of the principal areas of protection that preemption would not prevent the States from protecting. Its purpose is to make clear, consistent with the 1964 Supreme Court decisions in Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, [11] and Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, [12] that preemption does not extend to causes of action, or subject matter outside the scope of the revised Federal copyright statute.

**\*132**  The numbered clauses of subsection (b) list three general areas left unaffected by the preemption: (1) subject matter that does not come within the subject matter of copyright; (2) causes of action arising under State law before the effective date of the statute; and (3) violations of rights that are not equivalent to any of the exclusive rights under copyright.

**\*\*5748**  The examples in clause (3), while not exhaustive, are intended to illustrate rights and remedies that are different in nature from the rights comprised in a copyright and that may continue to be protected under State common law or statute. The evolving common law rights of 'privacy, ' 'publicity,' and trade secrets, and the general laws of defamation and fraud, would remain unaffected as long as the causes of action contain elements, such as an invasion of personal rights or a breach of trust or confidentiality, that are different in kind from copyright infringement. Nothing in the bill derogates from the rights of parties to contract with each other and to sue for breaches of contract; however, to the extent that the unfair competition concept known as 'interference with contract relations' is merely the equivalent of copyright protection, it would be preempted.

The last example listed in clause (3)-- 'deceptive trade practices such as passing off and false representation'-- represents an effort to distinguish between those causes of action known as 'unfair competition' that the copyright statute is not intended to preempt and those that it is. Section 301 is not intended to preempt common law protection in cases involving activities such as false labeling, fraudulent representation, and passing off even where the subject matter involved comes within the scope of the copyright statute.

'Misappropriation' is not necessarily synonymous with copyright is not preempted if it is in fact based neither on a right within the general scope of copyright as specified by section 106 nor on a right equivalent thereto. For example, state law should have the flexibility to afford a remedy (under traditional principles of equity) against a consistent pattern of unauthorized appropriation by a competitor of the facts (i.e., not the literary expression) constituting 'hot' news, whether in the traditional mold of International News Service v. Associated Press, 248 U.S. 215 (1918), [13] or in the newer form of data updates from scientific, business, or financial data bases. Likewise, a person having no trust or other relationship with the proprietor of a computerized data base should not be immunized from sanctions against electronically or cryptographically breaching the proprietor's security arrangements and assessing proprietor's data. The unauthorized data access which should be remediable might also be achieved by the intentional interception of data transmissions by wire, microwave or laser transmissions, or by the common unintentional means of 'crossed' telephone lines occasioned by errors in switching.

The proprietor of data displayed on the cathode ray tube of a computer terminal should be afforded protection against unauthorized printouts by third parties (with or without improper access), even if the data are not copyrightable. For example, the data may not be copyrighted because they are not fixed in a tangible medium of expression (i.e., the data are not displayed for a period of not more than transitory duration).

  **\*133**  Nothing contained in section 301 precludes the owner of a material embodiment of a copy or a phonorecord from enforcing a claim of conversion against one who takes possession of the copy or phonorecord without consent.

  **\*\*5749**  A unique and difficult problem is presented with respect to the status of sound recordings fixed before February 12, 1972, the effective date of the amendment bringing recordings fixed after that date under Federal copyright protection. In its testimony during the 1975 hearings, the Department of Justice pointed out that, under section 301 as then written:

This language could be read as abrogating the anti-piracy laws now existing in 29 states relating to pre-February 15, 1972, sound recordings on the grounds that these statutes proscribe activities violating rights equivalent to \* \* \* the exclusive rights within the general scope of copyright. \* \* \* ' Certainly such a result cannot have been intended for it would likely effect the immediate resurgence of piracy of pre-February 15, 1972, sound recordings.

The Department recommended that section 301(b) be amended to exclude sound recordings fixed prior to February 15, 1972 from the effect of the preemption.

The Senate adopted this suggestion when it passed S. 22. The result of the Senate amendment would be to leave pre-1972 sound recordings as entitled to perpetual protection under State law, while post-1972 recordings would eventually fall into the public domain as provided in the bill.

The Committee recognizes that, under recent court decisions, pre-1972 recordings are protected by State statute or common law, and that should not all be thrown into the public domain instantly upon the coming into effect of the new law. However, it cannot agree that they should in effect be accorded perpetual protection, as under the Senate amendment, and it has therefore revised clause (4) to establish a future date for the pre-emption to take effect. The date chosen is February 15, 2047, which is 75 years from the effective date of the statute extending Federal protection to recordings.

Subsection (c) makes clear that nothing contained in Title 17 annuls or limits any rights or remedies under any other Federal statute.

SECTION 302. DURATION OF COPYRIGHT IN WORKS CREATED AFTER EFFECTIVE DATE

In general

# EXHIBIT 2

Chapter 411

## (House Bill 518)

AN ACT concerning

## Public Libraries – Electronic ~~Book~~ <u>Literary Product</u> Licenses – Access

FOR the purpose of requiring a publisher who offers to license an electronic ~~book~~ <u>literary product</u> to the public to also offer to license the electronic ~~book~~ <u>literary product</u> to public libraries in the State on reasonable terms that would enable public libraries to provide library users with access to the electronic ~~book~~ <u>literary product</u>; ~~requiring~~ <u>authorizing</u> the terms of a license authorizing public libraries to provide access to an electronic ~~book~~ <u>literary product</u> to include certain limitations and measures; prohibiting the terms of a license from including a limitation on the number of licenses public libraries may purchase on the same date an electronic ~~book~~ <u>literary product</u> license is made available to the public; providing that a violation of this Act shall constitute an unfair, abusive, or deceptive trade practice subject to certain enforcement; defining certain terms; *<u>providing for a delayed effective date;</u>* and generally relating to electronic ~~book~~ <u>literary product</u> licenses.

BY adding to
    Article – Education
    Section 23–701 and 23–702 to be under the new subtitle "Subtitle 7. Electronic ~~Book~~
        <u>Literary Product</u> Licenses"
    Annotated Code of Maryland
    (2018 Replacement Volume and 2020 Supplement)

    SECTION 1. BE IT ENACTED BY THE GENERAL ASSEMBLY OF MARYLAND, That the Laws of Maryland read as follows:

## Article – Education

## SUBTITLE 7. ELECTRONIC ~~BOOK~~ <u>LITERARY PRODUCT</u> LICENSES.

**23–701.**

    (A)   IN THIS SUBTITLE THE FOLLOWING TERMS HAVE THE MEANINGS INDICATED.

    (B)   "ELECTRONIC ~~BOOK~~ <u>LITERARY PRODUCT</u>" MEANS ~~A:~~

        <u>(1)</u>   <u>A</u> TEXT DOCUMENT THAT HAS BEEN CONVERTED INTO OR PUBLISHED IN A DIGITAL FORMAT THAT IS READ ON A COMPUTER, TABLET, SMART PHONE, OR OTHER ELECTRONIC DEVICE<u>; OR</u>

(2)      AN AUDIO RECORDING OF A TEXT DOCUMENT, READ OUT LOUD IN A FORMAT THAT IS LISTENED TO ON A COMPUTER, TABLET, SMART PHONE, OR OTHER ELECTRONIC DEVICE.

