# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| ASSOCIATION OF AMERICAN PUBLISHERS, | * | |
| *Plaintiff*, | * | |
| v. | * | Civil Action No.: |
| | | 1:21-cv-03133-DLB |
| BRIAN E. FROSH, Attorney General of Maryland, | * | |
| | * | |
| *Defendant*. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**CONSOLIDATED MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS AND OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

BRIAN E. FROSH
Attorney General of Maryland

/s/ Elliott L. Schoen
ELLIOTT L. SCHOEN
Fed. Bar No. 26210

/s/ Lynae Turner Polk
LYNAE TURNER POLK
Fed. Bar No. 13136
Assistant Attorneys General
200 St. Paul Street, 19th Floor
Baltimore, Maryland 21202
(410) 576-6465
(410) 576-6309 (facsimile)
eschoen@oag.state.md.us
lpolk@oag.state.md.us
Attorneys for Defendant

January 14, 2022

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND .............................................................................................. 2

    The History of Libraries and Copyright Law .......................................... 2

    The Copyright Clause and the Copyright Act ......................................... 3

    The First Sale Doctrine ............................................................................. 5

    Publishers Capitalize on the Digital Revolution at Libraries' Expense ... 6

    The Maryland Act ..................................................................................... 8

    The Association's Complaint .................................................................... 9

STANDARD OF REVIEW ............................................................................... 9

ARGUMENT .................................................................................................... 10

I.    THE ASSOCIATION IS NOT ENTITLED TO INJUNCTIVE
RELIEF. ............................................................................................................ 11

    A.    The Association Has Not Shown a Likelihood of Success on the
        Merits. ............................................................................................. 11

        1.    The Maryland Act Is Not Expressly Preempted by the U.S.
            Copyright Act. .................................................................... 13

        2.    The Maryland Act Is Not Preempted Based on Conflict with
            the U.S. Copyright Act. ...................................................... 18

    B.    The Association Has Not Shown That It Will Suffer Irreparable
        Harm in the Absence of Preliminary Relief. ................................. 22

    C.    The Association Has Not Shown that the Balance of Equities Is in Its
        Favor and that Injunction Is in the Public Interest. ...................... 25

II.    THE MARYLAND ACT DOES NOT VIOLATE THE DORMANT COMMERCE
CLAUSE OF THE U.S. CONSTITUTION. ...................................................... 28

III.  THE MARYLAND ACT DOES NOT VIOLATE THE DUE PROCESS CLAUSE OF THE U.S. CONSTITUTION ........................................................................................ 30

    A.  The Phrase "Reasonable Terms" Is Not Unconstitutionally Vague. ............ 30

    B.  Public Libraries in the Act are the City and County Public Libraries. ....... 32

    C.  The Act Relies Upon the Maryland Consumer Protection Act for Enforcement. ................................................................................................. 32

CONCLUSION ................................................................................................. 33

**TABLE OF AUTHORITIES**

**Cases**

*Allied Artists Picture Corp. v. Rhodes*, 679 F.2d 656 (6th Cir. 1982) .........................2, 18

*Allied Artists Pictures Corp. v. Rhodes*, 496 F. Supp. 408 (S.D. Ohio 1980)............passim

*Antietam Battlefield KOA v. Hogan*, 461 F. Supp. 3d 214 (D. Md. 2020).......................25

*Arizona v. United States*, 567 U.S. 387 (2012) .................................................................11

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)..............................................................................10

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) .......................................................10

*Brown v. Hovatter,* 561 F.3d. 357 (4th Cir. 2009) .............................................................28

*Close v. Sotheby's, Inc.*, 894 F.3d 1061 (9th Cir. 2018) ..............................................13, 17

*Colon Health Centers of America v. Hazel*, 733 F.3d 535 (4th Cir. 2013)......................29

*Colon Health Ctrs. of Am., LLC v. Hazel*, 813 F.3d 145 (4th Cir. 2016)...................28, 29

*Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000)....................................12

*Department of Revenue of Ky. v. Davis*, 553 U.S. 328 (2008).........................................29

*Devine Seafood v. Attorney General*, 37 Md. App. 439 (1977) ........................................33

*Di Biase v. SPX Corp*., 872 F.3d 224 (4th Cir. 2017) .....................................................2, 9

*Estate Constr. Co. v. Miller & Smith Holding Co.,* 14 F.3d 213 (4th Cir. 1994) .............10

*Flood v. New Hanover County*, 125 F.3d 249 (4th Cir. 1997).........................................10

*Francis v. Giacomelli*, 588 F.3d 186 (4th Cir. 2009) .......................................................10

*Hines v. Davidowitz*, 312 U.S. 52 (1941) .........................................................................12

*Hunt v. Walsh State Apple Adver. Comm'n*, 432 U.S. 333 (1977).....................................2

*Huron Portland Cement Co. v. City of Detroit, Mich.*, 362 U.S. 440 (1960) ..................13

*In re Jackson*, 972 F.3d 25 (2d Cir. 2020).......................................................................14

*International Paper Co. v. Ouellette*, 479 U.S. 481 (1987) .............................................12

*Jones v. Rath Packing Co.*, 430 U.S. 519 (1977) .............................................. 18

*Just Puppies, Inc. v. Frosh*, 2021 WL 4594630 (D. Md. Oct. 6, 2021) ............... 22, 28, 29

*Kansas v. Garcia*, 140 S. Ct. 791 (2020)........................................................ 12

*Klein v. State,* 52 Md. App. 640 (1982)........................................................... 33

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330 (4th Cir. 2021) . 22, 27, 28

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ......................................... 2

*Maloney v. T3Media, Inc.*, 853 F.3d 1004 (9th Cir. 2017)................................. 13

*Martin v. Lloyd*, 700 F.3d at 137 ................................................................... 33

*Maryland Highways Contractors Ass'n, Inc. v. State of Md.*, 933 F.2d 1246 (4th Cir. 1991) ........................................................................................................ 2

*Merrill Lynch, Pierce, Fenner & Smith v. Ware*, 414 U.S. 117 (1973) ........................... 12

*Murphy v. Nat'l Collegiate Athletic Assn.*, 138 S. Ct. 1461 (2018) ................................... 12

*Nat'l City Bank of Indiana v. Turnbaugh*, 367 F. Supp 2d 805 (D. Md. 2005)................ 27

*Nat'l City Bank of Indiana v. Turnbaugh*, 463 F.3d 325 (4th Cir. 2006) ......................... 27

*Oregon Waste Systems, Inc. v. Department of Envtl. Quality of State of Oregon*, 511 U.S. 93 (1994)..................................................................................................... 29

*Orson, Inc. v. Miramax Film Corp.*, 189 F.3d 377 (3d Cir. 1999)........................ 18, 20, 21

*Pacific Gas & Elec. Co. v. State Energy Res. Conservation and Dev. Comm'n*, 461 U.S. 190 (1983)................................................................................................... 12

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970)............................................... 29

*Poder in Action v. City of Phoenix*, 481 F. Supp. 3d 962 (D. Ariz. 2020)...... 22, 23, 24, 25

*Sandlands C&D LLC v, County Of Horry*, 737 F.3d 45 (4th Cir. 2013) ......................... 29

*Smith v. Attorney General of Maryland*, 46 Md. App. 86 (1980) ..................................... 33

*Stinnie v. Holcomb*, 355 F. Supp. 3d 514 (W.D. Va. 2018) .............................................. 22

*Thomas v. Chicago Park District*, 534 U.S. 316 (2002) ................................................... 31

*United States ex re. Berge v. Board of Trustees of the Univ. Al.*, 104 F.3d 1453 (4th Cir. 1997) ................................................................................................................. 14

*United States v. Ide*, 624 F.3d 666 (4th Cir. 2010).................................................... 32

