# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ASSOCIATION OF AMERICAN PUBLISHERS, | * | |
| *Plaintiff*, | * | |
| | * | |
| v. | * | Civil Action No.: |
| | * | 1:21-CV-03133-DLB |
| BRIAN E. FROSH, Attorney General of the State of Maryland | * | |
| *Defendant*. | * | |

\* \* \* \* \* \* \* \* \* \* \*

## DECLARATION OF MICHAEL BLACKWELL

I, Michael Blackwell, am not a party to this proceeding and I am competent to testify and aver as follows:

1. I am over 18 years of age, a resident of Maryland, competent to testify, and have personal knowledge of the facts and matters set forth herein.

2. Since October 2015 I have been employed as the Library Director with the St. Mary's County Library located at 23630 Hayden Farm Lane, Leonardtown, Maryland 20650. I have a Master's of Library Science degree and have been a librarian since 1995.

3. I wrote a letter in support of Maryland House Bill 518 which was eventually codified as Sections 23-701 and 23-702 of the Annotated Code of Maryland Education Article. My support letter was submitted on behalf of my library, as well

1

as on behalf of the Maryland Digital Library Consortium, the American Library Association's Joint Digital Content Working Group, and Readers First which is a 300-library international advocacy group. Attached at Exhibit 1A is a true and accurate copy of my letter.

4. For centuries, publishers have offered books available to public libraries at the same time they are available to the public. With the purpose of collecting knowledge and promoting education that is perpetually integral to societal progress, libraries have always been granted a deservedly privileged status. The Maryland law seeks to return to the historic status quo arrangement.

5. Without the Maryland legislation, the public library I direct is disadvantaged in offering electronic media in the following ways:

    a. License duration: The standard industry-imposed license duration is two years for ebooks. At the end of two years, the ebook automatically disappears from our holdings. We have to order it again at the same industry-imposed price and time period if we want it. Librarians hate this. Unlike a book that may wear out over time, and needs to be replaced, the ebook just goes away. The public library simply does not know how well its investment will be returned.

b. License rules. Within the 24-month period of a typical license, the library is restricted in the number of loans it can make of an ebook before the license has to be renewed. In 24 months, a library may be able to loan an ebook no more than 34 times, since the loan period is usually 3 weeks. The titles do not automatically go from one patron to another, so usually about 32 is the maximum number of loans before a license expires. Moreover, the public libraries have to accept the terms the industry imposes for the license.

c. Concurrent users. Although the media is digital, the industry often only allows one copy to be loaned at a time. There is a process used by publishers, referred to as windowing, whereby a library is restricted to one copy of the title per library for the first two months after publication. The licenses are made available to other consumers immediately for license. Some publishers opted not to make digital content available to libraries at all.

d. Cost: The industry imposes the license costs on the public libraries without an opportunity to negotiate for a better cost. When compared to the return publishers get from print, terms for digital content are not reasonable. A look at the top *New York Times* Bestsellers for the week December 13, 2021, provides a relevant

3

example. All are published by the Big 5 publishers. (The Big 5 Publishers are: Hachette, HarperCollins, Macmillan, Penguin Random House and Simon & Schuster). Print costs for St. Mary's County Library that week would be $230.58. Under copyright law, libraries offer access to physical content as long as the book is in lendable condition: typically 30 to 100+ circulations. There is no time limit on use of the books. Cost for the same titles in ebook form would be $738.97. This figure is over three times that of library print costs, with none of the titles being available after two years because of publisher licenses. If demand for a title remained, it would have to be licensed again, adding to costs. At this rate, libraries cannot meet growing demand in an increasingly desirable format. If the industry charges the library $64.99 for an ebook, and the library gets the expected maximum circulations within the two-year license term, it costs the library about $2 per use. By comparison, my library would pay $15.99 for print. It could last over a hundred circulations and, generally the book doesn't disappear in two years. The cost of a book to the library is pennies.

e. Access for people who are poor and print disabled: Industry licensing practices weigh most heavily on those in straightened

4

economic circumstances, including the poor and print disabled, who cannot afford to purchase licenses for ebooks. Not everyone can afford to buy all the titles they would like to read to stay informed or can access written materials. Full texts of digital materials are essential for people with visual impairments or a reading disability. Many people with physical disabilities, who cannot manipulate print materials rely on libraries having the digital materials available for their use and equal access.

6. Under the Maryland law, the industry and the public libraries can negotiate reasonable terms to address fairness in licensing terms and pricing. Without the ability of libraries to negotiate reasonable terms with the industry, libraries will continue to pay unfair prices and licensing periods that are short for the cost paid.

7. My belief, based on my experience as a library director, and librarian, is that the licensing limitations were developed by the publishing industry in the hopes that it would make patrons more likely to buy the book rather than use the library.

8. Maryland's law will help restore the traditional balance between the publishing industry and public libraries.

9. The Maryland legislation will also help us fulfill one of our most basic duties: preservation. We cannot preserve for the future items to which we have no

access, and there is no guarantee that publishers will bother to maintain the intellectual record after titles are no longer of commercial interest.

10. This change to Maryland law is not "anti-publisher." Libraries pay the publishers for access to content, as it has been throughout history, and this law merely requires the publishing industry to enter negotiations with the public libraries for a license at reasonable terms at the same time the industry offers a license to the overall public. The law has defined some reasonable provisions to reassure publishers, including built in protections for library digital content to prevent unauthorized use. Libraries pay agreed-upon prices and work with the publishing industry as partners, as we have historically. Public libraries just want fair access licenses at reasonable terms for Maryland library users.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

_January 13, 2022_  
Date

_[signature]_  
Michael Blackwell