# EXHIBIT 2A

225 N. Michigan Avenue
Suite 1300
Chicago, Illinois 60601
USA

Telephone 312 944 6780
Toll Free 800 545 2433
Email: ala@ala.org
www.ala.org

# ALA AmericanLibraryAssociation

December 16, 2021

The Honorable Brian E. Frosh, Esq.

The Attorney General

Office of the Attorney General of Maryland

200 St. Paul Place

Baltimore, Maryland 21202

> VIA: Ms. Irene Padilla, State Librarian, Maryland State Library
>
> COPY: Ms. Mary Ann Bowman, President, Maryland Library Association
>
> Mr. Joshua Stone, Executive Director, Maryland Library Association

Dear Attorney General Frosh,

The American Library Association (ALA), the largest library association in the world, represents 117,000 libraries in the United States. ALA has learned about the complaint filed in federal district court by the Association of American Publishers (AAP) on Maryland's new law, "Public Libraries—Electronic Literary Product Licenses—Access" under Article II, Section 17c of the Maryland Constitution—Chapter 412. ALA finds this complaint to be both unfortunate in terms of the public interest and inaccurate in its legal analysis. As ALA President Patricia "Patty" Wong states: "This law is an essential and fully constitutional measure to ensure equitable access to information for all Marylanders. ALA firmly stands behind this commonsense legislation and will continue to advocate for the rights of all people to access materials through their library."

This letter begins with a discussion of the public interest and concludes with a legal analysis prepared by ALA's copyright counsel, Jonathan Band, Esq.

**THE PUBLIC INTEREST**

Public libraries require access to digital content to fulfill their mission of providing the public with equitable access to information. While libraries continue to provide access to print materials, the demand for access to digital content has increased. Access to library materials plays a critical role for members of the community in advancing education and learning, economic opportunity, civic engagement, and managing daily life tasks.

We note that print and digital media (e.g., books) are not interchangeable. Older Americans, people with disabilities, and others may find digital books to be more accessible and manageable than print books, as digital books allow for print size adjustments and other key features to better accommodate accessibility needs. And of course, digital books may be accessed without a physical visit to a library, which can at times be convenient or necessary—as dramatically demonstrated during the COVID-19 pandemic. In any event, libraries—and therefore library users—should not be excluded from a class of materials (digital), especially for those community members who cannot afford to purchase their own digital content and solely rely on libraries for access.

Libraries only request access to digital content at reasonable terms, which they have not been granted thus far. Without this important law, future prospects for digital access at reasonable terms for libraries in Maryland will be dimmed.

During the last decade, some publishers, such as Simon & Schuster and Macmillan Publishers, did not make their digital books available to public libraries at all, at any price or terms. In 2019, Macmillan Publishers instituted an embargo on libraries, such that libraries were required to wait 8 weeks after release to the consumer before they could purchase copies of ebooks. This embargo was rescinded in 2020 after intense public pressure.

Even with the access that libraries do have today, the terms are not reasonable. A public library would commonly pay $50 for one copy of an ebook of a popular title, as compared to about $15 for a consumer. But the library's copy—which can be loaned to one person at a time, to simulate physical book lending—would be valid for only two years after which time it expires. The library is free to extend this licensed access for an additional two years at a time, at the cost of an additional $50 after each term expires. This model is neither reasonable nor sustainable for the public library or the taxpaying public.

Currently, many digital titles are not available to public libraries. In particular, a great swath of digital audio books is not available to libraries, at any price or terms. But there are also ebooks that are not available to libraries, or minimally available (e.g., only available through a distributor that most public libraries do not use).

In its recent release, the AAP asserts that "…the vast majority of AAP members already make their full digital catalogs available to public libraries across the country." This is untrue. In any case, the new law is needed to prevent publishers from changing terms abruptly and implementing additional barriers to libraries' access to digital works, as we have seen over the past decade. Public libraries, and the general public, have few rights under law for access to digital materials, and the new Maryland law simply reinstates some of these rights for the public. While there is a need for more protection of access in the future, the new Maryland law is an essential first step toward reinstating the general public's fair access to digital content through the library.

Libraries and their associations are prepared to negotiate in good faith to reach terms that are acceptable to all parties. Enforcement actions are the last, and least desirable, resort. For literally centuries, libraries have partnered with publishers to provide the public with broad access to books. It is time to convene at the negotiating table, not the court room—which is the laudable goal and purpose of the new Maryland law.

**LEGAL ANALYSIS**

The four claims in the complaint of the Association of American Publishers ("AAP") challenging the lawfulness of the Maryland ebook legislation, Md. Code, Educ. §§ 23-701 and 23-702 ("Maryland Act"), have no merit.

