# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ASSOCIATION OF AMERICAN PUBLISHERS, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No.: 1:21-cv-03133-DLB |
| BRIAN E. FROSH, Attorney General of the State of Maryland | * | |
| | * | |
| Defendant. | | |

\* \* \* \* \* \* \* \* \* \* \*

## DECLARATION OF IRENE PADILLA

I, Irene Padilla, am not a party to this proceeding and I am competent to testify and aver as follows:

1. I am over 18 years of age, a resident of Maryland, competent to testify, and have personal knowledge of the facts and matters set forth herein.

2. I am currently employed as a State Librarian with the Maryland State Library Agency, located at 25 South Charles Street, Suite 1310, Baltimore, Maryland 21201. The Maryland State Library (MSL) is an independent agency. We provide strategic leadership, resources, and programmatic support to Maryland libraries to transform lives. As the state library agency for Maryland, the Maryland

1

State Library administers State and Federal funds to support Maryland libraries in their mission to offer outstanding resources, programs, and excellent customer service. Responsibilities include oversight of the Maryland State Library for the Blind and Print Disabled; Maryland's Public Libraries; the State Library Network; the Library Capital Grants Programs; and the Deaf Culture Digital Library.

3. Libraries and publishers have a long established and mutually beneficial relationship buying and selling print materials. For fiscal year 2020, 56% of the population held library cards. The total holdings for the Maryland library system were 20,793,517. Of this total, there were 4,733,755 e-book holdings. There was a 32% increase in e-material holdings since the last fiscal year. There was also a 31% increase in customer access to digital materials. For the Maryland State Library for the Blind and Print Disabled, there were 6,411 registered borrowers and 4,578 digital readers. Digital titles were more than half of the library's total collection – 36,174 digital titles out of a total of 62,267 in the collection. (See attachment - Maryland Public Library Statistics – Fiscal Year 2020).

4. With digital technology publishers developed licensing models that are in some cases problematic and unfair for libraries. Some publishers' pricing make digital lending far costlier for libraries than print lending, even to the point of being unsustainable, which is a disadvantage to library readers.

5. Some publishers have used various forms of embargoing to limit the availability of titles or refused to license to libraries altogether. Digital content can only be provided under the set license terms, so that readers are effectively prevented from seeing content through libraries.

6. Faced with issues of cost and availability, libraries in Maryland turned to the General Assembly, which responded with new legislation. In 2021, Maryland enacted a law requiring "…a publisher who offers to license an electronic literary product to the public to also offer to license the product to public libraries in the State on reasonable terms that would enable public libraries to provide library users with access to the electronic literary product."

7. Testimony from legislators when proposing the legislation, and indeed the final bill itself, is only that the Maryland General Assembly meant that licenses for eBooks and eAudiobooks offered to the public in Maryland must also be offered to libraries fairly when offered to the public without restriction on when libraries can access the book or how many copies can be obtained.

8. The Maryland General Assembly further encouraged the development of basic eBook and eAudiobook license terms that use print as a model. Library eBooks and eAudiobooks with print-equivalent license terms (loaned sequentially for a limited lifespan) should have print-equivalent prices. Based upon a centuries-

3

old model, updated for the digital realm, print-equivalent terms could be fair to publishers, authors, libraries, and users; supporting the rich and healthy reading ecosystem on which we all depend.

9. The General Assembly also recognized that an eBook does not deteriorate in the same manner as a physical copy. "Reasonable terms" could include a limitation on the number of times a library could lend a digital copy, based on the number of times a library typically could lend a copy of a work in a physical format before replacing it due to damage or deterioration.

10. Library research found the following lifespans for physical items: a hardback book is, on average, circulated between 30-35 times; a paperback book is, on average, circulated between 15-20 times, and; an audiobook on CD is, on average, circulated between 55-60 times.

11. It is reasonable for digital licenses to be similar: eBooks could be limited to 25 circulations, and eAudiobooks could be limited to 55 circulations. Since audiobooks on CD are being phased out, however, a circulation number for eAudiobooks equal to that of eBooks would also be considered reasonable.

12. Since library print pricing depends on both publisher and distributor, the library system would be happy to provide publishers with estimates on what Maryland libraries typically spend on physical materials. A rough idea of print-

equivalent licensing could be gathered by looking at cost divided by the number of circulations.

13. Since library pricing depends on both publisher and distributor, the library system would invite publishers and distributors to discuss with us individually, or at least to propose individually, the best ways to determine print-equivalent licensing for digital content.

14. The library system is aware that many publishers choose eBook licenses that expire after a certain time period, such as 12 or 24 months. Time-based licenses are reasonable if the number of circulations that can occur within a given period could provide print-equivalent costs. As with print pricing, we would invite publishers to work with us to determine an average circulation on time-based eBooks and eAudiobooks.

15. Time-based licenses, however, incentivize library selectors to purchase books by only established authors, so as to ensure that they are continuously checked out and thereby maximizing the value of that license.

16. Libraries assist readers in discovering new authors and building fan bases. Because of this, we strongly recommend that publishers use a circulation-based formula to determine the limits of digital licenses rather than a time-based limit.

17. Some eBook and eAudiobooks are currently offered by some publishers under other terms that libraries value: (1) perpetual use – where libraries own the license for as long as it is available from the publisher and distributor. The license does not expire after a given time period or a certain number of circulations. Such licenses enable libraries to archive and preserve our culture, one of our mandates, and; (2) concurrent use – where libraries are allowed to loan an item to more than one patron at a time.

18. While it could be argued that a print copy could last indefinitely and so perpetual use is already a print-equivalent, most heavily-used print books do wear out. It is reasonable for prices on perpetual use to exceed those of metered licenses, and we encourage publishers to negotiate individually to offer perpetual licenses at appropriate costs.

19. Some publishers offer a perpetual use license at a higher price point as well as various metered-access or pay-per-use licenses. This choice allows libraries to invest in the books they know they will want in the collection for years to come as well as to "take risks" on unknown authors. Therefore, we recognize the good faith of publishers who offer multiple license models per title.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge,

information and belief.

January 13, 2022  
Date

*Irene Padilla*  
Irene Padilla  
State Librarian