## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ASSOCIATION OF AMERICAN PUBLISHERS, INC., <br><br>     455 Massachusetts Avenue, NW <br>     Washington, DC 20001, <br><br>                      Plaintiff, <br><br> v. <br><br> BRIAN E. FROSH, in his official capacity as <br> Attorney General of the State of Maryland, <br><br>     200 St. Paul Place <br>     Baltimore, MD 21202, <br><br>                    Defendant. | Civil Action No. 1:21-cv-03133-DLB |

### PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION AND OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

   I.    The Inapplicability of the First Sale Doctrine to Digital Dissemination is Central to the U.S. Copyright Act, Not a "Loophole," as Maryland Claims ...................................... 3

   II.   Maryland's Assertions of a Market "Imbalance" Rely on Inapposite Comparisons. ......... 5

ARGUMENT ................................................................................................................... 7

   I.    The Maryland Act Should be Preliminarily Enjoined. ................................................ 7

     A.   AAP Is Likely to Succeed in Showing that the Maryland Act is Preempted. ............... 7

       1.   Maryland Cannot Rewrite Copyright Law Under the Guise of Unfair Trade Practice Regulation. ............................................................................................ 8

       2.   Maryland Does Not Overcome Conflict Preemption.................................. 10

       3.   Maryland's Express Preemption Arguments Fail. ..................................... 16

     B.   Maryland is Wrong About the Likely Irreparable Harm. ............................... 19

     C.   Maryland's Balance of Equities and Public Interest Arguments Fail. .......................... 21

   II.   Maryland's Motion to Dismiss AAP's Remaining Claims Should Be Denied. ............... 23

     A.   AAP States a Claim for Violation of the Commerce Clause. ....................................... 23

     B.   AAP States a Claim for Violation of the Due Process Clause Because the Terms of the Maryland Act Are Void for Vagueness. ................................................................ 27

CONCLUSION ................................................................................................................ 30

## **TABLE OF AUTHORITIES**

<u>Cases</u>

*Access Floors v. Interface Architectural Res., Inc.*,
    132 F. Supp. 2d 365 (D. Md. 2001) ................................................................. 20

*Advance Magazine Publishers, Inc. v. Leach*,
    466 F. Supp. 2d 628 (D. Md. 2006) ................................................................. 22

*Allied Artists Pictures Corp. v. Rhodes*,
    496 F. Supp. 408 (S.D. Ohio 1980) ........................................................ 2, 14, 15

*Am. Beverage Ass'n v. Snyder*,
    735 F.3d 362 (6th Cir. 2013) .......................................................................... 25

*Am. Soc'y of Composers, Authors, & Publishers v. Pataki*,
    No. 95 CIV. 9895, 1997 WL 438849 (S.D.N.Y. Feb. 27, 1997) ................... 13

*American Booksellers Found. v. Dean*,
    342 F.3d 96 (2d Cir. 2003) ............................................................................. 25

*Asociacion de Educacion Privada de Puerto Rico v. Garcia-Padilla*,
    490 F.3d 1 (1st Cir. 2007) .............................................................................. 26

*Ass'n for Accessible Medicines v. Frosh*,
    887 F.3d 664 (4th Cir. 2018) .......................................................................... 24

*Brantley v. Epic Games, Inc.*,
    463 F. Supp. 3d 616 (D. Md. 2020) .................................................................. 8

*Brown v. Hovatter*,
    No. RDB 06-524, 2006 WL 2927547 (D. Md. Oct. 11, 2006) ....................... 27

*Capitol Records, LLC, v. ReDigi Inc.*,
    910 F.3d 649 (2d Cir. 2018) ............................................................................. 4

*Close v. Sotheby's, Inc.*,
    894 F.3d 1061 (9th Cir. 2018) ........................................................................ 18

*Colon Health Centers of Am., LLC v. Hazel*,
    733 F.3d 535 (4th Cir. 2013) .......................................................................... 27

*Connally v. Gen. Constr. Co.*,
    269 U.S. 385 (1926) ....................................................................................... 28

*Dana's R.R. Supply v. Attorney Gen., Fla.*,
    807 F.3d 1235 (11th Cir. 2015) ...................................................................... 27

*Eldred v. Ashcroft*,
    537 U.S. 186 (2003) ......................................................................................... 7

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ................................................................................... 27, 28

*Fla. Action Comm., Inc. v. Seminole Cty.*,
    212 F. Supp. 3d 1213 (M.D. Fla. 2016) ..................................................... 28, 30

*Golan v. Holder*,
   565 U.S. 302 (2012) ............................................................................................... 7

*Goldstein v. California*,
   412 U.S. 546 (1973) ............................................................................................. 14

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) ............................................................................................. 28

*Harper & Row Publishers,*
   *Inc. v. Nation Enterprises*, 471 U.S. 539 (1985) ................................................. 22

*Healy v. Beer Institute*,
   491 U.S. 324 (1989) ....................................................................................... 24, 25

*Int'l Harvester Co. of Am. v. Kentucky*,
   234 U.S. 216 (1914) ............................................................................................. 29

*Italian Colors Restaurant v. Harris*,
   99 F. Supp. 3d 1199 (E.D. Cal. 2015) ................................................................. 27

*Kansas v. Garcia*,
   140 S. Ct. 791 (2020) .......................................................................................... 10

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
   2 F.4th 330 (4th Cir. 2021) ............................................................................ 19, 21

*Manning v. Caldwell for City of Roanoke*,
   930 F.3d 264 (4th Cir. 2019) ............................................................................... 28

*Mills Music. Inc. v. State of Arizona*,
   591 F.2d 1278 (9th Cir. 1979) ............................................................................. 14

*OpenRisk, LLC, v. Microstrategy Servs. Corp.*,
   876 F.3d 518 (4th Cir. 2017) ............................................................................... 16

*Orson v. Miramax*,
   189 F.3d 377 (3d Cir. 1999) .......................................................................... *passim*

*Ritchie v. Williams*,
   395 F.3d 283 n.3 (6th Cir. 2005) ......................................................................... 17

*Splitfish AG v. Bannco Corp.*,
   727 F. Supp. 2d 461 (E.D. Va. 2010) ............................................................ 19, 20

*Stewart v. Abend*,
   495 U.S. 207 (1990) ..................................................................................... 7, 9, 16

*Storer Cable Commc'ns v. City of Montgomery, Ala.*,
   806 F. Supp. 1518 (M.D. Ala. 1992) ..................................................................... 8

*U.S. v. Reliant Energy Services, Inc.*,
   420 F. Supp. 2d 1043 (N.D. Cal. 2006) ............................................................... 29

*U.S. Vinyl Manufacturing Corporation v. Colour & Design, Inc.*,
   No. 4:12-CV-00217-HLM, 2013 WL 12409319 (N.D. Ga. Mar. 25, 2013) ........... 13

*United States v. L. Cohen Grocery Co.*,
   255 U.S. 81 (1921) ............................................................................ 29

*Update, Inc. v. Samilow*,
   311 F. Supp. 3d 784 (E.D. Va. 2018) ........................................... 20

*Urbont v. Sony Music Ent.*,
   831 F.3d 80 (2d Cir. 2016) ............................................................ 15

*Warner Bros. v. Wilkinson*,
   533 F. Supp. 105 (D. Utah 1981) ................................................ 12

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................ 21

*Yamaha Motor Corp., U.S.A. v. Jim's Motorcycle, Inc.*,
   401 F.3d 560 (4th Cir. 2005) ........................................................ 26

<u>Statutes</u>

17 U.S.C. § 106 ..................................................................................... *passim*

17 U.S.C. § 107(1) ............................................................................... 11

17 U.S.C. § 109(a) ................................................................................ 4

17 U.S.C. § 110(8) ............................................................................... 11

17 U.S.C. § 118 ..................................................................................... 11

17 U.S.C. § 301 ..................................................................................... 17

Md. Code, Educ. § 23-702 ............................................................... *passim*

U.S. Const. amend. V ......................................................................... 27

U.S. Const. art. I, § 8 ................................................................... 1, 23

## <u>INTRODUCTION</u>

Maryland opens its brief by stating, "This case is not about copyright protection," but follows with an extensive discussion that proves the opposite.  Maryland makes clear that it intended both to interfere with the statutory provisions of the United States Copyright Act ("Copyright Act") and to challenge the authority of the United States Congress ("Congress") to weigh and determine questions of copyright policy in the digital environment.

