**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| **ASSOCIATION OF AMERICAN** | | |
| **PUBLISHERS, INC.,** | * | |
| | | |
| **Plaintiff,** | * | |
| | | |
| **v.** | * | **Case No.: DLB-21-3133** |
| | | |
| **BRIAN E. FROSH, in his official capacity as** | * | |
| **Attorney General of the State of Maryland,** | | |
| | * | |
| **Defendant.** | | |
| | * | |

**MEMORANDUM OPINION**

The Association of American Publishers, Inc. ("AAP") challenges the constitutionality of a recently enacted Maryland law ("Maryland Act" or "the Act") that requires publishers who offer to license "electronic literary products" to "the public" to offer to license the same products to Maryland public libraries on "reasonable terms." Md. Code Ann., Educ. § 23-701 – 23-702. AAP, the national trade association and principal public policy advocate for publishing houses in the United States, filed a complaint against Brian E. Frosh in his official capacity as the Maryland State Attorney General ("the State") in which it alleged, *inter alia*, that the Maryland Act is preempted by the Copyright Act, 17 U.S.C. § 101 *et seq.* ECF 1. AAP moved for a preliminary injunction enjoining enforcement of the Maryland Act, which took effect on January 1, 2022. ECF 4. The State opposed the motion and moved to dismiss the complaint. ECF 10. AAP replied and opposed, ECF 13, and the State replied, ECF 17. The Court held a virtual hearing on the preliminary injunction motion on February 7, 2022. For the reasons set forth in this Memorandum Opinion, plaintiff's motion for a preliminary injunction is granted.

## I.      Background

The Copyright Clause of the Constitution empowers Congress "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Rights to their respective Writings and Discoveries . . . ."  U.S. Const. art. I, § 8, cl. 8.  Congress exercised this constitutional authority when it enacted the Copyright Act.  The Copyright Act confers on the owner of a copyright certain "exclusive rights," including the right to "distribute copies or phonorecords of . . . copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending."  17 U.S.C. § 106(3).

The exclusive rights protected by the Copyright Act are limited in duration.  17 U.S.C. §§ 302–05.  Generally, copyright in a new work "endures for a term consisting of the life of the author and 70 years after the author's death."  *Id.* § 302(a).

> [This] limited grant is a means by which an important public purpose may be achieved.  It is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired.

*Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 546 (1985) (quoting *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984)).

There are exceptions to the exclusive rights enumerated in 17 U.S.C. § 106.  For example, not considered copyright infringement is the "fair use" of protected material, which may include "criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research."  17 U.S.C. § 107.  Also not considered copyright infringement is the reproduction of "damaged, deteriorating, lost, or stolen" copyrighted materials by libraries or archives—an exception that allows those institutions to preserve the public record for future generations.  *Id.* § 108.  A well-known exception is for the sale or disposition "of a particular copy or phonorecord" protected by the Copyright Act.  *Id.* § 109.  This exception, known as the

statutorily codified "first sale doctrine," prevents the far-reaching protections of copyright from interfering with the bundle of rights held by the owners of personal property. *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 523, 538–39 (2013).[1]

It is clear from the text and history of the Copyright Act that the balance of rights and exceptions is decided by Congress alone. The Copyright Act contains an expansive express preemption provision:

> On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by section 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a). This preemption provision effectuated Congress's intent to "adopt[] a single system of Federal statutory copyright from creation." Pub. L. 94-553, Title I, § 101, Oct. 19, 1976, 90 Stat. 2572; H.R. Rep. 94-1476, 1976 WL 14045, at *129 (1976). Congress stated that "[t]he

---

[1] The "first sale doctrine" allows libraries to lend hardcopy books and other tangible copyrighted materials to patrons. *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199, 203 (4th Cir. 1997). The federal government has studied the possibility of expanding the first sale doctrine to cover digital works on more than one occasion. In 2001, the Register of Copyrights and the Assistant Secretary for Communication and Information of the Department of Commerce prepared a report in compliance with § 104 of the Digital Millennium Copyright Act of 1998, Pub. L. No. 105–304, 112 Stat. 2860, 2876. The Copyright Office recommended against expanding the first sale doctrine to digital transmissions in part because "[t]he risk that expansion of section 109 [would] lead to increased digital infringement weigh[ed] heavily against such an expansion." U.S. Copyright Office, *DMCA Section 104 Report* 96–101 (2001). Then, in 2016, the Department of Commerce's Internet Policy Task Force prepared a "White Paper on Remixes, First Sale, and Statutory Damages." Dep't of Commerce Internet Policy Task Force, *White Paper on Remixes, First Sale, and Statutory Damages* (2016). The Task Force likewise recommended against expansion of the first sale doctrine to digital transmissions. *Id.* at 58. The Task Force found that "the risks to copyright owners' primary markets as described by the Copyright Office in its 2001 Report d[id] not appear to have diminished, or to have been ameliorated by the deployment of effective new technologies." *Id.* To date, Congress has not expanded the first sale doctrine to digital transmissions. *See* 17 U.S.C. § 101 *et seq.*

intention of section 301 [was] to preempt and abolish any rights under the common law or statutes of a State that [were] equivalent to copyright and that extend[ed] to works coming within the scope of the Federal copyright law."  H.R. Rep. 94-1476, 1976 WL 14045, at *130.  Section 301's "declaration of [that] principle" was "intended to be stated in the clearest and most unequivocal language possible, so as to foreclose any conceivable misinterpretation of its unqualified intention that Congress shall act preemptively, and to avoid the development of any vague borderline areas between State and Federal protection."  *Id.*