(C)      "PUBLISHER" MEANS A PERSON IN THE BUSINESS OF MANUFACTURING, PROMULGATING, AND SELLING BOOKS, AUDIO BOOKS, JOURNALS, MAGAZINES, NEWSPAPERS, OR OTHER LITERARY PRODUCTIONS, INCLUDING THOSE IN DIGITAL FORM, THAT CONSIST OF TEXT, IMAGERY, OR BOTH AUDIO RECORDINGS, OR ANY COMBINATION OF TEXT, IMAGE, AND AUDIO RECORDING.

(D)      "UNFAIR, ABUSIVE, OR DECEPTIVE TRADE PRACTICES" HAS THE MEANING STATED IN § 13–301 OF THE COMMERCIAL LAW ARTICLE.

23–702.

(A)      SUBJECT TO SUBSECTIONS (B) AND (C) OF THIS SECTION, A PUBLISHER WHO OFFERS TO LICENSE AN ELECTRONIC BOOK LITERARY PRODUCT TO THE PUBLIC ALSO SHALL OFFER TO LICENSE THE ELECTRONIC BOOK LITERARY PRODUCT TO PUBLIC LIBRARIES IN THE STATE ON REASONABLE TERMS THAT WOULD ENABLE PUBLIC LIBRARIES TO PROVIDE LIBRARY USERS WITH ACCESS TO THE ELECTRONIC BOOK LITERARY PRODUCT.

(B)      THE TERMS OF A LICENSE UNDER SUBSECTION (A) OF THIS SECTION SHALL MAY INCLUDE:

(1)      A LIMITATION ON THE NUMBER OF USERS A PUBLIC LIBRARY MAY SIMULTANEOUSLY ALLOW TO ACCESS AN ELECTRONIC BOOK LITERARY PRODUCT;

(2)      A LIMITATION ON THE NUMBER OF DAYS A PUBLIC LIBRARY MAY ALLOW A USER TO ACCESS AN ELECTRONIC BOOK LITERARY PRODUCT; AND

(3)      THE USE OF TECHNOLOGICAL PROTECTION MEASURES THAT WOULD PREVENT A USER FROM:

(I)      MAINTAINING ACCESS TO AN ELECTRONIC BOOK LITERARY PRODUCT BEYOND THE ACCESS PERIOD SPECIFIED IN THE LICENSE; AND

(II)      ALLOWING OTHER USERS TO ACCESS AN ELECTRONIC BOOK LITERARY PRODUCT.

(C)      THE TERMS OF A LICENSE UNDER SUBSECTION (A) OF THIS SECTION MAY NOT INCLUDE A LIMITATION ON THE NUMBER OF ELECTRONIC BOOK LITERARY PRODUCT LICENSES A PUBLIC LIBRARY MAY PURCHASE ON THE SAME DATE THE

LAWRENCE J. HOGAN, JR., Governor                    Ch. 411

ELECTRONIC ~~BOOK~~ <u>LITERARY PRODUCT</u> LICENSE IS MADE AVAILABLE TO THE
PUBLIC.

   **(D)**   A VIOLATION OF THIS SUBTITLE SHALL CONSTITUTE AN UNFAIR,
ABUSIVE, OR DECEPTIVE TRADE PRACTICE AND IS SUBJECT TO ENFORCEMENT IN
ACCORDANCE WITH TITLE 13, SUBTITLE 4 OF THE COMMERCIAL LAW ARTICLE.

   SECTION 2. AND BE IT FURTHER ENACTED, That this Act shall take effect ~~July
1, 2021~~ *January 1, 2022*.

**Enacted under Article II, § 17(c) of the Maryland Constitution, May 30, 2021.**

# EXHIBIT 3

## Article - Education

[Previous][Next]

§23–701.    NOT IN EFFECT

** TAKES EFFECT JANUARY 1, 2022 PER CHAPTERS 411 AND 412 OF 2021 **

(a)     In this subtitle the following terms have the meanings indicated.

(b)     "Electronic literary product" means:

(1)     A text document that has been converted into or published in a digital format that is read on a computer, tablet, smart phone, or other electronic device; or

(2)     An audio recording of a text document, read out loud in a format that is listened to on a computer, tablet, smart phone, or other electronic device.

(c)     "Publisher" means a person in the business of manufacturing, promulgating, and selling books, audio books, journals, magazines, newspapers, or other literary productions, including those in digital form, that consist of text, imagery, audio recordings, or any combination of text, image, and audio recording.

(d)     "Unfair, abusive, or deceptive trade practices" has the meaning stated in § 13–301 of the Commercial Law Article.

[Previous][Next]

- 1 -

# Article - Education

[Previous][Next]

§23–702.     NOT IN EFFECT

 ** TAKES EFFECT JANUARY 1, 2022 PER CHAPTERS 411 AND 412 OF 2021 **

 (a) Subject to subsections (b) and (c) of this section, a publisher who offers to license an electronic literary product to the public also shall offer to license the electronic literary product to public libraries in the State on reasonable terms that would enable public libraries to provide library users with access to the electronic literary product.

 (b) The terms of a license under subsection (a) of this section may include:

  (1) A limitation on the number of users a public library may simultaneously allow to access an electronic literary product;

  (2) A limitation on the number of days a public library may allow a user to access an electronic literary product; and

  (3) The use of technological protection measures that would prevent a user from:

   (i) Maintaining access to an electronic literary product beyond the access period specified in the license; and

   (ii) Allowing other users to access an electronic literary product.

 (c) The terms of a license under subsection (a) of this section may not include a limitation on the number of electronic literary product licenses a public library may purchase on the same date the electronic literary product license is made available to the public.

 (d) A violation of this subtitle shall constitute an unfair, abusive, or deceptive trade practice and is subject to enforcement in accordance with Title 13, Subtitle 4 of the Commercial Law Article.

[Previous][Next]

# EXHIBIT 4



BILL:  SB432, Public Libraries - Electronic Book Licenses - Access
COMMITTEE:  House Ways and Means
HEARING DATE:  March 24, 2021
CONTACT:  Terrence Hart, thart@publishers.org
POSITION:  Oppose

The Association of American Publishers (AAP) respectfully submits the following testimony in opposition to Senate Bill 432 (SB432), which violates and is preempted by federal copyright law and, in any event, is unconstitutional.[1]

AAP is the national trade association for book, journal, and education publishers in the United States.  AAP's members include major commercial book publishers of fiction and nonfiction; education publishers; small, specialized, and independent publishers; and nonprofit publishers such as university presses and scholarly research societies.  Among AAP's most critical priorities is ensuring the viability of our nearly 230-year-old legal framework that encourages publishers to invest in and distribute a great variety of books to the public.  It is not an overstatement to say that the free operation of the publishing industry cannot be separated from the free exercise of democracy in this country.