*United States v. Johnson*, 911 F.3d 8494 (7th Cir.2018) ............................................ 31

*United States v. Microsoft Corp.*, No. CIV. A. 98-1232-TPJ, 1998 WL 614485 (D.D.C. Sept. 14, 1998) ........................................................................................................ 24

*United States v. Terminal R.R. Ass'n of St. Louis*, 224 U.S. 383 (1912) ........................ 31

*United States v. Williams,* 553 U.S. 285 (2008) ........................................................ 33

*Utility Air Regulatory Group v. E.P.A.*, 573 U.S. 302 (2014).......................................... 32

*Warner Bros., Inc. v. Wilkinson*, 533 F. Supp. 105 (D. Utah 1981)................................ 21

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008).......................................... 9

*Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446 (6th Cir. 2001) ...................................... 14

*Yamaha v. Jim's Motorcycle*, 401 F.3d 560 (4th Cir. 2005) .......................................... 29

## Constitutional Provisions

U.S. Const. art. I, § 8, cl. 8 ........................................................................................ 3

## Statutes

17 U.S.C. § 101 ........................................................................................................ 4

17 U.S.C. § 106 ........................................................................................................ 4

17 U.S.C. § 108 ........................................................................................................ 5

17 U.S.C. § 109 ........................................................................................................ 5

17 U.S.C. § 118 ...................................................................................................... 15

17 U.S.C. § 301 ........................................................................................... 4, 5, 13

Md. Code Ann., Com. Law §13-102 ........................................................................ 14

Md. Code Ann., Com. Law § 13-401 ........................................................................ 33

Md. Code Ann., Com. Law § 13-402 ........................................................................ 33

Md. Code Ann., Com. Law § 13-403 .................................................................. 33

Md. Code Ann., Com. Law § 13-404 .................................................................. 33

Md. Code Ann., Com. Law § 13-410 .................................................................. 33

Md. Code Ann., Com. Law § 13-411 .................................................................. 33

Md. Code Ann., Educ. § 23-102 ........................................................................ 3

Md. Code Ann., Educ. § 23-701 ................................................................ 1, 8, 32

Md. Code Ann., Educ. § 23-702 ...............................................................passim

## Rules

Fed. R. Civ. P. 12(b)(6) ................................................................................. 9, 10

## Miscellaneous

Ariel Katz, *Copyright, Exhaustion, and the Role of Libraries in the Ecosystem of Knowledge*, 13 I/S: J.L. & Pol'y for Info. Soc'y 81 (2016)................................ 3

Eric B. Easton, *Patent, Copyright, Trade Secret, Right of Publicity, Trademark Handbook for Maryland Bus. and Litig. Lawyers*, Ch. 2 (2013)................................ 3, 4

Howard B. Abrams and Tyler T. Ochoa, *The Law of Copyright* § 1:3 (2021) ................ 20

Notes of the Committee on the Judiciary, House Report No. 94-1476, 94th Cong., 2d Sess. (1976)...................................................................................... 5, 15

Rachel Ann Geist, *A "License to Read": The Effect of E-Books on Publishers, Libraries, and the First Sale Doctrine*, 52 IDEA 63 (2012) ........................................... 5

United States Copyright Office, DMCA Section 104 Report (Aug. 2001)........................ 6

## INTRODUCTION

This case is not about copyright protection—it is about the unfair and discriminatory trade practices of publishers at the expense of public libraries.  Many publishers have exploited the rapid advancement of digital technology to discriminate against public libraries when licensing e-books and audiobooks.  A public library can purchase as many print books as it deems necessary, at the same time and price as members of the general public, and lend those print books to its patrons under the "first sale" doctrine, which allows them to do so without having to pay for the privilege.  But the proliferation of digital media has outpaced the first sale doctrine, and publishers have capitalized on this loophole through both price discrimination against public libraries and withholding from public libraries access to e-books and audiobooks, to the detriment of library patrons.  Technology has enabled publishers to create two classes of customers—those who can afford to buy electronic literary products and public libraries who serve those who cannot—while charging the latter substantially more for the same product.  The historical balance between publishers' commercial motives and public libraries' role in providing fair access to literature and information to benefit all members of the public has been lost.

Chapter 411, Laws of Maryland, which is codified in Maryland Annotated Code, Education Article §§ 23-701 and 23-702 (hereinafter the "Maryland Act") does not infringe on the rights of copyright holders or otherwise interfere with the intent and purpose of the Copyright Act.  The Copyright Act allows state legislation with respect to "activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified in section 106." *Allied Artists Pictures*

*Corp. v. Rhodes* ("*Allied Artists I*"), 496 F. Supp. 408, 443 (S.D. Ohio 1980), *aff'd in part, remanded in part sub nom. Allied Artists Picture Corp. v. Rhodes* ("*Allied Artists II*"), 679 F.2d 656 (6th Cir. 1982). Publishers are still able to control their licensing schemes in Maryland within the framework set out in the state law.  Federal law does not preempt Maryland's effort to rectify an unfair trade practice and advances the non-commercial purposes of public libraries.

On December 9, 2021, Plaintiff, an association of publishers[1] filed a complaint against the Maryland Attorney General and, on December 17, 2021, moved for preliminary injunction, seeking to enjoin enforcement of the Maryland Act.  For the reasons stated below, the complaint fails to state a claim upon which relief may be granted and should be dismissed as to all counts.  The Association also fails to meet its burden to prove all four required factors to justify a preliminary injunction; thus, it should be denied. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).

## BACKGROUND

### The History of Libraries and Copyright Law

"[L]ibraries stimulate awareness and understanding of critical social issues, and assist individuals in reaching their highest potential for self-development."  Md. Code

---

[1] The Association has asserted standing to sue in this matter based solely on its status as an association representing its members.  Associational standing relies on a number of factual determinations.  *See Hunt v. Walsh State Apple Adver. Comm'n*, 432 U.S. 333 (1977); *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992); *Maryland Highways Contractors Ass'n, Inc. v. State of Md.*, 933 F.2d 1246 (4th Cir. 1991).  These factual determinations can only be made by the court after discovery is completed and evidence is introduced in this matter.  Therefore, Defendant seeks to preserve this issue until discovery is completed.

Ann., Educ. § 23-102.   Section 23-102 codifies the continued development of library services as Maryland policy to provide the widest possible access to information resources and ensure more effective and economical services to its patrons. *Id*.

Libraries, with the purpose of collecting knowledge and promoting education that is perpetually integral to societal progress, have historically been granted a privileged status regarding copyright.   *See* Ariel Katz, *Copyright, Exhaustion, and the Role of Libraries in the Ecosystem of Knowledge*, 13 I/S: J.L. & Pol'y for Info. Soc'y 81, 85 (2016) (describing the requirement of the first copyright Act, the British Statute of Anne, that copyrighted books be delivered to libraries and its mechanism for controlling the prices of books deemed to be "too high and unreasonable"); *see also* Eric B. Easton, *Patent, Copyright, Trade Secret, Right of Publicity, Trademark Handbook for Maryland Bus. and Litig. Lawyers*, Ch. 2, 2 (2013) ("*Trademark Handbook*") (explaining how the Statute of Anne served as a framework for early American copyright laws and the first iteration of the Copyright Act).

### The Copyright Clause and the Copyright Act

The Copyright Clause of the Constitution provides the basis of authority for American Copyright Law: "The Congress shall have Power . . . . To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries[.]" U.S. Const. art. I, § 8, cl. 8.  This constitutional charge is not unlimited, however, and is tempered by social and economic consequences.