### I. Express Preemption Under the Copyright Act

AAP incorrectly asserts that the Maryland Act is expressly preempted by section 301(a) of the Copyright Act, 17 U.S.C. § 301(a). Congress adopted section 301(a) in 1976 to preempt state copyright laws—laws that created rights that are "equivalent to any of the exclusive rights within the general scope of copyright." Courts around the country have repeatedly held that section 301 does not preempt state laws relating to contracts because contract rights are not "equivalent" to the exclusive rights of copyright.[1] Central to those courts' analysis is that the existence of a contract constituted an "extra element" not present in copyright law. Because the Maryland Act regulates license terms, it is completely outside the scope of section 301.

The U.S. Copyright Office has stated that section 301(a) does not preempt the Maryland Act. On August 30, 2021, Shira Perlmutter, the Register of Copyrights and Director of the U.S. Copyright Office, replied to a May 26, 2021, letter written by Senator Thom Tillis (R-N.C.) requesting the Office's analysis of potential federal copyright law preemption of state ebook legislation in Maryland, New York, and Rhode Island. The Office observed that section 301(a) addresses only states' grants of legal or equitable rights equivalent to copyright. The state legislation, by contrast, "seeks to regulate the identity of licensees and the terms upon which licenses may granted, rather than granting rights." Accordingly, the Office found that section 301(a) does not preempt the state legislation.

### II. Conflict Preemption Under the U.S. Constitution

AAP incorrectly argues that the Maryland Act conflicts with the operation of the Copyright Act adopted by Congress pursuant to the Intellectual Property Clause of the U.S. Constitution. The Copyright Office letter addressed this issue as well.

The Office correctly recognized that "courts have allowed state regulation of the terms of copyright licenses in some instances." The Office stated "this is especially true where the state has demonstrated a pattern of abuse of market power or suppression of competition." The Office further acknowledged that the legislative history of the Maryland Act "cites a pattern of practices by large publishers that negatively impact Maryland citizens." The Office noted that many popular book titles are not available for public libraries to license at the same time ebooks are made available to the public, and that libraries are charged significantly more to license ebooks than the general public.

Nonetheless, on the basis of a single Third Circuit decision, *Orson v. Miramax*, 189 F.3d 377 (3d Cir. 1999), the Copyright Office opined that a court considering the state legislation at issue would likely find

---

[1] *See ProCD v. Zeidenberg*, 86 F. 3d 1447 (7th Cir. 1996); Guy Rub, *Copyright Survives: Rethinking the Copyright-Contracts Conflict,* 103 Va. L. Rev. 1141, 1160 (2017).

it preempted. In *Orson*, a state law required a film distributer to expand its distribution after 42 days by licensing another commercial exhibitor in the same geographic area. The *Orson* court found preempted such a regulation that "appropriated a product protected by the copyright law for commercial exploitation against the copyright owner's wishes."

But the Office itself recognized that *Orson* might be distinguishable. In footnote 21 on the bottom of page 8, the Office conceded that *Orson* dealt with

> forced *commercial* exploitation of copyrighted works; the state legislation at issue seeks to require licensing of works to libraries, which, while arguably a commercial transaction, ultimately serves a non-commercial goal of furthering the traditional mission of public libraries to provide free access to materials for their communities. It is unclear whether this would be a significant factor for a court considering the question of federal conflict preemption….

The Office further conceded on page 9 that:

> To date neither the Supreme Court nor any other circuit courts (including the Second and Fourth Circuits, which have jurisdiction over New York and Maryland) have had occasion to consider whether state regulations seeking to require licensing of copyrighted works could avoid conflict preemption either generally or under narrow circumstances, such as upon a showing of a state interest that is sufficiently compelling and distinct from the Copyright Act's purposes.

In other words, the Office admitted that there was no controlling precedent suggesting preemption in Maryland, and the one precedent from another jurisdiction was readily distinguishable. Accordingly, the Office had no reasonable basis for concluding that a court considering the legislation "would likely find it preempted under a conflict preemption analysis."

The Office stated that it would address "only the technical question of the state legislation's potential federal preemption, and not the policy questions involved." But as the Office conceded, a critical issue in a conflict preemption analysis is whether the state had a sufficiently compelling interest for adopting the legislation. This is a "policy question" that the Copyright Office did not attempt to answer.

Additionally, the Office did not consider whether the Maryland Act in fact is consistent with the structure and objectives of the Copyright Act by preserving the privileged status of libraries in the Copyright Act. Libraries predate copyright law, and the first copyright law in England, the 1709 Statute of Anne, includes accommodations to libraries.[2] The current Copyright Act likewise accords a privileged status to libraries.[3]

---

[2] Ariel Katz, *Copyright, Exhaustion, and the Role of Libraries in the Ecosystem of Knowledge*, 13 I/S: A Journal of Law and Policy for the Information Society 81, 84-88 (2016).