It is unambiguous that the U.S. Constitution, through its Copyright Clause, grants Congress the enumerated power to promote the public good by securing to authors the exclusive rights to their writings.  U.S. Const. art. I, § 8, cl. 8.  In interpreting the Copyright Clause, the Supreme Court has repeatedly underscored that this constitutional authority must be broadly construed, empowering Congress the plenary authority to determine the intellectual property regimes that, overall, in that body's judgment, will serve the ends of the Clause.

The Maryland Act, both on its face and by the accounts of its supporters, is an attempt to unravel decades of federal legislation and jurisprudence that delineate the contours of copyright law, including for digital licensing.  The Maryland Act subjects publishers to a state mandated licensing scheme that is at odds with the Copyright Act.  Under the Maryland Act, publishers will now face state-law liability—from monetary penalties to jail time—for choosing to abide by the authority and provisions of the Copyright Act.  These conflicts are the definition of a preempted state law.

Maryland draws a false, much too-absolute distinction by arguing that state copyright laws are preempted while state laws restraining unfair trade practices are not.  Contrary to Maryland's claim, when a state law purports to restrain unfair trade practices, the preemption analysis depends on what the law does.  Here, the Maryland Act restricts exclusive rights that are

reserved for copyright owners to exercise under federal copyright law, as Congress and the United States Supreme Court have confirmed, and the state law is therefore preempted.

Maryland's attempts to justify the Maryland Act make the case for why it is preempted. Maryland argues the state law is needed to address perceived shortcomings in federal copyright law in the digital age, and the State's desire to restore the "historical balance" between publishers and public libraries.  Dkt. 10-1 at 1.  Maryland claims that "digital media has outpaced the first sale doctrine" and that publishers have capitalized on what Maryland incorrectly calls a "loophole" in copyright law.  *Id.*  These policy arguments only serve to underscore that the Maryland Act is an improper override of the Copyright Act that Congress enacted and has sole authority to calibrate, including as to the distinct characteristics and related legal treatments of physical sales and digital licensing, and between authors, publishers, and public libraries.

Maryland is unable to distinguish or fails to even address the key cases AAP raised that compel the conclusion that the Maryland Act is preempted.  That case law includes the Third Circuit's *Orson* decision, which held an equivalent state law preempted for the very same reasons the Maryland Act is preempted here, as well as several other important decisions.  The Copyright Office's own independent analysis, which Maryland mischaracterizes, likewise concluded that the Maryland Act is "likely to be found preempted."  Dkt. 7-1, Ex. 7 at 1.  And the main case that Maryland relies upon—the four-decade-old *Allied Artists* district court decision out of the Sixth Circuit—is easily distinguishable and supports preemption here.

Just last month, New York Governor Kathy Hochul vetoed a bill in New York that was virtually identical to the Maryland Act and similarly rushed through the legislature, correctly concluding that "copyright protection provides the author of a work with the exclusive right to

their works" and "the provisions of this bill are preempted by federal copyright law."[1]  For the same reasons, the Maryland Act is preempted by the Copyright Act.

As set forth herein, the Maryland Act should be enjoined as preempted, and Maryland's motion to dismiss AAP's preemption claims should be denied.  Likewise, Maryland's motion to dismiss AAP's remaining Commerce Clause and Due Process Clause claims should be denied.[2]

## BACKGROUND

Maryland provided the Court with substantial background discussion.  AAP puts that background into clearer focus below.

I.    **The Inapplicability of the First Sale Doctrine to Digital Dissemination is Central to the U.S. Copyright Act, Not a "Loophole," as Maryland Claims**

Maryland claims that "digital media has outpaced the first sale doctrine," publishers are exploiting what Maryland calls a "loophole," and Maryland must "rectify the imbalance prompted by the digital revolution."  Dkt. 10-1 at 1, 8.  But those assertions are not right. Congress has repeatedly considered—and rejected—the idea of expanding first sale exhaustion principles to digital disseminations, taking into account factors such as the value of original works of authorship, the distinct differences between tangible and digital copies, and importance of primary copyright markets.  The first sale doctrine permits the owners of a physical copy of a work—*e.g.*, hardcover books or vinyl records—to resell, lend, or otherwise transfer their particular tangible copy, but the doctrine does not apply to digital dissemination.  17 U.S.C. §

---

[1] https://www.authorsguild.org/wp-content/uploads/2021/12/GovernorHochulVetoMessage.pdf.

[2] AAP moved for a preliminary injunction on only its preemption claims, recognizing that these claims present only legal questions.  Accordingly, if the Court grants that motion, summary judgment for AAP is also appropriate.  Provided the Maryland Act is permanently enjoined based on preemption, AAP is willing to forego adjudication of its dormant Commerce Clause and Due Process claims.

109(a); *see Capitol Records, LLC, v. ReDigi Inc.*, 910 F.3d 649 (2d Cir. 2018) (recognizing same).

The scope of the first sale doctrine is consistent with treaties that the United States and governments around the world have executed to ensure that copyright remains viable in the digital age.  As Maryland concedes, the Copyright Office delivered a detailed report to Congress in 2001 specifically considering—and ultimately rejecting—the application of first sale principles to digital dissemination.  *See* Dkt. 10-1 at 5-6; *see* U.S. Copyright Office, DMCA Section 104 Report (August 2001), https://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf ("DMCA Section 104 Report") ("We recommend no change to section 109 at this time.") Congress commissioned the 2001 report after adopting the 1998 Digital Millennium Copyright Act (DMCA), which implements the 1996 WIPO Internet Treaties into federal law. These Treaties and the DMCA underscore that Congress intended to protect the scope and viability of exclusive rights in online commerce.[3]

The U.S. Department of Commerce's Internet Policy Task Force reconsidered the scope of the first sale doctrine in 2016 in a detailed public process culminating in the publication of a white paper, which similarly declined to recommend extending the first sale doctrine beyond physical copies.  The white paper noted "insufficient evidence to show that there has been a change in circumstances since the [Copyright Office's] Report in 2001," and that "if anything, the change has been for the better in terms of the consumer experience."[4]

---

[3] *See* DMCA Section 104 Report, https://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf at 96.

[4] *See* U.S. Department of Commerce, White Paper on Remixes, First Sale, and Statutory Damages at 67-68 (January 2016), https://www.uspto.gov/sites/default/files/documents/copyrightwhitepaper.pdf.

II.     **Maryland's Assertions of a Market "Imbalance" Rely on Inapposite Comparisons.**

When Congress periodically reviews the Copyright Act, it does so with extensive studies, hearings, debate, and input from affected stakeholders as well as expert agencies like the Copyright Office, taking into account applicable jurisprudence, new technologies, and market innovations, as well as the Nation's international obligations.  Although the Maryland Act is not a permissible area for state legislation by any measure, it is also noteworthy that its enactment did not involve any formal factfinding, stakeholder dialogue, expert agency engagement, or adjudication.  Maryland's brief therefore draws upon a state record that is cloudy at best and incorrect at worst.

First, Maryland's assertion that libraries typically pay more than individual consumers to license literary works in digital format ignores the obvious, critical differences between the types of licenses these two groups purchase.  Licenses purchased by libraries permit them to disseminate copies of digital works to dozens of library patrons, while licenses purchased by individual consumers are generally limited to personal use.

As with any license, copyright licenses covering different activities and different numbers of users understandably may likely have different pricing.  For example, when a streaming video service purchases a license to transmit a film to its thousands of subscribers, it is not surprising if the streaming service pays far more for that license than an individual user would pay for a license to stream the same film on demand, or download it digitally, for their personal viewing.