Despite Congress's clear intention to preempt state copyright laws, in early 2021 the Maryland General Assembly introduced legislation with a two-part mission: (1) to require publishers to offer to license copyrighted electronic literary products, such as ebooks and digital audiobooks, to public libraries, and (2) to ensure the terms of such licenses would be fair.  S.B. 432, 2021 Gen. Assembly, 442d Sess. (Md. 2021), 2021 Md. Laws Ch. 412; H.B. 518, 2021 Gen. Assembly, 442d Sess. (Md. 2021), 2021 Md. Laws Ch. 411.  The legislation attracted much support—and opposition—from interested stakeholders with fundamentally divergent views on its costs, benefits, and legality.  *Compare* ECF 7-1, *with* ECF 10-4 & 10-6.  On the one hand, public libraries and their champions viewed the legislation as essential to ensuring public access to copyrighted materials that publishers previously withheld from libraries or offered on economically unfavorable terms.  *See, e.g.*, ECF 10-8, at 2–3.  The proposed law, according to its proponents, was reasonable and necessary to stop publishers from up-charging libraries for licenses shackled with stringent time and use limitations.  *See, e.g.*, ECF 10-9, at 2–3.  On the other hand, publishers and other copyright holders saw the legislation as an unconstitutional infringement on the rights conferred by the Copyright Act, most significantly the exclusive right to distribute.  *See, e.g.*, Pallante Decl. ¶¶ 17–26, ECF 7, at 6–9.  Opponents also maintained that,

by interfering with the profit-making of copyright holders, the legislation frustrated its own purpose. Curbing copyright holders' profits would prevent them from producing new content for the public to enjoy. *See, e.g.*, ECF 7-1, at 19–21.

The parties here dispute the scope of the problem the legislation purported to solve. The State paints a picture of an inflexible publishing industry that "increasingly offer[s] ebooks and digital audiobooks that [it] will not share with libraries." ECF 10-4, at 2. Maria Pallante, the Chief Executive Officer of AAP, controverts that depiction of the relationship between publishers and libraries. Pallante Decl., ¶¶ 1–26, ECF 7, at 1–9. In her December 16, 2021 declaration, she stated that "[l]ibrary and ebook and audiobook lending" was "thriving." *Id.* ¶ 14, ECF 7, at 5. She also reported that in 2020 "more than 100 public library systems exceed[ed] one million digital checkouts on the ebook lending platform of a library aggregator named OverDrive." *Id.* ¶ 15, ECF 7, at 6. Globally, "430 million ebooks were borrowed . . . in 2020." *Id.* "In 2021, 129 library systems [were] on track to . . . break[] [2020's] all-time [lending] record." *Id.* ¶ 16, ECF 7, at 6. The Authors Guild, which testified in opposition to the legislation, described the legislation as "responding to the practice by a dominant player of deliberately withholding its electronic books from libraries with a law that [swept] in thousands of small publishers and self-published authors who cannot manage distribution and licensing at scale." ECF 7-1, at 25. Motivating the legislation's proponents, according to the Authors Guild, was a negative response to "[t]he practices of one or two actors in the industry." *Id.*

Proponents of the legislation additionally decried the terms on which electronic literary products were offered to libraries. Licenses typically lasted only two years for products that may be lent a designated number of times to one individual at a time. Blackwell Decl. ¶¶ 5(a)–(c), ECF 10-3, at 3–4. The cost of the licenses also far exceeded the cost of personal use licenses offered to

the public.  *Id.* ¶ 5(d), ECF 10-3, at 5.  For example, a book on the New York Times Best Sellers list in December 2020 cost an individual consumer $22.05, but a license for the same product cost libraries $95.00.  ECF 10-8, at 4.  From the perspective of AAP and other opponents of the law, comparing electronic literary product licenses offered to libraries with licenses for the same products offered to individuals is like comparing apples with oranges.  Personal use licenses are sold to and used by only one person.  Library licenses are used by multiple library customers for short periods over the course of the term of the license.

Heated public debate notwithstanding, the legislation was passed unanimously and became law on May 30, 2021, without the Governor's signature.  2021 Md. Laws Ch. 411 & 412.  The Maryland Act, Md. Code Ann., Educ. §§ 23-701 – 23-702, took effect on January 1, 2022.  *Id.* The substantive provision of the Act provides:

> Subject to subsections (b) and (c) of this section, a publisher who offers to license an electronic literary product to the public shall offer to license the electronic literary product to public libraries in the State on reasonable terms that would enable public libraries to provide library users with access to the electronic literary product.

Md. Code Ann., Educ. § 23-702(a).  "Electronic literary product" is defined as either

> (1) [a] text document that has been converted into or published in a digital format that is read on a computer, tablet, smart phone, or other electronic device; or (2) [a]n audio recording of a text document, read out loud in a format that is listened to on a computer, tablet, smart phone, or other electronic device.

*Id.* § 23-701(b).  A publisher is "a person in the business of manufacturing, promulgating, and selling books, audio books, journals, magazines, newspapers, or other literary productions, including those in digital form, that consist of text, imagery, audio recording, or any combination

of text, image, and audio recording." *Id.* § 23-701(c). The Act does not define "the public," "public libraries in the State," or "reasonable terms."[2]

Subsection (b) of the Act, "Terms of license," sets forth certain licensing terms that are acceptable. It provides:

> The terms of a license under subsection (a) . . . may include: (1) [a] limitation on the number of users a public library may simultaneously allow to access an electronic literary product; (2) [a] limitation on the number of days a public library may allow a user to access an electronic literary product; and (3) [t]he use of technological protection measures that would prevent a user from: (i) [m]aintaining access to an electronic literary product beyond the access period specified in the license; and (ii) [a]llowing other users to access an electronic literary product.

*Id.* § 23-702(b). The Act forbids licensing terms that "include a limitation on the number of electronic literary product licenses a public library may purchase on the same date the electronic literary product license is made available to the public." *Id.* § 23-702(c).