SB432 would undermine the long-established and unambiguous federal legal framework enacted by Congress to govern the distribution of copyrighted works by forcing publishers to license digital works to all Maryland public libraries under undefined "reasonable terms" if the digital works in question have been otherwise made available to the public.

Federal copyright law prohibits this type of regulation of copyrights by state governments.  Moreover, SB432 raises significant Commerce Clause and Due Process Clause concerns and would likely be found to violate the U.S. Constitution.  We therefore urge lawmakers to revisit the intent and expression of this draft bill and to engage broader stakeholder input into its intended and unintended impacts. To the extent that the bill aims to address the licensing decisions of a particular dominant online company doing business in the state, we ask the Committee to handle those concerns as a matter of antitrust law arising from their dominance in order to avoid the troubling implications noted below.

The legislation is vulnerable to challenge on the following grounds:

First, federal copyright law preempts it.  Copyright law is exclusively federal, and section 301 of the Copyright Act states that "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright . . . [that] come within the subject matter of copyright as specified by sections 102 and 103 . . . are governed exclusively by this

---

[1] The concerns raised in this statement also apply to the House companion bill, HB518.

title."[2]  Among the exclusive rights of copyright owners is the exclusive right to distribute a work by sale or other transfer of ownership.[3]  SB432 conflicts with this exclusive right to distribute by mandating the sale or licensing of copyrighted works—eBooks and audiobooks—to specific customers under specific terms.[4]

Second, the mandatory license created by SB432 would force an involuntary transfer of ownership that is prohibited under section 201(e) of the Copyright Act. The bill, in mandating publishers to license works, amounts to an exercise of a right of ownership with respect to a publisher's copyright, which is precluded by that section.[5]

Third, the bill would impermissibly regulate both interstate and out-of-state commerce by specifying conditions on which out-of-state publishers do business.  Because the Commerce Clause protects against state regulations that erect unjustified barriers against interstate trade,[6] Maryland would need to meet the difficult burden of showing that a constitutionally sufficient state interest justifies the erection of such barriers.

Finally, the proposed legislation raises fundamental due process concerns, as it does not define what "reasonable terms" are or provide any means for publishers to know whether the terms they offer violate the law and expose them to penalties.  Laws that proscribe conduct

---

[2] 17 U.S.C. § 301(a).

[3] 17 U.S.C. § 106(3).

[4] See, e.g., Close v. Sotheby's, Inc., 894 F.3d 1061 (9th Cir. 2018) (finding requirement for re-sellers of fine art to pay artist a 5% royalty on sales within California violated section 301 of Copyright Act because it conflicted with exclusive distribution right under section 106(3)); Author's Guild v. Google, Inc., 770 F. Supp. 2d 666, 681 (S.D.N.Y. 2011) (noting that "[a] copyright owner's right to exclude others from using his property is fundamental and beyond dispute" and "[t]he owner of the copyright, if he pleases, may refrain from vending or licensing and content himself with simply exercising the right to exclude others from using his property"); Rodrige v. Rodrigue, 218 F.3d 432, 436-42 (5th Cir. 2000) (finding that Louisiana's community property law could not interfere with the copyright author's right to control his or her work).

[5] See, e.g., Assoc. Am. Med. Colleges v. Carey, 728 F. Supp. 873 (N.D.N.Y. 1990) (holding that the unambiguous language of section 201(e) prohibits a state from mandating disclosure of copyrighted testing materials because it would abrogate a copyright owner's federally protected rights).

[6] See, e.g., Lewis v. BT Inv. Managers, Inc., 447 US 27, 35 (1980); American Booksellers Found. v. Dean, 342 F.3d 96, 102 (2d Cir. 2003).

except on undefined "reasonable terms" have been held to be unconstitutionally vague in other circumstances.[7]

AAP is unaware of any demonstrated, pervasive market failure or other basis involving the hundreds of publishers we represent that would justify the systemic market regulation of copyrights that SB432 would establish, even if Maryland were not federally preempted from enacting legislation of this nature.  To the contrary, it is copyright law that operates as the legal foundation that brings about the creation of such a wide variety of published works that libraries' customers value so highly: it supplies the economic incentive for authors and publishers to invest creatively, intellectually, and financially in the dissemination of literary works, and it does so by according them exclusive rights over the disposition of their works for the term of protection established by Congress.

AAP appreciates that SB432 aims to affirm the importance of public libraries as a marketplace for eBooks and audiobooks.  We wholeheartedly agree, as AAP's member companies vigorously compete with one another to market and license their immeasurably important novels, biographies, poetry, children's books, and scholarly works to their library customers through a wide variety of constantly evolving formats and innovative business models.  Libraries have become and are expected to remain an important market for AAP's members' eBooks, with millions of digital titles currently available to libraries.

For the reasons noted above, AAP respectfully but strongly opposes SB432 and urges the Committee to reconsider its intended objective with the benefit of broader stakeholder input.

We appreciate the opportunity to present these views to the Committee.

Respectfully submitted,

Terrence Hart
General Counsel

---

[7] See, e.g., United States v. L. Cohen Grocery Co., 255 U.S. 81, 86-88 (1921); Int'l Harvester Co. of Am. v. Kentucky, 234 U.S. 216, 221-22 (1914); United States v. Reliant Energy Services, Inc., 420 F. Supp. 2d 1043 (N.D. Cal. 2006).

# EXHIBIT 5



March 22, 2021

The Authors Guild respectfully submits the following testimony in opposition to Senate bill 432 (SB432) and its companion House bill 518 (HB518), which, if enacted, would violate our members' constitutional right to free expression and their rights under federal copyright law. The Authors Guild is a national non-profit association of approximately 10,000 professional, published writers of all genres including historians, biographers, academicians, journalists, and other writers of nonfiction and fiction. The Guild works to promote the rights and professional interests of authors in various areas, including copyright, freedom of expression, and taxation. A significant number of our members are self-published writers working in various genres and forms who would be directly impacted by SB432.

It goes without saying that the Guild and its member authors would like nothing more than for all books in every format to be available to libraries, but we firmly disagree with the legislative approach taken by the drafters of SB432/HB518 to give effect to the otherwise laudable policy of expanding Maryland libraries' access to digital books. While many self-published authors have strong relationships with and license their works to libraries, creating a requirement that they offer licenses on "reasonable terms" to libraries will create an undue burden on many more who simply don't have the resources or sophistication to manage licensing at scale, yet the legislation makes no distinction between a large publisher and distributor like Amazon and small, individual creators.[1] Furthermore, it also sweeps in thousands of other writers who publish short works online through their blogs and websites, or put out online literary journals. All of these writers would be subject to potential violations of Maryland's unfair, abusive, or deceptive trade practice laws if they do not "offer to license" their electronic publications to Maryland libraries.

---

[1] The legislation defines "publisher" as any "person in the business of manufacturing, promulgating, and selling books, journals, magazines, newspapers, or other literary productions," which sweeps in thousands of self-published writers and writers who publish their works online within its ambit.