3

First passed in 1790, the Copyright Act went through several amendments and major revisions before the current statute, codified in 17 U.S.C. §§ 101 *et seq.*, was enacted in 1976. *See* Eric B. Easton, *Trademark Handbook*, Ch. 2, 2.  The Copyright Act of 1976 included an express preemption clause in 17 U.S.C. § 301(a):  "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 . . . and come within the subject matter of copyright as specified by sections 102 and 103 . . . are governed exclusively by this title."  The exclusive rights specified in § 106 include, among other rights, the right, "to reproduce . . . [,] prepare derivative works . . . [, and] distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending[,]" as well as to perform and display the work publicly. 17 U.S.C. § 106.  A separate provision of the Act, however, clarifies that a state may regulate "activities violating legal or equitable rights that are *not* equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106[.]" 17 U.S.C. § 301(b)(3) (emphasis added).

The legislative history reflects that Congress saw the Copyright Act as a balancing of competing interests.  On one hand, the Act prohibited states from establishing their own copyright regimes, to prevent the development of a multitude of state copyright schemes.  The legislative history reveals that this preemptive intent was "stated in the clearest and most unequivocal language possible, so as to foreclose any conceivable misinterpretation of its unqualified intention that Congress shall act preemptively, and to avoid the development of any vague borderline areas between State and Federal protection." Notes

of the Committee on the Judiciary, House Report No. 94-1476, 94th Cong., 2d Sess., at 130 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5746.

At the same time, however, the legislative history also notes how § 301(b) "represents the obverse of subsection (a). It sets out, in broad terms and without necessarily being exhaustive, some of the principal areas of protection that preemption would not prevent the States from protecting," including violations of rights not equivalent to any exclusive rights under copyright as stated in subsection (3). *Id*. at 131. The House Report states that "rights and remedies that are different in nature from the rights comprised in a copyright . . . may continue to be protected under State common law or statute." *Id*. at 132.

### The First Sale Doctrine

Congress has afforded special protections to libraries. Libraries may reproduce and distribute copies for preservation, replace damaged or missing copies, and acquire otherwise inaccessible works through interlibrary loans. *See* 17 U.S.C. § 108. But the lifeblood of libraries is the "first sale" doctrine. That judge-made rule, codified in the Copyright Act, 17 U.S.C. § 109, entitles "[a] library that has acquired ownership of a copy is entitled to lend it under any conditions it chooses to impose." House Report No. 94-1476, at 79. Together, these protections ensured the economic sustainability of libraries. They allowed for secondary markets, including donors and secondhand booksellers, and prevented publishers from engaging in price discrimination against libraries, while also spreading the cost of each book over numerous uses through the life of the physical copy of the work. *See* Rachel Ann Geist, *A "License to Read": The Effect of E-Books on Publishers, Libraries, and the First Sale Doctrine*, 52 IDEA 63, 72-73 (2012). In 2001, as

the digital revolution was only just beginning to unfold, Congress considered the possibility

of codifying a "digital first sale" doctrine.  Congress decided that it was too early within

the evolution of the market to do so, but it recognized the potential for abuse:

> The fact that we do not recommend adopting a 'digital first sale' provision at
> this time does not mean that the issues raised by libraries are not potentially
> valid concerns . . . . The library community has raised concerns about how
> the current marketing of works in digital form affects libraries . . . . Most of
> these issues arise from terms and conditions of use, and costs of license
> agreements . . . . These issues arise from existing business models and are
> therefore subject to market forces. We are in the early stages of electronic
> commerce. We hope and expect that the marketplace will respond to the
> various concerns of customers in the library community. However, these
> issues may require further consideration at some point in the future. Libraries
> serve a vital function in society, and we will continue to work with the library
> and publishing communities on ways to ensure the continuation of library
> functions that are critical to our national interest.

United States Copyright Office, DMCA Section 104 Report, at xxi (Aug. 2001)

https://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf  (last  accessed

Jan. 14, 2022). Twenty years later, the abuses that Congress "hope[d]" would not come to

pass have emerged here in Maryland.

### Publishers Capitalize on the Digital Revolution at Libraries' Expense

"Access to library materials plays a critical role for members of the community in

advancing education and learning, economic opportunity, civic engagement, and managing

daily life tasks. Library digital book lending is important for equity: for older

adults, children, people with disabilities, and people in rural areas." Exhibit 2, Declaration

of Alan Inouye, at 2 (¶ 6). Many publishers of electronic literary products, however, do not

currently allow public libraries to license these products or will not allow libraries to

purchase a license for a period of time immediately after offering licenses to individual

members of the public. These practices weigh most heavily on those who cannot afford to purchase these products. *See* Exhibit 1, Declaration of Michael Blackwell, at 4-5 (¶ 5(e)). Irene Padilla, the State Librarian for the Maryland State Library Agency, notes how "[s]ome publishers have used various forms of embargoing to limit the availability of titles or refused to license to libraries altogether." Exhibit 7, Declaration of Irene Padilla, at 3 (¶ 5).

Further, when these publishers do offer to license these products to public libraries, they charge public libraries up to three times as much as consumers for electronic literary product licenses. *See* Exhibit 4, Testimony of Delegate Kathleen M. Dumais, at 3-4. "With digital technology, publishers developed licensing models that are in some cases problematic and unfair for libraries. Some publishers' pricing make digital lending far costlier for libraries than print lending, even to the point of being unsustainable, which is a disadvantage to library readers." Ex. 7 at 2 (¶ 4).  And unlike the consumer, who enjoys perpetual access to the electronic literary products purchase, the library's license period is typically only two years. *See* Exhibit 5, James C. Cooke and Natalie Edington Letter, Baltimore County Public Library. The publishers' biased pricing practices place a significant burden of added cost on county library systems and prevent all citizens from gaining equal access to literature and information. No Marylander should be required to use a credit card in order to read a book. *See* Exhibit 6, Testimony of Morgan Miller, President of the Maryland Library Association.

**The Maryland Act**

On May 30, 2021, House Bill 518 and the cross-filed Senate Bill 432 were enacted into law at Chapter 411, Laws of Maryland 2021. These bills, effective January 1, 2022, have been codified at §§ 23-701 and 23-702 of the Education Article. Section 23-701 defines key terms in the statute, including "electronic literary product," "publisher," and "unfair, abusive, or deceptive trade practices." Section 23-702 sets out the substantive provisions for licensing electronic literary products, the terms of a license, and violations. It requires a publisher who offers to license an ebook to the public to also license it to "public libraries in the State" on "reasonable terms." Educ. § 23-702(a). The State seeks to rectify the imbalance prompted by the digital revolution and the consequent exploitative tactics used by some publishers to limit libraries' access to digital media, including "exclusive" titles, prohibitively expensive prices, and embargoes. *See* Exhibit 8, Letter from Prince George's County Memorial Library System.

The Act establishes these protections for libraries while still providing publishers with significant leeway in how to structure the licenses that they offer libraries—they may limit the number of users that may access an e-book at the same time, Educ. § 23-702(b)(1); limit the number of days a user may have access to the e-book, *id*. at (b)(2); and require the use of measures to prevent a user from using the e-book beyond the loan period or from allowing others to use the e-book, *id.* at (b)(3). Publishers may not, however, limit the number of licenses a public library may purchase on the date of the e-book's first public release. *Id*. at (c).

8

**The Association's Complaint**

The Association's Complaint alleges four causes of action: (1) Express Preemption under the U.S. Copyright Act and/or the Supremacy Clause of the U.S. Constitution; (2) Conflict Preemption under the U.S. Copyright Act and/or the Supremacy Clause of the U.S. Constitution; (3) Violation of the dormant Commerce Clause of the U.S. Constitution; and (4) Violation of the Due Process Clause of the Fifth and Fourteenth Amendments to the U.S. Constitution. The Association has also moved for a preliminary injunction, though based solely on its preemption claims.

## STANDARD OF REVIEW

A preliminary injunction is an extraordinary remedy never awarded as a matter of right. Rather, a preliminary injunction is granted only sparingly and in limited circumstances. A plaintiff seeking preliminary relief bears the burden to demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). A failure to demonstrate any of the four factors will be fatal to its motion for preliminary relief. *Di Biase*, 872 F.3d at 230.