[3] In addition to benefiting from exceptions of general applicability, such as the fair use and first sale doctrines, libraries and educational institutions enjoy protections Congress has provided specifically to them. Section 108 permits libraries and archives to reproduce and distribute copies for purposes of preservation, replacement of damaged or missing copies, and interlibrary loans. Section 108(h) shortens the copyright term by twenty years for certain library uses related to scholarship or research. The House Judiciary Committee Report on the 1976 Copyright Act, in its discussion of section 109(a), specifically refers to libraries: "[a] library that has acquired ownership of a copy is entitled to lend it under any conditions it chooses to impose." H.R. Rep. No. 94-1476, § 109, at 79 (1976), as reprinted in 1976 U.S.C.C.A.N. 5659, 5693. Section 109(b)(1)(A) provides libraries with an

Moreover, the question of conflict preemption (as opposed to express preemption under section 301(a)) turns less on copyright law than on constitutional law. The Copyright Office does not have any particular expertise in interpreting the Constitution's allocation of power between the states and the federal government.

**III. Dormant Commerce Clause**

Contrary to AAP's claims, the Maryland Act does not impermissibly regulate interstate commerce. The AAP misreads the Act as "regulat[ing] commerce that takes place wholly outside of the State of Maryland." Clearly, when the Act refers to "a publisher who offers to license an electronic literary product to the public," it means the public in the State of Maryland, not the public anywhere in the world. The State of Maryland does not interfere with interstate commerce when it prohibits publishers that do business in Maryland from unreasonably discriminating against public libraries in Maryland.

Significantly, the Act could have gone much further; it could have required that publishers license ebooks to public libraries on precisely the same terms as they license ebooks to the general public in Maryland. After all, this is the status quo with physical books—a publisher cannot force a bookstore to charge a library more than it charges individual consumers. Nonetheless, the Act recognizes that there are practical differences between the lending of ebooks and the lending of physical books, and accordingly allows for a degree of price discrimination. However, that price discrimination cannot be unreasonable.

The State has a sufficient interest in imposing this modest condition on publishers. Some publishers altogether have refused to license ebooks to libraries. Others license ebooks only on unreasonable terms, effectively charging libraries ten or even twenty times as much as the general public. This significantly restricts the ability of libraries to broadly serve the educational and cultural needs of Maryland residents.

---

exception to the prohibition on the rental of phonorecords and computer programs. Section 110(1) allows the performance and display of works in the course of face-to-face teaching activities of educational institutions (and thus libraries affiliated with educational institutions). Similarly, section 110(2) permits performances and displays for purposes of distance education. Sections 121 and 121A allow libraries and other institutions with the primary mission of providing services to people with print disabilities to reproduce and distribute copies in accessible formats. Section 504(c)(2)(i) requires courts to remit statutory damages to libraries, archives, and educational institutions in cases of innocent infringement. Section 512(e) adapts the limitations on liability for online services providers to the higher education environment. Section 602(a)(3)(C) provides organizations operated for scholarly, educational, or religious purposes with an exception to the importation right for library lending and archival purposes. Section 1201(d) of the Digital Millennium Copyright Act ("DMCA") gives libraries, archives, and educational institutions the right to circumvent technological protection measures on a copy for purposes of determining whether to acquire a copy of the work. Section 1203(c)(5)(B) allows a court to remit statutory damages to libraries, archives, and educational institutions in cases of innocent violations of the DMCA. Moreover, section 1204(b) excludes libraries, archives and educational institutions from criminal liability for DMCA violations. The Classics Protection and Access Act, which extends protection to pre-1972 sounds recordings, contains an exception for "uses by libraries, archives, and educational institutions." 17 U.S.C. § 1401(f)(1). The Copyright Alternative in Small-Claims Enforcement ("CASE") Act, which establishes a small claims tribunal in the Copyright Office, allows libraries to opt-out preemptively. 17 U.S.C. § 1506(aa)(1). Congress has adopted these exceptions over a period of almost fifty years, reflecting its deep, ongoing commitment to enabling libraries to operate in periods of rapid technological change. Similarly, "orphan works" legislation, which contained a special safe harbor for libraries, archives, museums, and educational institutions, passed the Senate in 2008. Shawn Bentley Orphan Works Act of 2008, S. 2913, 110th Cong. (2008).

**IV. Due Process**

The Maryland Act does not violate due process. Paragraphs (b) and (c) of section 23-702 provide sufficient guidance on what constitutes "reasonable terms." Paragraph (b) mandates that library ebook licenses contain terms: restricting the number of users to whom a library may allow to access an ebook simultaneously; restricting the number of days a library can allow a user to access a book; and requiring a library to use technological measures that protect a publisher's copyrights. Paragraph (c) further provides that a publisher cannot limit the number of ebook licenses a library can purchase on the same day an ebook is made available to the public. Paragraphs (b) and (c), therefore, provide a detailed framework within which publishers and libraries can negotiate in good faith on a more level playing field than currently exists. Additionally, the Act applies only prospectively; it does not disturb any ebook licenses already in place. In short, the Act satisfies the publishers' due process rights. Moreover, to the extent that publishers do not understand their obligations under the Act, they could request guidance from the Maryland Attorney General.

Sincerely,

*Alan S. Inouye*

Alan Inouye, Senior Director of Public Policy & Government Relations
American Library Association, Public Policy & Advocacy
ainouye@alawash.org