Maryland's assertions that libraries pay more than individual customers looks only at the initial purchase, without consideration of the subsequent lending.  According to the Maryland Act's House bill sponsor, Rep. Kathleen Dumais, "An electronic book that might cost an individual $9.99 to $14.99 [to license for personal use] will typically cost libraries $55 to $65 for a two year license."  Dkt. 10-8 at 2.  Assuming a library allows a standard checkout period of

two weeks, a two-year license to lend the book electronically would allow for a minimum of 52

checkouts.  For the library, this would result in a cost per reader of only $1.06 to $1.25, far below

the $9.99 to $14.99 cost per reader at retail.

Second, what Maryland criticizes as "exploitative tactics," Dkt. 10-1 at 8, to the extent

they even occur, are legitimate practices in digital licensing across copyright industries that have

developed over several decades and stem directly from the exercise of exclusive rights.  For

example, a film studio may decide to window its electronic dissemination of a new film to the

public, with an exclusive period at a higher price point through one streaming platform at first

(without offering streaming through libraries), followed by broader availability through multiple

platforms at different price points several months later, followed by sales of physical DVDs at

even lower price points later.  Similarly, a streaming film and television platform, or a streaming

videogame platform, may license its works only to the platform's subscribers, without licensing

for library e-lending.[5]

Third, library lending of literary works in digital formats is thriving.  *See, e.g.*, Overdrive,

*Over 120 library systems reach 1 million digital checkouts in 2021* (Jan. 12, 2022),

https://company.overdrive.com/2022/01/12/over-120-library-systems-reach-1-million-digital-

checkouts-in-2021/ (reporting more than 4 million digital checkouts by Maryland's Digital

eLibrary Consortium and over 1 million checkouts each by Maryland's Montgomery County

---

[5] Does Maryland really contend that film studios, video game companies, and numerous other copyright owners across various industries are likewise guilty of "exploitative tactics" simply because they do not license their copyrighted works to libraries for electronic lending at the same price and on the same day that they provide these works electronically to the consumer public? Is every public library entitled to be its own version of Netflix?  As opposed to "exploitative tactics" by publishers, what is afoot here is an attempt by library advocates to recast customary licensing practices and ordinary business decisions that copyright industries of all types engage in in accordance with section 106 of the Copyright Act as inherently unfair and discriminatory.

Public Libraries and Baltimore County Public Library).  Maryland's own brief acknowledges "publishers' demonstrated ability to work with libraries to make electronic materials available to the public."  Dkt. 10-1 at 24.  And Maryland itself cites statistics demonstrating that the market for digital library lending in the State is flourishing.  *See id.* ("In Fiscal Year 2020, Maryland libraries held 4,733,755 e-books and saw a 31% increase in customer access to digital materials.").  Moreover, this explosive growth in library digital lending has coincided with a multi-year, downward trend in ebook purchases by consumers.[6]

## ARGUMENT

### I.     The Maryland Act Should be Preliminarily Enjoined.

#### A.     AAP Is Likely to Succeed in Showing that the Maryland Act is Preempted.

There should be no question that the Maryland Act is preempted by the Copyright Act. In interpreting the Copyright Clause, the Supreme Court has repeatedly underscored that this Constitutional authority must be broadly construed, empowering Congress the plenary authority "to determine the intellectual property regimes that, overall, in that body's judgment, will serve the ends of the Clause."  *See Golan v. Holder*, 565 U.S. 302, 325 (2012); *Eldred v. Ashcroft*, 537 U.S. 186, 222 (2003).  The Copyright Act provides copyright owners the exclusive right to decide when, whether, and how to license their works, *see* 17 U.S.C. § 106, including the right to refrain in any particular instance, *see Stewart v. Abend*, 495 U.S. 207, 229 (1990) (recognizing that "a copyright owner has the capacity arbitrarily to refuse to license one who seeks to exploit the work").  Because the Maryland Act creates a compulsory license in derogation of that federally protected right, the state law is preempted.

---

[6] E-book revenues have been declining for several years.  Indeed, according to AAP December 2021 StatShot, ebook revenues were down 4.7% in 2021 as compared to calendar year 2020. *See* https://publishers.org/news/%ef%bf%bcaap-december-2021-statshot-report-publishing-industry-up-2-8-for-month-and-12-2-calendar-2021/.

1.     <u>**Maryland Cannot Rewrite Copyright Law Under the Guise of Unfair Trade Practice Regulation.**</u>

Maryland's preemption argument begins by setting forth a false dichotomy—claiming that "[s]tate copyright laws are preempted by federal law, but [s]tate laws restraining unfair trade practices are not." Dkt. 10-1 at 10.  The analysis of whether a state law is federally preempted obviously considers what the law does, not merely how the law is characterized.  Otherwise, a state could easily circumvent federal preemption.  While state copyright laws are certainly preempted by the Copyright Act, so too are state unfair trade practice laws that intrude into the principles and operation of federal copyright law.

As one federal district court has explained, "local authorities, under the guise of trade regulation, cannot enact laws which . . . target and extinguish one or more of the exclusive rights granted under § 106 [of the Copyright Act]. . . .  If this were not so, states could effectively extinguish copyright rights with their police power, a result which would surely frustrate the copyright scheme."  *Storer Cable Commc'ns v. City of Montgomery, Ala.*, 806 F. Supp. 1518, 1536 (M.D. Ala. 1992).  For these reasons, courts routinely find state law unfair trade practice claims to be preempted where they restrict exclusive rights under the Copyright Act.  *See, e.g.*, *Brantley v. Epic Games, Inc.*, 463 F. Supp. 3d 616, 627 (D. Md. 2020) ("[T]he rights protected by the unfair competition claims are not qualitatively different from those protected by the Copyright Act because the gravamen of both types of claims is the misappropriation of an original work.").

Maryland makes various attempts to construe the terms of the Maryland Act so as not to interfere with federal copyright law, but each of those arguments fails.

First, Maryland wrongly claims that "[p]ublishers are still able to control their licensing schemes in Maryland within the framework set out in the state law," Dkt. 10-1 at 2, and that

publishers "continue[] to enjoy complete control over the rights granted by the Copyright Act," *id.* at 21. Those statements cannot be squared with the what the Maryland Act does. The Maryland Act both compels publishers to license their literary works to libraries for digital lending and prescribes terms and penalties that are in conflict with the Copyright Act. It therefore creates a state-mandated compulsory licensing scheme, as well as an unprecedented first sale scheme by which publishers (and authors) are deemed to have exhausted their statutory rights to control digital disseminations to library customers simply because they have made an initial consumer offering. The Maryland Act violates publishers' legal prerogative "to refuse to license one who seeks to exploit the work." *Abend*, 495 U.S. at 229. Whether publishers have some modicum of "leeway in how to structure the licenses that they offer libraries," Dkt. 10-1 at 8, is hardly sufficiently and ultimately irrelevant, since Maryland has no authority to diminish their exclusive rights under the Copyright Act in the first place. Likewise, Maryland's claim that the Maryland Act "does not force publishers to ***transfer*** any of their exclusive rights" is immaterial, Dkt. 10-1 at 16 (emphasis added), when the state law forces publishers to ***exercise*** their exclusive rights against their will and deprives them of the myriad licensing options and market-based decisions that are both their prerogative and responsibility to decide on behalf of their many authors.

Second, Maryland attempts to minimize the Maryland Act's interference with publishers' exclusive rights under the Copyright Act by claiming that the state law requires only that publishers "*offer* to license"—rather than license—their copyrighted works. *See* Dkt. 10-1 at 15 (emphasis in original). In the circumstances presented, that is a distinction without a difference. By mandating that publishers "offer to license" their copyrighted works to libraries on "reasonable terms" dictated by the State, the Maryland Act deprives publishers of their discretion

to control or refrain from such licensing decisions.[7]  The end result is the same: a forced license to any interested library, on terms that Maryland regulates and even sets.