The Act includes a penalties provision. A violation of the Act "shall constitute an unfair, abusive, or deceptive trade practice and is subject to enforcement in accordance with Title 13, Subtitle 4 of the Commercial Law Article." *Id.* § 23-702(d). Title 13, Subtitle 4 of Maryland's Commercial Law Article states: "A merchant who engages in a violation of [that] title is subject to a fine not exceeding $10,000 for each violation[,]" and "[a] merchant who has been found to have engaged in a violation of [that] title and who subsequently repeats the same violation is

---

[2] The parties dispute the meaning of the term "the public." AAP argues "the public" means the broader public, not just members of the Maryland public—an interpretation that would trigger the Act's requirements when a publisher offers to license an electronic literary product to anyone in the world. The State argues "the public" means the public in Maryland. At the hearing, the State essentially conceded that where ebooks and audiobooks are offered online to any interested buyer, they are being offered to the public in Maryland. As for the undefined terms "public libraries in the State" and "reasonable terms," AAP claims that they are unconstitutionally vague, and therefore, that the Act violates the Due Process Clause. ECF 1, ¶¶ 103–10. The due process claim, which is not at issue in this preliminary injunction motion, is the subject of the State's motion to dismiss.

subject to a fine not exceeding $25,000 for each subsequent violation."  Md. Code Ann., Com. Law § 13-410(a)–(b).  Maryland's Attorney General "may seek an injunction to prohibit a person who has engaged or is engaging in a violation of [that] title from continuing or engaging in the violation." *Id.* § 13-406(a).  In such circumstances, "the Attorney General is entitled to recover the costs of the action for the use of the State." *Id.* § 13-409.  Similarly, any aggrieved party may bring an action for damages "to recover for injury or loss sustained by him as the result of a practice prohibited by [that] title" and may be entitled to "reasonable attorney's fees." *Id.* § 13-408(a)–(b). Criminal penalties are also possible: "[A]ny person who violates any provision of [the Act] is guilty of a misdemeanor and, unless another criminal penalty is specifically provided elsewhere, on conviction is subject to a fine not exceeding $1,000 or imprisonment not exceeding one year or both, in addition to any civil penalties." *Id.* § 13-411(a).

On December 9, 2021, three weeks before the Act was scheduled to take effect, plaintiff AAP filed suit against the Attorney General of Maryland Brian Frosh in his official capacity.  ECF 1.  In its complaint, AAP alleges that (i) the Maryland Act is expressly preempted under the Copyright Act (Count I), (ii) the Maryland Act is preempted by the Copyright Act under conflict preemption principles (Count II), (iii) the Act violates the Dormant Commerce Clause of the Constitution (Count III), and (iv) the Act violates the Due Process Clauses of the Fifth and Fourteenth Amendments (Count IV). *Id.* ¶¶ 75–110.  Soon after filing the complaint, AAP filed a motion for a preliminary injunction based on its express and conflict preemption claims.

## II.    Preliminary Injunction Standard

Prior to the entry of a final judgment, a court may enter a preliminary injunction.  Fed. R. Civ. P. 65(a).  Such an injunction "protect[s] the status quo and . . . prevent[s] irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful

judgment on the merits." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013)

(quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003)).  In other words,

a preliminary injunction enables the Court to ensure that, should the plaintiff prevail, the relief

sought will be available to it to the same extent as when it filed suit.  *See id.*  "A preliminary

injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the

plaintiff is entitled to such relief' and may never be awarded 'as of right.'"  *Mountain Valley*

*Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (quoting

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008)); *see also Leaders of a Beautiful*

*Struggle v. Balt. Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021) (en banc).

A plaintiff seeking preliminary injunctive relief bears the burden of proof and must meet

"a high bar" by "[s]atisfying . . . four factors."  *SAS Inst., Inc. v. World Programming Ltd.*, 874

F.3d 370, 385 (4th Cir. 2017); *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812

(4th Cir. 1991).  The plaintiff must clearly show "[1] that [it] is likely to succeed on the merits, [2]

that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance

of equities tips in [its] favor, and [4] that an injunction is in the public interest."  *Winter*, 555 U.S.

at 20; *The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346–47 (4th

Cir. 2009), *vacated on other grounds, Citizens United v. FEC*, 558 U.S. 310 (2010), *aff'd, The*

*Real Truth About Obama, Inc. v. FEC*, 607 F.3d 355 (4th Cir. 2010) (per curiam) (discussing

*Winter* factors).  Each factor must be "satisfied as articulated."  *Pashby v. Delia*, 709 F.3d 307,

320–21 (4th Cir. 2013) (quoting *The Real Truth*, 575 F.3d at 347).

## III.    Discussion

Plaintiff asks this Court to enjoin enforcement of the Maryland Act pending resolution of

this case because the Act is expressly preempted by and conflicts with the Copyright Act.  AAP

claims its members will suffer irreparable harm if the Act is not enjoined, that the balance of the equities weighs in favor of preliminary injunctive relief, and that the public interest would be served by an injunction.  ECF 4 & 4-1.  After considering the parties' written submissions and arguments of counsel, the Court finds plaintiff has clearly satisfied the four preliminary injunction factors.

### A.  Likelihood of Success on the Merits

To secure a preliminary injunction, a plaintiff must "make a 'clear showing' that [it is] likely to succeed at trial, [but it] need not show a certainty of success."  *Pashby*, 709 F.3d at 321 (internal citations omitted); *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).  Therefore, AAP bears the burden of clearly showing the Maryland Act is likely to be found preempted by the Copyright Act.

The preemption doctrine stems from the Supremacy Clause.  The Supremacy Clause provides that the "Constitution, and the laws of the United States which shall be made in pursuance thereof[,] . . . shall be the supreme law of the land . . . ."  U.S. Const. art. VI, cl. 2.  It is "[a] fundamental principle of the Constitution . . . that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (citing U.S. Const. art. VI, cl. 2; *Gibbons v. Ogden*, 9 U.S. (1 Wheat.) 1, 211 (1824); *Savage v. Jones*, 225 U.S. 501 (1912); *California v. ARC Am. Corp.*, 490 U.S. 93 (1989)).

"Federal law may preempt state law in three ways: by 'express preemption,' 'field preemption,' and 'conflict preemption.'"  *W. Star Hosp. Auth. Inc. v. City of Richmond, Va.*, 986 F.4th 354, 360 (4th Cir. 2021) (quoting *H & R Block E. Enters., Inc. v. Raskin*, 591 F.3d 718, 722 (4th Cir. 2010)).  Plaintiff moves for an injunction based on express and conflict preemption. Express preemption occurs when "Congress expressly states its intent to preempt state law."

*Decohen v. Capital One, N.A.*, 703 F.3d 213, 223 (4th Cir. 2012) (citing *Cox v. Shalala*, 112 F.3d 151, 154 (4th Cir. 1994)).  Conflict preemption "occurs when a state law 'actually conflicts with federal law.'"  *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 191 (4th Cir. 2007) (quoting *S. Blasting Servs., Inc. v. Wilkes Cnty.*, 288 F.3d 584, 590 (4th Cir. 2002) (quoting *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985))).