Beyond the myriad ways in which the bills would prejudice writers, the legislation suffers from constitutional defects that makes its demise in courts all but certain. First, as the Association of American Publishers states in its testimony, "SB432 would impermissibly undermine the long-established and unambiguous legal framework enacted by Congress to govern the distribution of copyrighted works."[2] That copyright law is an exclusively federal domain is plain from the reading of Section 301 of the Copyright Act, which states that "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright . . . [that] come within the subject matter of copyright as specified by sections 102 and 103 . . . are governed exclusively by this title."[3] The principle of federal supremacy in this area is also well-established case law.

Upholding the principle of federal preemption of copyright, and, in particular, the copyright owner's exclusive rights, courts across the federal circuits have struck down state laws that interfere with the copyright owner's right to control his or her work.[4] Requiring that anyone "who offers to license and electronic book to the public" also "offer to license the electronic book to public libraries in the state on reasonable terms" encroaches upon the exclusive distribution right secured by federal copyright law for the benefit of the owner.

Second, by creating a mandatory license, and compelling authors to make their works available, the legislation prejudices the freedom of expression rights of authors and their publishers. Authors' rights under copyright, which the U.S. Supreme Court has called the "engine of free from expression,"[5] are not unrelated to their constitutional rights to free speech and expression. The legislation encroaches upon this freedom not only by mandating a certain manner of commercial dealing under penalty of law but by mandating when and how their expression is made available.

---

[2] AAP Testimony

[3] 17 U.S.C. 301

[4] See, e.g., Close v. Sotheby's, Inc., 894 F.3d 1061 (9th Cir. 2018) (finding requirement for re-sellers of fine art to pay artist a 5% royalty on sales within California violated section 301 of Copyright Act because it conflicted with exclusive distribution right under section 106(3)); Author's Guild v. Google, Inc., 770 F. Supp. 2d 666, 681 (S.D.N.Y. 2011) (noting that "[a] copyright owner's right to exclude others from using his property is fundamental and beyond dispute" and "[t]he owner of the copyright, if he pleases, may refrain from vending or licensing and content himself with simply exercising the right to exclude others from using his property"); Rodrige v. Rodrigue, 218 F.3d 432, 436-42 (5th Cir. 2000) (finding that Louisiana's community property law could not interfere with the copyright author's right to control his or her work).

[5] Harper & Row v. Nation Enterprises, 471 U.S. 539 (1985)

We are deeply sympathetic to the motivations underlying this legislation, but responding to the practice by a dominant player of deliberately withholding its electronic books from libraries with a law that sweeps in thousands of small publishers and self-published authors who cannot manage distribution and licensing at scale is not the right approach. We also ask the legislature to take into account the prevailing practice in the publishing industry—which is to expand distribution to libraries and foster their growth. At the onset of the Covid19 crisis, most major publishers made electronic resources freely available to libraries.[6] The Authors Guild itself has been a vocal proponent of expanding library funding so that libraries can grow their digital collections.[7] The practices of one or two actors in the industry should not gloss over the long and enduring history of authors' and publishers' support for libraries, and they certainly should not result in extreme consequences for the entire industry.

We respectfully oppose SB432 and HB518 and ask that you reconsider your approach in light of the broader legal context and possible serious repercussions of this legislation for hard-working, self-published authors.

Respectfully submitted,

Mary Rasenberger
CEO, The Authors Guild

---

[6] https://publishers.org/aap-news/covid-19-response/
[7] https://www.authorsguild.org/wp-content/uploads/2020/06/Libraries-Pelosi-McCarthy-Letter.cd_.pdf

# EXHIBIT 6

THOM TILLIS
NORTH CAROLINA

113 DIRKSEN SENATE OFFICE BLDG
WASHINGTON, DC 20510
PH: (202) 224–6342

https://tillis.senate.gov

COMMITTEES

ARMED SERVICES
BANKING, HOUSING, AND URBAN DEVELOPMENT
JUDICIARY
VETERANS' AFFAIRS

# United States Senate

WASHINGTON, DC 20510

May 26, 2021

## VIA ELECTRONIC TRANSMISSION

Ms. Shira Perlmutter
Register of Copyrights and Director
U.S. Copyright Office
101 Independence Ave, S.E.
Washington, D.C. 20559

Dear Register Perlmutter,

I write you today in my capacity as Ranking Member of the Senate Judiciary Committee Subcommittee on Intellectual Property. Our nation's copyright system supports creators and industries that collectively add over $1.5 trillion dollars to the American economy, employ 5.7 million hard-working Americans, and contribute more than $200 billion in exports.[1] A key reason for the success of these incredible industries is our federal copyright system. Indeed, copyright law is one of Congress's enumerated powers in the U.S. Constitution, and my understanding is that current copyright law expressly preempts state laws in this area.[2]

However, I am concerned that despite this clear and longstanding framework, some states are encroaching upon the exclusive domain of federal copyright law. My understanding is that recently one state passed legislation that would require "a publisher who offers to license an electronic literary product to the public to also offer to license the electronic literary product to public libraries in the state on reasonable terms that enable public libraries to provide library users with access to the electronic literary product."[3] Similar bills have been introduced this year and in previous years.[4]

Among the most concerning issues these bills raise is that they require copyright owners to license their works to specific parties by government mandate. This compulsory license removes from the copyright owner the decision as to whether, in what format, and on what terms works will be made available. The decision to mandate licensing terms also appears to be an unprecedented government intrusion into the copyright marketplace for creative literary works, outside the province of a state's authority. Although Congress authorizes statutory and compulsory copyright licenses administered by the Copyright Office, such licenses arise only in select carefully considered circumstances.[5]

These state legislative efforts would appear to directly conflict with the Copyright Act's clear language preempting "all legal or equitable rights that are equivalent to any of the exclusive

---

[1] International Intellectual Property Alliance, Copyright Industries in the U.S. Economy, the 2020 Report (2020).
[2] H.R. 94-1476, at 129 (1976); 17 U.S.C. § 301(a).
[3] H.B. 518, 442nd Sess. (Md. 2021); S.B. 432, 442nd Sess. (Md. 2021).
[4] S.2890, 204th Leg. (NY 2021); A.5837, 204th Leg. (NY 2021); S.2773, 148th Sess. (RI 2020).
[5] See Circular 75, The Licensing Division of the Copyright Office, https://www.copyright.gov/circs/circ75.pdf.

CHARLOTTE OFFICE:
9300 HARRIS CORNERS PKWY
SUITE 170
CHARLOTTE, NC 28269
PH: (704) 509–9087

RALEIGH OFFICE:
310 NEW BERN AVE
SUITE 122
RALEIGH, NC 27601
PH: (919) 856–4630

HIGH POINT OFFICE:
1840 EASTCHESTER DR
SUITE 200
HIGH POINT, NC 27265
PH: (336) 885–0685

GREENVILLE OFFICE:
1694 E ARLINGTON BLVD
SUITE B
GREENVILLE, NC 27858
PH: (252) 329–0371

HENDERSONVILLE OFFICE:
1 HISTORIC COURTHOUSE SQ
SUITE 112
HENDERSONVILLE, NC 28792
PH: (828) 693–8750

rights within the general scope of copyright . . ."[6] The proposed licensing requirement appears to encroach upon the Copyright Act's exclusive rights of reproduction and distribution.[7]

Accordingly, I ask that your office examine these bills in light of what appear to be clear preemption rules that situate copyright law exclusively at the federal level. As the expert adviser to Congress on copyright matters, I ask that you use your valuable expertise to clarify if federal preemption applies to these legislative efforts. This in turn will provide helpful direction to states so they may avoid proposing or enacting legislation that is preempted by the Copyright Act. I appreciate your immediate attention to this matter.