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint when the allegations of fact do not properly state a claim on which relief can be granted. To adequately state a claim under Rule 12(b)(6), a complaint, relying on only well-pled factual allegations, must state at least a "plausible claim for relief." *Ashcroft v. Iqbal*, 556

U.S. 662, 679 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 545 (2007). Further, the "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.*; *see also*, *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citations and internal quotations omitted). In determining whether to dismiss a complaint pursuant to Rule 12(b)(6), the court must consider the well-pleaded material allegations in the light most favorable to the plaintiff. *Flood v. New Hanover County*, 125 F.3d 249, 251 (4th Cir. 1997) (citing *Estate Constr. Co. v. Miller & Smith Holding Co., Inc.,* 14 F.3d 213, 217-18 (4th Cir. 1994)).

## ARGUMENT

The Association's complaint fails to state a claim, much less a likelihood of success on the merits, because it rests on the mistaken assumption that the Maryland Act is a copyright law and not a regulation of unfair trade practices. State copyright laws are preempted by federal law, but State laws restraining unfair trade practices are not. In fact, the opinion of the United States Copyright Office included in the Association's Motion for Preliminary Injunction rejects its argument that express preemption analysis applies here. And while the Copyright Office also predicted that a court might conclude that the Maryland Act was preempted by conflict, it acknowledged that there is no controlling precedent on point, and that the case serving as the principal foundation for both the Copyright Office's and the Association's argument is distinguishable.

As for the Association's other claims—none of which it invokes in support of its motion for preliminary relief—none have any merit.  The Maryland Act does not violate the dormant Commerce Clause because it does not discriminate against out-of-state commerce and regulates even-handedly to effectuate a legitimate local public interest.  The Act is not unconstitutionally vague or overbroad, because it gives publishers and public libraries fair notice that they must negotiate reasonable terms of licenses and its enforcement is to be governed by the familiar terms of Maryland's Consumer Protection Act. As described in greater detail below, the Association is far short of stating a claim for relief, much less the showing necessary to justify extraordinary relief.

## I.      THE ASSOCIATION IS NOT ENTITLED TO INJUNCTIVE RELIEF.

The Association limits its motion for a preliminary injunction on preemption by the Copyright Act, ECF 4 and 4-1, which it presumably believes is its strongest argument. But even limited in this fashion, the Association's motion fails to satisfy *any* of the four factors required for preliminary relief, and its complaint should be dismissed.

### A.      The Association Has Not Shown a Likelihood of Success on the Merits.

In the first and second counts of the complaint, the Association erroneously contends that the Maryland Act is in conflict with the Copyright Act and thus is preempted by federal law. ECF 1 at 24-26 (¶¶ 77-78, 86). The Supreme Court has recognized two forms of federal preemption: express and implied, with the latter including conflict preemption. *Arizona v. United States*, 567 U.S. 387, 398-400 (2012).

Express preemption arises when Congress states its intention to preempt state laws

"in express terms." *Pacific Gas & Elec. Co. v. State Energy Res. Conservation and Dev. Comm'n*, 461 U.S. 190, 203 (1983). Conflict preemption, on the other hand, takes place when, "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 373 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Conflict preemption occurs where "federal law 'imposes restrictions or confers rights on private actors' and 'a state law confers rights or imposes restrictions that conflict with the federal law.' " *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020) (quoting *Murphy v. Nat'l Collegiate Athletic Assn.*, 138 S. Ct. 1461, 1480 (2018)).

Analysis of preemption challenges—with the delicate balance of state and federal relations at stake—requires a cautious approach. Courts "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *International Paper Co. v. Ouellette*, 479 U.S. 481, 492 Fn. 11 (1987) (internal quotation omitted). "Preemption analysis must proceed on 'the conviction that the proper approach is to reconcile the operation of both statutory schemes with one another rather than holding one completely ousted.'" *Allied Artists I*, 496 F. Supp. at 442 (quoting *Merrill Lynch, Pierce, Fenner & Smith v. Ware*, 414 U.S. 117, 127 (1973)). "An inconsistency does not warrant preemption unless it is clear and readily apparent; '(t)o hold otherwise would be to ignore the teaching of this Court's decisions which enjoin seeking out conflicts between state and federal regulation where none clearly exists.'" *Allied Artists I*, 496 F. Supp. at 442 (quoting *Huron Portland Cement*

*Co. v. City of Detroit, Mich.*, 362 U.S. 440, 446 (1960)).

### 1.     The Maryland Act Is Not Expressly Preempted by the U.S. Copyright Act.

The express preemption clause in the Copyright Act provides that "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103 . . . are governed exclusively by this title." 17 U.S.C. §301(a). At the same time, however, the Copyright Act allows state legislation with respect to, among other things, "activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified in section 106." 17 U.S.C. § 301(b)(3).

Courts apply a two-pronged test when applying the Copyright Act's express preemption provision to a state law claim: "First, [courts] decide whether the subject matter of the state law claim falls within the subject matter of copyright as described in 17 U.S.C. §§ 102 and 103. . . . Second, assuming it does, [courts] determine whether the rights asserted under state law are equivalent to the rights contained in 17 U.S.C. § 106." *Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1069 (9th Cir. 2018) (quoting *Maloney v. T3Media, Inc.*, 853 F.3d 1004, 1010 (9th Cir. 2017)). As to the first prong, Defendant does not dispute that the electronic literary products published by the Association's members are original works of authorship within the subject matter of copyright.

However, analysis of the second prong—whether a state law confers rights

13

equivalent to the rights contained in section 106—relies on the "extra element" test. Under that test, equivalency will not exist if violation of the state law requires "an extra element that changes the nature of the state law action so that it is qualitatively different from a copyright infringement claim." *United States ex rel. Berge v. Board of Trustees of the Univ. Al.*, 104 F.3d 1453, 1463 (4th Cir. 1997) (quotation and citations omitted). Equivalency exists only where "the right defined by state law may be abridged by an act which in and of itself would infringe one of the exclusive rights." *See Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 456 (6th Cir. 2001). Stated plainly, the issue is whether the rights created by state law are equivalent to exclusive rights. "The critical inquiry is whether such extra elements of the state law claim beyond what is required for copyright infringement 'change[ ] the nature of the action so that it is qualitatively different from a copyright infringement claim.'" *In re Jackson*, 972 F.3d 25, 43-44 (2d Cir. 2020).

Here, the extra element that distinguishes the Maryland Act from the requirements of copyright is Maryland's authority to regulate market practices. "[T]he broadness of the Federal Copyright Law does not cover the consumer protection statutes, only the copyright owner's individual rights. Consumer protection legislation is reserved to the state." *People v. Borriello*, 588 N.Y.S.2d 991, 997 (Sup. Ct. 1992). Maryland has a legitimate interest in protecting its citizens, including libraries and their patrons, against unfair, abusive, or deceptive trade practices. *See* Md. Code Ann., Com. Law § 13-102(b)(3). Michael Blackwell, Library Director of the St. Mary's County Library, describes some of the unfair practices that the Maryland Act addresses: short license duration, limited number of times e-books can be loaned, limited number of concurrent users, exorbitant costs, and limited

14

access to materials to disabled and poor library users. Ex. 1 at 2-5 (¶ 5). By ensuring that publishers and libraries work together toward mutually acceptable licenses, the Maryland Act follows the congressional intent for the Copyright Act.