Third, Maryland cannot overcome preemption of the Maryland Act by arguing that, once publishers make the initial decision to license copyrighted works to the public, the State is free to step in to require that those publishers license those works to libraries.  *See* Dkt. 10-1 at 21-22. Maryland's argument fails as a matter of law.  Copyright owners' exclusive rights under copyright law do not simply end with the first exercise of an exclusive right.  For the entire period of copyright protection, publishers have the authority to decide whether to license their works, subject only to the exceptions and limitations that Congress establishes.  For these reasons, the Third Circuit in *Orson* rejected the exact same argument that Maryland makes here. *See Orson v. Miramax*, 189 F.3d 377, 385 (3d Cir. 1999) (en banc) ("[Plaintiff] argues that once a copyright holder, such as [defendant], makes an initial distribution, a state is free to regulate the manner in which the work is thereafter distributed.  ***We reject [plaintiff's] contention***." (emphasis added)).

### 2.      Maryland Does Not Overcome Conflict Preemption.

Maryland's brief fails to rebut AAP's conflict preemption arguments in any meaningful way.  *See* Dkt. 4-1 at 13-17.  Maryland concedes that "[c]onflict preemption occurs where 'federal law imposes restrictions or confers rights on private actors and a state law confers rights or imposes restrictions that conflict with the federal law.'"  Dkt. 10-1 at 12 (quoting *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020) (internal quotation marks omitted).  But Maryland fails to

---

[7] Maryland contradicts itself as to this "offer to license" argument, by conceding elsewhere in its brief that the Maryland Act "requires a publisher who offers to license an ebook to the public to also license it to 'public libraries in the State' on 'reasonable terms.'" Dkt. 10-1 at 8 (quoting Md. Code, Educ. § 23-702(a)).

explain why the Maryland Act—which restricts publishers from exercising their federally protected right to decide whether to license or refrain from licensing their copyrighted works—is not therefore conflict preempted by the Copyright Act.

Tellingly, Maryland's brief largely ignores the *Orson* case, a highly persuasive decision in which the Third Circuit held an equivalent state law compulsory licensing scheme to be conflict preempted for the same reasons that the Maryland Act is preempted here. *See* Dkt. 4-1 at 14-16. Specifically, the *Orson* court held that when a state law—like the Maryland Act— "impose[s] on copyright holders, contrary to their exclusive rights under § 106 [of the Copyright Act], an obligation to distribute and make available other copies of the work following their initial decision to publish and distribute copies of the copyrighted item," the state law conflicts with federal law and is preempted. *Orson, Inc.*, 189 F.3d at 386.

Maryland fails to explain why the same outcome as in *Orson* should not follow here. Rather than engage with *Orson*'s overall analysis or holding, Maryland instead tries to simply wave away the case because of a passing reference in the *Orson* opinion to "commercial exploitation." Dkt. 10-1 at 21. But that argument fails, for multiple reasons.

As an initial matter, the Copyright Act applies to commercial and noncommercial uses and users. Where Congress intended a distinction, it explicitly spelled out that distinction, *e.g.*, 17 U.S.C. §§ 107(1), 110(8), and 118. Even if the Third Circuit's *Orson* ruling was limited to state laws affecting commercial transactions of copyrighted works—which it is not—the decision would still support preemption of the Maryland Act. That is because publishers' licensing of copyrighted works to libraries are clearly commercial transactions. Regardless of whether libraries are non-profits or serve a purportedly "non-commercial function," they still negotiate and enter into commercial transactions when purchasing physical books and licensing

digital content, just as they do when paying for employee salaries, equipment and supplies, and dozens of other expenses.

More importantly, the Third Circuit's preemption analysis in *Orson* was in no way limited to commercial transactions, as Maryland claims.  Nor did *Orson* recognize any preemption exception for transactions involving libraries.  Rather, the *Orson* court broadly emphasized the "fundamental principle" that "***the state may not mandate distribution and reproduction of a copyrighted work in the face of the exclusive rights to distribution granted under § 106***."  *Orson*, 189 F.3d at 386 (emphasis added).

Significantly, Maryland misleadingly quotes the one sentence from *Orson* on which it relies to supposedly distinguish the case.  Maryland's brief emphasizes one phrase from that sentence—"*for commercial exploitation*."  Dkt. 10-1 at 21 (citing *Orson*, 189 F.3d at 386) (emphasis in Maryland's brief).  But the Third Circuit actually emphasized an entirely ***different*** phrase in that sentence—"*against the copyright owner's wishes*."  *Orson*, 189 F.3d at 386 (quoting *Warner Bros. v. Wilkinson*, 533 F. Supp. 105, 108 (D. Utah 1981)) (emphasis in *Orson*).[8]  Maryland's brief obscures both that Maryland added its own emphasis and that it removed the Third Circuit's original emphasis.  As the original emphasis makes clear, the *Orson* preemption ruling was not premised on any commercial exploitation requirement, but rather because the state law at issue—like the Maryland Act—"direct[ed] a copyright holder to distribute and license against its will or interests."  *Orson*, 189 F.3d at 386.

Numerous other courts have held that state laws (and state law claims) similar to the Maryland Act are preempted for the same reasons.

---

[8] In fact, the *Orson* court quoted this sentence from a separate district court decision, which found a Utah state law not preempted, in order to distinguish that case and demonstrate that the other court's rationale actually supported *Orson*'s preemption ruling.  *Orson*, 189 F.3d at 386.

For example, in *Storer Cable Communications v. City of Montgomery*, the district court held that a city ordinance that prevented "[a] party who holds a copyright for cable programming" from "grant[ing] another an exclusive distribution or exhibition license" was preempted by the Copyright Act.  806 F. Supp. at 1539.  In other words, by prohibiting exclusive licensing, the ordinance required copyright owners to license their works to additional entities against their wishes.  The court recognized "[i]f [an ordinance] creates liability for a copyright holder and a licensee simply because the copyright holder granted an exclusive license to exhibit her work, then the ordinance cannot stand under the copyright laws."  *Id.* at 1536.  The court held the ordinance preempted "both expressly by the [Copyright Act's] preemption clause and because it irreconcilably conflicts with the federal copyright scheme."  *Id.* at 1531.

Similarly, in *U.S. Vinyl Manufacturing Corporation v. Colour & Design, Inc.*, the district court agreed with the defendant copyright owner's argument that the plaintiff licensee's state law "constructive fraud claim [was] preempted because granting the requested relief would 'eviscerate' [d]efendant's rights and protections under federal copyright law—specifically, ***copyright holders' exclusive right to voluntarily license or consent to the use of their copyrighted works***."  No. 4:12-CV-00217-HLM, 2013 WL 12409319, at *12 (N.D. Ga. Mar. 25, 2013) (emphasis added).  Accordingly, the court ruled that "[p]laintiff's requested relief would interfere with one of the exclusive rights conferred by the Copyright Act on [d]efendant:  the right to decide who may use its copyrighted works and on what terms."  *Id.*[9]

---

[9] Other courts have found preemption in instances where the state law imposes burdens on exclusive rights far more attenuated than the direct encroachment at issue here.  *See, e.g.*, Dkt. 4-1 at 17 (citing cases); *Am. Soc'y of Composers, Authors, & Publishers v. Pataki*, No. 95 CIV. 9895, 1997 WL 438849, at *4 (S.D.N.Y. Feb. 27, 1997) (preliminarily enjoining New York law requiring plaintiff performing rights societies to provide notice to businesses regarding investigations of infringing public performances of copyrighted musical works, and ruling that,

On the other side of the ledger, Maryland relies largely on a single district court case out of the Sixth Circuit—*Allied Artists*—to support its contention that the Maryland Act is not conflict preempted. *Allied Artists Pictures Corp. v. Rhodes*, 496 F. Supp. 408 (S.D. Ohio 1980). That case does not save the Maryland Act from preemption.