"The Supreme Court has instructed that conflict preemption 'includes cases where compliance with both federal and state regulations is a physical impossibility, and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *South Carolina*, 720 F.3d at 529 (quoting *Arizona v. United States*, 567 U.S. 387, 399–400 (2012)).  "Determining whether a state law 'stands as an obstacle' to federal law is a two-step process."  *Va. Uranium, Inc. v. Warren*, 848 F.3d 590, 599 (4th Cir. 2017).  "First, [a court] determine[s] Congress's 'significant objective[s]' in passing the federal law."  *Id.* (quoting *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 330 (2011)).  A court "then turn[s] to whether the state law stands 'as an obstacle to the accomplishment of a significant federal regulatory objective.'"  *Id.* (quoting *Williamson*, 562 U.S. at 330).

Congress passed the Copyright Act to serve public goals by protecting private rights.  It achieved those objectives by "implement[ing] a nationally uniform system for the creation and protection of rights in a copyrighted work."  *Orson, Inc. v. Miramax Film Corp.*, 189 F.3d 377, 382 (3d Cir. 1999) (en banc) (citing *Goldstein v. California*, 412 U.S. 546, 561 (1973)).  To attain national uniformity, Congress included a preemption provision.  17 U.S.C. § 301(a).  "Federal Copyright Act preemption is 'broad and absolute.'"  *OpenRisk, LLC, v. Microstrategy Servs. Corp.*, 876 F.3d 518, 523 (4th Cir. 2017) (quoting *United States ex rel. Berge v. Bd. of Trs.*, 104 F.3d 1453, 1464 (4th Cir. 1997)).

It is clear the Maryland Act likely stands as an obstacle to the accomplishment of the purposes and objectives of the Copyright Act.  The Maryland Act commands that, if a publisher offers to license an electronic literary product to the public at large, the publisher "shall offer to license" the same product to libraries "on reasonable terms that would enable public libraries to provide library users with access to the electronic literary product."  Md. Code Ann., Educ. § 23-702(a).  The Act's "offer to license" requirement is triggered when a publisher offers to license the product "to the public"—an act publishers do online every day through various websites and apps.  Publishers could avoid the Act's reach only by refraining entirely from offering their ebooks and audiobooks to the public.  Forcing publishers to forgo offering their copyrighted works to the public in order to avoid the ambit of the Act interferes with their ability to exercise their exclusive right to distribute.  Alternatively, forcing publishers to offer to license their works to public libraries also interferes with their exclusive right to distribute.  This is especially so because the Act does not allow copyright holders to limit the number of licenses libraries may purchase; they may purchase as many licenses as they wish.  *Id.* § 23-702(c).

Although, as the State points out, the Act requires only an "offer to license" and does not explicitly require publishers to grant licenses to libraries, this is a distinction without a difference. Any publisher who does not offer to license to libraries the same electronic literary products they offer to the public faces steep civil—and even criminal—penalties under Maryland's Consumer Protection Act, Md. Code Ann., Com. Law § 13-401 *et seq.*  The practical impact of the Act is that publishers will be forced to offer their products to libraries—whether they want to or not—lest they face a civil enforcement action or criminal prosecution.  And libraries—now able to purchase licenses for ebooks and audiobooks on terms "that would enable [them] to provide library users with access" to the digital products—have made clear their intent to accept those offers.  This

forced transaction between publishers and libraries effectively strips publishers of their exclusive

right to distribute their copyrighted work—a right that necessarily includes the right to decide

whether, when, and to whom to distribute.  *See Stewart v. Abend*, 495 U.S. 207, 220, 229 (1990)

(copyright holders "hold[] a bundle of exclusive rights in the copyrighted work," including "the

capacity [to] arbitrarily . . . refuse to license [to] one who seeks to exploit the work.") (citing *Fox*

*Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932)); *Fox Film Corp.*, 286 U.S. at 127 ("The owner of

the copyright, if he pleases, may refrain from vending or licensing and content himself with simply

exercising the right to exclude others from using his property.").[3]

As far as the Court is aware, no court has considered whether a state law that requires

copyright owners to offer to license copyrighted works conflicts with the Copyright Act.  The most

analogous case is the Third Circuit's decision in *Orson, Inc. v. Miramax Film Corporation*, 189

F.3d 377 (3d Cir. 1999) (en banc).  In *Orson*, the Third Circuit considered whether § 203-7

("Pennsylvania law") of the Pennsylvania Feature Motion Picture Fair Business Practices Law

conflicted with § 106 of the Copyright Act.  189 F.3d at 379.  The plaintiff, a Philadelphia theater

owner, sued Miramax Film Corporation under the Pennsylvania law, which provided:

> No license agreement shall be entered into between distributor and exhibitor to
> grant an exclusive first run or an exclusive multiple first run for more than 42 days
> without provision to expand the run to second run or subsequent run theatres within
> the geographical area and license agreements and prints of said feature motion
> picture shall be made available by the distributor to those subsequent run theatres
> that would normally be served on subsequent run availability.

---

[3] The State argues that the Supreme Court's statements in *Stewart* and *Fox Film* that a copyright holder may exercise its exclusive rights by refusing to license its work to others applies only to copyright holders who choose to hoard their works and not to copyright holders who choose to make their works available to the public.  ECF 17, at 4.  The Court disagrees.  Such a result would run contrary to the Copyright Act's grant of an exclusive right to distribute during the term of the copyright.  Even after a publisher has chosen to license its work to one or several members of the public, it retains the right to distribute or refrain from distributing the same work to other members of the public.  *See Orson*, 189 F.3d at 385.