Sincerely,

Thom Tillis
Ranking Member
Subcommittee on Intellectual Property

---

[6] 17 U.S.C. § 301(a).
[7] 17 U.S.C. § 106(1) and (3).

# EXHIBIT 7



**The Register of Copyrights of the United States of America**
United States Copyright Office · 101 Independence Avenue SE · Washington, DC 20559-6000

The Honorable Thom Tillis
United States Senate
113 Dirksen Senate Office Building
Washington, DC  20510

August 30, 2021

Dear Senator Tillis:

I am pleased to provide this response to your letter dated May 26, 2021, requesting that the United States Copyright Office provide an analysis of potential federal copyright law preemption of certain legislation in Maryland and other states governing licensing requirements for electronic literary products.  I appreciate that you are seeking the Office's input on these important issues after receiving inquiries from your constituents.

Our response begins with a brief summary of federal copyright preemption law generally, and then discusses how these doctrines may relate to an analysis of the subject legislation.  We address only the technical question of the state legislation's potential federal preemption, and not the policy questions involved.  As set out below, we conclude that under current precedent, the state laws at issue are likely to be found preempted.

### I.      Federal Preemption of State Laws: Doctrine

Under the Supremacy Clause of the U.S. Constitution, the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof," as well as all treaties made under the authority of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution of Laws of any State to the Contrary notwithstanding."  U.S. CONST. art. VI, cl. 2.  Thus Congress, when promulgating laws pursuant to its enumerated powers, may preempt conflicting state laws.[1]

---

[1] The Copyright Clause explicitly grants to Congress the right to promulgate federal copyright laws.  U.S. CONST. art. 1, § 8, cl. 8.

The Supreme Court has recognized two forms of federal preemption: express preemption and implied preemption, with implied preemption being further subdivided into field preemption and conflict preemption.  *Ariz. v. U.S.*, 567 U.S. 387, 398–400 (2012).  Express preemption will be found when Congress states its intention to preempt state laws "in express terms."  *Pacific Gas & Elec. Co. v. State Energy Res. Conservation and Dev. Comm'n*, 461 U.S. 190, 203 (1983).  Field preemption applies when Congress has "legislated so comprehensively" in a given field that it "left no room for supplementary state legislation."  *R. J. Reynolds Tobacco Co. v. Durham Cty.*, 479 U.S. 130, 140 (1986).  Finally, conflict preemption occurs when "under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (brackets and internal quotation marks omitted).  In particular, the Supreme Court has found that conflict preemption will occur "[i]f federal law 'imposes restrictions or confers rights on private actors' and 'a state law confers rights or imposes restrictions that conflict with the federal law."  *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020) (*citing Murphy v. Nat'l Collegiate Athletic Assn.*, 584 U. S. ——, ——, 138 S. Ct. 1461, 1480 (2018)).  The doctrines of express and conflict preemption are discussed in further detail below.[2]

### A.    Express Preemption Under § 301(a)

The Copyright Act contains an express preemption clause in § 301(a) that provides that "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103 . . . are governed exclusively by this title," but allows state legislation with respect to, among other things, "activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified in section 106."  17 U.S.C. §§ 301(a), (b)(3).  Federal courts have recognized that section 301(a) has a "broad preemptive scope," in order "to insure that the enforcement of these rights remains solely within the federal domain."  *Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 309 (4th Cir. 2012) (internal citations omitted).  Courts apply a two-pronged test for the Copyright Act's preemption of a state law claim:  "First, we decide whether the subject matter of the state law claim falls within the subject matter of copyright as described in 17 U.S.C. §§ 102

---

[2] As noted below, while the Copyright Act contains an express preemption provision, it also allows certain state regulations to survive preemption.  Thus, it is unlikely that Congress would be found to have preempted the field entirely through the Copyright Act.  *See Foad Consulting Grp., Inc. v. Musil Govan Azzalino*, 270 F.3d 821, 827 (9th Cir. 2001).

and 103. . . . Second, assuming it does, we determine whether the rights asserted under state law are equivalent to the rights contained in 17 U.S.C. § 106." *Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1069 (9th Cir. 2018) (internal citations omitted). As the Fourth Circuit has noted, the analysis under section 301(a) focuses not on the conduct or the facts pled, but on the elements of the state cause of action. *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 659 (4th Cir. 1993).

Where the subject matter of the state law claim is a work of original authorship that is fixed in a tangible medium of expression, it easily falls within the subject matter of copyright. *Close*, 894 F.3d at 1068 (finding that the subject of California's Resale Royalties Act—works of fine art—were within the subject matter of copyright).[3] Whether a state law confers rights equivalent to the rights contained in section 106 is a more difficult question. Equivalency exists if the right defined by state law may be abridged by an act which in and of itself would infringe one of the exclusive rights. *See Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 456 (6th Cir. 2001). Conversely, equivalency will not exist if violation of the state law requires "an extra element that changes the nature of the state law action so that it is qualitatively different from a copyright infringement claim." *U.S. ex re. Berge v. Bd. of Trustees of the Univ. Al.*, 104 F.3d 1453, 1463 (4th Cir. 1997) (quotation marks and citations omitted); *see also Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 455 (6th Cir. 2001) (collecting cases).[4] But not all "extra elements" will be sufficient to protect a state law from preemption—as the Second Circuit has noted, "[t]he critical inquiry is whether such extra elements of the state law claim beyond what is required for copyright infringement 'change[ ] the nature of the action so that it is qualitatively different from a copyright infringement claim.'" *In re Jackson*, 972 F.3d 25, 43–44 (2d Cir. 2020).

Importantly, section 301(a) addresses only states' grants of "legal or equitable *rights* that are equivalent to any of the exclusive rights." 17 U.S.C. § 301(a) (emphasis added). Given the clear language of the statute, while some courts have analyzed state-imposed *limitations* on the exclusive rights granted in section 106 as a question of express preemption, the better approach appears to be to analyze such limitations under the conflict preemption doctrine.

---

[3] Even if a claim does not concern copyrightable expression, it may still be within the subject matter of the Copyright Act if it is the kind of claim the Copyright Act was intended to exclude. *See U.S. ex re. Berge v. Bd. of Trustees of the Univ. Al.*, 104 F.3d 1453, 1463 (4th Cir. 1997) ("But scope and protection are not synonyms. Moreover, the shadow actually cast by the Act's preemption is notably broader than the wing of its protection.").