The legislative history of the Copyright Act makes clear that the Maryland Act's requirement that publishers and libraries negotiate over reasonable pricing is entirely consistent with congressional intent. Congress understood that "authors and publishers [assure] that licensing arrangements for readings from their books, poems, and other works . . . for reasonable compensation and under reasonable safeguards for authors' rights [are] worked out in private negotiation." House Report No. 94-1476, at 119; *see also Allied Artists I*, 496 F. Supp. at 447-48 ("This effect [of the state law] . . ., far from frustrating the objectives of Congress in enacting the Copyright Act, further[s] the wide dissemination of copyrighted works and thereby its primary object to advance the public welfare through the talents of authors." (internal quotation omitted)).

The Association alleges that the Maryland Act "unilaterally force[s] publishers to disseminate their literary works to Maryland public libraries, on terms and timing dictated by the State of Maryland." ECF 4-1 at 19. Not so. The Maryland Act does not give public libraries the right to dictate the terms of a license agreement with a publisher; all it requires is that the publishers *offer* to license these products to Maryland public libraries on reasonable terms. This is consistent with the historical relationship between publishers and libraries. Ex. 2 at 2 (¶ 6) ("For centuries, libraries have partnered with publishers to provide the public with broad access to books and other physical media."); Ex. 1 at 6 (¶ 10) ("Libraries pay the publishers for access to content, as it has been throughout history, and

this law merely requires the publishing industry to enter negotiations with the public libraries for a license at reasonable terms at the same time the industry offers a license to the overall public."); Ex. 7 at 3-4 (¶ 8) ("Based upon a centuries-old model, updated for the digital realm, print-equivalent terms could be fair to publishers, authors, libraries, and users; supporting the rich and healthy reading ecosystem on which we all depend.").

Nor does the Maryland Act even require that an agreement be reached between the publisher and the public library. It seeks to ensure that the terms upon which publishers offer to license electronic literary products are fair and not abusive when compared to the terms offered to the public generally. "The Act seeks to prevent unreasonable discrimination against libraries with respect to ebook licensing practices and return the centuries old balance that has existed between publishers and libraries." Ex. 2 at 5 (¶ 14). It does not force publishers to transfer any of their exclusive rights, nor does it "creat[e] rights which could be violated by the mere act of reproduction, performance, distribution or display." *Allied Artists I*, 496 F. Supp. at 443 (citing 1 *Nimmer on Copyright* § 1.01(B) at 1-11)).

Express preemption does not apply here. None of the cases cited by the Association involves a requirement that an author or publisher sell a product *already* made available to the public, nor do they involve the unique relationship between authors, publishers, and libraries. And the opinion of the U.S. Copyright Office cited by the Association, ECF 4-1 at 10-11, concluded that the Maryland Act is *not* expressly preempted:

> Importantly, section 301(a) addresses only states' grants of "legal or equitable rights that are equivalent to any of the exclusive rights." 17 U.S.C. § 301(a) (emphasis added). Given the clear language of the statute, while

16

some courts have analyzed state-imposed limitations on the exclusive rights granted in section 106 as a question of express preemption, the better approach appears to be to analyze such limitations under the conflict preemption doctrine . . . . Because the legislation at issue seeks to regulate the identity of licensees and the terms upon which licenses may be granted, rather than granting rights, the more appropriate analysis is based on conflict preemption.

ECF 4-1, Ex. 7 at 3, 7.

*Close v. Sotheby's*, 894 F.3d 1061 (9th Cir. 2018)—on which the Association also relies, ECF 4-1 at 21-22—is readily distinguishable. The sole purpose of the state law at issue in *Close*, the California Resale Royalty Act ("CRRA"), was to completely alter the first sale doctrine by providing artists with a royalty on every sale after the first, which had the effect of ensuring that artists never fully alienated copies of their work. *Id.* at 1071. The crux of the issue in *Close* was the fact that, "at root, both [the CRRA and § 106(3)] concern the distribution of copies of artwork and define artists' right (or lack thereof) to payment on downstream sales of those copies." *Id*. at 1070. *That* is copyright. The Maryland Act, by contrast, is a consumer protection statute regulating reasonable terms regarding licensing of electronic literary products. It certainly does not "reshape the contours of federal copyright law's existing distribution right," as was true in *Close*. *Id*.

Because there is no inconsistency between the exclusive rights provided by the Copyright Act and the regulation of trade practices set forth in the Maryland Act, it is not expressly preempted and both statutory schemes should be reconciled with one another. The "extra element" of consumer protection changes the nature the Maryland Act so that it is qualitatively different from copyright.

### 2.     The Maryland Act Is Not Preempted Based on Conflict with the U.S. Copyright Act.

Conflict preemption applies where it is impossible to comply with both state and federal law, or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Orson, Inc. v. Miramax Film Corp.*, 189 F.3d 377, 381-82 (3d Cir. 1999) (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977)). "[N]othing in the federal Copyright Act prohibit[s] the state from exercising its police powers to rectify a market situation it perceives as inequitable." *Allied Artists I*, 496 F. Supp. at 447. In *Allied Artists I*, the district court and the Sixth Circuit confronted a copyright preemption issue involving an Ohio statute that sought to "achieve fair and open bargaining" and curtail anticompetitive conduct in the licensing of copyrighted motion pictures by prohibiting the practice of "blind bidding."[2] The Sixth Circuit affirmed the district court's conclusion that the Ohio statute was not preempted, and it found no authority "for the argument that state trade regulation which affects distribution procedures and, indirectly, monetary returns from copyrighted property is invalidated implicitly or explicitly by the terms of the Copyright Act . . . or the copyright clause." *Allied Artists II*, 679 F.2d at 662-63.

Like Ohio, Maryland is exercising its authority to rectify an inequitable market situation between publishers and public libraries. "The authority of the states to regulate

---

[2] " 'Blind bidding' is a term used in the motion picture industry to describe the licensing of a motion picture to a theater owner without the owner's first viewing the picture." *Allied Artists I*, 496 F. Supp. at 412.

market practices dealing with copyrighted subject matter is well-established." *Associated Film Distribution Corp. v. Thornburgh*, 614 F. Supp. 1100, 1122 (E.D. Pa. 1985), *aff'd*, 800 F.2d 369 (3d Cir. 1986); *Allied Artists I*, 496 F. Supp. at 447.  "[O]wnership of a copyright does not entitle a company to abuse the market power it obtains thereby by engaging in . . . fraudulent or deceptive practices." *Allied Artists I*, 496 F. Supp. at 447. Now more than ever, public libraries and their patrons need equitable access to digital content. *See* Ex. 2 at 2 (¶ 6). By enacting the Maryland Act, the State seeks to curtail the exploitative practices used by some publishers that have limited libraries access to electronic literary products, *see* Ex. 8, and return libraries and publishers to their "historic status quo arrangement." Ex. 1 at 2 (¶ 4).

In an effort to fit the Maryland Act within the realm of copyright, the Association contends that the Act "requires publishers to involuntarily provide copies of their works." ECF 4-1 at 14. This is inconsistent with the testimony of the Act's Senate sponsor that the bill only requires publishers to *offer* Maryland public libraries reasonable terms on licenses at the same time licenses are offered to individual members of the public. "The bill does not set pricing on titles, it merely stipulates that terms be reasonable." *See* Exhibit 3, Sponsor Statement of Senator Nancy J. King.

Next, the Association suggests that the Maryland Act would "make[] it impossible for publishers to both exercise their federally protected right to decide whether to distribute or refrain from distributing their copyrighted works, on the one hand, and comply with the state law's compulsory licensing scheme, on the other." ECF 4-1 at 14. Once again, *Allied Artists I* disposes of the Association's claim:

> The provision does not deprive the plaintiffs of their right to decide whether or not to perform the work publicly . . . . [T]he plaintiffs are free to choose not to perform their work publicly, and may continue to enjoin others from performing it. Thus they retain complete control over the rights granted by the Copyright Act: to prohibit display, performance, reproduction and distribution. It is only after the copyright owner has made the decision to perform the work to release the motion picture in Ohio that the Ohio Act steps in and compels a performance before exhibitors as a condition to the distribution of films in Ohio. And this condition is not unfounded.