Most importantly, the Ohio state law at issue in *Allied Artists* did ***not*** mandate that copyright owners offer or enter into new licensing agreements, as the Maryland Act does here. In fact, the *Orson* court noted this in its explanation for why the Pennsylvania state law at issue in *Orson* was not akin to the Ohio state law in *Allied Artists*. *Orson, Inc. v. Miramax Film Corp.*, 174 F.3d 377, 384 (3d Cir. 1999) (noting that "the Ohio statute [in *Allied Artists*] . . . did not have any comparable provision" to the provision limiting distributors' right to exclusive licensing in the statute at issue in *Orson*), *affirming preemption holding en banc*, 189 F.3d 377 (3d Cir. 1999).

Instead, the *Allied Artists* state law applied only to specific "distribution procedures" employed by copyright owners ***after*** those copyright owners had decided to license their works to the parties at issue. *See* Dkt. 10-1 at 18 (quoting *Allied Artists II*, 679 F.2d at 662-63). The Maryland Act has nothing to do with distribution ***procedures***—it compels publishers to license their works to public libraries for digital lending to others in the first place and regulates the nature and scope of terms directly related to exclusive rights. Accordingly, *Allied Artists* has no

---

"[b]ecause the provisions [of the state law] impose a notice requirement on copyright enforcers, and make non-compliance with the requirement actionable, the provisions hinder the realization of the federal copyright scheme"); *cf. Mills Music. Inc. v. State of Arizona*, 591 F.2d 1278, 1285-86 (9th Cir. 1979) ("Although states may provide for additional protections for copyright holders, a state may neither abrogate nor in any way diminish the federally granted and protected rights of a copyright holder. . . . The 'exclusive Rights' of an author, guaranteed under the Constitution and Copyright Act, would surely be illusory were a state permitted to appropriate with impunity the rights of a lawful copyright holder." (citing *Goldstein v. California*, 412 U.S. 546 (1973))).

bearing on the preemption of state laws—like the Maryland Act—that restrict the underlying decision as to whether to exercise certain exclusive rights under the Copyright Act.  In fact, the district court in *Allied Artists* specifically noted that that the state law in that case "recognize[d] sub silentio the right of the copyright owner to exhibit the motion picture and to grant an exclusive or restrictive license to others to exhibit it."  *Allied Artists I*, 496 F. Supp. at 443.  By contrast, the Maryland Act's compulsory licensing requirements abolish that right.[10]

Moreover, not only does the *Allied Artists* decision predate *Orson* by nearly two decades, but the decision also relies almost exclusively on dated cases from ***before*** the 1976 Copyright Act, rendering it even further inapposite.  A hallmark of the 1976 Copyright Act is implementation of a uniform federal copyright system.  *See, e.g.*, *Urbont v. Sony Music Ent.*, 831 F.3d 80, 93 (2d Cir. 2016) ("One of the goals of the Copyright Act of 1976 was to create a 'national, uniform copyright law by broadly pre-empting state statutory and common-law copyright regulation.'") (citation omitted).

Ultimately, the fact that Maryland's conflict preemption argument rests on *Allied Artists'* four-decades-old analysis of a dissimilar state law—while disregarding *Orson* and other courts' more recent preemption holdings with respect to analogous state laws—underscores why the Maryland Act is preempted here.  Because a state law cannot "direct a copyright holder to distribute and license against its will or interests," the Maryland Act is preempted by federal law.  *Orson*, 189 F.3d at 386.

---

[10] Maryland also cites *Allied Artists* for the proposition that "ownership of a copyright does not entitle a company to abuse the market power it obtains thereby by engaging in . . . fraudulent or deceptive practices," Dkt. 10-1 at 19 (quoting *Allied Artists I*, 496 F. Supp. at 447).  But there is absolutely no allegation here—let alone any evidence—of "fraudulent or deceptive practices."

### 3.      __Maryland's Express Preemption Arguments Fail.__

Separately, AAP is also likely to succeed in showing express preemption, which provides a second, independent basis for enjoining the Maryland Act.  Maryland concedes that AAP has satisfied the first prong of the express preemption test.  *See* Dkt. 10-1 at 13.  Thus, all that is required for AAP to succeed on its express preemption claim is to satisfy the second prong of the test—by showing that the Maryland Act concerns rights that are "equivalent to those protected by federal copyright."  *OpenRisk, LLC, v. Microstrategy Servs. Corp.*, 876 F.3d 518, 523 (4th Cir. 2017) (citations and internal quotation marks omitted); *see also* Dkt. 10-1 at 14 ("Stated plainly, the issue is whether the rights created by state law are equivalent to exclusive rights.").

AAP's opening brief details the many ways in which the Maryland Act both creates and destroys rights equivalent to those guaranteed under the Copyright Act.  *See* Dkt. 4-1 at 20-21. Maryland fails to rebut those specific arguments.

Here, the Maryland Act defines a new right for libraries to automatically receive the state mandated digital lending licenses for scores of valuable literary works protected by the Copyright Act, including requiring that the terms include only those Maryland deems reasonable. Publishers lose the ability to control to whom they license their works to and on what terms, eviscerating their rights under 17 U.S.C. § 106.  Publishers would violate the Maryland Act merely by exercising their exclusive rights under the Copyright Act.  *See, e.g., Abend*, 495 U.S. at 229 (recognizing that "a copyright owner has the capacity arbitrarily to refuse to license one who seeks to exploit the work").  Accordingly, the rights defined under the Maryland Act are equivalent to those protected by federal copyright, and the Maryland Act is expressly preempted.

Although Maryland contends that the Maryland Act survives express preemption on the basis of the "extra element" test, Maryland misunderstands the nature and application of that

test.[11]  The Fourth Circuit has explained the "extra element" test as follows:  "[W]hen a state-law claim requires an 'extra element'—an element that goes beyond the elements of copyright infringement, such as unauthorized reproduction or distribution—that claim may be saved from Copyright Act preemption."  *OpenRisk, LLC*, 876 F.3d at 524.  The Fourth Circuit has emphasized that, "critically, not any 'extra element' will do."  *Id*.  "Only when an extra element changes the nature of the action so that it is *qualitatively* different from a copyright infringement claim is preemption avoided."  *Id.* at 524-25 (citations and internal quotation marks omitted) (emphasis in original).

Maryland fails to meet that standard.  Maryland claims only that, "[h]ere, the extra element that distinguishes the Maryland Act from the requirements of copyright is Maryland's authority to regulate market practices."  Dkt. 10-1 at 14.  But that argument misunderstands the requirements of the extra element test.  Maryland fails the extra element test because its pretext of regulating market practices does not create a qualitatively different claim.  No extra element is present.  Rather, Maryland sees unfair practices through its misperception of the metes and bounds of federal copyright law, threatening copyright owners with monetary liability—and even jail time—merely for exercising their exclusive rights under federal law.

It bears noting that Maryland mischaracterizes the Copyright Office's analysis of the express preemption of the Maryland Act.  Maryland's brief incorrectly claims that "the opinion of the United States Copyright Office . . . *rejects* [AAP's] argument that express preemption analysis applies here," Dkt. 10-1 at 10 (emphasis added), and that the Copyright Office

---

[11] Courts have criticized the "extra element" test as circular and unhelpful.  *See, e.g.*, *Ritchie v. Williams*, 395 F.3d 283, 287 n.3 (6th Cir. 2005).  It does not displace the key inquiry as to whether the state law concerns "rights that are equivalent to any of the exclusive rights" under the Copyright Act.  17 U.S.C. § 301.

"concluded that the Maryland Act is *not* expressly preempted," *id.* at 16 (emphasis in Maryland's brief).  Those statements are simply incorrect.  The Copyright Office did ***not*** conclude that the Maryland Act was not expressly preempted.  Rather, the Copyright Office specifically recognized that "some courts have analyzed state-imposed limitations on the exclusive rights granted in section 106 as a question of express preemption," and limited its analysis in its letter to conflict preemption, viewing it as "the ***better approach***" to analyzing "such limitations under the conflict preemption doctrine."  Dkt. 7-1, Ex. 7 at 3 (emphasis added).  And, of course, the Copyright Office ultimately concluded that the Maryland Act is "likely to be found preempted" under conflict preemption, relying in particular on *Orson*, (*id.* at 1, 5).