*Id.*  The plaintiff alleged it featured films in the geographic area where Miramax distributed films, yet it "rarely received second-run movies after the forty-second day of play at [another area theater] despite repeated requests."  *Id.*

The Third Circuit held the state law was preempted.  The Court reasoned that if the state law "directly regulate[d] a right that is protected by federal copyright law, it must of necessity, [have] be[en] preempted under conflict preemption principles."  *Id.* at 385.  It recognized that § 106 of the Copyright Act grants copyright owners the exclusive right to distribute their copyrighted works.  *Id.* at 379.  This exclusive right "encompasse[d] the right to refuse to license" and "to decide to whom [rights holders] will transfer the [copyrighted] work."  *Id.* at 385–86 (citing *Stewart*, 495 U.S. at 228–29).  The preempted law "require[d] the distributor to expand its distribution after forty-two days by licensing another exhibitor in the same geographic area, even if such expansion [was] involuntary and uneconomic."  *Id.* at 385.  "A distributor who exercise[d] its federal right to grant an exclusive license to an exhibitor of choice [would have been] subject to liability under the Pennsylvania Act for refusing to grant licenses to other exhibitors in the same geographic area after the forty-second day."  *Id.*  The Third Circuit found the Pennsylvania law "would impose on copyright holders, contrary to their exclusive rights under § 106, an obligation to distribute and make available other copies of the work following their initial decision to publish and distribute copies of the copyrighted item."  *Id.* at 386.

Although the Maryland Act and the Pennsylvania law are not identical, they are sufficiently similar that the reasoning in *Orson* applies here.  Both state laws implicate the exclusive right to distribute, which encompasses the right to refuse to distribute.  Like the Pennsylvania law, the Maryland Act imposes on publishers—against their will and interests—an obligation to offer to license copyrighted work to one portion of the public following their initial decision to offer to

license the same work to a different portion of the public.  If publishers exercise their right to refrain from offering to license their copyrighted work to libraries, they face potential liability under the Maryland Act, much like the film distributors subject to the Pennsylvania law.  The potential for liability "for the [publisher's] exercise of its federal rights . . . illustrates the conflict created by" the Maryland Act.  *See Orson*, 189 F.3d at 384.

The State argues *Orson* is not persuasive because in *Orson* "[t]he Third Circuit reasoned that the Pennsylvania statute 'appropriated a product protected by the copyright law *for commercial exploitation* against the copyright owner's wishes,'" and that the reasoning does not apply here because the Maryland Act does not involve commercial exploitation as libraries serve a noncommercial function.  ECF 10-1, at 21 (quoting *Orson*, 189 F.3d at 386 (quoting *Warner Bros., Inc. v. Wilkinson*, 533 F. Supp. 105, 108 (D. Utah 1981), *appeal dismissed and case remanded*, 782 F.2d 136 (10th Cir. 1985)) (emphasis in def.'s mem.).  This argument is unconvincing.  The exclusive rights protected by the Copyright Act are as "to the public," regardless of whether a licensee uses those rights for commercial or noncommercial purposes.  17 U.S.C. § 106(3) (granting a copyright owner the exclusive right to distribute copyrighted material "to the public").  Moreover, the State mischaracterizes the *Orson* holding and the significance of the quote in which the Third Circuit referred to commercial exploitation.  The Third Circuit's central holding was that the Pennsylvania law "'[stood] as an obstacle' to the federally created exclusive rights given to a copyright holder, namely, the exclusive right to distribute the copyrighted work," and was consequently "preempted by the federal Copyright Act."  *Orson*, 189 F.3d at 386–87.  And, "the fundamental principle underlying [*Orson*]" was that "the state may not mandate distribution and reproduction of a copyrighted work in the face of the exclusive rights granted under § 106."  *Id.* at 386.  Whether the state-regulated transaction was commercial in

nature was not relevant to the Third Circuit's holding.  The only reference to commercial transactions appeared in a quote from a District of Utah case the plaintiff in *Orson* argued supported its argument that the Pennsylvania law was not preempted.  The Third Circuit disagreed and emphasized the reasoning in the District of Utah case was consistent with its holding that the state may not "direct a copyright holder to distribute and license against its will or interest."  *Id.*

The State argues *Allied Artists Pictures Corporation v. Rhodes*, 496 F. Supp. 408 (E.D. Ohio 1980) ("*Allied Artists I*"), and *Allied Artists Picture Corporation v. Rhodes*, 679 F.2d 656 (6th Cir. 1982) ("*Allied Artists II*"), are more analogous to this case than *Orson*.  In *Allied Artists I*, producers and distributors of motion pictures sued the Governor of Ohio and alleged recently enacted Ohio laws regulating the terms of motion picture licenses were preempted by the Copyright Act.  *Allied Artists* I, 496 F. Supp. at 413.  The Ohio laws at issue outlawed blind bidding, "a term used in the motion picture industry to describe the licensing of a motion picture to a theater owner without the owner's first viewing the picture."  *Id.* at 412.  They also prohibited mandatory minimum payments and advances required more than fourteen days before the exhibition of films.  *Id.* at 419.  Finally, they set forth certain parameters for bidding.  *Id.* at 419–20.  For example, invitations to bid had to set out "[t]he number and length of runs to which the invitation to bid applie[d]" and "the geographic area for each run."  *Id.*  Significantly, the law did not require film distributors to distribute copyrighted films in any circumstance.  *See generally id.*

The district court rejected the plaintiff's argument that the Ohio laws conflicted with the Copyright Act.  *Allied Artists I*, 496 F. Supp. at 444–48.  The court reasoned the Copyright Act did not secure to rights holders the rights to market products with unfair tactics or to distribute them in the manner deemed most desirable.  *Id.* at 446–47.  Of particular significance here, the court clarified that the Ohio laws

> [did] not deprive the plaintiffs of their right to decide whether or not to perform the
> work publicly . . . . [T]he plaintiffs [were] free to choose not to perform their work
> publicly and [could have] continue[d] to enjoin others from performing it.  Thus[,]
> they retain[ed] complete control over the rights granted by the Copyright Act: to
> prohibit display, performance, reproduction and distribution.

*Id.* at 447.  The Sixth Circuit summarily adopted the reasoning of the district court in *Allied Artists I* and held that "state trade regulation[,] which affect[ed] distribution procedures and, indirectly, monetary returns from copyright property," was valid, both "explicitly and implicitly by the terms of the Copyright Act."  *Allied Artists II*, 679 F.2d at 662–63.