[4] For example, the Copyright Act does not preempt conversion or trespass claims against a defendant who steals and retains a copyrighted book insofar as the claims relate to the tangible property (i.e., the physical book).

B.          Conflict Preemption Under the Copyright Act

Conflict preemption under the Copyright Act is broader than express preemption under section 301(a) and will be found when it is either impossible for a party to comply with both state and federal law or when the state law interferes with the objectives of the federal law.  *See ASCAP v. Pataki*, 930 F. Supp. 873, 878 (S.D.N.Y. 1996).  The Second Circuit has described the second of these circumstances as including situations where the state law "interfere[s] with or frustrate[s] the functioning of the regime created by the Copyright Act."  *In re Jackson*, 972 F.3d at 33.  Similarly, state laws have been found to be preempted when they have the effect of "burden[ing] enforcement and thus threaten[ing] to marginalize copyright itself."  *Am. Soc. of Composers, Authors, & Publishers by Bergman v. Pataki*, 930 F. Supp. 873, 878 (S.D.N.Y. 1996).  It is not enough, however, that the state law merely affect or seek to regulate copyrightable subject matter or the exclusive rights provided by the Copyright Act.  *See Associated Film Distribution Corp. v. Thornburgh*, 683 F.2d 808, 815 (3d Cir. 1982) (citing with approval a district court's holding that "[t]he authority of the states to regulate market practices dealing with copyrighted subject matter is well-established"); *cf. Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979) (noting that "[s]tate law is not displaced merely because the contract relates to intellectual property").

State laws that "restrict (and in some cases prohibit) the publication and dissemination of works of authorship governed by the Act" may survive preemption when they further an important state objective, such as protecting against false advertising or invasions of privacy, that is distinct from the Copyright Act's objectives.  *In re Jackson*, 972 F.3d at 34–37.  Thus, "when a person undertakes to exert control over a work within the subject matter of the Copyright Act under a mechanism different from the one instituted by the law of copyright (*i.e.*, a state law claim), implied preemption may bar the claim unless the state-created right vindicates a substantial state law interest, *i.e.* an 'interest[ ] outside the sphere of congressional concern in the [copyright] laws.'" *Id.* (quotation marks and citation omitted).  However, when the state law invokes less substantial rights or "amounts to little more than camouflage for an attempt to exercise control over the exploitation of a copyright," such claims will be preempted. *Id.* at 38.

As the Supreme Court has noted, while one goal of the Copyright Act is to promote the dissemination of creative works, the purpose and intended effects of the Act are broader; "the Act creates a balance between the artist's right to control the work during the term of the copyright protection and the public's need for access to creative works."  *Stewart v. Abend*, 495 U.S. 207, 228 (1990); *see also College Entrance Examination Bd. v. Pataki*, 889 F. Supp. 554, 564

(N.D.N.Y. 1995) (evaluation of "the balance struck by Congress between copyright owners found in § 106 of the Copyright Act and the exceptions to those exclusive rights found in §§ 107–118 of the same Act" leads to a finding that the state law is preempted). This balance includes giving the author the right "arbitrarily to refuse to license one who seeks to exploit the work." *Stewart*, 495 U.S. at 229; *see also Schnapper v. Foley*, 667 F.2d 102, 114 (D.C. Cir. 1981) (vesting "the liberty not to license rights in his work"); *Lawlor v. Nat'l Screen Serv. Corp.*, 270 F.2d 146, 154 (3d Cir. 1959) (recognizing the right to exclude others as a corollary to the licensing right).

Courts looking at potential conflicts between state regulatory schemes and federal copyright law have tended to allow "regulations that are designed to assure a fair market and honest business dealings," while finding that copyright law preempts those "that direct a copyright holder to distribute and license against its will or interests." *Orson, Inc. v. Miramax Film Corp.*, 189 F.3d 377, 386 (3d Cir. 1999), *cert. denied*, 529 U.S. 1012 (2000). Thus, courts have allowed states to regulate movie distribution by adopting anti-blind bidding statutes[5] or regulating the bidding and negotiation process,[6] but have rejected state laws that require a copyright owner to file test questions with the state for public distribution,[7] a cable programming provider to license programs to all city-franchised cable operators,[8] software providers to allow third party interoperability when doing so necessarily involves the creation of copies and derivative works,[9] or film distributors to license their films to second-run theaters after 42 days.[10] Other state laws that have been found to be preempted by federal copyright law include a requirement that cable operators remove advertisements for alcohol from the

---

[5] *Warner Bros., Inc. v. Wilkinson*, 533 F. Supp. 105, 109 (D. Utah 1981), *appeal dismissed and case remanded*, 782 F.2d 136 (10th Cir. 1985).

[6] *See, e.g.*, *Associated Film Distribution Corp. v. Thornburgh*, 800 F.2d 369, 376 (3d Cir. 1986); *Allied Artists Pictures Corp. v. Rhodes*, 679 F.2d 656 (6th Cir. 1982).

[7] *Assoc. of Am. Medical Colleges v. Cuomo*, 928 F.3d 519, 521–23 (2d Cir. 1991); *accord College Entrance Examination Bd. v. Pataki*, 889 F. Supp. 554, 564 (N.D.N.Y. 1995). *But see Newport-Mesa Unified Sch. Dist. v. State of Cal. Dep't of Educ.*, 371 F. Supp. 2d 1170, 1179 (C.D. Cal. 2005) (state law that required copies of test protocols to be provided to parents by school district as part of student's records constituted fair use).

[8] *Storer Cable Commc'ns v. City of Montgomery*, 806 F. Supp. 1518, 1534 (M.D. Ala. 1992).

[9] *CDK Glob. LLC v. Brnovich*, 461 F. Supp. 3d 906, 917 (D. Ariz. 2020).

[10] *Orson, Inc. v. Miramax Film Corp.*, 189 F.3d 377, 386 (3d Cir. 1999), *cert. denied*, 529 U.S. 1012 (2000).

copyrighted signals they retransmit[11] and a state resale royalty that granted artists a remuneration right for sales of their works subsequent to the first sale.[12]

## II.     State Legislation Regarding Licensing of Electronic Literary Products

### A.  Background

On April 1, 2021, the Maryland General Assembly passed legislation providing that any publisher "who offers to license an electronic literary product to the public shall offer to license the electronic literary product to public libraries in the State on reasonable terms that would enable public libraries to provide library users with access to the electronic literary product."[13] The legislation defines electronic literary products as "[a] text document that has been converted into or published in a digital format that is read on a computer, tablet, smart phone, or other electronic device" or "[a]n audio recording of a text document, read out loud in a format that is listened to on a computer, tablet, smart phone, or other electronic device."[14] Failure to comply constitutes an "unfair, abusive, or deceptive trade practice" under Maryland law, which is subject to enforcement via an action for injunctive relief, damages, and attorneys' fees.[15]  Similar legislation has passed both houses of the New York State Assembly but has not yet been submitted to the governor for signature,[16] while legislation in Rhode Island has been referred to committee.[17]

---

[11] *Cap. Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 710–11 (1984)

[12] *Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1070–71 (9th Cir. 2018).