*Allied Artists I*, 496 F. Supp. at 447.

In fact, *Allied Artists I* refutes the foundational implication of the Association's argument that the exclusive distribution right under the Copyright Act translates to a perpetual distribution right, "in the manner deemed most desirable by the copyright holder." 496 F. Supp. at 446. The Association asserts that the Maryland Act, "would impermissibly require publishers to 'expand [the] distribution' of their works, 'even if such expansion is involuntary and uneconomic.'" ECF 4-1, at 16 (quoting *Orson*, 189 F.3d at 385). But as noted in *Allied Artists I*, the state-law requirement here "only affects copyright holders who wish to license their films in [the state]; it does not compel performance in any other circumstances." *Id.* at 447. A copyright does not make a product invulnerable to regulation of the manner in which it is marketed, especially to correct unfair and inequitable treatment against public libraries. "No property rights can exist in a vacuum devoid of any social, political, economic, aesthetic and moral consequences, and the rights of copyright, which are particularly abstract and dependent on the interaction of many members of society, are certainly no exception." 1 Howard B. Abrams and Tyler T. Ochoa, *The Law of Copyright* § 1:3 (2021).

Finally, *Orson v. Miramax*, 189 F.3d 377 (3d Cir. 1999), does not control this case.

*Orson* involved a Pennsylvania statute required an art film distributor with an exclusive 'first-run' agreement with a theater to expand its distribution after 42 days by licensing another commercial exhibitor in the same geographic area. The Third Circuit found the statute preempted as an obstacle to the Copyright Act because it prohibited the copyright holder from exercising their exclusive right under 17 U.S.C. § 106 to refuse to distribute their work. The Third Circuit reasoned that the Pennsylvania statute "appropriated a product protected by the copyright law *for commercial exploitation* against the copyright owner's wishes." *Orson*, 189 F.3d at 386 (quoting *Warner Bros., Inc. v. Wilkinson*, 533 F. Supp. 105, 108 (D. Utah 1981), *appeal dismissed and case remanded*, 782 F.2d 136 (10th Cir.1985)).

The Association's suggestion that the present case and *Orson* "involve[] the same core factual and legal issues" is substantially incorrect. ECF 4-1 at 14. The factor that distinguishes *Orson* from the case at bar is the nature of the transaction involved. *Orson* involved the forced commercial exploitation of the copyrighted art films at issue, to the benefit of the commercial theaters who would show the film after 42 days. The Maryland Act, on the other hand, seeks to require an offer to license literary works to public libraries, in furtherance of their non-commercial function. This is confirmed in footnote 21 of the U.S. Copyright Office's analysis of the Maryland Act. ECF 4-1 Ex. 7 at 8 n. 21.

Again, there is no clear and readily apparent inconsistency between the Copyright Act and the Maryland Act that either makes compliance with both laws impossible or renders the Maryland Act an obstacle to the purposes of the Copyright Act. The Association continues to enjoy complete control over the rights granted by the Copyright Act. Only

21

when the publisher makes the decision to license the electronic literary product to the Maryland public does the Maryland Act step in—for the sake of public libraries and their patrons—to require an offer of the same product to Maryland public libraries on reasonable terms. "The copyright law, like the patent statutes, make reward to the owner a secondary consideration." *Allied Artists I*, 496 F. Supp. at 446 (internal quotation omitted). But, when a publisher elevates its own reward to the detriment of the public, the state has a legitimate interest in remedying the situation. Maryland decided to remedy such a situation and chose a remedy that is fully consistent with the purpose of copyright.

      **B.**      **The Association Has Not Shown That It Will Suffer Irreparable Harm in the Absence of Preliminary Relief.**

"A plaintiff seeking a preliminary injunction must demonstrate that irreparable injury is likely in the absence of preliminary relief. Mere possibility of harm is not enough." *Poder in Action v. City of Phoenix*, 481 F. Supp. 3d 962, 978 (D. Ariz. 2020) (quotation omitted). It is true that "where Plaintiff's constitutional rights are being violated, there is a presumption of irreparable harm." *Stinnie v. Holcomb*, 355 F. Supp. 3d 514, 532 (W.D. Va. 2018); *See Just Puppies, Inc. v. Frosh*, 2021 WL 4594630, at 21 (D. Md. Oct. 6, 2021) (citing *Leaders of a Beautiful Struggle v. Baltimore Police Dep't* ("*Leaders*"), 2 F.4th 330, 346 (4th Cir. 2021)). But the Association "cannot meet [its] burden of establishing a likelihood of irreparable harm simply by noting that [it is] raising a preemption challenge. More is required." *Poder*, 481 F. Supp. 3d at 979. The Court in *Poder* thus rejected the same argument that the Association makes here, namely, that "a likelihood of irreparable harm automatically arises in cases involving preemption challenges." *Id*.; *see* ECF 4 at 24

("no further injury is needed[.]"). Instead, Courts "must carefully examine[] the practical effect the challenged policy would have on the plaintiffs, [and] assess[] whether that injury could be remedied retroactively by an award of damages." *Id*.

Any presumption of irreparable harm would be overcome by the facts here. The Association suggests that "forc[ing publishers] to enter into licensing agreements on involuntary and uneconomic terms mandated by the State of Maryland, will irreparably harm publishers." ECF 4-1 at 24. A contextual reading of the Maryland Act reveals that publishers will not be forced to enter into involuntary and uneconomic licensing agreements. When publishers offer to license their products to the Maryland public, all that is required is that they make an offer to license the same product to libraries on reasonable terms. The Maryland Act is modest and sets out terms in the license designed to protect authors and publishers. Ex. 2 at 3 (¶ 8) ("Libraries only request access to digital content at reasonable terms, which they have not been granted thus far.").

The Association's reliance on *Splitfish AG v. Bannco Corp.*, 727 F. Supp. 2d 461, 467 (E.D. Va. 2010), is misplaced. *Splitfish* involved the Bannco company essentially copying the Nabon Corporation's programming code wholesale and marketing their own product using this code, thereby depriving Nabon of exclusive rights under 17 U.S.C. § 106. 727 F.Supp.2d at 462-64. In other words, Bannco's wholesale distribution of Nabon's copyrighted work, "particularly . . . [where] the plaintiffs have not licensed the use of the copyrighted code in any third party's devices," posed a threat to Nabon's right to exclude all others if it wishes. *Id*. at 467. To the contrary, the Maryland Act only applies to works that the Association has already elected to license to the Maryland public. "[C]opyright

law does not give . . . blanket authority to license (or refuse to license) its intellectual property as it sees fit. A copyright does not give its holder immunity from laws of general applicability . . . ." *United States v. Microsoft Corp.*, No. CIV. A. 98-1232-TPJ, 1998 WL 614485, at *15 (D.D.C. Sept. 14, 1998).

"Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Poder*, 481 F. Supp. 3d at 978. The theorized harm ultimately translates to a loss of revenue, which can be retroactively cured through monetary damages, as the Association seemingly confirms. ECF 4-1 at 24 ("[The Maryland Act] will irreparably harm publishers, their businesses, and the value of their works."). More importantly, the Association acknowledges that its members have the ability to negotiate terms for e-books to public libraries without harm: "Libraries play an important role in the publishing ecosystem by promoting literacy and connecting readers to books, as publishers have always recognized. Publishers compete vigorously with one another to craft ever-more innovative and responsive relationships and agreements with libraries, just as they do with retail partners." ECF 1 at 20 (¶ 65). The publishers demonstrate that they can agree on reasonable terms to license digital literary products to public libraries, as evidenced by increasing e-book holdings for libraries. In Fiscal Year 2020, Maryland libraries held 4,733,755 e-books and saw a 31% increase in customer access to digital materials. Ex. 7 at 2 (¶ 3).