Maryland's attempt to distinguish the Ninth Circuit's preemption ruling in *Close* also fails.  Maryland does not dispute that the Ninth Circuit held that the California state law in *Close* was preempted because, among other reasons, it impermissibly "*restrict[ed]* the federal distribution right."  *Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1071 (9th Cir. 2018) (emphasis in original).  Lacking the ability to meaningfully distinguish the case, Maryland's only response is to argue that the Maryland Act is a consumer protection statute that does not reshape the distribution right as in *Close*.  Of course, because the Maryland Act's compulsory licensing requirement likewise would "restrict" publishers' exclusive rights—by creating an exhaustion scheme that removes control after initial public offerings and by depriving publishers of the rights to decline licenses through digital lending—the Maryland Act is preempted for the same reasons as in *Close*.  Identicality of facts is not required.

Finally, Maryland is wrong that the preemption cases cited by AAP are inapposite because they do not "involve[] a requirement that an author or publisher sell a product already

made available to the public"[12] or "the unique relationship between authors, publishers, and

libraries." Dkt. 10-1 at 16.  Maryland makes this up from whole cloth.  There is no reason those

distinctions alter the straightforward application of preemption principles discussed above.

> **B.**     **Maryland is Wrong About the Likely Irreparable Harm.**

AAP has shown it will suffer irreparable harm, on multiple independent grounds.

First, Maryland does not dispute that, where "there is a likely constitutional violation, the

irreparable harm factor is satisfied."  *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2

F.4th 330, 346 (4th Cir. 2021); *see* Dkt. 10-1 at 22 (conceding that "[i]t is true that 'where

Plaintiff's constitutional rights are being violated, there is a presumption of irreparable harm'"

(citation omitted)).  Thus, the fact that the Maryland Act violates the Supremacy Clause and is

therefore preempted is alone sufficient to demonstrate irreparable harm.

Second, Maryland ignores that the Maryland Act's stripping publishers of their exclusive

rights under the Copyright Act constitutes irreparable harm sufficient to enjoin the state law.

Maryland does not dispute the legal principle that "depriv[ing] the copyright holder of intangible

exclusive rights to control the means and methods by which its work will be seen by the public"

causes irreparable harm.  *Splitfish AG v. Bannco Corp.*, 727 F. Supp. 2d 461, 467 (E.D. Va.

2010) (internal citation and quotation marks omitted).  Meanwhile, Maryland's attempt to

distinguish *Splitfish* on the facts is unavailing.  Dkt. 10-1 at 23-24.  While the *Splitfish* court did

note that the copyright owner in that case had not licensed its copyrighted work to third parties,

the court found irreparable harm not because the work had never been licensed, but because

distributing the work against the copyright owner's will "would significantly diminish the

---

[12] As discussed in Background Sec. II, Maryland makes the inapposite comparison of a license
for digital lending with a license for personal use.

intangible value of the work to [the copyright owner] in a manner that could not be cured by damages alone." *Splitfish AG*, 727 F. Supp. 2d at 467.

Nor does Maryland even address the other cases cited by AAP from within this Circuit showing that depriving copyright owners of their exclusive rights under the Copyright Act constitutes irreparable injury. *See* Dkt. 4-1 at 24 n.6 (citing cases).

Third, by forcing publishers to involuntarily license their works to libraries on terms dictated by the State of Maryland, the state law is likely to undermine both the value of publishers' works and consumer demand for these works through non-library commercial markets in ways that are both irreversible and impossible to quantify.[13] That the Maryland Act is likely to negatively impact publishers' revenues should not be minimized, let alone denigrated, given that these revenues drive publishers' abilities to provide advances and royalties to authors, hire employees to develop and produce these works, and, ultimately, underly the incentive to create and publicly disseminate the works in the first place.

Fourth, while the Maryland Act fails to define what constitutes "reasonable" terms, several of Maryland's own affiants have offered the opinion that the current terms on which libraries license digital literary works from publishers are not reasonable. *See, e.g.*, Dkt. 10-5, Innouye Affidavit ¶ 8; Dkt. 10-3, Blackwell Affidavit ¶¶ 5-6. If those opinions are correct—and the state statute says nothing either way—then the Maryland Act could require all publishers to immediately offer to renegotiate all their digital lending licenses involving Maryland libraries.

---

[13] *See, e.g.*, *Update, Inc. v. Samilow*, 311 F. Supp. 3d 784, 795 (E.D. Va. 2018) ("Generally, irreparable harm is suffered when monetary damages are difficult to ascertain or are inadequate." (citation and internal quotation marks omitted)); *Tate Access Floors v. Interface Architectural Res., Inc.*, 132 F. Supp. 2d 365 (D. Md. 2001), *aff'd sub nom. Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357 (Fed. Cir. 2002) (considering "loss of revenues and good will" in irreparable harm analysis).

And, if the Maryland Act is allowed to remain in effect only to later be struck down as preempted, publishers will be forced to needlessly spend time, money, and resources to comply with the invalid state law while it is in effect—and they may even be subject to fines or criminal liability during this time. *See Air Evac EMS, Inc. v. Dodrill*, No. 2:21-CV-00310, 2021 WL 2877603, at *11 (S.D.W. Va. July 8, 2021) (finding irreparable harm based on similar considerations). The better course is to preserve the status quo and prevent further irreparable harm to publishers by enjoining the state law pending resolution of this case.

Maryland's attempt to show an absence of irreparable harm by pointing to the vitality of the existing market for licensing digital literary works to libraries is unavailing. Dkt. 10-1 at 24. Maryland acknowledges that this market is blossoming, with publishers already "agree[ing] on reasonable terms to license digital literary products to public libraries, as evidenced by increasing e-book holdings for libraries." *Id.* The Maryland Act will only interfere with the free market.

**C.     Maryland's Balance of Equities and Public Interest Arguments Fail.**

As to the balance of equities and public interest, Maryland wrongly focuses its brief on its underlying policy arguments for the state law. The relevant inquiry is whether the balance of equities and public interest favor preliminarily enjoining the law pending the outcome of this case—***not*** Maryland's purported underlying justifications for the law. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 27-33 (2008). As set forth in AAP's opening brief, the balance of equities and public interest favor enjoining the Maryland Act. *See* Dkt. 4-1 at 26-28.

Maryland does not identify any way in which it would be harmed by being preliminarily enjoined from enforcing a state law likely to be found preempted. *See Leaders of a Beautiful Struggle*, 2 F.4th at 346. Nor does Maryland dispute that the public interest is likewise served by enjoining a state law likely to be found invalid. Enjoining the Maryland Act here is a measured

21

step that will simply maintain the status quo and prevent further harm during the pendency of this lawsuit.  *See Dodrill*, 2021 WL 2877603, at *11.

Maryland also fails to address the numerous cases AAP cited demonstrating that "the public interest can only be served by upholding copyright protections."  *Advance Magazine Publishers, Inc. v. Leach*, 466 F. Supp. 2d 628, 638 (D. Md. 2006); *see also* Dkt. 4-1 at 27 and n.9 (citing additional cases).  Here, enjoining the Maryland Act will serve the public interest by preserving the integrity and operation of exclusive rights under the Copyright Act.