Allied Artists I & II are factually distinguishable from this case.  The Ohio laws at issue did not mandate that copyright owners offer to license their copyrighted work.  Rather, they regulated the manner of distribution after the copyright holder made the initial decision to distribute.  The State argues the Maryland Act, like the Ohio laws, "only affect[s] copyright holders who wish to license" their electronic literary works to the public.  ECF 10-1, at 28–29; *see Allied Artists I*, 496 F. Supp. at 447.  This argument elides a critical distinction between the laws:  The Ohio laws regulated distribution procedures by requiring a performance of the work before exhibitors as a condition to the distribution of films, *after* the decision to distribute was made.  Here, in contrast, the Maryland Act does not regulate the terms and conditions of distribution of ebooks and audiobooks to libraries only after the publishers have decided to license to libraries.  The Maryland Act forces publishers to offer to license to libraries—whether they want to or not.

Allied Artists I & II, moreover, are consistent with *Orson*.  In *Orson*, the Third Circuit explained that the preempted provision, § 203-7, was part of a larger regulatory scheme in Pennsylvania that prohibited blind bidding and other similar trade practices corrupting the film distribution industry, much like the Ohio laws upheld in *Allied Artists I & II*.  189 F.3d at 383–85. The court held that "[t]hese market regulations . . . d[id] not create a preemption issue because they only touch[ed] copyrighted works indirectly, if at all."  *Id.* at 385.  Citing *Allied Artists I* and

*Allied Artists II*, the Third Circuit contrasted the lawful market regulations aimed at combating unfair trade practices in the film distribution industry with the unlawful provision in the Pennsylvania law that interfered with a copyright holder's exclusive right to distribute. *Id.* at 384–85. Thus, the holdings in *Allied Artists I* and *Allied Artists II* are consistent with *Orson* and the Court's decision here.

Finally, the State argues that the Maryland Act is a proper exercise of its power to protect its public libraries from unfair trade practices and that, by enacting the Act, Maryland sought to "rectify the imbalance prompted by the digital revolution and the consequent exploitative tactics used by some publishers to limit libraries' access to digital media." ECF 10-1, at 8. While the State may view the Act as necessary to correct an imbalance and expand library access to digital literary products, the salutary legislative purpose plays no role in the conflict preemption analysis. *See Perez v. Campbell*, 402 U.S. 637, 651–52 (1971), *overruling Kesler v. Dep't of Pub. Safety*, 369 U.S. 153 (1962), *and Reitz v. Mealey*, 314 U.S. 33 (1941) (rejecting "the aberrational doctrine . . . that state law may frustrate the operation of federal law as long as the state legislature in passing its law had some purpose in mind other than one of frustration"). The "controlling principle" in Supremacy Clause cases is whether the state law "frustrates the full effectiveness of federal law." *Id.* at 652. Here, it does. The State's characterization of the Act as a regulation of unfair trade practices notwithstanding, the Act frustrates the objectives and purposes of the Copyright Act.

Ultimately, the Court finds that the fundamental principles underlying this case are the same as those in *Orson*. "[T]he [S]tate may not mandate distribution and reproduction of a copyrighted work in the face of the exclusive rights to distribution granted under § 106." *See Orson*, 189 F.3d at 386. That is essentially what the Maryland Act does. The Act's mandate that publishers offer to license their electronic literary products to libraries interferes with copyright

owners' exclusive right to distribute by dictating whether, when, and to whom they must distribute their copyrighted works.  Accordingly, the Court finds that the Maryland Act likely stands as an obstacle to the accomplishment of the objectives of the Copyright Act and that it is likely preempted under the Supremacy Clause.[4]

### B.  Likelihood of Irreparable Harm

To satisfy the second requirement for preliminary injunctive relief, a plaintiff "must make a clear showing of irreparable harm[,] . . . and the required irreparable harm must be neither remote nor speculative, but actual and imminent." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002); *Direx Israel*, 952 F.2d at 812 (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989)).  The harm also must be more than a mere possibility; it must be likely.  *Winter*, 555 U.S. at 22.  A plaintiff seeking a preliminary injunction "must overcome the presumption that a preliminary injunction will not issue when the harm suffered can be remedied by money damages at the time of judgment." *Di Biase*, 872 F.3d at 230 (citing *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994)).  Phrased differently, "the harm must be irreparable, meaning that it 'cannot be fully rectified by the final judgment after trial.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012)).

AAP argues it has established irreparable harm merely by showing a likely violation of the Supremacy Clause and cites *Leaders of a Beautiful Struggle v. Baltimore Police Department*, 2 F.4th 330 (4th Cir. 2021), for support.  The Court is unpersuaded.  In *Leaders of a Beautiful*

---

[4] Because the Maryland Act likely conflicts with the Copyright Act, the Court declines to decide the express preemption issue.

*Struggle*, the Fourth Circuit considered a Fourth Amendment challenge to Baltimore City Police Department's aerial surveillance program.  2 F.4th at 333.  Ultimately, the Fourth Circuit held that "[b]ecause the . . . program enable[d] police to deduce from the whole of individuals' movement, . . . accessing its data [was] a search, and its warrantless operation violate[d] the Fourth Amendment."  *Id.* at 346.  In considering whether the plaintiff was entitled to preliminary relief, the Fourth Circuit held that "[b]ecause there [was] a likely constitutional violation, the irreparable harm factor [was] satisfied."  *Id.*  For this proposition, the Fourth Circuit cited *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009), another case involving a likely Fourth Amendment violation in which the D.C. Circuit held: "It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'"  571 F.3d at 1308–09, 1312 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.)).  In *Elrod v. Burns*, the case on which the D.C. Circuit relied in *Mills*, the Supreme Court held that public employees who alleged discharge based on their political affiliations adequately stated a claim with respect to irreparable harm because they alleged a violation of the First Amendment.  *Elrod*, 427 U.S. at 349.  Thus, *Leaders of a Beautiful Struggle* and the preceding cases holding constitutional violations result in irreparable harm *per se* involved the loss of constitutional freedoms guaranteed by the Bill of Rights.  This case does not.  It involves a likely violation of the Supremacy Clause, which "is not the 'source of any federal rights.'"  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015) (quoting *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107 (1989) (quoting *Chapman v. Houston Welfare Rts. Org.*, 441

U.S. 600, 613 (1979))).  *Leaders of a Beautiful Struggle* does not hold that a violation of the Supremacy Clause gives rise to irreparable harm *per se*.[5]