[13] Public Libraries – Electronic Literary Product Licenses – Access, 2021 Md. Laws ch. 411, MD. CODE ANN., EDUC. § 23-702 (2021), http://mgaleg.maryland.gov/mgawebsite/Legislation/Details/SB0432?ys=2021RS.  Under the Maryland Constitution, the bill became law without the governor's signature when he failed to veto it within 30 days after its presentment.  MD. CONST. art. II, § 17(c).

[14] 2021 Md. Laws ch. 411, MD. CODE ANN., EDUC. § 23-701(B) (2021), http://mgaleg.maryland.gov/mgawebsite/Legislation/Details/SB0432?ys=2021RS.

[15] MD. CODE ANN., COM. LAW § 13-401 *et seq.* (2021).

[16] N.Y. ASS. BILL A5837B (2021), https://www.nysenate.gov/legislation/bills/2021/A5837.

[17] R.I. HOUSE BILL 6246 (2021), https://legiscan.com/RI/bill/H6246/2021; R.I. SENATE BILL 2773 (2021), https://legiscan.com/RI/bill/S2773/2020.

### B.  Copyright Act Preemption Analysis[18]

As noted above, section 301(a) by its terms addresses only states' *grants* of "legal or equitable rights that are equivalent to any of the exclusive rights." 17 U.S.C. § 301(a).[19]  Because the legislation at issue seeks to regulate the identity of licensees and the terms upon which licenses may be granted, rather than granting rights, the more appropriate analysis is based on conflict preemption. Whether the Copyright Act implicitly preempts such laws will turn on whether the laws make it impossible for a party to comply with both the state licensing law and the Copyright Act, or otherwise interfere with the objectives of the Copyright Act.  *See ASCAP*, 930 F. Supp. at 878.  In addition, under *In re Jackson*, courts will likely look to the state purpose behind the legislation.  The Fiscal Summary that accompanies the Maryland legislation cites to the Maryland State Library Association in stating that "many popular book titles are not available for public libraries to license at the same time the electronic books are made available to the public due to restrictions placed on sales by large publishers" and that "public libraries are charged significantly higher amounts to license the same electronic books," and notes that one anticipated effect of the bill is that "[l]ocal libraries may realize cost savings on digital publications, thereby *allowing funds to be used to purchase more digital publications* or for other purposes."[20]

One of the objectives of the Copyright Act is to promote the dissemination of creative works, which the Act does by, among other things, creating "a balance between the artist's right to control the work during the term of the copyright protection and the public's need for access to creative works."  *Stewart*, 495 U.S. at 228.  Courts have found that the copyright law ordinarily does not preempt enforcement of the terms of a contract, on the grounds that "[a] copyright is a right against the world," while "[c]ontracts . . . generally affect only their parties; strangers may do as they please, so contracts do not create 'exclusive rights.'"  *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1454 (7th Cir. 1996); *see also Bowers v. Baystate Techs., Inc.*, 320 F.3d 1317, 1324–25 (Fed. Cir. 2003) (collecting cases).  Similarly, courts have allowed state regulation of the terms of copyright licenses in some instances.  *See, e.g., Associated Film Dist.*, 683 F.2d at 815

---

[18] While the Takings Clause (U.S. CONST. amend. V) and the Dormant Commerce Clause (U.S. CONST. art. 1, § 8, cl. 3) may also limit states' ability to require publishers to license works to public libraries, this analysis is confined to federal preemption under the Copyright Act.

[19] The electronic literary products at issue are clearly within the subject matter of copyright, as they constitute copyrightable subject matter fixed in a tangible medium of expression.  17 U.S.C. § 102(a).

[20] DEPARTMENT OF LEGISLATIVE SERVICES, MARYLAND GENERAL ASSEMBLY, FISCAL AND POLICY NOTE: SB 432 (2021) (emphasis added), http://mgaleg.maryland.gov/2021RS/fnotes/bil_0002/sb0432.pdf.

("The Supreme Court has rejected claims that the exclusive right granted by Congress to distribute copyrighted material included the exclusive right to distribute it in the manner deemed most desirable by the copyright holder.").  This is especially true where the state has demonstrated a pattern of abuse of market power or suppression of competition.  *See Allied Artists Pictures Corp. v. Rhodes*, 496 F. Supp. 408, 447 (S.D. Ohio 1980), *aff'd in part, remanded in part sub nom. Allied Artists Picture Corp. v. Rhodes*, 679 F.2d 656 (6th Cir. 1982) (collecting cases).

Here, while the legislative history cites a pattern of practices by large publishers that negatively impact Maryland citizens, the state legislation does not purport to regulate the terms of an existing contract (the license offered to the public), but instead requires publishers to grant licenses to a certain class of customers (public libraries) on certain terms ("reasonable" terms) any time they "offer[] to license [the work] to the public."  Because the Maryland and New York legislation require publishers to grant a license, rather than regulating the terms of a license that has already been granted, the legislation is closer in kind to the state law found to be preempted in *Orson*, which "require[d] the distributor to expand its distribution after forty-two days by licensing to another exhibitor in the same geographic area."  189 F.3d 386.  Both the Third Circuit and the District of Utah have explicitly excluded from permissible state regulations those that "appropriate[] a product protected by the copyright law for commercial exploitation against the copyright owner's wishes."[21]  To date neither the Supreme Court nor any other circuit courts (including the Second and Fourth Circuits, which have jurisdiction over New York and Maryland) have had occasion to consider whether state regulations seeking to require licensing of copyrighted works could avoid conflict preemption either generally or under

---

[21] *Orson*, 189 F.3d at 386; *Warner Bros., Inc. v. Wilkinson*, 533 F. Supp. 105, 108 (D. Utah 1981), *appeal dismissed and case remanded*, 782 F.2d 136 (10th Cir. 1985).  *Wilkinson* cites for this proposition 17 U.S.C. § 201(e), which states:

> When an individual author's ownership of a copyright, or of any of the exclusive rights under a copyright, has not previously been transferred voluntarily by that individual author, no action by any governmental body or other official or organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under a copyright, shall be given effect under this title, except as provided under title 11.

*Cf. Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 680–81 (S.D.N.Y. 2011) (noting Copyright Act concerns with proposed settlement agreement because copyright owners that fail to affirmatively opt out of the license would "lose their rights" due to forced licensing of their works).  It is worth noting that both *Orson* and *Wilkinson* discussed forced *commercial* exploitations of copyrighted works; the state legislation at issue seeks to require licensing of works to libraries, which, while arguably a commercial transaction, ultimately serves a non-commercial goal of furthering the traditional mission of public libraries to provide free access to materials for their communities.  It is unclear whether this would be a significant factor for a court considering the question of federal conflict preemption under *In re Jackson* (972 F.3d 25).

narrow circumstances, such as upon a showing of a state interest that is sufficiently compelling and distinct from the Copyright Act's purposes.  Nonetheless, we believe the *Orson* court's reasoning is sufficiently sound that a court considering the state legislation at issue would likely find it preempted under a conflict preemption analysis.