In light of publishers' demonstrated ability to work with libraries to make electronic materials available to the public, the Association's assertion of harm is purely theoretical. But such theoretical harms are "generally insufficient in the preliminary-injunction

context." *Poder*, 481 F. Supp. 3d at 983. The Association suggests it will suffer irreparable harm because the Maryland Act interferes with publishers' "business decisions", including the decision "whether to distribute specific works and the terms of such distributions, including timing, quantity, and price." ECF 4-1 at 24. But the library-publisher relationship is necessarily symbiotic: publishers benefit from the taxpayer dollars that libraries use to access their literary works, while publishers provide access to the works that library patrons will enjoy.

### C.   The Association Has Not Shown that the Balance of Equities Is in Its Favor and that Injunction Is in the Public Interest.

The Association has failed to show that the balance of equities tips in its favor, and that injunction is in the public interest. "[T]he balance of the equities and the public interest . . . "merge when the Government is the opposing party[.]" *Antietam Battlefield KOA v. Hogan*, 461 F. Supp. 3d 214, 242 (D. Md. 2020), *appeal dismissed*, No. 20-1579, 2020 WL 6787532 (4th Cir. July 6, 2020). Equitable access to electronic literary products for library lending is critical for fulfilling the purpose of libraries and realizing the public benefits that they bestow, particularly for older adults, children, people with disabilities, and people in rural areas. Ex. 2 at 2 (¶ 6).

The Maryland Act is a modest and reasonable solution to the current imbalance between publishers and public libraries to protect the public and library patrons from present and future harm. As the Act's House sponsor, Delegate Kathleen Dumais, explained, "this bill aims to be pro-reader, not anti-publisher." *See* Ex. 4 at 1. By contrast, enjoining the Maryland Act would perpetuate an inequitable "status quo" that, as applied

to electronic literary products, upsets the centuries-old tradition of library access and does so solely to improve the publishers' bottom line. The higher cost and lower duration of access relative to consumers is "neither reasonable nor sustainable for the public library or the taxpaying public." Ex. 2A at 2.

Second, the Association argues that preliminary relief will prevent harm to the public, but the only tangible effect of enjoining the Act would be to allow those publishers who engage in discriminatory pricing and other unfair trade practices to continue to do so, and at the *public's* expense. ECF 4-1, Declaration of Maria Pallante, at ¶ 22. And an injunction would mean that public libraries and their patrons would continue to be denied digital literary content on reasonable terms. The ability of libraries and their patrons to access these electronic literary products—to fulfill their purpose of providing *equitable* access to information *to the public*—is more critical now than ever due to increased demand in light of both the digital revolution and the COVID-19 pandemic. Ex. 2A at 1-2. The greatest hardship, as noted by Michael Blackwell, would likely be experienced by older Americans and people with disabilities:

> Industry licensing practices weigh most heavily on those in straightened economic circumstances, including the poor and print disabled, who cannot afford to purchase licenses for ebooks. Full texts of digital materials are essential for people with visual impairments or a reading disability. Many people with physical disabilities, who cannot manipulate print materials rely on libraries having the digital materials available for their use and equal access.

Ex. 1 at 4-5 (¶ 5(e)).

The financial burden faced by public libraries is felt by the taxpayers whose taxes pay for the funding of libraries. The digital revolution enabled publishers to develop

licensing models that are in some cases problematic, unfair, and far costlier for libraries. Ex. 7 at 2 (¶ 4). Simultaneously, various forms of embargoing have limited the availability of titles to libraries. Ex. 7 at 3 (¶ 5). With the barriers that some publishers have created with regard to fair access to electronic literary works for libraries and their patrons, the Maryland Act is a reasonable statute carefully and deliberately designed to balance the playing field, for the benefit of the Maryland public. "Thus libraries—and therefore library users—should not be excluded from a class of materials (digital), especially for those community members who cannot afford to purchase their own digital content and solely rely on libraries for access." *See* Ex. 2 at 3 (¶ 7). Alan Inouye, the Senior Director of Public Policy & Government Relations for the American Library Association, summarizes the public interest concerns at issue:

> Libraries and their associations are prepared to negotiate in good faith to reach terms that are acceptable to all parties. Enforcement actions are the last, and least desirable, resort. However, as with print materials, libraries must be accorded with the ability to acquire digital materials under reasonable terms when such materials are offered to the public. Such ability is fundamental to the functioning of a library to serve its community—and especially our fellow residents who need help the most because they have modest means.

Ex. 2 at 5 (¶ 15).

The facts here are distinguishable from *Leaders* and *National City Bank of Indiana v. Turnbaugh*, 367 F.Supp.2d 805, 822 (D. Md. 2005), *aff'd sub nom. National City Bank of Indiana v. Turnbaugh*, 463 F.3d 325 (4th Cir. 2006) as cited by the Association. In *Leaders*, the court was faced with balancing the Baltimore City Police Department's interest in policing using mass aerial surveillance with individuals' Fourth Amendment

rights against unreasonable searches and seizures. Hanging in the balance of *Leaders* was individual liberty. Here, by contrast, the tension is between publishers' profits and public libraries' goal of providing literature and information to all Marylanders, many of whom do not have the means to access these important works in the commercial marketplace. And in *National City,* the court did not reach the balance of equities, because the parties reached an agreement on preliminary injunction before the motion was heard, and the remainder of the case was decided on other factors. Neither case supports preliminary relief here.

## II.   THE MARYLAND ACT DOES NOT VIOLATE THE DORMANT COMMERCE CLAUSE OF THE U.S. CONSTITUTION.

Plaintiff alleges that the Act violates the dormant Commerce Clause of the U.S. Constitution, ECF 1 at 27-28 (¶¶ 94-102), but it abandons that claim for purposes of its request for preliminary relief, ECF 4-1 at 2, n. 1.  And for good reason.  The dormant Commerce Clause is principally aimed at "prevent[ing] the States from adopting protectionist measures and thus preserves a national market for goods and services." *Just Puppies*, 2021 WL 4594630 at 29 (citing *Tennessee Wine & Spirits Retailers Assoc. v. Thomas*, 139 S. Ct. 2449, 2459 (2019)); *see also, e.g.*, *Colon Health Ctrs. of Am., LLC v. Hazel ("Hazel II")*, 813 F.3d 145, 152, 156 (4th Cir. 2016).  As discussed below, the Act does not discriminate against interstate commerce or "unjustifiably burden" it in any way. *Brown v. Hovatter,* 561 F.3d. 357, 363 (4th Cir. 2009).

Courts apply "a two-tiered approach for determining whether state law violates the dormant Commerce Clause. *Just Puppies*, 2021 WL 4594630 at 29.  First, a court must

"ask whether the challenged law discriminates against interstate commerce." *Id.* (citing *Department of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008)); *see Sandlands C&D LLC v, County Of Horry*, 737 F.3d 45, 51 (4th Cir. 2013). In the context of the dormant Commerce Clause, discrimination "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Just Puppies*, 2021 WL 4594630 at 29 (citing *Oregon Waste Systems, Inc. v. Department of Envtl. Quality of State of Oregon*, 511 U.S. 93, 99 (1994)).  That is plainly not the case here.  The Maryland Act treats all publishers alike, whether they are located in Maryland or elsewhere.

Under the second tier of analysis, a law that does not discriminate against interstate commerce but places "incidental burdens" on interstate commerce is subject to the balancing test established in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).  *Hazel II*, 813 F.3d at 155 (citing *Sandlands C&D*, 737 F.3d at 53). "Under *Pike* balancing, a court must uphold the challenged law if it 'regulates even-handedly to effectuate a legitimate local public interest . . . unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.' " *Just Puppies*, 2021 WL 4594630 at 31 (quoting *Pike*, 397 U.S. at 142)*.*  Plaintiffs bear the burden of showing that the burden on interstate commerce outweighs the putative local benefits, *id.* at 38, and the court evaluates those benefits under the deferential rational basis standard of review. *Colon Health Centers of America v. Hazel*, 733 F.3d 535, 545 (4th Cir. 2013) ("*Hazel I*") (citing *Yamaha v. Jim's Motorcycle*, 401 F.3d. 560, 569 (4th Cir. 2005)). The Maryland Act easily meets this standard.