Maryland's various claims about "equitable access" go to its purported justifications for the state law itself—not whether a preliminary injunction is warranted.  But these arguments also fail in their own right.  Maryland does not have the authority to demand that publishers and authors provide every interested public library in the state with immediate access to all of their literary holdings, whether or not they call it "equitable access."  To be sure, in keeping with the Copyright Clause, Congress has considered the goal of ***public*** access to literary works, and it has decisively determined that such access is best achieved through a system of exclusive rights and economic incentives.  *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 558 (1985) ("By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas.").  Of course, as borne out by the robust practices discussed above, any publisher may decide to license to libraries simultaneously with the consumer market as a matter of good business judgment, but they are entitled to make these decisions—and constantly adjust the particulars of these decisions—according to a host of balancing considerations and the economic interests that extend from their exclusive rights under the Copyright Act.  As to the interests of "older Americans and seniors with disabilities," Dkt. 10-1 at 26, these persons should not be coopted to justify an unrelated, preempted, and

22

unconstitutional legislative effort like the Maryland Act.[14]

## II.      Maryland's Motion to Dismiss AAP's Remaining Claims Should Be Denied.

### A.      AAP States a Claim for Violation of the Commerce Clause.

Maryland's barebone recitals of the law and conclusory assertions that the Maryland Act does not create "any burden on interstate commerce," Dkt. 10-1 at 30, fall flat, especially at the pleading stage.  AAP has alleged more than enough facts to survive dismissal and states a claim for violation of the Commerce Clause of the U.S. Constitution.  The Commerce Clause provides that only Congress has the authority "[t]o regulate commerce . . . among the several States." U.S. Const. art. I, § 8.  Maryland cannot usurp this authority of the federal government by regulating interstate and out-of-state commerce through the Maryland Act.

Maryland incorrectly asserts—on multiple occasions—that the Maryland Act is triggered only when "publishers offer to license their products *to the Maryland public*."  Dkt. 10-1 at 23 (emphasis added); *see also id*. ("[T]he Maryland Act only applies to works that the Association has already elected to license *to the Maryland public*.") (emphasis added)); *id*. at 21-22 ("Only when the publisher makes the decision to license the electronic literary product *to the Maryland public* does the Maryland Act step in.") (emphasis added)).

But Maryland cannot rewrite its own statute to avoid a Commerce Clause violation at the same time it defends it.  Maryland must defend its statute as it is written.

The Maryland Act unequivocally applies to any "publisher who offers to license an electronic literary product *to the public*"—not just the "Maryland public."  Dkt. 1-1 at 2 (citing Md. Code, Educ. §§ 23-702 (a) (emphasis added)).   Indeed, it is because of this very language,

---

[14] Further to preemption, Congress has worked with publishers and other stakeholders for decades to ensure that the Copyright Act provides special accommodations to persons with print disabilities.  *See, e.g.*, 17 U.S.C. §121.  And, more generally, publishers have longstanding partnerships with these communities and libraries.

among other reasons, that the Maryland Act violates the Commerce Clause and is
unconstitutional.

*First*, the Maryland Act regulates commerce that takes place wholly outside of the State
of Maryland.  The dormant Commerce Clause forbids a State from "regulat[ing] commerce
occurring wholly outside of its borders."  *Ass'n for Accessible Medicines v. Frosh*, 887 F.3d 664,
667 (4th Cir. 2018) (citing cases).  Indeed, the Supreme Court has recognized that "[a] state
statute may not regulate 'commerce that takes place wholly outside of the State's borders,
whether or not the commerce has effects within the State," and that "'[a] [state] statute that
directly controls commerce occurring wholly outside the [state's] boundaries . . . is invalid
regardless of whether the statute's extraterritorial reach was intended by the legislature.'"  *Id.* at
669 (quoting *Healy v. Beer Institute*, 491 U.S. 324, 336-37 (1989)).

Here, the Maryland Act impermissibly regulates commerce "occurring wholly outside of
[Maryland's] borders," *id.* at 667, by forcing any publisher who licenses an ebook, audiobook, or
other digital literary work to the public—no matter where the publisher is located or where the
publisher offers such licenses, whether inside or outside of Maryland—to license the work to
libraries in Maryland for digital lending on terms deemed reasonable by the State.  *See* Dkt. 1 ¶
98.  Publishers doing business outside of Maryland must nevertheless comply with the Maryland
Act or risk civil and criminal penalties.  In a digital economy, with instantaneous transactions
across state lines not to mention national borders, this far-reaching and misguided measure
creates a race to the bottom.  For good reason, courts have recognized that such laws are
unconstitutional under the Commerce Clause.[15]

---

[15] *See, e.g.*, *Ass'n for Accessible Medicines*, 887 F.3d at 673 (holding Maryland state law
unconstitutional under the dormant Commerce Clause, where the statute "effectively seeks to

For the same reasons, the Maryland Act is unconstitutional. Notably, nowhere in its motion to dismiss does Maryland even address AAP's allegations regarding the unconstitutional extraterritorial effects of the state law, let alone demonstrate that dismissal is warranted. To the contrary, Maryland misstates the text of its statute, fundamentally ignoring its extraterritorial nature and excessive burden on publishers who license to the U.S. "public."

*Second*, the Maryland Act also runs afoul of the Commerce Clause's "protect[ion] against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Healy*, 491 U.S. at 337. The Maryland Act carries the risk of subjecting publishers' interstate licensing transactions to inconsistent regulations. Dkt. 1 ¶ 100. This risk is particularly acute given, first, that library lobbyists are pursuing similar, tag-along legislation in numerous other states, including, as of the date of this filing, Illinois, Massachusetts, Missouri, Rhode Island and Tennessee, and second, that the Governor of New York has already vetoed a nearly identical law.[16] As with AAP's allegations regarding the extraterritorial effects of the state law, Maryland fails to even address this aspect of AAP's Commerce Clause claim in its motion to dismiss.

Given that the Maryland Act is unconstitutional on these grounds, there is no need for the Court to apply the *Pike* balancing test based on the general burden the state law also places on

---

compel manufacturers and wholesalers to act in accordance with Maryland law outside of Maryland"); *American Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003) (holding Vermont state law unconstitutional under the dormant Commerce Clause, where the statute "project[ed] Vermont's regulation onto the rest of the nation," given that "those outside Vermont must comply with [the state law] or risk prosecution by Vermont"); *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 376 (6th Cir. 2013) (Michigan law requiring consumers to pay a bottle deposit when purchasing certain beverage containers violated dormant Commerce Clause because "Michigan is forcing states to comply with its legislation in order to conduct business within its state, which creates an impermissible extraterritorial effect.")

[16] https://www.authorsguild.org/wp-content/uploads/2021/12/GovernorHochulVetoMessage.pdf.

interstate commerce. *See, e.g.*, *Dean*, 342 F.3d at 104 (after holding statute was unconstitutional for extraterritorial effects, "declin[ing] to consider . . . whether the statute would also fail the *Pike* test based on the general burden it places on interstate commerce").

In any event, the Maryland Act would fail the *Pike* balancing test. State laws that incidentally burden interstate commerce will be struck down as unconstitutional where "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Yamaha Motor Corp., U.S.A. v. Jim's Motorcycle, Inc.*, 401 F.3d 560, 567, 573-74 (4th Cir. 2005) (dormant Commerce Clause violated where it "imposes [] heavy burdens predominantly on out-of-state interests . . . [and these] burdens clearly exceed [the statute's] benefits"). The Maryland Act requires all publishers who license their electronic literary works to the public— even those who only license such works to the public outside of Maryland—to nevertheless enter into mandatory licensing agreements for the same works with Maryland libraries, under terms deemed reasonable by the State. As described above, *see supra* Argument Sec. I.B., those requirements will irreparably harm publishers, in numerous ways.