In another preemption case, the Fourth Circuit analyzed the likelihood of irreparable harm by considering the practical effects of the state laws on the plaintiffs.  *See South Carolina*, 720 F.3d at 533.  In *South Carolina*, the Fourth Circuit affirmed an injunction against South Carolina laws that provided for state prosecution of state law immigration offenses.  *Id.*  The Fourth Circuit approvingly cited the district court's reasoning with respect to the irreparable harm caused by the state laws and held "[t]he irreparable injury to the nation's foreign policy if the relevant sections [took] effect ha[d] been clearly established by the United States."  *Id.* (citing *United States v. South Carolina*, 840 F. Supp. 2d 898, 924–27 (D.S.C. 2011)).  In discussing the irreparable injury to the United States' foreign policy, the district court credited government statements that permitting the continued operation of the South Carolina laws would, *inter alia*, "disrupt and conflict with the comprehensive federal enforcement scheme," potentially "raise significant foreign relations issues," and "create a chaotic situation in immigration enforcement [whereby]" "persons [would

---

[5] As additional support for its argument that a violation of the Supremacy Clause causes irreparable harm *per se*, AAP cites a district court decision from 1993, *United States v. Ferrara*, No. CIV.A. 92-2869(NHJ), 1993 WL 405477, at *1 (D.D.C. Feb. 8, 1993), in which the court stated a violation of the Supremacy Clause "alone constitutes irreparable harm."  The court's summary conclusion, however, provides no useful reasoning for this Court to make the same determination.  As another district court recently faced with the same question held, "more is required."  *See Poder in Action v. City of Phoenix*, 481 F. Supp. 3d 962, 979 (D. Ariz. 2020) (rejecting argument that "likelihood of irreparable harm automatically arises in cases involving preemption challenges" and assessing "the practical effect the challenged policy would have on the plaintiffs" and "whether that injury could be remedied retroactively by an award of damages").

be] subject to state prosecution . . . when the same conduct would [have been] lawful under federal law." *South Carolina*, 840 F. Supp. 2d at 926.[6]

In preemption cases outside the Fourth Circuit, courts have similarly analyzed irreparable harm by considering the challenged state laws' practical effects on the plaintiffs.  In *Valle del Sol Inc. v. Whiting*, the Ninth Circuit upheld a preliminary injunction where federal law likely preempted an Arizona statute that attempted to criminalize the harboring and transporting of unauthorized aliens and the plaintiff "demonstrated a credible threat of prosecution under the statute and the organizational plaintiffs [showed] ongoing harms to their organizational missions as a result of the statute."  732 F.3d 1006, 1029 (9th Cir. 2013).  And in *Chamber of Commerce of U.S. v. Edmondson*, the Tenth Circuit found irreparable harm where compliance with Oklahoma laws that regulated illegal immigration through employment practices would have caused the plaintiffs financial harm that could not have been redressed because "Oklahoma and its officers [were] immune from suit for retrospective relief."  594 F.3d 742, 771 (10th Cir. 2010).  Additionally, the Tenth Circuit observed that, should the plaintiffs have refused to comply with the laws, they faced investigation, liability for certain practices likely improperly banned by the laws, and debarment from public contracts.  *Id.*

---

[6] District courts in the Fourth Circuit have conducted a similar analysis when deciding whether a plaintiff has established irreparable harm would result if a state statute is not enjoined.  For example, in *Air Evac EMS, Inc. v. Dorrill*, the Southern District of West Virginia found the plaintiff, an air ambulance company, sufficiently demonstrated irreparable harm where it might have been "subject to fines; forced to spend time, money, and resources to comply with the new requirements and regulations under [a likely preempted state law] that may [have been] later . . . struck down, or may ultimately [have been] forced to close its doors entirely."  No. 2:21-cv-00310, 2021 WL 2877603, at *11, --- F. Supp. 3d ---- (S.D.W.V. July 8, 2021).  The Court "also recognize[d] that 'any interruption in [Air Evac's] ability to offer the program'" affected by the likely preempted law would have "'cause[d] the loss of revenue and [would have] damage[d] its relationships with customers, including large and county municipal customers.'"  *Id.* (quoting *Air Evac EMS, Inc. v. Dorrill*, 523 F. Supp. 3d 859, 873 (S.D.W.V. 2021)).

With these principles in mind, the Court finds AAP has clearly established its members likely will suffer irreparable harm if the Maryland Act is not enjoined.[7]  Absent an injunction, publishers have three courses of action—each of which would cause harm to AAP's members that could not be adequately remedied by money damages at the end of this litigation.

First, publishers could elect not to offer to license electronic literary products to the public at all, thereby avoiding the reach of the statute.  To achieve this, publishers would have to refrain from offering their products online entirely.  This is because the Maryland Act is triggered by merely offering to license to "the public" online.  The damages resulting from this course of action would be extensive and unquantifiable.  There would be no way to know how many ebooks and audiobooks would have been purchased if the publishers had been able to offer them online without concern that they would be subject to the Maryland Act.

Second, publishers could exercise their right not to distribute their copyrighted work by refusing to offer to license electronic literary products to libraries even after they offer to license the same products to the public.  This conduct would violate the Act.  As a result, publishers could face steep civil penalties—a possible $10,000 fine for the first violation and a potential $25,000 fine for each subsequent violation—and even criminal penalties, including a $1,000 fine and up to one year in jail.  Quantifying damages resulting from a criminal prosecution would be nearly impossible.

---

[7] Based on the Complaint, it appears that AAP relies primarily on associational standing to bring this lawsuit.  "[A]n association may have standing to sue in federal court . . . as the representative of its members who have been harmed." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 155 (4th Cir. 2000) (en banc) (citing *Warth v. Seldin*, 422 U.S. 490, 511 (1975)).  Accordingly, the irreparable harm analysis focuses on the harm to AAP's members, not AAP itself.