We hope that the foregoing analysis is helpful in answering the questions regarding the state legislation noted in your letter.  Please do not hesitate to contact me if you need any additional information.

Respectfully submitted,

Shira Perlmutter
Register of Copyrights and Director
U.S. Copyright Office

# EXHIBIT 8

KATHLEEN M. DUMAIS
*Legislative District 15*
Montgomery County

———

*Vice Chair*
Economic Matters Committee

*Chair*
Property and Casualty Insurance
Subcommittee

———

*House Chair*
Joint Committee on Legislative Ethics



The Maryland House of Delegates
6 Bladen Street, Room 231
Annapolis, Maryland 21401
410-841-3052 · 301-858-3052
800-492-7122 *Ext.* 3052
*Fax* 410-841-3219 · 301-858-3219
Kathleen.Dumais@house.state.md.us

## The Maryland House of Delegates
### ANNAPOLIS, MARYLAND 21401

February 5, 2021

**Testimony in Support of House Bill 518 – Public Libraries – Electronic Book Licenses -- Access**

Good afternoon Madam Chair and members of the Committee.  Thank you for the opportunity to speak to you on behalf of **House Bill 518 – Public Libraries – Electronic Book Licenses – Access.**

House Bill 518 would require a publisher who offers to license an electronic book to the public to also offer to license the electronic book to public libraries on terms reasonable enough to enable public libraries to provide their patrons access to the electronic book.

The terms the bill lays out include:

1. Limiting the number of users a public library may simultaneously allow to access an electronic book.
2. Limiting the number of days a public library may allow a user to access an electronic book.
3. Implementing technological protection measures that prevent a user from maintaining access to the electronic book beyond the specified access period and prevent a user from allowing other users to access an electronic book.

This bill aims to be pro-reader, not anti-publisher.  Some current and past publisher practices impede Maryland's library patrons access to books.  For example, Amazon and Audible currently have between them over 20,000 "exclusive" titles. They will license these titles -- which include high demand content by J.K. Rowling, Margaret Atwood, Alice Walker, Dean Kootz, Neil Gaiman, and others -- to consumers, but not to libraries.  Additionally, Blackstone, a major provider of audiobooks, currently supplies 10 new titles per month exclusively to Audible. Libraries are not allowed to purchase these titles for three months after release.  Macmillan similarly has limited library access to titles for three months, although the publisher rescinded this policy during the pandemic.  Macmillan could revert to more restrictive policies later.

Libraries work with publishers, paying for all content and ensuring it is fairly used. Publishers benefit from their relationship with libraries because libraries promote the discovery of titles, often leading readers to a purchase. As a Pew Report concluded, "Looking specifically

at library card holders, we find they are buyers as well as borrowers of books." In addition to promoting publisher content, libraries pay much higher prices for this content than consumers pay.  An electronic book that might cost an individual $9.99 to $14.99 will typically cost libraries $55 to $65 for a two year license.  A digital audio that might cost an individual $20 may cost a library $95.  Attached to this testimony you will find some comparisons of consumer and library price points.  Also attached is amendment language, the purpose of which is to add electronic and digital audio books to the definition of electronic book.

This legislation will not set prices. It merely stipulates that terms be reasonable, anticipating that publishers and libraries will negotiate mutually beneficial terms.

House Bill 518 will be a tremendous asset to our public libraries as they strive to fulfill their dual missions of preserving the written word and providing the public free access to the widest possible array of books and knowledge.

Joining me in support of this measure are Michael Blackwell, Director of St. Mary's County Library; Tonya Aikens, CEO of Howard County Public Library; and Blane Halliday, Director for Collection Strategies, Prince Georges County Public Library.  I respectfully request a favorable report for House Bill 518.

Some recent price figures:

Digital Audiobooks (based on NYT Best Sellers, Dec. 2020), from a forthcoming article:

| Title | Consumer price | Library price |
|---|---|---|
| Ready Player Two | $22.05 | $95.00 |
| Deadly Cross | $21.55 | $65.00 |
| The Return | $21.55 | $65.00 |
| A Time for Mercy | $22.05 | $95.00 |
| Daylight | $21.55 | $65.00 |
| The Awakening | $19.59 | $69.99 |
| The Law of Innocence | $21.55 | $65.00 |
| Rhythm of War | $46.54 | $99.99 |
| The Sentinel | $22.05 | $95.00 |
| The Vanishing Half | $22.05 | $95.00 |
| Fortune and Glory | $14.69 | $59.99 |
| Where the Crawdads Sing | $22.05 | $66.50 |
| Anxious People | $14.69 | $79.99 |
| The Invisible Life of Addie Larue | $32.82 | $69.99 |
| A Promised Land | $31.85 | $95.00 |
| Greenlights | $19.60 | $66.50 |
| Dolly Parton, Songteller: My Life in Lyrics | $22.04 | $51.00 |
| Becoming | $25.00 | $95.00 |
| No Time Like the Future: An Optimist Considers Mortality | $14.69 | $39.99 |
| Modern Warriors: Real Stories from Real Heroes | $16.76 | $52.48 |
| Caste: The Origins of Our Discontents | $31.50 | $95.00 |
| Is This Anything? | $14.69 | $79.99 |
| Saving Freedom: Truman, the Cold War, and the Fight for Western Civilization | $19.16 | $59.98 |
| Untamed | $22.05 | $66.50 |
| The Answer Is...: Reflections on My Life | $14.69 | $59.99 |
| Killing Crazy Horse: The Merciless Indian Wars in America | $19.59 | $49.99 |
| Uncomfortable Conversations With a Black Man | $12.24 | $29.99 |
| Frontier Follies: Adventures in Marriage & Motherhood in the Middle of Nowhere | $16.76 | $52.48 |

From a study done in September of 2019:

| Title | Consumer ebook | Library ebook | Consumer e-audiobook | Library e-audiobook |
|---|---|---|---|---|
| The Institute by Stephen King | 14.99 | 59.99 | 14.95 | 99.99 |
| The Testaments by Margaret Atwood | 14.99 | 55 | 14.95 | 95 |
| Where the Crawdads Sing by Delia Owens | 14.99 | 55 | 14.95 | 66.5 |
| The Goldfinch by Donna Tartt | 11.99 | 65 | 14.95 | 65 |
| The Titanic Secret by Clive Cussler | 14.99 | 55 | 14.95 | 95 |
| Total cost | 71.95 | 289.99 | 74.75 | 421.49 |

## House Bill 518
## Public Libraries – Electronic Books - Access

*Amendments offered by the Maryland Association of Public Library Administrators*

### Amendment No. 1

On page 2, in line 5, after "DEVICE", insert: "**, INCLUDING A TEXT DOCUMENT THAT HAS BEEN READ ALOUD AND RECORDED AND LISTENED TO ON A COMPUTER, TABLET, SMARTPHONE, OR OTHER ELECTRONIC DEVICE**"

Explanation: This amendment adds electronic and digital audio books to the definition of electronic book.