The only obligation that the Act imposes on publishers is that they offer to license electronic literary products to public libraries on reasonable terms at the same time that they offer those products to the general public.  Educ. § 23-702.  The Act even-handedly addresses licensing of electronic literary products from both in-state and out-of-state publishers.  The Association has failed to show that the Maryland Act creates any burden on interstate commerce, let alone one that is "clearly excessive."   Thus, there is no cognizable constitutional burden on the Association and no factual support for its claim that the alleged burden is excessive in relation to the obvious local benefits that public libraries provide.

III.    **THE MARYLAND ACT DOES NOT VIOLATE THE DUE PROCESS CLAUSE OF THE U.S. CONSTITUTION**

There is similarly no merit to the Association's claim that the Maryland Act is unconstitutionally vague or overbroad.  ECF 1 at 29-30 (¶¶ 103-110).  The Association alleges that three aspects of the Act are vague—the phrase "reasonable terms" is not sufficiently defined; it is not clear what the term "public libraries in the State" means; and the standards for enforcement invite arbitrary enforcement.  As with its Commerce Clause claim, the Association again leaves this claim out of its motion for preliminary relief for good reason, as it does not withstand even minimal scrutiny.

A.    **The Phrase "Reasonable Terms" Is Not Unconstitutionally Vague.**

The Maryland Act uses the term "reasonable" to describe the terms to be negotiated in the licenses between publishers and public libraries. This is well within constitutional boundaries.  The term "reasonable" is "one of those protean words that resists specification.

It is ubiquitous in statutes and regulations, designed for the protection of people who otherwise would be beset by petty bureaucratic demands." *United States v. Johnson*, 911 F.3d 849, 854 (7th Cir. 2018) (holding that the word "reasonable" is not impermissibly vague even in situations governed by the First Amendment and in criminal law) (citing *Thomas v. Chicago Park District*, 534 U.S. 316, 324 (2002)).  "Reasonable terms" can be used to describe the "use, character, and cost of service" in an agreement so as to place the parties upon a "plane of equality in respect of benefits and burdens." *United States v. Terminal R.R. Ass'n of St. Louis*, 224 U.S. 383, 411 (1912).  Particularly in the business regulation context, the word "reasonable" is nowhere near the line of constitutional vulnerability.

But the Maryland Act does not simply use the term "reasonable"; it goes on to give examples of the "reasonable terms" that negotiated licenses might contain: (1) a limitation on the number of users a public library may simultaneously allow to access an electronic literary product; (2) a limitation on the number of days a public library may allow a user to access an electronic literary product; and (3) the use of technological protection measures that would prevent a user from both maintaining access to an electronic literary product beyond the access period specified in the license and allowing other users to access an electronic literary product. Educ. § 23-702(a).  Conversely, subsection (c) of § 23-702 provides an example of a term that is *not* reasonable—a limitation on the number of electronic literary product licenses a public library may purchase on the same date the electronic literary product license is made available to the public. The Association's

members cannot seriously complain that they cannot tell what is expected of them under the Act's provisions.

### B.    Public Libraries in the Act are the City and County Public Libraries.

Nor is the Act's reference to "public libraries in the State" vague, as the Association claims. ECF 1 at 29 (¶ 106). The phrase "public libraries in the State" in Educ. § 23-702 is unambiguous within the context of the statutory scheme and means the public libraries in the Maryland counties. Reasonable statutory interpretation must account for both the specific context in which language is used and the broader context of the statute as a whole. *Utility Air Regulatory Group v. E.P.A.*, 573 U.S. 302, 321 (2014) (internal citations omitted); *see also United States v. Ide*, 624 F.3d 666, 668 (4th Cir. 2010). The Maryland Act is placed within the context of Title 23 of the Education Article, which applies only to public libraries in the counties. Title 23, subtitle 5 establishes the process for funding public libraries and employee retirement; subtitle 6 governs public library personnel collective bargaining in Howard County; and subtitle 7 governs collective bargaining in Baltimore County. The Association even acknowledges that the Maryland Act applies to Maryland public libraries. ECF No. 1 at 12-13 (¶¶ 40, 41).  There is no plausible alternative construction that §§ 23-701 and 23-702 refer to anything other than the public libraries in the Maryland counties.

### C.    The Act Relies Upon the Maryland Consumer Protection Act for Enforcement.

The enforcement standards of the Maryland Act are not nebulous and the penalties are sufficiently defined. ECF No. 1 at 29 (¶¶ 107-108). The Maryland Act is enforced under

the Maryland Consumer Protection Act (MCPA). A violation of the Maryland Act "shall constitute an unfair, abusive, or deceptive trade practice and is subject to enforcement in accordance with Title 13, Subtitle 4 of the Commercial Law Article." Educ. § 23-702(d).

After a complaint is filed, the due process afforded under the MCPA is specific and well-established, as set out in Title 13 of the Commercial Law Article. There must be sufficient sworn testimony to support each violation. *Smith v. Attorney General of Maryland*, 46 Md. App. 86, 88-9 (1980). Before any penalty is issued under Commercial Law §§ 13-410 or 411, the detailed and specific due process includes investigation, Com. Law § 13-401, opportunity for conciliation, *id.* § 13-402, a public hearing, *id.* § 13-403, and arbitration, *id.* § 13-404. The proof for a civil penalty must be by a preponderance of the evidence. Com. Law § 13–404(b)(i); *see also Devine Seafood v. Attorney General*, 37 Md. App. 439, 444 (1977), *cert. dismissed*, 282 Md. 482 (1978). For a criminal penalty, proof must be beyond a reasonable doubt. *Klein v. State,* 52 Md. App. 640, 645-46 (1982).

These are familiar principles and they have been applied few decades under the MCPA.  There is nothing nebulous or unspecific about the process, and the mere fact that differences of opinion might arise at the margins does not make the Maryland Act unconstitutionally vague. *Martin v. Lloyd*, 700 F.3d at 137 (internal citations omitted); *see also United States v. Williams,* 553 U.S. 285, 305-06 (2008) (noting that close cases can be imagined under virtually any statute).

## CONCLUSION

For the reasons set forth herein, the State requests that the Association's Complaint as to all four counts be dismissed, and the Association's Motion for Preliminary

33

Injunction be denied.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/ Elliott L. Schoen
Elliott L. Schoen
Assistant Attorney General
Maryland State Department of
Education
Fed. Bar No.: 26210
eschoen@oag.state.md.us

/s/ Lynae Turner Polk
Lynae Turner Polk
Assistant Attorney General
Maryland State Department of
Education
Fed. Bar No.: 13136
lpolk@oag.state.md.us

200 St. Paul Street, 19th Floor
Baltimore, Maryland 21202
410-576-6460 (Phone)
410-576-6309 (Fax)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of January, 2022, a copy of the

foregoing Defendant's Consolidated Memorandum of Law in Support of Motion to

Dismiss and Opposition to Plaintiff's Motion for Preliminary Injunction, was served via

CM/ECF on:

Scott A. Zebrak, Esq
Matthew J. Oppenheim, Esq.
Nicholas C. Hailey, Esq.
Carly A. Kessler, Esq.
Ever M. Hess, Esq.
Oppenheim + Zebrak, LLP
4530 Wisconsin Avenue, NW, 5th Floor
Washington, D.C. 20016
*Attorneys for Plaintiff*

/s/ Elliott L. Schoen
Elliott L. Schoen