Meanwhile, Maryland does not have a substantial state interest to support its legislation. Maryland's allegations regarding the "expensive prices" libraries pay for digital lending licenses and the fact that "some publishers" previously "limit[ed] libraries' access to digital media," Dkt. 10-1 at 8, is insufficient justification. Maryland's desire to get "more for less" is not a substantial state interest, as numerous courts have recognized.[17]

---

[17] *See, e.g.*, *Asociacion de Educacion Privada de Puerto Rico v. Garcia-Padilla*, 490 F.3d 1, 17-18 (1st Cir. 2007) (finding complaints about "the excessive costs of textbooks" to be "insufficient to establish a legitimate state interest," where the record was "entirely devoid of any evidence [] suggest[ing] that the prices of textbooks are excessive, or that textbook publishers' or distributors' pricing practices are in any way abusive, unfair or arbitrary," and where "[t]he absence of standards against which we might be able to judge the need for consumer protection

Accepting AAP's factual allegations in the Complaint as true, and drawing all reasonable inferences in AAP's favor, AAP clearly states a claim for a violation of the Commerce Clause. Courts have rejected motions to dismiss Commerce Clause claims in similar cases. *Colon Health Centers of Am., LLC v. Hazel*, 733 F.3d 535, 546 (4th Cir. 2013) (district court erred in dismissing Commerce Clause claim because the "*Pike* inquiry, like the discrimination test, is fact-bound" which "counsels against a premature dismissal"); *Brown v. Hovatter*, No. RDB 06-524, 2006 WL 2927547, at \*10 (D. Md. Oct. 11, 2006) (denying defendant's motion to dismiss dormant Commerce Clause claim because "this Court is simply unable to conclude at this stage" that plaintiff cannot prove facts in support of his claim that would entitle him to relief).

For the same reasons, Maryland's motion to dismiss here should be denied.

### B.    AAP States a Claim for Violation of the Due Process Clause Because the Terms of the Maryland Act Are Void for Vagueness.

The Maryland Act violates the Due Process Clause because it fails to provide adequate notice and guidance to publishers of what is required of them under the law.  Under the Fifth Amendment, "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law. . . ."  U.S. Const. amend. V.  "[T]he void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."  *FCC v. Fox*

---

legislation in the textbook publishing industry renders [the] assertion of a substantial state interest mere speculation"); *Dana's R.R. Supply v. Attorney Gen., Fla.*, 807 F.3d 1235, 1249-50 (11th Cir. 2015) (holding that there was no government interest, let alone a substantial one, in a no-surcharge law applied to credit card companies); *Italian Colors Restaurant v. Harris*, 99 F. Supp. 3d 1199, 1210 (E.D. Cal. 2015) (holding that there was no substantial interest in no-surcharge laws applicable to credit card companies).

*Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

A law is impermissibly vague if it fails to "give a person of ordinary intelligence adequate notice of what conduct is prohibited" or if it fails to "include sufficient standards to prevent arbitrary and discriminatory enforcement." *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019). Although "[l]ess clarity is required in purely civil statutes because the consequences of imprecision are qualitatively less severe . . . if criminal penalties may be imposed for violations of a law, a stricter standard is applied in reviewing the statute for vagueness." *Id.* at 273 (citation and internal quotation marks omitted). Because the Maryland Act provides for criminal penalties, Dkt. 4-1 at 16, the stricter standard applies here.

Here, the Maryland Act is unconstitutionality vague because it fails to provide fair notice of (1) the "reasonable terms" that publishers are subject to, and (2) what libraries qualify as "public libraries in the State." Dkt. 1 ¶¶ 40, 41, 105-06.

First, the Maryland Act's "reasonable terms" requirement forces publishers and authors to essentially guess what price terms, among other terms, are reasonable. *Fla. Action Comm., Inc. v. Seminole Cty.*,212 F. Supp. 3d 1213, 1224 (M.D. Fla. 2016) ("In short, a vagueness claim lies where those who enforce the law or those who are subject to its enforcement 'must necessarily guess at its meaning and differ as to its application.'" (citing *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926))). Maryland argues that the Maryland Act provides examples of what "reasonable" means, Dkt. 10-1 at 31; but the Maryland Act merely specifies three terms that are reasonable and one that is not, *see* Md. Code, Educ. §§ 23-702(b)), leaving far too much room for speculation. For instance, does Maryland view as unreasonable a pricing term that reflects the fact that, unlike individual consumers who license a single title for personal

use, libraries' licenses enable them to become online distributors of that same title to patron after patron after patron?  Does Maryland view as unreasonable a license term that limits the number of times a library can "check out" digital copies of that title to its patrons?  Does Maryland view as unreasonable a license that expires after two years?  As to these questions, those behind the Maryland Act are already in disagreement.  *See* Dkt. 4-1 at 9.[18]  The panoply of unanswered questions is left to be decided as the State of Maryland brings enforcement actions (civil and criminal) and as private litigants sue publishers under the state law.

Concerns like these have led the U.S. Supreme Court to find laws constitutionally invalid in similar circumstances.  *See United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 86-88 (1921) (ruling that a law making it unlawful "for any person willfully . . . to make any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries" was unconstitutionally vague); *Int'l Harvester Co. of Am. v. Kentucky*, 234 U.S. 216, 221-22 (1914) (holding that a law prohibiting farmers from "fixing a price that was greater or less than the real value of the article" was unconstitutionally vague); *see also U.S. v. Reliant Energy Services, Inc.*, 420 F. Supp. 2d 1043, 1058 (N.D. Cal. 2006) (suggesting that criminalizing the selling of a product at an unreasonable price would render a statute impermissibly vague).

Maryland argues that the term "reasonable" is "well within constitutional boundaries," Dkt. 10-1 at 30, but the case law it cites does not stand for the proposition that the term "reasonable" is per se constitutional in all circumstances.  Rather, as shown above, this question depends on the facts of the individual case.

---

[18] *See* Dkt. 4-1, n2.; Dkt. 10-5, Innouye Affidavit ¶ 8; Dkt. 10-3, Blackwell Affidavit ¶¶ 5-6 (offering opinion that the current terms on which libraries license digital literary works from publishers are not reasonable).

Second, the Maryland Act violates due process because it does not provide publishers fair notice of what libraries qualify as "public libraries in the State."  Md. Code, Educ. § 23-702(a); Dkt. 1 ¶¶ 40, 106.  Maryland asserts that "[t]here is no plausible alternative construction that [the Maryland Act] refer[s] to anything other than the public libraries in the Maryland counties." Dkt. 10-1 at 32.  To the contrary, the term "public libraries in the State" leaves a litany of unanswered questions.  For instance, are public libraries determined based on who they serve, how they are funded, or some other metric?  Is there some restriction that public libraries serve only those in Maryland?  Must a public library have a physical location in Maryland?  None of these questions is answered in the Maryland Act.  *See* Dkt. 4-1 at 9-10; *see e.g., Seminole Cty.*, 212 F. Supp. 3d at 1225 (plaintiff stated vagueness claim where it alleged that ordinance establishing an exclusion zone for sex offenders was unconstitutionally vague because ordinance "fail[ed] to identify all schools, daycare centers, parks, and playgrounds covered by the [o]rdinance").  Maryland's conclusory statement that the term "public libraries" is "unambiguous," Dkt. 10-1 at 32, does not save the Maryland Act from AAP's legitimate due process concerns, especially at the pleading stage.

## **CONCLUSION**

For these reasons, and as set forth in more detail in AAP's opening brief, AAP is likely to succeed in showing that the Maryland Act is preempted by federal law, under conflict and/or express preemption principles; AAP and its members will likely suffer irreparable harm in the absence of an injunction; and the balance of equities and public interest favor an injunction. Accordingly, the Maryland Act should be enjoined.  Likewise, Maryland's motion to dismiss should be denied.

Dated: January 28, 2022                    Respectfully submitted,

                                           */s/ Scott A. Zebrak*
                                           Scott A. Zebrak (17741)
                                           Matthew J. Oppenheim (22256)
                                           Nicholas C. Hailey
                                           Carly A. Kessler
                                           Ever M. Hess
                                           **OPPENHEIM + ZEBRAK, LLP**
                                           4530 Wisconsin Avenue, NW, 5th Floor
                                           Washington, DC 20016
                                           Phone: (202) 480-2999
                                           scott@oandzlaw.com
                                           matt@oandzlaw.com
                                           nick@oandzlaw.com
                                           carly@oandzlaw.com
                                           ever@oandzlaw.com

                                           *Attorneys for Plaintiff Association of*
                                           *American Publishers, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 28, 2022, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which sent notice of such filing to all counsel of

record entitled to service.

*/s/ Scott A. Zebrak*
Scott A. Zebrak (17741)