Third, publishers could acquiesce to a forced licensing transaction with libraries on terms that the libraries—and the State's attorneys enforcing the Act—deem reasonable.  If a publisher and library are able reach an agreement on "reasonable terms," it would be very difficult, if not impossible, to ascertain the full extent of the publisher's damages if the Act is later struck down. While the Act states the terms of a license "may include" limitations favorable to publishers— such as limitations on the number of simultaneous users and the number of days a user may access the ebook—the Act compels publishers to offer to license to libraries as many copyrighted works as the libraries desire.  Md. Code Ann., Educ. § 23-702(b)–(c).  With no limitation on the number of licenses libraries may purchase, the State-mandated licensing terms likely would alter the current market for ebooks and audiobooks by, for example, reducing consumer demand for the products in non-library, commercial markets.  In addition, compliance with the Act likely would impact daily business decisions that publishers make when deciding whether, when, how, to whom, and for how long to distribute their copyrighted works—all of which would ultimately impact publishers' bottom lines in ways that are unquantifiable.  *See* Pallante Decl. ¶ 12, ECF 7, at 5.  Any end-of-litigation damages calculation would be speculative because neither the Court nor the parties would know what the contracted-for price for the licenses would have been in the absence of the Maryland Act.  *See Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 236 (M.D.N.C. 2020) ("[A]n injury is typically deemed irreparable if monetary damages are inadequate or difficult to ascertain." (citing *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994), *abrogated on other grounds by Winter*,

555 U.S. at 22)).  To the extent damages might be quantifiable, they would be difficult to ascertain with any precision.[8]

The State offers little counterargument to plaintiff's irreparable harm arguments other than claiming the damages are "theoretical."  The Court disagrees.  The Act is currently in effect, and while there is no indication that it has been enforced since it took effect, there is every reason to believe it will be.  Damages, furthermore, stem even from a publisher's choice to comply with the Act.  Therefore, the harm does not hinge on mere enforcement of the penalty provisions.  The harms publishers likely will suffer if they comply with the Act are actual and imminent.

The Court finds AAP has shown that its members likely will suffer irreparable harm if the Maryland Act is not enjoined.

### C.  Balance of the Equities and the Public Interest

The Court considers the last two factors in tandem because "the balance of the equities and the public interest . . . 'merge when the Government is the opposing party.'"  *Antietam Battlefield KOA v. Hogan*, 461 F. Supp. 3d 214, 242 (D. Md. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  As to the balance of the equities, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested

---

[8] The difficulty in quantifying damages here is similar to the challenge of calculating damages in copyright infringement cases.  In *Christopher Phelps & Associates, LLC v. Galloway*, a copyright infringement action, the Fourth Circuit held that "[i]rreparable injury often derives from the nature of copyright violations, which deprive the copyright holder of intangible exclusive rights."  492 F.3d 532, 544 (4th Cir. 2007).  In deciding whether to grant permanent injunctive relief to an aggrieved copyright holder, the Court found irreparable injury was "most likely . . . satisfied" because "[d]amages at law [would] not [have] remed[ied] the continuing existence of [the copyright infringement]" and "the calculation of future damages and profits for each future sale [of the copyrighted work] might [have been] possible, [but] any such effort would [have] entail[ed] a substantial amount of speculation and guesswork that render[ed] the effort difficult or impossible."  *Id.*  The damages in infringement cases differ from the damages at issue here, but similar guesswork is involved in calculating both.

relief.'" *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)). When considering the public interest, the Court "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

The State and the public have no legitimate interest in the operation of a state law that is likely preempted by federal law.  When federal law preempts conflicting state law, the state law "constitutes an unconstitutional obstacle to federal law" in violation of the Supremacy Clause. *United States v. Alabama*, 691 F.3d 1269, 1281 (11th Cir. 2012); *Perez*, 402 U.S. at 656; *Crosby*, 530 U.S. at 388 (holding state law preempted by federal law was "unconstitutional, under the Supremacy Clause").  A state "is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional.  If anything, the system is improved by such an injunction." *Leaders of a Beautiful Struggle*, 2 F.4th at 346.  AAP's members, on the other hand, likely will be irreparably harmed if the Maryland Act is not enjoined.

The State argues the public interest would be served by allowing the law to remain in effect because doing so will enlarge public access to electronic literary products through public libraries. Should an injunction issue, the State argues, Marylanders—especially the elderly, homebound, and visually impaired—would face hardship without access to those literary works.  In response, AAP claims that digital lending in public libraries, including Maryland public libraries, was alive and well before the Maryland Act took effect.  Indeed, the State reported that "[i]n fiscal year 2020," the year before the Act took effect, "Maryland libraries held 4,733,755 e-books and saw a 31% increase in customer access to digital materials."  ECF 10-1, at 24.

AAP also argues, convincingly, that forcing publishers to offer licenses for electronic literary products on terms "that would enable public libraries to provide library users with access

to the electronic literary product" will not necessarily increase access to those products for library users over time.  It is only through the protection of copyright that books and other creative works may be generated and distributed at all.  "The economic philosophy behind the [Copyright] [C]lause . . . is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors."  *Eldred v. Ashcroft*, 537 U.S. 186, 213 n.18 (2003).  "[C]opyright law serves public ends by providing individuals with an incentive to pursue private ones."  *Id.*

Having considered the competing arguments, the Court finds that the balance of the equities tips in favor of AAP's members and that the public interest would be better served by allowing publishers to fully exercise their exclusive rights protected by the Copyright Act until the constitutionality of the Maryland Act is finally adjudicated.

## IV.     Conclusion

Libraries serve many critical functions in our democracy.  They serve as a repository of knowledge—both old and new—and ensure access to that knowledge does not depend on wealth or ability. They also play a special role in documenting society's evolution.  Congress has underscored the significance of libraries and has accorded them a privileged status on at least one occasion, legislating an exception to the Copyright Act's regime of exclusive rights that permits libraries to reproduce copyrighted material so it may be preserved in the public record across generations.  *See* 17 U.S.C. § 108.  Libraries face unique challenges as they sit at the intersection of public service and the private marketplace in an evolving society that is increasingly reliant on digital media.  Striking the balance between the critical functions of libraries and the importance of preserving the exclusive rights of copyright holders, however, is squarely in the province of Congress and not this Court or a state legislature.

Plaintiff's motion for a preliminary injunction is granted.  A separate Order will issue.


Date: <u>February 16, 2022</u>

                                                  _____
Deborah L. Boardman
United States District Judge