```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                      NORTHERN DIVISION

 3   ASSOCIATION OF AMERICAN        )
     PUBLISHERS, INC.               )
 4        Plaintiff,                )
          vs.                       )   CIVIL ACTION NO.
 5   BRIAN E. FROSH                 )   1:21-cv-03133-DLB
          Defendant.               )
 6   _____)
                                        Baltimore, Maryland
 7                                      February 7, 2022
                                        11:02 a.m.
 8
              THE ABOVE-ENTITLED MATTER CAME ON FOR
 9                 MOTIONS HEARING VIA ZOOM
          BEFORE THE HONORABLE DEBORAH L. BOARDMAN
10
                    A P P E A R A N C E S
11
     On Behalf of the Plaintiff:
12        SCOTT A. ZEBRAK, ESQUIRE
          MATTHEW OPPENHEIM, ESQUIRE
13
     On Behalf of the Defendant:
14        SEAN M. FITZGERALD, ESQUIRE
          ELLIOTT L. SCHOEN, ESQUIRE
15        LYNAE T. TURNER POLK, ESQUIRE
          HEIDI E. DUDDERAR, ESQUIRE
16
     Also Present:
17        TERRY HART, GENERAL COUNSEL AMERICAN PUBLISHERS
          MARIA PALLANTE, CEO AMERICAN PUBLISHERS
18        NAVEED AMALFARD, LAW CLERK

19

20

21
          (Computer-aided transcription of stenotype notes)
22
                        Reported by:
23             Ronda J. Thomas, RMR, CRR
                  Federal Official Reporter
24          101 W. Lombard Street, 4th Floor
                Baltimore, Maryland 21201
25
```

*P R O C E E D I N G S*

1

2          **THE COURT:**  Good morning.  If you could call the case.

3          **THE CLERK:**  United States District Court for the

4   District of Maryland is now in session.  The Honorable Deborah

5   L. Boardman is presiding.  The matter now pending before this

6   court is Civil Number 21-cv-03133-DLB, Association of American

7   Publishers, Inc. v. Brian E. Frosh.

8          This matter now comes before the Court for the purpose

9   of a motions hearing.

10          Counsel for the record, starting with the Plaintiff.

11          **MR. ZEBRAK:**  Good morning, Your Honor.  Scott Zebrak

12   with the law firm of Oppenheimer + Zebrak for the Plaintiff,

13   the Association for American Publishers.  With me today is my

14   partner, Matthew Oppenheim, as well as two representatives from

15   the Plaintiff.  First it's CEO Maria Pallante as well as its

16   General Counsel Terry Hart.

17          **THE COURT:**  Okay.  Good morning.  And for the

18   Defendant?

19          **MR. FITZGERALD:**  Good morning, Your Honor.  Sean

20   Fitzgerald, Assistant Attorney General on behalf of Brian

21   Frosh.  I am joined by my colleagues from the Office of the

22   Attorney General, Elliott Schoen, Principal Counsel for the

23   Maryland State Department of Education, Heidi Dudderar and

24   Lynae Polk.

25          Good morning.

1          **THE COURT:**  Okay.  Good morning.  And also my intern

2    is on, Naveed Amalfard.  You'll see his name.

3          Just a few things before we get started.  We are here

4    for a hearing on Plaintiff's Motion for a Preliminary

5    Injunction.  I have considered all of the relevant filings in

6    this case.  Just for the record, I've read the Complaint of

7    course and Plaintiff's motion ECF-4 and the exhibits.

8    Defendant filed an opposition to the motion and moved to

9    dismiss the Complaint in the same briefing along with the

10   exhibits, that's ECF10.  Plaintiff replied and opposed the

11   Motion To Dismiss, ECF-13.  And then Defendants replied in

12   support of their Motion To Dismiss, ECF-17.

13         The focus of course today is on the Motion For

14   Preliminary Injunction and not the Motion To Dismiss.  Some

15   issues may come up that relate to the Motion To Dismiss to the

16   extent they relate to this PI motion.  I'm sure we're going to

17   have a spirited discussion today.  I know that I have many

18   questions for both sides.

19         Let me ask you this before we get started, since we

20   are proceeding virtually, I want to try as much as possible to

21   mimmick the formality of federal court.  It would also be

22   useful, if you haven't already, to put on your name and who you

23   are with, if you're with the Plaintiff or Defendant.  I'm

24   familiar with many of the names, but it would be easier for me

25   and the court reporter if you could identify yourself much like

```
 1  Mr. Fitzgerald and Mr. Zebrak have.
 2          THE CLERK:  Your Honor, I can go ahead and do that
 3  while the hearing is going on.
 4          THE COURT:  Okay.  If you can do that, I wasn't sure
 5  you'd be able to do that.  All right.
 6          I guess I'm comfortable if you're counsel of record
 7  with your video being off.  Although that's not really
 8  mimmicking court because if we were in court I'd be able to see
 9  you all.  So I would encourage you, if you can, to turn your
10  video on.  It would be nice to see people.  I understand there
11  may be reasons not to.
12          Thank you very much.  That's helpful for me.  I
13  appreciate it.
14          Okay.  Let's get started.  First off, I'm happy to
15  hear if the Plaintiff and the Defendant have an opening sort of
16  statement they would like to provide.  I certainly don't want
17  to prevent you from doing that.  But the truth is I've got a
18  list of questions for both sides, and I certainly want to get
19  to those.
20          So, Mr. Zebrak, do you have anything you would like to
21  start with?
22          MR. ZEBRAK:  Well, Your Honor, taking the queue you
23  just gave us, I won't do a sort of full-blown presentation as
24  if, you know, we were walking through every nuance of this.
25  Your Honor has made it clear that you've had an opportunity to
```

review the papers, and we had that brief status conference, but
I would like to just make just a very brief opening statement
without delving into the details of the preliminary injunction
if that's okay.

THE COURT:  That is okay.  Perhaps you can sit just a
little closer to the microphone.  I can hear you but it's --
it's not as loud as it can be.

MR. ZEBRAK:  I'm going to see if I can adjust that.
If you can't hear me, if you'd let me know I'd appreciate that.

THE COURT:  Okay.

MR. ZEBRAK:  Usually people are telling me to stop
talking, not to speak up.  So I doubly appreciate it.

THE COURT:  I will say this, I think today is going to
be quite interactive, and I apologize in advance for
interrupting both lawyers.  I'm not trying to be rude, but I
want this to be a conversation.  So I can't tell you that I
won't ask you to stop talking later.

But, Mr. Zebrak, please, I'm ready to hear from you.

MR. ZEBRAK:  Thank you, Your Honor.  So let me start
briefly just by saying a word about who the Plaintiff is and
then I'll proceed into the few things that I'd like to
emphasize upfront.

So the Association of American Publishers that we
refer to as AAP, they're the trade association for the U.S.
publishing industry.  You know, their members invest in and

1  publish some of the most acclaimed fiction, non-fiction,

2  educational works, scholarly works of the world.  And AAP

3  represents those members who are both large and small, profits,

4  nonprofits, in matters of law and policy.  In particular, one

5  of its biggest priorities is to ensure the viability of the

6  U.S. Copyright Act and its framework which really underlies the

7  creative communities that make America's, you know, output in

8  that regard really second to none in the world.

9         And those communities whether it's publishing, authors

10 of books, publishers of books, movies, newspapers, any of the

11 content industries, you know, they all rely on this

12 congressional balancing and framework that's very complex,

13 carefully balanced, and something that Congress does over the

14 course of many, many years with extensive public debate and

15 stakeholder input, hearings and transparency.  And these

16 exclusive rights are what allow industries to invest in and

17 then make incredibly complex, you know, daily, long-term,

18 short-term, every which way kind of decision on how they go

19 about exercising the exclusive rights that they obtain when

20 they work with authors for the creation of works.

21        So if you just consider the publishing industry for a

22 moment.  Once publishers acquire an exclusive license or a

23 transfer of copyright, they then have to make myriad

24 marketplace decisions about contracting with brick and mortar

25 bookstores, online retailers, public lending libraries,

schools, big box stores, and constantly new innovative business
models.  Could be a video game context.  It changes all the
time.

          So that's just a backdrop on sort of who we are and
why we're here.

          There's been a bit of back and forth between Plaintiff
and Defendant about what the case is about so let me start
there.

          This case is about a state statute that conflicts with
and challenges the U.S. Copyright Act, Congress' authority, and
the exclusive rights that Congress has deemed fit to give
copyright holders under the Copyright Act.

          The state law that we're challenging, you know,
Maryland Education Code 23-701, 702, I'm not one to exaggerate,
but, quite frankly, it is the definition of preemptive state
law.  I think that will be apparent when we have the back and
forth here today.

          In many ways it really is what we've dubbed a shadow
Copyright Act that seeks to legislate federal copyright issues.
That's apparent by both the text in the four corners of the Act
as well as how those that enacted the Act and how the Defendant
has attempted to defend it.  We'll go through that today.

          The Maryland Act, which is what we'll call that today,
the Maryland Act, it really does reshape publishers' exclusive
rights under the Copyright Act and in the process supplant

1   Congress' decision-making that under the Copyright Clause in

2   the U.S. Constitution is for Congress to decide.  And Congress,

3   as I mentioned before, has, you know, has created a very

4   complex, carefully-balanced framework for federal copyright

5   policy, and that includes exclusive rights such as

6   reproduction, distribution, public performance as well as

7   exceptions and limitations to those rights.  And we'll talk

8   about those more today I'm sure, but they include special

9   limitations or exceptions for libraries in 108 where Congress

10   has already factored into this complex framework how to think

11   about libraries and the role of libraries.

12        There's exhaustion principles under what's referred to

13   as the First Sale Doctrine and Congress has considered that in

14   its scope including what to limit it to.

15        And Congress, in enacting the statute, has very

16   deliberately determined to have a single national uniform

17   copyright policy, and it did that to advance Congress'

18   objectives in implementing its responsibilities under the

19   Copyright Clause as well as, you know, entering into treaty

20   obligations and making sure we're in compliance with those

21   treaty obligations.

22        So there's really a lot at stake with this Maryland

23   statute and, you know, in terms of a word about what the

24   statute is about, the statute really does intrude, very

25   directly, into the publishers' and authors' exclusive rights

1  under the Copyright Act as well as Congress' objectives with

2  the Copyright Act.

3          Now, the publishers have discretion on how to exercise

4  or not exercise those rights, those exclusive rights, which are

5  limited rights given to the copyright holders only for the term

6  of copyright; and in that term, you know, they have the option

7  and responsibility to achieve value from those copyrights.

8          This Maryland statute what it does is it requires

9  publishers to license their literary works as either eBooks or

10 audio books to public libraries in Maryland and it controls the

11 timing and terms for them to do so.

12         In effect, even though publishers have the exclusive

13 right to grant or not grant a distribution license or to

14 exercise other exclusive rights, Maryland statute forces

15 publishers to grant a license for that distribution, and it

16 also controls the timing and terms for doing so.

17         Really, what it does is it, really, with zero

18 precedent for it, it converts the publishers' and authors'

19 exclusive rights under copyright into a right only to offer

20 their work for licensing or sale once; and then once you do

21 that, according to the state -- and I'm using language from

22 their reply in support of their Motion To Dismiss -- but the

23 State has actually said that once a copyright holder offers

24 their work for distribution or distributes it, they leave the

25 world of copyrighting.  And, Your Honor, that just could not be

1   more wrong.

2          There is a First Sale Doctrine that has exhaustion

3   principles to it when a copyright owner sells a particular

4   unit, a book, a physical book or a CD.  That's why you have

5   used markets for that.  But Maryland just makes it up from

6   whole cloth, the idea that once a copyright owner exercises

7   their exclusive right once, the state, at a state level, can

8   force them into subsequent distributions and/or regulate the

9   terms in which they exercise their rights.

10          And so, really, this state statute -- and this I think

11  will become apparent today -- really unravels decades of

12  federal legislation and the related jurisprudence and Congress'

13  objectives from the Copyright Act, especially in the digital

14  world.

15          One of the reasons I used the phrase it's a definition

16  of a preempted state law is that the state law literally

17  threatens publishers with civil and even criminal liability for

18  exercising their exclusive rights under copyright.  That's just

19  in direct conflict with the statute and its objectives.

20          So in terms of a little more about the Copyright

21  Act --

22          THE COURT:  Mr. Zebrak, again, I'm happy to hear from

23  you, but I think it might make sense for us to start delving

24  into the issues I have questions about.  Although I am

25  reluctant to cut you off if you really have something you think

1    is important.  Definitely at the end if you missed anything and

2    we haven't covered what you would like to cover I'll ask you

3    about that then.  Is that okay?

4          **MR. ZEBRAK:**  Of course, Your Honor.  Thank you.

5          **THE COURT:**  All right.  Thank you.

6          Mr. Fitzgerald, do you have anything you'd like to say

7    to start?  I'd actually like to start my questions with you.

8          **MR. FITZGERALD:**  Certainly, Your Honor.  I want to

9    encourage the Court, if the Court has questions during my

10   argument I'm happy to take them midway through.  I don't want

11   the Court to be shy or reluctant to interrupting me.  I don't

12   take it personally, I promise.

13         (Laughter.)

14         **THE COURT:**  Yeah, I'm not that shy.  I guess what I'm

15   saying is I want to give you an opportunity, if you want, to

16   have an opening statement.

17         **MR. FITZGERALD:**  Sure.

18         **THE COURT:**  Frankly, what I'd like to start with you

19   is the text of the statute in talking about exactly what it

20   does and how it operates.  But if you have an opening statement

21   I'll hear that, otherwise we can delve right into the statutory

22   text.

23         **MR. FITZGERALD:**  I'd like to give the Court just a

24   brief roadmap --

25         **THE COURT:**  Thank you.

1      **MR. FITZGERALD:**  -- and a lens for which to view this

2  case.  Just for the record, may it please the Court, my name is

3  Scott Fitzgerald, and I do represent the Defendant Brian E.

4  Frosh, the Attorney General of Maryland.

5      As the Court I know is already well aware from just

6  it's own experience and reading the pleadings in this matter, a

7  preliminary injunction as sought by the Association today is an

8  extraordinary remedy.  That remedy is granted sparingly and in

9  limited circumstances.  And it's the Association's burden in

10  this hearing to demonstrate, 1) that it is likely to succeed on

11  the merits; 2) that it is likely to suffer irreparable harm in

12  the absence; 3) that the balance of equity tips in its favor;

13  and 4) the injunction is in the public interest.

14      Your Honor, the Association's failure to demonstrate

15  any of those factors would be fatal to the Motion For

16  Preliminary Relief and the Association I anticipate will fail

17  to meet that burden for three critical reasons.

18      First, the Association has not shown a likelihood of

19  success on the merits with regard to this preemption issue.  It

20  is an issue of first impression before this Court.  But the key

21  critical fact with regard to preemption with regard to this

22  case is the Maryland Act is reconcilable with the Copyright Act

23  and, certainly, I'll go into why during my argument.

24      The second reason the Association is going to fail to

25  meet their burden is because they have not shown that they will

1    suffer irreparable harm in the absence of a preliminary

2    injunction.  The harm they are alleging here is theoretical, it

3    is insufficient to justify extraordinary relief.

4         And third, and I think the most critical reason they

5    will fail to meet their burden today, is they have not shown

6    the balance of equities is in their favor.  They have not shown

7    this injunction they seek is in the public interest because of

8    the critical ways that the Maryland Act supports the mission of

9    public libraries and provides the public greater access to

10   electronic literary works.

11        So the real lens through which to view this case, and

12   the copyright laws in general, if there's one key word that I

13   want the Court to remember during this hearing is the word

14   "bounce."

15        Congress' intent in providing for the grant of

16   copyright is to provide the necessary bargaining capital for

17   creators of creative works to garner a fair price for the value

18   of those works passing in public use.

19        But the purpose of copyright is to balance the

20   artist's right to control the work with the public's need for

21   access.  And that balance, the Maryland Act -- the reason it

22   was passed in the first place is because that balance cannot be

23   maintained in a world where publishers can license products to

24   the Maryland public at large while specifically refusing to

25   license these electronic literary works to Maryland public

1  libraries or doing so only on demonstratively unfair terms.

2          There is more than a century of library lending that

3  is protected by the Copyright Act under the First Sale

4  Doctrine.  And it bears mentioning that Congress, as Mr. Zebrak

5  conceded in his opening, and as I think it's undisputed in this

6  case, Congress has afforded special protections to libraries

7  relating to copyright given the critical role they serve in

8  collecting and protecting our treasured literary works.

9          Section 108 in the Copyright Act has several specific

10  protections I can discuss later.  The Section 109, the First

11  Sale Doctrine, is really the lifeblood of library lending.

12          And I want to be clear about a couple things that

13  caught me in the Association's opening.  They indicated in the

14  opening that there's zero precedent for the Maryland Act.

15  There is, again, more than a century of historical and Supreme

16  Court precedent related to the balance of copyright that I

17  discussed that I think the Court should be well guided on.

18          But the Maryland Act, and this is a critical point,

19  the Maryland Act is not a First Sale Doctrine.  Although it has

20  the same beneficial effects that I can discuss later in the

21  argument, it is not a First Sale Doctrine.  They are

22  designed -- the language -- they're fundamentally different

23  laws.  But they do have the same beneficial effect with regard

24  to libraries, which is they prevent price gouging, they prevent

25  discrimination against libraries, they prevent the embargoes

1   against libraries that we've seen publishers do as recently as
2   a couple of years ago.

3          So I'd ask the Court when considering the factors
4   today to just consider the purpose of -- the historical
5   significance of libraries and copyright, and, particularly, I'd
6   ask the Court to pay close attention to the third point I made
7   in my roadmap:  The balance of equities in the public interest
8   here.

9          It is -- the bottom line is there is a -- this case --
10  with regard to those two factors and those two factors do merge
11  when the Government is the opposing party.  On one side rests
12  publishers' qualms about the theoretical harm they face and
13  really publishers' bottom lines, publishers' profits.  On the
14  other side rests the Maryland public's ability to access these
15  literary works that are critical in helping them realize their
16  highest self-awareness, their best self-actualization.

17         It's -- many of these individuals, you know, who are
18  directly affected by -- would be affected by enjoinment of the
19  Maryland Act would not have the means to access those important
20  works in the commercial marketplace.  And on that side of the
21  scale rests public libraries who were providing literature and
22  information to those public Marylanders.

23         So I'd ask the Court to pay close attention to that
24  third element -- those last two elements of the preliminary
25  injunction.  But I think that gives the Court a good, general

1    starting point.

2             I'm happy to take the Court's questions.

3             **THE COURT:**  It does.  Thank you both for that

4    introduction.

5             What I'd like to do, Mr. Fitzgerald, and Mr. Zebrak

6    certainly follow along, I've got the statute in front of me.

7    I'd like to read it into the record and discuss it with you,

8    Mr. Fitzgerald.

9             So in particular I'm reading Maryland Code § 23-702

10   from the Education title of course, and it says "Subject to

11   Subsections B and C of this section, a publisher who offers to

12   license an electronic literary product to the public also shall

13   offer to license the electronic literary product to public

14   libraries in the state on reasonable terms that would enable

15   public libraries to provide library users with access to the

16   electronic literary product."

17            So, Mr. Fitzgerald, let's first focus on the beginning

18   part of it which says "a publisher who offers to license an

19   electronic literary product to the public."

20            In your papers you say that obviously "to the public"

21   is the public in Maryland.  The statute just says "to the

22   public."  Who is the public?  And what does it mean to offer to

23   license an electronic literary product to the public?

24            **MR. FITZGERALD:**  So this was, I think, part of the

25   Association's argument with regard to due process and one of

```
1   the arguments that the Act is void for vagueness.  And the
2   Maryland public as it's defined by -- I mean, critically it is
3   not explicitly defined in the statute, but according to the
4   Canons of Statutory Interpretation the Maryland Act is seeking
5   to regulate those products offered to the Maryland public.
6           THE COURT:  Does that mean a Marylander who lives in
7   Maryland?  A person who buys a license in Maryland?
8           MR. FITZGERALD:  So -- so the -- the plain language of
9   the statue in context is read to -- when the Court's
10  considering this issue the Maryland legislature only legislates
11  activity in Maryland.  So when we're talking about the public
12  in Maryland, it is the general public in Maryland that the
13  product is being offered to.
14          And, again, the reasons that the principles of
15  statutory construction compel that conclusion is because we're
16  looking at what is the legislative purpose, the ends to be
17  accomplished by passing the Maryland Act.
18          The legislative history of the Act and the plain
19  language of it elucidates that it's to forbid publishers from
20  discriminating against Maryland public libraries.  If a
21  publisher isn't offering an eBook in Maryland, it's not
22  discriminating against Maryland libraries by refusing to offer
23  the book.
24          THE COURT:  But this gets to the point why we're here
25  because the Copyright Act was passed in the '70s when there
```

1    were no eBooks.

2         How does the publisher offer to license an electronic

3    literary product to, as you say it, the general public in

4    Maryland?  Aren't they all offered online?

5         MR. FITZGERALD:  They are.  And if they are selling

6    their products in Maryland -- if they're licensing their

7    products in Maryland to Marylanders that would be to the

8    Maryland public.

9         But in Maryland regulatory statutes are generally

10   construed as not having extraterritorial effect unless a

11   contrary legislative intent is expressly stated and no such

12   express intent has been stated here.

13        It is -- again, the critical target of the legislation

14   was not the issue of the public, it's not extraterritorial --

15   or it's extraterritorial, excuse me, but it is the Maryland

16   public that is at issue.

17        THE COURT:  I understand these issues overlap with the

18   due process argument, but they actually I think do relate to

19   the preliminary injunction question which is what is the effect

20   of this statute and what are the Plaintiff's options to either

21   comply or not comply with the statute?  So I'm trying to

22   understand the reach of the statute.  And to me it would

23   apply -- even if I were to read into the statute that the

24   public means the general public in Maryland, because these are

25   offered online and the internet has no state boundaries or

```
 1  doesn't honor state boundaries, it would apply to any time they
 2  offer to the public around the world.
 3          MR. FITZGERALD:  So if they're offering it to the
 4  public around the world, but that public includes the public of
 5  Maryland, yes, that would be triggered by the Act.
 6          But the -- the critical fact is it's still offered in
 7  the state of Maryland.  They're still availing themselves of
 8  the monies of the Maryland public.  They're still enjoying the
 9  benefits of and the profits of exploiting their copyrighted
10  products in the state of Maryland.  The critical fact here is
11  they can certainly do so, but should they choose to do so
12  Maryland, as a state, is not precluded from regulating the
13  trade, the terms of that licensing.
14          And so one of the critical points to consider here is
15  when we're locking in on this particular clause of this
16  Subsection A of 23-702, reading the statute as a whole makes it
17  clear this isn't a copyright issue, this is a trade regulation.
18  This is designed to cure the unfair trade practices against
19  Maryland public libraries.
20          THE COURT:  Well then let's move to the next -- before
21  we do that I want to focus on -- so I understand your position
22  as to what the public is.  What does it mean to offer to
23  license an electronic literary product?
24          MR. FITZGERALD:  With regard to the Maryland Act what
25  it means is they must come -- publishers must come to the
```

negotiating table.  They must make an offer to make the product

available to these Maryland public libraries on reasonable

terms.  It explicitly precludes -- it does not -- let me first

say what it does not preclude which seems to be at issue and

then I'll talk about what it does preclude.

At the outset the Maryland Act does not restrict the

decision whether to license a work or whether to issue an

exclusive license, whether at a higher price point or not.

Again, the Act's provisions apply when the publisher

decides to license the work and make those licenses available

to the Maryland public.  Once that happens, the Maryland Act is

triggered.  And at that point all that is required under the

Act is an offer to license it to the Maryland public libraries

as well on reasonable terms and that --

**THE COURT:**  But don't publishers or copyright holders

have the exclusive right.  Once they have offered it to the

public, the Maryland public, let's say, at that point they can

stop offering it to anyone else.  Don't they have a right to

then say "Nope, I don't want to offer anymore licenses.  I

continue to invoke my right to refrain from distribution"?

**MR. FITZGERALD:**  Yes, Your Honor.  They have that

right but it's not -- one of the things that the Association

does in relying on the *Orson* case -- and I'm sure we'll talk

more about *Orson* and *Allied Artists*, the case on which we

primarily rely, and kind of a circuit split.  It really is a

1  circuit split from where we're sitting.  This really isn't a

2  show first impression before this Court.

3         But binding authority from the Supreme Court makes

4  clear that the right sought by the Association is still intact.

5         Nothing -- the critical history of copyright -- and

6  this is the *Abend* case that they cited in their brief as well

7  as *Fox Film Corporation* -- indicates nothing prevents

8  publishers from hoarding all of their works during the term of

9  copyright.  They can certainly refrain from vending, they can

10 refrain from licensing, they can content themselves with

11 exercising their right to exclude others from using their

12 property.  What they cannot do is broaden the Copyright Act and

13 that's really what they are trying to do is broaden the

14 Copyright Act and grant themselves a perpetual distribution

15 right in the manner deemed most desirable by the copyright

16 holder.  A copyright, simply put, does not make a product

17 invulnerable to the regulation of the manner in which it is

18 marketed and distributed.

19         **THE COURT:**  But there's the threshold question I think

20 that makes this case different than *Allied* one, *Allied* two

21 which is -- although I think it's a little closer call than the

22 Plaintiffs contend in their papers -- that in that case the

23 state was regulating the terms of the distribution of film once

24 the distribution decision was made.

25         Here it seems the Maryland Act is regulating or is

1  compelling Plaintiffs to engage in negotiations with libraries

2  once they've licensed an eBook to anyone else.

3        So, in other words, if they don't want -- if they

4  don't want to sell their -- their copyright to the libraries,

5  they would have to stop selling to the public, which is why I

6  engaged in the initial discussion of how broad does the statute

7  apply?

8        **MR. FITZGERALD:**  So it is true that the Association

9  cannot sell their product -- under the Maryland Act and under

10  the history of copyright law -- cannot choose to sell their

11  products to the public at large and explicitly refuse to sell

12  that or license that same product to libraries.  That is

13  completely inconsistent with not only the Copyright Act but the

14  special protections that Congress has written into the

15  Copyright Act with regard to libraries.

16        When the Court was considering the Copyright Act in

17  1976, they contemplated the importance of the holders of

18  copyright and noncommercial entities that those authors and

19  publishers ensured that licensing arrangements for reissuing

20  their books, poems and other works for reasonable compensation

21  under reasonable safeguards for authors' rights are worked out

22  in private negotiation.  That's part of the legislative history

23  of the Copyright Act as it relates to a separate entity,

24  noncommercial radio, but still it shows Congress' intent that

25  noncommercial entities that are protected by the Copyright Act

1  and that enjoy those special protections not be foreclosed by

2  publishers offering their products to the public and that's

3  exactly what's at issue here.

4         One additional point, I do think it bears noting as

5  we're going down this road to talk a little bit about *Allied*

6  *Artist* and *Orson* if I may --

7         **THE COURT:**  Please.

8         **MR. FITZGERALD:**  -- just to give the Court some

9  perspective.

10        So in one breath of the Association's reply they argue

11  that *Allied Artists* is a four-decades-old analysis of a

12  dissimilar state law and in the immediately preceding breath I

13  think it was they had extolled the highly persuasive decision

14  in *Orson* that's also more than two decades old.

15        Both of these persuasive decisions involve commercial

16  actors in an entirely different industry.  The *Orson* case says

17  nothing about public libraries and their special role in

18  disseminating knowledge throughout our country.  Nor does th*e*

19  *Orson* case speak to the digital resolution that result in

20  complications that could not have even been remotely

21  contemplated in 1999.

22        *Orson* was decided on a vastly different landscape for

23  preemption analysis that does not provide adequate authority on

24  which to decide the complex balancing issues between public

25  libraries and publishers of eBooks in the digital revolution.

1         When you're comparing the commercial movie theater at

2   *Orson* to Maryland public libraries' mission to provide free

3   access to literary works to members of the Maryland public, the

4   latter is a compelling state interest that is directly aligned

5   with the properly balanced interest of the Copyright Act and --

6         **THE COURT:**  What authority do I have at this point to

7   consider compelling state interest?  Because I don't disagree

8   with you that there seems to be a compelling state interest in

9   increasing accessibility to eBooks for the Maryland public.

10  But what role does that play in the preemption analysis, either

11  express or conflict?

12        **MR. FITZGERALD:**  So if I may, Your Honor, and I guess

13  we're going into my whole argument.

14        **THE COURT:**  We are.

15        **MR. FITZGERALD:**  I think it would be helpful if I kind

16  of laid out the rules for kind of the issues for express

17  preemption and conflict preemption and why the Maryland Act is

18  not preempted.  So --

19        **THE COURT:**  Before we do that --

20        **MR. FITZGERALD:**  Sure.

21        **THE COURT:**  -- though, can we stick with the statute

22  before we get into -- I know it's challenging, all of these

23  issues overlap.  I find myself wanting to ask questions that

24  are going to take us all over the map, but let's continue with

25  this statute.

1      So once a publisher has offered to license an
2  electronic literary product to the public, the statute then
3  says that publisher also "shall," and that's a mandatory word,
4  "shall offer to license the same -- the electronic literary
5  product to public libraries in the state on reasonable terms
6  that would enable public libraries to provide library users
7  with access to the electronic literary product."

8      So this is a command to the publishers that if a
9  certain condition precedent is met, a command that they offer
10  to license it on reasonable terms, a command that they engage
11  in negotiations.  Correct?

12      **MR. FITZGERALD:**  Correct.

13      **THE COURT:**  Why -- in your initial opposition you -- I
14  think you cite legislative history and argued that the language
15  "shall offer" is -- to license -- is not the same as "shall
16  distribute."  I'm having a hard time understanding why if
17  you're ordering someone to engage in negotiations on reasonable
18  terms that is not an order to distribute?

19      **MR. FITZGERALD:**  So it is an order to make -- when we
20  say engage in negotiations let's -- cutting to brass tacks --
21  the Act requires that they shall offer it to -- that same
22  product to Maryland public libraries.  They must make an offer.
23  Again, in the Plaintiff's language they must make an offer to
24  public libraries and that offer must be reasonable.  That's the
25  critical --

1      THE COURT:  Then why don't the principles of contract

2  law then apply?  Once you make a reasonable offer, the other

3  side can accept, and there's a contract.  So there's a --

4  forcing that offer may, in certain circumstances, lead to a

5  contract that they would not have ordinarily agreed to enter

6  into.

7      MR. FITZGERALD:  And that's correct.  But the reason

8  that they -- the only reason why they would agree not to enter

9  into that contract or the only reason why publishers would not

10 enter into that contract is if they are seeking to exclude

11 public libraries while availing themselves to the Maryland

12 public at large.  And that is not consistent with the more than

13 a century of library lending under the Copyright Act protected

14 by the First Sale Doctrine, that is not consistent with the

15 history of Supreme Court case law on the Copyright Act.

16      It does not give -- the holders of copyright have the

17 right to exclude others from using their property and content

18 themselves with not licensing the product.

19      But once they start putting their product into the

20 marketplace they don't have the right -- A) they don't have the

21 right to do so free from regulation and B) more important and

22 more salient to the Court's issue, they do not have the right

23 to exclude a particular, in this case, such a special and

24 important class of noncommercial entity from their product.

25      THE COURT:  Has the statute been enforced?

1          MR. FITZGERALD:  I am not aware of any enforcement of

2   the statute.  Our office has tried -- has asked our commercial

3   protection division.  We have not received any information

4   indicating that there's been any enforcement of the -- and to

5   be clear it is the Association's burden so if they have

6   additional information about any enforcement certainly I'll

7   be -- we'll be listening for it.

8          But we are not aware of any enforcement of the Act and

9   that actually kind of -- I don't know if we're at any point

10  going to cross the road to a criminal injunction but that is

11  certainly -- forecloses that possibility at this juncture

12  because the harm is purely theoretical at this point.

13         THE COURT:  Understood.  I'm not going down that road

14  today.

15         The statute took effect January 1st, 2022.  What offer

16  of licensing to the public does it apply to?  Any offer that

17  occurred on January or later?  It's not retroactive, of course,

18  correct?

19         MR. FITZGERALD:  It is not retroactive to my knowledge

20  certainly.  It is -- it applies to a publisher's failure to

21  offer an electronic literary product licensed to the Maryland

22  public after January 21st, 2022.

23         THE COURT:  Just so I understand it, and forgive me if

24  I'm watering this down too much, if one of the members of the

25  Plaintiff's association offered to license to the public an

```
1   eBook on January 15, and has not offered that to Maryland
2   public libraries on reasonable terms, that would be a violation
3   of this statute, correct?
4           MR. FITZGERALD:  Correct.  And it would -- I suppose
5   in playing this theoretical situation out, it would also apply
6   to products that have been licensed previously and are
7   continuing to be licensed, because I guess the nature of some
8   of these products is that they are continually available for
9   licensing, let's say.
10          So if a book was offered on -- at any time before
11  January 1st, 2022, and then it's continuing to be offered in
12  Maryland public, but it's discriminating against public
13  libraries and is not offered to them, that would be covered by
14  the Maryland Act.
15          Again, I want to answer all of the Court's questions
16  that it has, but I certainly do want to deal with the -- with
17  the preemption elephant in the room.
18          THE COURT:  I definitely want to deal with that,
19  without a doubt.  Let me ask you this, though, just focusing on
20  the statute, who determines the reasonability of the terms?
21          MR. FITZGERALD:  That determination would be made
22  pursuant to subsection -- I mean, this is assuming *arguendo*
23  that an enforcement action arises out of the statute.  It would
24  be governed by Title 13 Subtitle 4 of the Commercial Law
25  Article and that gets to the due process issues of a
```

1    determination before a tribunal.

2         THE COURT:  Well, the statute says "on reasonable

3    terms" and the parties don't really focus on what comes after

4    that and to me you would think it's important, "on reasonable

5    terms that would enable public libraries to provide library

6    users with access."

7         So the terms must enable public libraries to provide

8    users with access.

9         MR. FITZGERALD:  Correct.  And the parties -- I mean

10   ultimately -- one more point about reasonable terms.  The

11   parties are going to end up making that determination as to

12   what are the terms of the license that they work out, the

13   initial reasonable terms.

14        It's only when a party finds that there are either

15   unreasonable terms or a blanket refusal to license is when they

16   would, in theory, file an action that would go down there --

17        THE COURT:  What happens if the Plaintiff, a

18   publisher, thinks a set of terms is reasonable and the

19   libraries don't think it's reasonable?

20        MR. FITZGERALD:  Then an individual may file a

21   complaint for a violation of Title 13, Subtitle 4 of the

22   Commercial Law Article for a violation of this statute as an

23   unfair, abusive or deceptive trade practice.

24        THE COURT:  Then there's litigation either before a

25   judge on summary judgment or before a jury on the

```
1   reasonableness of the price?
2        MR. FITZGERALD:  Correct.  And I do want to just add
3   here, a lot of protections afford to both -- really to
4   primarily publishers I would say -- are contemplated in the
5   statute itself, which is why I think there's a strong argument
6   this is a trade statute because Subsection B details what those
7   terms can include.  And, again, Subsection B deals with a lot
8   of protections for publishers:  A limitation on the number of
9   users a public library may allow to -- simultaneously to access
10  the product.  A limitation on the number of days a public
11  library can allow a user to access that product.  The use of
12  technological protection measures to prevent someone from
13  having access beyond the time specified in the license or
14  allowing others to access it.
15       Those are all protections for the copyright holder
16  that are contemplated in the statute as reasonable terms, which
17  I think further demonstrates the Maryland Act's attempt to
18  comport with the Copyright Act's balanced interest for
19  copyright holder and the public at large.
20       Subsection C also does deal with the -- again
21  reasonable terms can include a limitation of a number of
22  electronic literary product licenses that the library can
23  purchase on the same date -- or cannot, excuse me --
24       THE COURT:  Right.
25       MR. FITZGERALD:  -- and put a limitation on that.  So
```

1   that is a library protection.  But certainly it's -- the

2   language in the statute offers reasonable protections to both

3   sides and that's the whole point.

4          It is trying to restore the balance of -- between

5   copyright holder and the public's need for the work that is

6   fundamental to the Copyright Act.

7          THE COURT:  So under Subsection C, it says "The terms

8   of the license may not include a limitation on the number of

9   electronic literary product licenses a public library may

10  purchase on the same date the electronic literary product

11  licenses made available to the public."

12         I have no idea how many licenses a library might buy

13  but this seems to put no limit on the number of licenses they

14  can buy.  So it's a Harry Potter book, I see J.K. Rowling, it's

15  an author that seems to be inaccessible to certain public

16  libraries.  But if it's a Harry Potter book that comes out you

17  can buy a hundred licenses even if the publisher doesn't want

18  to sell you a hundred?

19         MR. FITZGERALD:  Correct.  Because once again the

20  publisher cannot foreclose libraries from having access to

21  these literary works.  That's not consistent with copyright.

22         THE COURT:  Why isn't this for Congress to decide?

23  Are you -- I understand why the State has acted.  You've talked

24  appropriately about the care that the Copyright Act has given

25  to libraries and how important libraries are to robust,

functioning literate, cultural literate and healthy society, I
don't disagree with you.  But just seems that this is something
that needs -- the Copyright Act needs to be amended to
incorporate the new digital age that we're in.

      **MR. FITZGERALD:**  Certainly that would have been a
simpler fix to the problem.

      **THE COURT:**  Right.

      **MR. FITZGERALD:**  And I'm sure the Court has read in
the pleadings the -- I think two instances where Congress asked
the copyright office to look into the issue of whether or not
to create a digital First Sale Doctrine and both times federal
law was indifferent on the issue.  They declined to act.

      The critical rationale for doing so is because
Congress wanted to leave it to the marketplace.  The first time
the issue was considered I believe was in 2001, and they
indicated they wanted to leave it to the marketplace as to how
to handle the advent of digital technology.

      The critical point here is that states have always
been free to regulate that marketplace.  This was a new area
that Congress did leave open over the past 20 years.  But the
Supreme Court has held that state regulations permitted with a
question relates to what may be considered a separable or
distinct segment of the matter covered by the federal statute
and the federal agency has not acted on that segment.

      Again, this gets to my point that the Maryland Act

1  does not create a digital First Sale Doctrine where the
2  copyright holder's distribution right to a particular copyright
3  ends.

4         Instead, what this statute does, what the Maryland Act
5  does is it regulates the trade practices of publishers and
6  relates to the terms or to the -- excuse me -- relates to the
7  terms upon which libraries can license electronic literary
8  products.

9         So that is a separable and distinct issue about which
10 federal law has not acted and it follows that Maryland has the
11 legal authority to do so.

12        THE COURT:  Okay.  I think that's a good segue into
13 discussing just getting directly at preemption naming *Allied*
14 versus *Orson*, you know, neither of which I agree with you are
15 directly on point.  Even *Orson* is 23 years old, dealt with a
16 distribution of films, did not deal with the entirely different
17 market of eBooks as they relate to libraries.  But I think the
18 principles in both cases seem to be sound.

19        So I'm happy to hear from you, Mr. Fitzgerald, on the
20 likelihood of success on the express preemption or the conflict
21 preemption.  And I will tell you that I'm less interested in
22 argument on express preemption, but I'm happy to hear from you
23 on both.

24        MR. FITZGERALD:  Thank you, Your Honor.  I'll try to
25 be more brief with regard to express preemption accordingly.

1    Before we go down the preemption analysis, there's one
2  standard of review issue with regard to it.  An inconsistency
3  does not warrant preemption unless it is clear and readily
4  apparent.  The proper approach is to generally to reconcile the
5  operation of those statutory schemes to one another rather than
6  holding the one to preempted.  And it's our position that's the
7  approach this Court should take.

8    Just quickly as to express preemption really at issue
9  is the second prong of the express preemption test, whether a
10 state law confers equivalent rights to those contained in
11 Section 106 of the Copyright Act.  Again, case law makes clear
12 this relies on the extra element test, because equivalency does
13 not exist where an extra element of the state law claim, beyond
14 what's required for copyright infringement, changes the nature
15 of the state law action and makes it qualitative and different
16 from a copyright infringement claim.

17    Here, the extra element is regulation against unfair
18 trade practices.  It makes the Maryland Act qualitatively
19 different than copyright infringement.

20    The express preemption argument made by the
21 Association loses sight of the forest through the trees.  It
22 fails to consider the Maryland Act as a whole and instead
23 focuses solely on one clause and one sentence of Subsection A
24 of 23-702 of the Education Article as violative of the
25 exclusive rights of the copyright owners.

1    When the Court reads the statute as a whole, it

2 becomes apparent it's directly designed to remedy an unfair

3 trade practice against Maryland public libraries that has

4 already been taking place and that is qualitatively different

5 from a copyright infringement case.

6    One last point to express preemption before we get to

7 conflict.  The Association relies on the case of *Close v.*

8 *Sotheby's* in making that argument.  That case is also

9 distinguishable.  That case involved the California Resale

10 Royalty Act and that Act reshaped the contours of federal

11 copyright laws with existing distribution right by giving

12 artists a 5 percent perpetual royalty and thereby effectively

13 ensuring that artists never fully alienated copies of their

14 works.  That directly conflicted with the First Sale Doctrine

15 which said once the copyright holder lends their work, they

16 have alienated their interest in -- their copyright as to that

17 particular copy.

18    The Maryland Act is a library protection statute,

19 again regulating reasonable terms regarding licensing of

20 electronic literary products, rather than conflicting with the

21 First Sale Doctrine as was the case in *Close*, the Maryland Act

22 keeps that doctrine alive in our present digital era.

23    So moving to conflict preemption, unless the Court has

24 any questions as to express preemption?

25    **THE COURT:**  No.  Thank you.

1      **MR. FITZGERALD:**  Thank you, Your Honor.  The Maryland

2  Act is not preempted by conflict because there's no clear and

3  readily-apparent inconsistency between the Copyright Act and

4  the Maryland Act that either makes compliance with both laws

5  impossible or renders the Maryland Act an obstacle to the

6  purposes of the Copyright Act.

7      So I'll start with the former about compliance with

8  both laws.

9      Compliance with both the Maryland Act and the

10  Copyright Act is possible.  The Association incorrectly

11  suggests that compliance with the Maryland Act makes it

12  impossible for publishers to exercise their federally protected

13  right to decide whether to distribute or refrain from

14  distributing their copyrighted works.

15      Again, binding authority from the Supreme Court makes

16  clear that right is still intact.  Nothing -- the cases, again,

17  *Abend* and *Fox Film Corporation* clarify that right to

18  arbitrarily refuse to license one who seeks to exploit the

19  work, clarify what that right means.

20      It means that nothing prevents publishers from

21  hoarding all of their works during the term of copyright.  It

22  means that nothing prevents them from refraining from vending,

23  or licensing to exercise their rights to exclude others from

24  using the property.  But they cannot turn that into a perpetual

25  distribution right and broaden the Copyright Act to give

```
 1  themselves the right to distribute in the manner deemed most
 2  desirable by them.
 3          THE COURT:  Wouldn't that argument -- I guess I'm
 4  just -- you're focusing on the regulation under reasonableness
 5  of the price to license eBooks.  That seems as more of a
 6  threshold question that they are being compelled to enter into
 7  a transaction as a threshold matter.  That's, to me, the issue.
 8  That this Act said something like if publishers offer license
 9  to -- license electronic literary products to libraries its
10  terms must be reasonable.  I'm not saying that would be -- I
11  don't want to really comment on the legality of a hypothetical
12  statue, but that seems to regulate the market, when someone has
13  decided to work with libraries they better do it on reasonable
14  terms.  Here it's, if you're putting your stuff out there to
15  anybody, you've got to come to libraries too.
16          MR. FITZGERALD:  So I think before directly addressing
17  the Court's question, I do want to just preface it with a
18  little bit about the copyright protections afforded to
19  libraries.
20          THE COURT:  Okay.
21          MR. FITZGERALD:  Because I think it will help set the
22  table for the point I'm making.
23          Congress has afforded special protections to libraries
24  relating to copyright given the critical role they serve to the
25  public.  As I said, Section 108 of the Copyright Act allows
```

1   them to distribute and reproduce copies for preservation,

2   replace damaged or missing copies, and acquire otherwise

3   inaccessible works through inter-library loans.

4        But the lifeblood of library lending always has been

5   the First Sale Doctrine, the judge-made rule codified in

6   Section 109 of the Copyright Act, which entitles a library that

7   owns a copy of a book in print to lend it under any conditions

8   it chooses to impose.

9        The practical effect of that First Sale Doctrine

10  ensured economic sustainability of libraries because it allowed

11  for secondary markets, like, donors and secondhand book

12  sellers, and that prevented publishers from engaging in the

13  price discrimination that we've seen against libraries over the

14  last 20 years in the digital era while also spreading the cost

15  of that work throughout numerous uses, as long as a physical

16  copy of the work is viable.

17       But as I said in my opening, Congress' intent in

18  providing for the grant of copyright in the first place was to

19  give the necessary bargaining capital to the owner of the

20  copyright so they could garner a fair price for the value of

21  those works passing the public use.

22       The Copyright Act has to balance the artist's right to

23  control with the public's need for access.  That balance cannot

24  be maintained in a world where publishers can license products

25  to the Maryland public at large and specifically refuse to

1    license electronic literary works to Maryland public libraries.

2    The ever-increasing prevalence of technology would allow the

3    Association's argument to result in the death knell of more

4    than a century of library of lending literary works that is

5    protected by the Copyright Act under the First Sale Doctrine.

6    That's really the point.

7          The law is not -- the Maryland Act is not requiring

8    publishers to give the works away.  It's not requiring them to

9    divest themselves of the copyright rights that they have.  What

10   it's saying is you cannot discriminate and arbitrarily exclude

11   libraries because that is inconsistent with over 100 years of

12   library lending protected by the Copyright Act.

13         Again, as I said in the opening, I may have said this

14   actually in my arguments recently before the Court, the

15   legislative history of the Copyright Act of 1976, the most

16   recent iteration of the Act dealing with noncommercial

17   entities -- in that case I think it was non -- public

18   broadcasting, it -- Congress state their intent that authors

19   and publishers ensure licensing arrangements for reading their

20   books, poems, and other works be worked out in private

21   negotiation for reasonable compensation under reasonable

22   safeguards for authors' rights.

23         The Maryland Act is achieving congressional intent,

24   that's why it's not preempted.  It's not frustrating the

25   objective of Congress in enacting the Copyright Act, it's

1  furthering the wide dissemination of copyrighted works and the

2  Copyright Act's primary object to advance the public welfare

3  through the talents of authors and make sure that the public

4  who can't afford to access those works is not excluded from

5  their ability to do so because publishers refuse to license to

6  libraries.

7          I'm happy to answer any questions.

8          THE COURT:  Sure.  And then let's talk about the *Orson*

9  and *Allied* set of cases to the extent they're applicable here.

10  But I'm looking at Section 108 of the Copyright Act which

11  provides libraries with exclusive rights.  Where in this

12  section -- how do you square the Maryland Act with this

13  particular -- with the language here?

14          MR. FITZGERALD:  What specific language is --

15          THE COURT:  The rights of reproduction and

16  distribution under the section of either free copies or photo

17  records -- that's an unpublished work.

18          MR. FITZGERALD:  So again, I guess, Section 108 is

19  allowing for libraries to reproduce and distribute as it

20  relates to preservation and replace copies that have been

21  damaged or gone missing.  It allows them to use inner library

22  loans to acquire other works.

23          Section 108 is what allows public libraries their

24  basic rights to continue to exist in archive.  It doesn't

25  preempt the Maryland Act as it relates to Section 23-702(a),

```
 1   and I don't think there's been any argument from the
 2   Association even that it does specifically as to Section 108.
 3          Their point I think is more that the Maryland Act is
 4   inconsistent with the Copyright Act inasmuch as it-- their
 5   express preemption argument is that it regulates one of the
 6   exclusive rights and limits one of the exclusive rights and
 7   their argument as to conflict preemption stands as an obstacle.
 8   So I don't think 108 is --
 9          THE COURT:  We can agree that the current Copyright as
10   it stands doesn't address the sale or distribution of eBooks to
11   libraries, correct?
12          MR. FITZGERALD:  Correct.
13          THE COURT:  Okay.  I'm happy to hear from you about
14   why Orson doesn't apply and why you think Allied cases do?  If
15   that's where you were going?
16          MR. FITZGERALD:  So I think both, again, Allied
17   Artists 1 -- just to be clear I guess for perspective Allied
18   Artists 2 is simply the Sixth Circuit saying we agree with the
19   lower court's analysis.  So it's -- it's really the Sixth
20   Circuit in Allied Artists 1, and I may be incorrect, I thought
21   it may have been the Third Circuit in Orson off the top of my
22   head.
23          THE COURT:  It is.  The meat of the analysis is in the
24   District Court opinion in Allied Artist 1.
25          MR. FITZGERALD:  So I understand that Orson does
```

1  address *Allied Artist* but it does not truly wrestle with it or

2  distinguish it.  It doesn't truly speak to some of the same

3  principles of law that are echoed in *Allied Artist* 1.  They are

4  really contrary cases.  This really is, in the State's view, a

5  circuit split.

6       It's -- this is an issue as I've said several times of

7  first impression.

8       The critical facts to remember with regard to *Orson*.

9  *Orson* did not account -- the Court's weighing *Allied Artist v.*

10 *Orson*.  Again, I would caution the Court against relying too

11 heavily on either case because the history of copyright law,

12 even predating the Copyright Act itself, is consistent with the

13 Maryland Act.  But if there is one of the two circuit decisions

14 that is more aligned with the history of the Copyright Act with

15 regard to the balanced interest of the copyright holder and the

16 public at large it is *Allied Artist*s.

17      But I guess the primary takeaway I'd ask the Court to

18 have -- I know this hurts us just as much as it hurts the

19 Plaintiff -- but both of these persuasive decisions, excuse me,

20 are distinguishable because they're dealing with commercial

21 actors in what is an entirely different industry.

22      Again, the backdrop for preemption analysis that is,

23 you know, that both cases we're relying on doesn't contemplate

24 for libraries and the protections afforded to libraries under

25 copyright.  It doesn't account for protected library lending

1  under the First Sale Doctrine.  It doesn't weigh the complex

2  balancing issues we've already been discussing for about an

3  hour.

4          It doesn't provide adequate authority to provide --

5          THE COURT:  I don't disagree with you.  Neither one

6  seems to be directly on point.  They don't deal with the

7  statute that's like this.  I think that both offer some guiding

8  principles, and there are parallels between them to certain --

9  in certain respects.  But those are the two most, as far as I

10 could find and sounds like as far as you could find, the two

11 most relevant circuit court opinions out there that might

12 provide us with some guidance so let's talk about them.

13         MR. FITZGERALD:  I'm sorry, could the Court repeat the

14 question?  I apologize.

15         THE COURT:  I said let's talk about them and why you

16 think that if either one should be followed or leaned on more

17 heavily, why it should be *Allied Artist*?

18         MR. FITZGERALD:  So again the reason that *Allied*

19 *Artist* -- if either case is relied upon more heavily, the

20 reason that *Allied Artist* is more aligned with the industry of

21 the Copyright Act is because it talks about consistent with the

22 *Abend* decision, consistent with *Fox Film Corporation*, that the

23 authority of states to regulate market practices dealing with

24 copyrighted subject matter is well established.  That nothing

25 in the federal Copyright Act prohibits the state from

1    exercising its police powers to rectify a market situation that

2    it perceives as inequitable.

3           Actually, that point was made in *Allied Artist*, that

4    second point, nothing in the Copyright Act prohibits the state

5    from exercising its police powers to rectify a market situation

6    that it perceives inequitable by the state.

7           **THE COURT:**  Mr. Fitzgerald, can you slow down a bit.

8    The court reporter is having a hard time.

9           **MR. FITZGERALD:**  I apologize.  Sure.

10           **THE COURT:**  Why don't you state that a little more

11    slowly.

12           **MR. FITZGERALD:**  Sure.  So there is a quote from

13    *Allied Artist* that says "Nothing in the federal Copyright Act

14    prohibits the state from exercising its police powers to

15    rectify a market situation it perceives as inequitable."

16           That is a quote from *Allied Artist*s, but there's

17    another quote in *Allied Artist*s -- and I got this I think a

18    little bit confused when I first recited this so I'm glad the

19    Court slowed me down.  "The authority of the states to regulate

20    market practices dealing with copyrighted subject matter is

21    well established."  That point is made not only in the *Allied*

22    *Artist* case but also in *Associative Film Distribution Corp. v.*

23    *Thornburgh*, 614 F.Supp. 1100, the pincite to the quote is 1122.

24           And that's kind of the fundamental issue here is

25    Maryland -- the State's authority to regulate market practices

that deal with copyrighted subject matter is well established.
That's what's taking place here.

Maryland has seen a publisher in 2019 flatly embargo libraries.  Maryland has seen discriminatory price practices with regard to libraries.  And Maryland, seeing the market imbalancing, the downward trajectory of that market balance, said let's step in and regulate these market practices, and they have authority to do so under separate case law.

Again, I would point the Court to one last case and this is a Supreme Court case.  If there's one most important case it is the *Abend* case.  The Association is relying on it to their point out of context that the copyright holder can arbitrarily exclude one that seeks to exploit the work.  But again, reading that quote in context can exploit what that right really means.

Moreover, the *Abend* case at Page 228 and 229 explains the point of granting copyright in the first place that I've said several times.  It is to garner a fair price for the work.  It is to balance an artist's right to control their work and do with it as they see fit versus the public's need to balance -- the public's need to access those works.  Because the weighing too heavily in favor of the artist's right to control the work deprives the public of the ability to really use the work for benefit.  It's -- it's a tree falling in the forest without anyone to hear it; it doesn't make a sound.  And likewise,

 1   weighing too heavily in favor of the public's need for access,
 2   it deprives the artist of their rights to control it.
 3           So really a balance is critical here.  And what this
 4   Maryland Act does is it restores a balance that's existed for
 5   over a century.
 6           It -- yes, it forces publishers to make an offer to
 7   libraries because their failure to do so would be contrary to a
 8   century of library lending under the First Sale Doctrine.
 9           Yes, it requires them to make an offer under
10   reasonable terms because -- case law also makes clear that
11   reward to the owner of copyright is a secondary consideration,
12   but to the extent that they seek to gain unfair prices for the
13   profit, you know, to maximize their bottom line and secure
14   greater profitability, that's not contemplated by copyright.
15   The *Abend* case says a fair price for the works and that's --
16           **THE COURT:**  I was going to wait to get into this,
17   address irreparable harm, but I can't help myself.
18           Aren't there two different markets here?  The market
19   to the public, so for instance when I buy an eBook on Amazon or
20   some other website, Barnes & Noble, isn't there a different
21   market there versus the market, quote, "libraries," I'm talking
22   about eBooks of course, where the library lends it to people
23   and then it's returned and so there's a one-time use per person
24   I should say, but multiple uses per -- per eBook.
25           Isn't that just a different type of market?

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

1          **MR. FITZGERALD:**  It is.  It is.  They are different

2    types of markets.  And the latter, the library market is one

3    that is a quintessential Government function.  The closest

4    parallel that I could draw -- this is drawing from my last job

5    before I came to the Attorney General's office, the closest

6    parallel is think a private lawyer versus a public defender.

7          I was a public defender for about five years before I

8    came to OAG and the -- although they do one of the same

9    functions inasmuch as they, you know, a private lawyer will do

10   this in, you know, will still litigate a case on behalf of the

11   client, will still represent the client to the best of the

12   ability the same way a public defender will.  They serve two

13   different interests.  One is to make, you know, private lawyers

14   are commercial entities.  They are trying to, you know,

15   represent clients obviously, but they are also working to

16   support themselves in that vein, and they are trying to

17   maximize their profits in that regard.

18         A public defender is something that the Government has

19   decided is a quintessential fundamental right that -- *Gideon*

20   *versus Wainwright* -- that no one should be able to be precluded

21   by having legal counsel for a criminal charge based on their

22   inability to afford it.

23         So we've decided that's a quintessential Governmental

24   function that we're going to make sure that there's a lawyer to

25   represent those who can't afford it.  In the same way libraries

 1   are providing these literal works to those that can't afford

 2   them.  Both are quintessential Government functions and,

 3   therefore, to the Court's question they are different markets.

 4   Although they do end up licensing the same literary work and

 5   providing it to, I guess, different or overlapping swaths of

 6   the public in that regard.

 7          THE COURT:  As a former public defender I would say

 8   that the service that my former colleagues and I gave was

 9   better than that of paid lawyers.

10          (Laughter).

11          THE COURT:  But in any event.  So thank you for

12   acknowledging there are different markets.

13          I'm not suggesting that that means that -- well, I

14   can't -- it's not my job to comment on what a publisher

15   imagines the market for a library is versus what the market for

16   eBooks to the public is, but to me it seems to be fundamental

17   different markets, and I think that's one of the distinctions

18   from *Allied*.  There, there was regulation of the terms of

19   distribution of films preventing blind bidding, not allowing

20   for guarantees in certain circumstances.  But that's when a

21   distributor of film decided they were going to distribute their

22   film in Ohio.  Once that distribution decision was made, the

23   state stepped in and regulated certain terms.  So the

24   regulation there was after the decision to distribute was made.

25          MR. FITZGERALD:  Right.  But the critical point here

1    is that -- again, libraries are a unique case -- really quick

2    as an aside.  The law in *Allied Artist* is still in effect,

3    which is interesting even though it's four decades old, but the

4    point in *Allied Artist* is the law -- the regulation at issue

5    was to achieve fair and open bargaining just like the Maryland

6    Act.

7             And one additional point with regard *Allied Artist*.

8    While it is true that, yes, and that is the -- I'm sure going

9    to be the point that the Association raises because it is the

10   only way that -- that *Orson* chooses to distinguish *Allied*

11   *Artist* to say that the difference is that *Orson* has already --

12   I'm sorry -- in *Allied Artist*s they already elected to make a

13   distribution and in *Orson* they hadn't.  The critical

14   distinguishing factor is public libraries, are public

15   libraries.

16            It's the fact that this is a completely unique

17   circumstance when compared to either case and moreover it is an

18   overwhelmingly compelling state interest that serves as the

19   backdrop for this litigation.  It's a completely separate issue

20   than either of those persuasive decisions.  That is ultimately

21   the -- the reason why the commercial interest of either

22   Plaintiff in *Orson* or *Allied Artist* really doesn't provide the

23   Court legal authority to say, well, because these publishers

24   have refused to license to libraries in the first place they

25   don't have the right to do so.  That's not consistent with the

1  copyright law.

2        Moreover, just to be clear, they are licensing to

3  libraries already.

4        **THE COURT:**  Right.

5        **MR. FITZGERALD:**  The increasing book holdings for

6  libraries demonstrates their ability and the fact that they

7  have done so.

8        **THE COURT:**  Why doesn't the reasoning, even if the

9  facts aren't directly the same, why doesn't the reasoning of

10  forcing, maybe not dispose of this case, but guide me in this

11  case.  So in those facts, as I understand them, Miramax had

12  exclusive first-run distribution with a fancy theater in

13  Philadelphia and the smaller theater was unhappy with that.

14  There was a law that said after the 42nd day of a first run if

15  you distribute your film you must distribute it to others

16  within the same geographic area.  And the Third Circuit said

17  basically just because you make a decision to distribute to one

18  person you can't be compelled to then distribute to others.

19        Reduced to its brass tacks, it seems very similar.

20  What am I missing?

21        **MR. FITZGERALD:**  The *Orson* case deals with an

22  exclusive license, right.  It deals with the first run

23  arrangement.  It it's not dealing with a copyright holder

24  seeking to license the product to the world at large and

25  exclude one particular class of patrons.  When we say exclusive

1 license we mean everybody but you, that's not an exclusive

2 license.

3 And exclusive license, as was the case in *Orson*, we're

4 going to distribute to one entity first and then distribute to

5 everyone at large.  This is kind of the flip side of that where

6 we're distributing to everyone at large except for you and then

7 maybe we'll distribute to you.  And that's -- A, that wouldn't

8 be -- I think there's -- it's a grayer issue.  But there's an

9 argument that's not consistent with copyright law and not

10 consistent with the holding of *Orson* in the first place.  You

11 can't say we're going to distribute to the public at large but

12 exclude one particular class.  But certainly you cannot do so

13 with regard to libraries because of their privileged role in

14 disseminating knowledge to the public at large.

15 It is the quintessential governmental function of

16 libraries to make sure the public has access to these works if

17 they can't afford them.

18 And to say -- to argue based on *Orson* saying, you

19 know, the point of *Orson* is that exclusive first run license

20 means, you know, it was we're licensing to this small subset

21 and then to the public, you know, and I just -- I don't think

22 that's the Association's argument with regard to *Orson* as a

23 justification for licensing to the public at large and

24 excluding the one particular subclass that is the most

25 protected -- one of the most protected classes of governmental

1   entities under copyright.  It's analytically different than

2   *Orson*, this case is.

3          THE COURT:  Okay.  Why don't we -- at some point I do

4   want to move to irreparable harm, but I want to talk to

5   Mr. Zebrak about these issues.  The likelihood of success on

6   the merits issue.  We've been going for an hour and 20 minutes.

7          Ms. Thomas, would you like a 10-minute break,

8   15-minute break?  I see her nodding.  And let's do that,

9   Mr. Zebrak, and we'll resume.  I've got 12:22, how about 12:40?

10         MR. FITZGERALD:  That sounds great, Your Honor.  Thank

11  you.

12         THE COURT:  Very good.

13         THE CLERK:  This court stands in recess.

14         (Brief recess.)

15         THE CLERK:  This court resumes in session.

16         THE COURT:  Okay.  We're back after a brief break.

17         Mr. Zebrak, I talked a long time with Mr. Fitzgerald.

18  Very good discussion.  Excellent lawyering.  I'm sure you have

19  many things you would like to say, but I'm going to ask some

20  questions and I want to have a discussion with you.

21         I want to pick up on the point that Mr. Fitzgerald and

22  I left on which is looking at the exhibit, looking at the

23  legislative history and the economics, there does seem to be

24  two different losses here, one to the public and one to public

25  libraries by virtue of how eBooks are so different than hard

53

```
1   books.
2          It does seem to me that there is inequity and an
3   unfairness in how publishers have treated public libraries, and
4   why doesn't the State have an interest in regulating that and
5   why doesn't the statute do that?
6          It's not asking that you -- that you compel the
7   library -- excuse me -- that you compel publishers to license
8   eBooks on any terms.  They're requiring it on reasonable terms
9   once you've offered it to someone else.
10          MR. ZEBRAK:  Your Honor, thank you for the opportunity
11  to be able to speak and, yes, there is much I do need to
12  correct.  And I'll answer Your Honor's question directly now.
13  But I would --
14          THE COURT:  We're having a hard time hearing you,
15  Mr. Zebrak.  Maybe it's because I have such a loud voice and
16  yours is more pleasant, I don't know.  But I'm having a harder
17  time hearing you.
18          MR. ZEBRAK:  I'll speak up.
19          THE COURT:  That's great.  Thank you.
20          MR. ZEBRAK:  Your Honor, you're absolutely correct.
21  We do have a lot to respond to the back and forth that just
22  occurred.  I look forward to the opportunity to address some
23  points in that regard, but let me answer Your Honor first.
24          Your Honor, I don't understand the starting point of
25  the question that Your Honor just asked me in terms of there
```

1   being a perceived unfairness in how libraries are being treated

2   and I'd like to explain what I mean by that.

3           So Congress decides copyright policy and Congress --

4   so one thing that was said in the back and forth it's all about

5   balanced or achieving the right balance or a reasonable balance

6   or a proper balance, all of those words that involve judgment.

7   And that judgment is for Congress.  It's not for the state --

8   whatever interest -- however well-intentioned the State may

9   think it's being, whatever interest the State thinks it has,

10  the State cannot substitute its judgment for that of Congress.

11  This is an area fully for Congress and the Supreme Court has

12  said that.  It's enshrined in the Constitution in the Copyright

13  Clause.

14          And one of the things that happened in 1976, Your

15  Honor, and excuse me if -- I'm now really attempting to speak

16  loudly so if it comes across a little too loud I don't intend

17  that.

18          THE COURT:  It sounds great on my end.

19          MR. ZEBRAK:  Thank you.  It's more than my normal

20  projection.  I just didn't want to have it appear I was

21  shouting.

22          So the copyright statutes in the United States,

23  they're used to be more of a dual system of state and federal

24  regulation.  Congress did away with that in 1976.  And that's

25  one of the main objectives of the Copyright Act is to have

1  national uniformity and to do away with state laws that were
2  kind of vestiges of state regulation.  And one of the reasons
3  that the *Allied* case that they rely on is particularly
4  unavailing is that it largely relies on cases from before 1976.

5        But in terms of this perceived unfairness, it, quite
6  frankly, reflects the State's perception as the State's been
7  informed by library advocates.  I mean, you saw who the
8  declarations were from.  It's partisans that have a view of the
9  balance that those interested parties would like to see in
10 copyright.  That doesn't reflect what's actually happening in
11 the marketplace necessarily.  That reflects the view of those
12 partisans.

13       When Congress legislates in the area of copyright, it
14 has extensive hearings, it studies, it receives expert guidance
15 from the copyright office, it receives stakeholder input and
16 then it acts.  And it acts with regard -- Your Honor recognized
17 that the transactions are not limited to single state's
18 borders.  Congress is balancing copyright policy across the
19 country and internationally.  That's for Congress to do.  Not
20 the state to decide what's a reasonable term or what's a
21 reasonable price or just how much recoupment a publisher or an
22 author is entitled to have on their investment in what it takes
23 to create a work when they're doing the things they do when
24 they write a book on the side while they're doing some other
25 job during the day.

 1          You know, the State treats these copyrighted works
 2   like they're commodities.  They're not.  Some of these books
 3   are by best-selling authors.  Some of them are textbooks.  They
 4   run the gamut of what they are.  Some of them are also books by
 5   somebody who maybe is working three jobs and writing a book in
 6   the middle of night.  And authors and the publishers that
 7   contract and have a relationship with them are limited in terms
 8   of copyright.

 9          And Congress, in calibrating the copyright laws, has
10   determined that granting exclusive rights and the discretion
11   that comes with those exclusive rights and how to exercise them
12   redounds to the public welfare, the Supreme Court said that
13   numerous times, including in the *Eldridge* case we cited, Your
14   Honor.

15          And, quite frankly, a lot of what the State just put
16   forward in its discussion of the issues is wrong.  It's wrong
17   about the law, and it's wrong about the marketplace.  I'm not
18   going to address every one of them.  I don't think Your Honor
19   wants me to do that.

20          But as wrong as it is, it all goes to why the statute
21   is preempted, because if nothing else is clear is that the
22   State is attempting to substitute its judgment for what
23   Congress has done in calibrating these laws.

24          Now, there was some discussion back and forth
25   reflecting that perhaps the copyright statute is an old statute

1    that didn't contemplate digital transmission of works in

2    digital form, whether as an eBook, an audio book, or other

3    types of works in other formats.  That's not right, Your Honor.

4           There's many examples of this but Congress passed the

5    statute in 1976, but it's been amended many times since then.

6    And Congress carefully studies whether to amend it and whether

7    if it's going to do that how to approach that.

8           You know, for instance, with the First Sale exhaustion

9    principles Congress determined that applying those principles

10   to digital copies didn't make sense and so it didn't do that.

11   And that's Congress carefully calibrating copyright for the

12   digital age.  And what's happening here is an end-run by

13   certain groups that want to divert copyright policy from the

14   federal government to state legislatures.

15          But, again, it's unambiguous that that's Congress'

16   sole authority.  It's not for the State to decide what's

17   reasonable.  I could go through and list a whole bunch of other

18   examples, but the Digital Millennium Copyright Act passed in

19   1998, Your Honor, that's when it went into effect.  That was

20   reshaping the copyright law for the digital age.  That was a

21   year before the *Orson* case.

22          Congress carefully -- you know, in hearing the State's

23   presentation it almost seemed as if the State was arguing that

24   libraries were above copyright law and have some special

25   entitlement that the State needs to swoop in and recalibrate.

 1   That's not correct, Your Honor.

 2          Libraries are important.  They always have been and

 3   they still are.  But libraries are not above Congress'

 4   calibration of the copyright laws.  Congress calibrated how to

 5   treat libraries in terms of special protections.  That's the

 6   scope of 108.  Congress has done studies about whether to

 7   update or change the scope of 108.  It exists as it exists

 8   today.  The State doesn't have a valid interest in swooping in

 9   and recalibrating what Congress deems fit in terms of the

10   calibration of copyright laws.  Whether it be in Congress

11   choosing not to expand and adjust 108 which is for libraries,

12   whether it be in Congress choosing not to take the First Sale

13   exhaustion principles and extend that to digital

14   disseminations.

15          But make no mistake, it's unambiguous that this is

16   what the statute does and on top of that the State has doubled

17   down on it and not hidden the fact that everything it's trying

18   to do is a reaction to the State wanting to have special

19   treatment for its libraries and to do an end-run around

20   Congress' calibration.

21          And it also rests quite frankly -- this was the other

22   thing where I was really astounded when I heard the word "death

23   knell."  The "death knell" of libraries.  Your Honor,

24   libraries -- when you look at what's happening today in digital

25   lending, and there's no dispute about that, the State's

1  acknowledged it, digital lending is off the charts through

2  libraries.  This is not an issue about access and people not

3  being able to access materials or equitable access in terms of

4  folks without means or older individuals or those with

5  disabilities.  This is about whether individuals -- well, it's

6  about respecting Congress' balancing, but the point here, Your

7  Honor, is the State is dictating the terms in which a copyright

8  owner must exercise its discretion in its exclusive right, and

9  it's not just the initial choice of whether or not to grant a

10  license.  If the State's going to come in and then regulate the

11  terms, that intrudes very -- that's a frontal attack on the

12  exclusive right itself and Congress' decisions in the economic

13  incentives that inure to the copyright holder during the term

14  of protection and all the related balancing.

15        So to the extent there's an idea that a state can

16  regulate the terms of that distribution, you know, even after

17  someone has decided to do the distribution, that's just not

18  accurate.

19        Congress has something that it does in exceedingly,

20  exceedingly rare instances, it's referred to as a statutory

21  license.  In our briefing we referred to it as a compulsory

22  license.  These are incredibly rare and incredibly

23  controversial, Your Honor, because they represent Government

24  intervention into a free market -- it's essentially what

25  Maryland has done here.  And one example of it that exists in

1  federal law is something called the 115 Mechanical License,

2  Your Honor, which has to do with musical works, the written

3  songs that are then recorded.

4         And there the Government, Federal Government,

5  Congress, said with respect to musical works after it's been

6  first published or distributed to the public then certain uses

7  can be made upon certain payment terms as long as the user

8  stays within the scope of that license.  Well, that's exactly

9  what Maryland has done here, Your Honor, except it's at the

10  state level, it's not at the federal level.

11         Maryland is -- first of all it's mandating the

12  distribution after we've distributed in a different market.  It

13  is an apples to oranges comparison, Your Honor.  But the point

14  is this is something that Congress does.  It's extremely

15  controversial when Congress does it.  It's exceedingly rare.

16  Congress thought about at one point whether to have any kind of

17  a statutory license with respect to literary works and it

18  expressly decided not to do so, Your Honor.

19         So for the State to come in and now grant a compulsory

20  license when Congress chose not to do so, this couldn't be a

21  clearer example of the State interfering in an area solely

22  reserved for Congress.  And, again, it relies on this

23  misperception that libraries are being treated unfairly.  They

24  are not.

25         Your Honor was correct, you didn't use the term

1  "apples to oranges comparison," but make no mistake that's what

2  it is.

3        When a publisher sells a license to an individual,

4  that's for the individual's personal use.  Yet the State comes

5  in -- talking about the death knell of libraries -- when

6  libraries -- when they get a license it's to distribute it to

7  patrons.  Understandably two different licenses with different

8  scopes of use and will have different terms in them and

9  different prices.  That's not shocking.  The State even talks

10 about libraries paying a higher price.  That's not necessarily

11 even true.

12        In our briefing, Your Honor, we included an example

13 why over the course of a two-year license if, you know,

14 depending on how many checkouts there are, if the book -- it

15 actually could be much cheaper for the individual licenses, per

16 license, than it would be to buy the book outright.

17        So, Your Honor, the point here is not to debate the

18 state of marketplace.  The point that I'm making is the state

19 of Maryland proceeded in a rushed manner here without

20 understanding the marketplace and clearly it has made mistakes

21 in its understanding of it, as told by those interested in

22 seeing this legislation happen.

23        But in any event, whether Maryland is right or wrong

24 about the state of the marketplace it's irrelevant because it's

25 solely Congress' authority.

1          So let me pause there and ask Your Honor if there are

2     any questions based on anything I've just covered?

3          THE COURT:  One of the things that Mr. Fitzgerald said

4     at the end of his discussion was it's -- the copyright holder

5     can't exclude a swath of the public such as the libraries.

6     It's an interesting argument.  I haven't heard any authority

7     for it.  Particularly doesn't really square with the exclusive

8     rights enumerated in the Copyright Act, but what is your

9     response to that?

10         MR. ZEBRAK:  So my response is two-fold:  First of

11    all, I think Mr. Fitzgerald has acknowledged that that's

12    actually contrary to mostly what's happening in the

13    marketplace.  That's first off.  In terms of whether a

14    copyright holder has discretion about whether to grant a

15    license to person or entity A, but not to person or entity B,

16    the copyright holder absolutely has that right, Your Honor.

17         THE COURT:  Even when the second one is public

18    libraries?

19         MR. ZEBRAK:  Well, Your Honor, I know my statement may

20    come across as controversial but, you know, it's a hypothetical

21    example in the sense that these licenses are happening now, but

22    the copyright -- so Congress -- taking a step back.

23         Congress has granted a very carefully balanced set of

24    rights and exceptions to that and our exclusive rights don't

25    say you have an exclusive right to decide who to distribute or

1  not to distribute it to except you must always distribute it to

2  libraries if you want it.  That's not what the statute says.

3  The statute gives us exclusive rights and there are exceptions

4  for libraries.

5        So, again, these licenses are typically happening, but

6  the point is if a copyright holder -- if the copyright holder

7  has discretion on whether to grant the license at all and to

8  whom to grant the license and when and pricing and terms -- and

9  that's super important, Your Honor.  I'd like to spend a moment

10  on that because marketplaces are complicated.

11        There's many -- there's a lot of competition for

12  consumer interest.  You know, consumers want to read books,

13  they want to play video games, they want to look at social

14  media, they do a thousand different things.

15        So whether it's in publishing or any other industry,

16  every creator and the entity that works with them, whether it's

17  a publisher, a movie studio, they have to engage in very

18  careful, ongoing marketplace decisions to figure out what makes

19  sense; both for that particular work, for their larger body of

20  works, for that author, for the short-term and long-term gains.

21  And that's why these exclusive rights are so important.

22        But, again, it's all for Congress to decide, and we do

23  have the exclusive right to decide whether it be not to grant a

24  certain license to libraries or whether it be to grant a

25  license for, let's say, just one copy of the work but not 10

1   which of course this statute prohibits.  It says we can't

2   regulate the amounts.

3           So this all falls within the area of what Congress

4   regulates and the State can have its views on these things, but

5   it can't regulate what's regulated by Congress, and that's

6   exactly what it's doing.  And that's the reasoning from *Orson*

7   which is so compelling which is that a state can regulate false

8   advertising or defamation, right, if the copyrighted work is

9   defamatory or you falsely advertise or commit fraud.  But what

10  the state can't do is, well, I want you to grant more

11  distribution licenses to this library or this university, or I

12  want you to do it -- I think you're getting 10 percent too much

13  there and make a decision on how much return that author and

14  publisher is entitled to recoupe.  Or, you know, I know that

15  you just released the book, but I need you to do day one --

16  even though I think these licenses are happening immediately to

17  libraries, but the state can't go in and regulate these issues.

18  This is all for Congress.

19          And for some reason, Your Honor, I think folks are

20  more willing to superficially accept these intrusions when they

21  involve literary works, and I don't understand why that's the

22  case.  But if we relate this to other works for a minute, I

23  think it becomes impactful.

24          No one questions when, let's say, there's a

25  blockbuster new movie and there's a first run of that movie,

1  let's say, on Netflix and on Amazon and then a month or two
2  later it goes somewhere else and then to theaters and then
3  to -- but yet with books for some reason, Your Honor, folks
4  think that it's okay to say day one it must go to libraries
5  also and at limitless amounts and at prices the State thinks is
6  reasonable.
7         Again, this is just the state substituting its
8  judgment for Congress, and I think it all is directly preempted
9  by the statute, Fourth Circuit law, and Supreme Court law.
10        THE COURT:  Let me ask you this, Mr. Zebrak, about the
11  conflict preemption argument in your paper.  You seem to -- you
12  did have an argument about the impossibility of complying with
13  both, but it seemed like your focus was on the latter conflict
14  preemption analysis which is whether or not the law stands as
15  an obstacle to the accomplishment and the objective of Congress
16  in the Copyright Act, which one of the two or both are you
17  arguing?
18        MR. ZEBRAK:  First of all, I think the lines between
19  the two are somewhat blurry.
20        THE COURT:  Fair point.
21        MR. ZEBRAK:  Much as the lines between conflict and
22  express preemption are somewhat blurry.  And I'd like to answer
23  Your Honor's question but not lose sight of those blurred
24  boundaries.  And also not lose sight -- I heard Your Honor say
25  that perhaps the preemption analysis fit more comfortably

1  within the lens of conflict preemption.  But I would like to

2  address both grounds.

3           **THE COURT:**  Okay.

4           **MR. ZEBRAK:**  And I do think that even though the

5  Copyright Office concluded that statute was likely preempted on

6  conflict preemption and that it fit more comfortably in that

7  rubric rather than analyzing express preemption, the Copyright

8  Office didn't reject express preemption.  That was a

9  misstatement.

10          **THE COURT:**  I understand.

11          **MR. ZEBRAK:**  So having said that let me answer Your

12  Honor's question, and I think this is really an opening to

13  speak to conflict preemption.

14              So whether you view it -- so the State is making it --

15  look, it is an impossibility to comply with both the state law

16  and the federal law and that -- that speaks both to the first

17  piece and the second piece.  And what I mean by that is that

18  Congress gives you your exclusive rights.  Those rights are

19  fettered only by, you know, in terms of how you exercise them,

20  the exceptions and limitations that Congress put into the

21  statue.

22              Of course it is related to how you exercise them, such

23  as false advertisings, you know, the State can regulate that,

24  but not the exercise of your rights themselves.

25              And the point here is that once we, let's say,

 1 distribute something to a consumer, and perhaps even distribute
 2 it to a library with one copy, but we perhaps don't want to do
 3 10 or 100, right?  We don't like the price point.  It's
 4 irreconcilable in conflict with our exclusive right for us to
 5 abide by the statute, because the only way to follow the
 6 statute and not risk civil and actually criminal penalties,
 7 Your Honor -- which is staggering here -- the only way for us
 8 to, you know, as publishers fulfill our obligations to authors
 9 during the term of the copyrights to achieve value from it,
10 right, would be, you know, unless we want to risk civil
11 liability or potentially being put in jail is to acquiesce and
12 bend a knee to this state regulation that substitutes its
13 policy judgments on how to best calibrate copyright with what
14 Congress' determination is.
15         So I think it's directly in conflict with that.  You
16 know, our rights, you know, the State is under a
17 misapprehension that once we distribute something once, it
18 leaves the world of copyright.  It's just not true, Your Honor.
19 That's made up from whole cloth.
20         THE COURT:  I think Mr. Fitzgerald conceded that.  I
21 think -- my intention was to ask him just that, to the extent
22 he hasn't, I don't see any support to the contrary, but.
23         MR. ZEBRAK:  You know, my confusion, Your Honor, while
24 they may have ceded it today, make no mistake it's in their
25 papers repeatedly.  So, you know, it ought not to be a moving

1    target on what their positions are.

2             And, you know, the State has, quite frankly,

3    fundamentally misapprehended copyright law and its -- its

4    ability to substitute its judgment for Congress'.  And it's,

5    again, driven by misapprehension in the marketplace.  But let

6    me stay on why it's conflict preempted, Your Honor.

7             The balancing that the State is attempting to do here

8    upsets the balancing that Congress is after.  And so that

9    fundamentally is why it's conflict preempted.  The State is

10   about substituting its judgment for Congress and it's doing it

11   in multiple ways.

12            One way it's doing it, Your Honor, is by telling us

13   how we can and can't execute our exclusive rights.  That's the

14   first way.  The other way they're doing it, Your Honor, is by

15   having state level regulation in an area exclusively reserved

16   for Congress.

17            One of Congress' overarching objectives in the 1976

18   Act, I think it's referred to as foundational change or C

19   change, has been to have nation uniformity and eliminate the

20   confusion caused by this dual system of copyright regulation.

21            And what Maryland and other states are attempting to

22   do is to -- is to bring us back to a time before the 1976

23   Copyright Act, which is somewhat ironic because the '76 Act has

24   been so successful in advancing America's creative economies

25   into very cherished, creative works that the readers want to

1  read.  And Congress has updated and carefully validated and
2  modernized those laws over the course of the years right
3  through the 1998 Digital Millennium Copyright Act.

4          And what the State is now doing is attempting to what
5  it calls restore the balance.  It's attempting to restore a
6  balance that existed in the pre-digital era at a time where
7  there weren't digital works like there are today.  But the
8  point is Congress has thought about that again and again and
9  again and chosen where it's deemed fit both to revise and
10 update its laws as well as just as importantly where the laws
11 were right and properly calibrated the way they are.

12         And so, you know, the State's passioned arguments
13 about libraries -- you know, I love going to my library also.
14 I have great respect for the State.  I have great respect for
15 libraries.  This is not about are libraries good or bad.  This
16 is not about -- quite frankly, it's not even about unfair
17 treatment of libraries given what I've described about the
18 misperception on the differences and licenses and pricing and
19 how digital lending is flourishing, flourishing across
20 Maryland.  You know, there's not an access issue now.

21         So the point here is that this state statute compels
22 us -- tells us that we must exercise our rights.  The idea
23 between an offer to license and a license is the same thing.
24 It tells us once you distribute it or offer to distribute, if
25 the state library wants a license, it gets it, and it gets it

 1   on the terms that the state of Maryland says is the proper

 2   balance under copyright and that fundamentally rewrites the

 3   Copyright Act.  That's why we call it a shadow Copyright Act,

 4   Your Honor, because it substitutes the State's judgment about

 5   when the rights must be exercised, to whom, the terms, you

 6   know, the rights holders can't balance the markets and timing

 7   or any of that.  So it's just fundamentally at odds with what

 8   Congress has decided to do.

 9          And if I could speak to the distinction, if it please

10   the Court, Your Honor, between *Orson* and *Allied* I'd like to do

11   that in the context of express -- of conflict preemption and

12   then move on to express.  Would that be all right?

13          **THE COURT:**  That's fine.

14          **MR. ZEBRAK:**  So, Your Honor, in this area of conflict

15   preemption whether -- as I jump into *Orson* and *Allied* -- the

16   final point before I hit those two cases is whether you view it

17   as objectives or a direct conflict is that one can't make full

18   enjoyment of the federally-granted rights as Congress has

19   shaped those rights and any limits on those rights if the State

20   then steps in and it puts further shaping and contours on it.

21   So that's, you know, that's why it's fundamentally

22   inconsistent.

23          In terms of *Orson* and *Allied*, let me start by *Allied*

24   because, Your Honor, I think that case is -- while I agree that

25   there aren't scores and scores of these cases out there, that

1   doesn't mean that *Allied* is an important case in this area.  I

2   think it's an easily distinguishable case in this area for a

3   few reasons.

4        First of all, *Allied*, as I mentioned before -- I don't

5   have a quantification in front of me -- but it makes extensive

6   use of cases that came pre-1976 at a time when states had a

7   different interest in regulating copyright than they do today.

8   Now states can't regulate what Congress regulates in the area

9   of copyright.  But any measure, whether it's enforcing a

10  distribution or alternatively, even though it's not this

11  statute, in saying once someone distributes the state wants to

12  regulate the terms.  In either instance that state's regulating

13  what Congress regulates.

14        So, number one, *Allied* relies on pre '76 cases and in

15  particular I think in the State's reply brief on its Motion To

16  Dismiss it talks about -- it made reference -- it didn't cite

17  the Supreme Court case in their brief, but they said the

18  Supreme Court case says the copyright holder doesn't have

19  unfettered discretion on how they exercise their rights.

20  Again, that was a good example of *Allied* relying on a pre '76

21  case.  The case they were citing to I think was from the 1940s

22  from the Supreme Court, and it was an antitrust case from the

23  '40s.

24        You know, that's not where we are here today, Your

25  Honor.  There's no allegation of an antitrust problem.  There's

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

1   no allegation of a fraud problem or deceptive practices, Your

2   Honor.  The only thing afoot here is the state legislature

3   trying to recast practices that are very commonplace across

4   copyright industries, that are fully within the four corners of

5   the framework that Congress set forth as unlawful trade

6   practices.  Now that's what we have here.

7          So in terms of the other reason why *Allied* is not

8   helpful is that *Allied* really regulated something that was

9   very, very incidental to copyright compared to what *Orson* did

10  or what the Maryland statute has done.

11         Again, states can regulate false advertising, they can

12  regulate defamation but the Maryland statute is different,

13  we'll talk about that in a moment.

14         The issue in *Allied*, Your Honor, wasn't about forcing

15  distributions.  It was really about a negotiating practice, as

16  Your Honor pointed out, I believe about blind bidding.  And

17  that's just not this scenario at all.  That was really, again,

18  you know, I think -- I'm not saying that what that Court said

19  is okay with respect to regulating the distribution right is

20  acceptable.  I -- just distinguishing that case as being very

21  different than what's happening with respect to Maryland

22  statute in *Orson*.  But the point is it's a very limited

23  utility.  Whereas *Orson*, and the cases that we rely on, Your

24  Honor, are really spot on in their reasoning.

25         So first of all, *Orson*, Your Honor, was in 1999 very

 1  much with the advent of the digital age.  The idea of the

 2  digital market was not unknown to Congress or the courts.  The

 3  1998 Digital Millennium Copyright Act, which basically was kind

 4  of an overhaul of copyright for the digital age, was already in

 5  place at the time.  And the reasoning of *Orson* is very spot on

 6  because it really said that, you know, copyright holders can't

 7  be forced to be told when they must make distributions.  And

 8  while that was the narrow factual circumstance there, the

 9  reasoning applies not just to forcing the distribution, but in

10  explaining what the contours of that distribution must look

11  like.

12          And really the key -- the key aspect from that case

13  and others is the point here that if what the State is doing is

14  regulating a right protected by copyright law it must, of

15  necessity, be preempted under conflict preemption principles.

16  That reasoning should not be just limited to forcing a

17  distribution.  It's also saying that the state, at the state

18  level, can't dictate when or to whom or the price points.

19          To the extent there are any limitations on those

20  issues, you know, Congress as I mentioned in exceedingly rare

21  instances creates the statutory licenses to address that.  And

22  I don't think that's warranted here and, you know, that's one

23  of the reasons why *Orson* I believe is so -- is so compelling.

24          I believe that the State made some point that we don't

25  have a perpetual right to control distribution during, you

1    know, once we sold it once.  Well, we do.  We do during the

2    term of our copyright.

3             You know, if I could, Your Honor, what I'd like to do

4    is -- unless Your Honor has any questions about conflict

5    preemption, is turn briefly to express preemption.

6             THE COURT:  No.  That'll be fine and then I'd like to

7    start with you on irreparable harm.

8             MR. ZEBRAK:  Yes, Your Honor.  Sorry, I lost my page.

9    So, Your Honor, as Your Honor is aware, there's an express

10   preemption within the Copyright Act Section 301.  And the law

11   is clear that the existence of an express preemption in the

12   provision doesn't mean that conflict preemption can't apply.

13   They're separate analyses.

14            I believe that each of the two doctrines preempts the

15   State statute and both those doctrines whether it's conflict or

16   express need to be interpreted broadly, because under federal

17   supremacy law, clause, principles, you know, the federal laws

18   are the laws of the land.  And when Congress in a federal

19   statute is exclusively regulating a law in an area, you know,

20   the four corners of a provision and the policy objectives of

21   Congress can't be reshaped by the state.

22            So whether you look at it through either doctrine, you

23   know, Congress' statute and its principles are absolute.  And

24   on express preemption, Your Honor, the case that I ask Your

25   Honor to take a close look at is the one we cited of *Close v.*

1   *Sotheby's* from the Ninth Circuit which is a really powerful

2   case for a few reasons.  I'll talk about those in a minute.

3           But before I get into that I'd like to just talk about

4   the 301 preemption provision in the statute itself.  So that's

5   Congress manifesting its intent that laws that are equivalent

6   to those of copyright are preempted.

7           So as I mentioned, something that's not equivalent,

8   such as defamation, false advertising, something like that can

9   stand.  But with respect to unfair trade practices the State

10  has said unfair trade practices are okay to be regulated but

11  copyright is not.

12          You know, the analysis is a little more nuanced than

13  that.  You have to really look -- and the Fourth Circuit has

14  made this very clear in its *OpenRisk* decision.  It indicated

15  that you have to look at what a statute does, not to what it

16  says.  And there in the *OpenRisk* case the Fourth Circuit was

17  looking at state laws that regulated computer crime issues and

18  access to computers.  And in that instance the Court found a

19  series of -- and discussed cases finding provisions like that

20  where the core of what was being regulated by the state

21  statute, whereas about unauthorized copying it prohibited those

22  state statutes.

23          My point in raising *OpenRisk* is just to point out that

24  the Fourth Circuit very clearly recognized you have to look at

25  what the statute does, not to just what label you put on it.

1       So in Section 301 Congress is saying that laws that
2   are equivalent to what Congress is regulating in copyright
3   can't stand.  You know, in effect, states may not upset the
4   balance of what Congress puts forward in copyright through
5   their own issues because they view them different.

6       And, you know, courts have also said that the shadow
7   cast by the copyright preemption provision is broader than the
8   wing of its protection.  So the point there is when Congress is
9   regulating something that's what governs.  And it's not, you
10  know, it's not just what Congress enacts in the statutes, it's
11  also the limitations of what it's enacted, and the things it's
12  chosen not to enact in that statute that are covered.

13      As one of the reasons why the *Close v. Sotheby's* case
14  is so powerful and there -- Your Honor, so my partner who
15  speaks some French was able to make me sound a little smarter
16  today when I present a phrase that I was unaware about in
17  copyright which is droit de suite, which is a concept in French
18  law which entitled artists of copyrighted works in order to
19  receive a royalty on subsequent distributions of their works.
20  Essentially a continuing revenue stream beyond the first sale.

21      And Congress looked at whether to enact that in the
22  Copyright Act and decided that that would be inappropriate.

23      The state of California then enacted its own statute
24  to put that droit de suite into place in California and that
25  was what was at issue in that *Close v. Sotheby's* case.  And the

1  Ninth Circuit concluded that it was preempted by copyright.

2  And it wasn't -- it was preempted by copyright and Congress

3  established the close of distribution right, and it didn't

4  include this royalty stream payment, and it decided not to

5  enact the droit de suite.  There was a specific study by the

6  copyright -- the Copyright Office was asked to do a study and I

7  think determined not to have it be enacted and Congress didn't

8  enact it.

9          That's really -- you know, the State is trying to

10 regulate what it sees as unfairness but its perception of what

11 it sees as unfairness is clouded by its misperception of

12 copyright law.  Copyright law balances all this.  And what the

13 State sees as unfairness because First Sale exhaustion

14 principles don't apply to digital disseminations, that's not a

15 loophole in copyright law, Your Honor, that is copyright law.

16 That's Congress' balancing much in the way that the Congress

17 didn't enact the royalty stream payment for subsequent

18 distributions and why it was preempted in *Close v. Sotheby's*.

19         So when you look at it through express preemption or

20 conflict preemption, they both at its heart get back to the

21 same core point, which is that what the State is doing here its

22 essence is in copyright.  Whether it's enforcing the

23 distribution, regulating the price, indicating who is entitled

24 to be the beneficiary of a distribution, setting the amounts or

25 the terms.  Those are all decisions solely within the province

1    of copyright and, you know, we think that publishers are acting

2    reasonably and are supporting their library partners.  And they

3    do support and believe in their library partners, make no

4    mistake about that.  You know, it's not an accident that the

5    library market is thriving the way that it is with digital

6    lending.

7         The point here is that Congress has balanced all of

8    these issues and the State's just substituting its own

9    perception and priorities for that of Congress.

10        **THE COURT:**  Okay.  Let's -- thank you for that.  Let's

11   move to irreparable harm and the other three prongs, the

12   factors I should say, of their preliminary injunction analysis.

13        So, Mr. Zebrak, first question is you cite a District

14   of D.C. case I think for the proposition that the violation of

15   the Supremacy Clause is per se irreparable harm.  I didn't see

16   much briefing in that case.  I don't see any other cases that

17   cited violation of the supremacy clause is irreparable harm.

18        You also cite *Leaders of a Beautiful Struggle*, the en

19   banc 2021 Fourth Circuit opinion involving the illegal

20   surveillance of Baltimore City that talks about violating

21   constitutional right would result in irreparable harm.  There

22   that dealt with the Fourth Amendment and the obvious harms that

23   result by unlawful searches and seizures.

24        So just focusing on this, what case do you have to

25   support the notion that a violation of the supremacy clause is

1    irreparable harm.

2        **MR. ZEBRAK:**  Thank you, Your Honor.  My answer to that

3    question is two-fold.  So I don't have a list of cases beyond

4    what we've cited in the brief.  We're of course happy to do any

5    supplemental briefing that would be assistive to the Court.

6        In terms of why there's irreparable harm in the

7    absence of an immediate injunction -- and just speaking to the

8    Supremacy Clause issue for a moment, there's several reasons

9    why there's irreparable harm more broadly, and I'll be happy to

10   go through that litany of reasons.

11       But, you know, in terms of why there's irreparable

12   harm from a Supremacy Clause perspective -- well, certain cases

13   do, from a Supremacy Clause perspective, many of them are

14   indeed in the area of constitutional rights.  You know, many of

15   them do arise under Fourth Amendment search and seizures and

16   all these other constitutional rights that are afforded to

17   individuals.  So that's just the context in which many of these

18   cases are occurring and why you see it there.

19       But in terms of why there's irreparable harm when the

20   State is violating the Supremacy Clause, you know, I think

21   that's self-evident, Your Honor, in the sense that Congress'

22   law is the supreme law of the land.  And I think irreparable

23   harm happens when the state is substituting its judgment for

24   that of Congress' in an area that Congress exclusively

25   regulates.  I think by definition that's irreparable harm

1  because without the injunction the *status quo* is no longer what
2  it was before the unlawful state action.  The state action
3  then, you know, folks face civil liability or criminal
4  prosecution because the state in violation of the Supremacy
5  Clause has substituted its judgment for that of Congress.

6          So while those cases are, as I concede, often in the
7  area of constitutional violations, the point is the Supremacy
8  Clause is in the Constitution and the Copyright Clause and
9  Congress' authority to regulate and have a Copyright Act that
10  exclusively regulates copyright is enshrined in the
11  Constitution.  And these incredibly important public policy
12  issues, you know, I think there's irreparable harm if the
13  statute stands a day longer than it needs to when it's invalid.

14          **THE COURT:**  Thank you, Mr. Zebrak.  I do want to hear
15  about the more practical irreparable harms that you've
16  discussed in your paper and you submitted affidavits in support
17  of, but before we do that, a number of the cases that you cite
18  involving irreparable harm involving the Copyright Act, I think
19  all of them, correct me if I'm wrong, involve copyright
20  infringement.  So this is, you know, we're in a different area
21  where we don't have allegations of infringement.

22          So tell me how those cases support the notion that
23  there's irreparable harm?  Setting apart the alleged violation
24  of the Supremacy Clause.

25          **MR. ZEBRAK:**  Yes, Your Honor.  Thank you.  Well, so

the answer is the principles from those cases directly apply,
and I'll explain why.

          The reason, Your Honor, that there are not more cases
like the one we have today is that, you know, until this
Maryland eBook had sort of regulation of literary works
commercialized in eBook/audio book format, states haven't been
trying to do what Maryland's doing here.  You know, the 1976
Act preempted these state laws and, you know, so the absence of
these, I think, is actually telling and reenforces preemption.

          But in terms of these cases, Your Honor, they are
indeed often in the context of infringement because
unfortunately that's where many of these cases are dealt with
because there's unfortunately too much infringement happening.
And, you know, instances like the state statute are rare.  But
the infringement cases, it's the same principles.  The point is
in infringement irreparable harm exists because the copyright
holder's exclusive right is not being respected.

          In other words, the exclusive right that Congress
granted the copyright holder is being taken away contrary to
Congress' objectives and some interloper has come in and taken
that right and intruded on it.

          So the point from those cases is not irreparable harm
exists only to stop infringement; the point is that when
copyright holders' exclusives rights are being taken away,
whether it's been infringement or by a state statute that takes

1  away your rights by telling you when you must exercise them and
2  how, it's all irreparable harm.
3         And to expand on that a little bit, the point here is
4  that each day the statute stands, the copyright holder, you
5  know, if the copyright holder acquiesces then distributions and
6  agreements that supersede how the authors and publishers may
7  decide to do them, as is their right under the grant of rights
8  under federal copyright law, is not substituted based on
9  whatever the state of Maryland thinks is reasonable.
10        And, again, it's not that anyone doesn't want to
11  support libraries.  We do.  We do all the time.  But the point
12  here is that the State can't substitute its judgment.  And so
13  these cases apply squarely because it's the same exclusive
14  rights that are being limited.  You can't take back agreements
15  that we have to either revise to comply with the statute,
16  agreements we enter into to avoid similar risks of civil or
17  criminal penalty, you can't take back distributions that are
18  happening or public performances if its audio books pursuant to
19  library licenses on involuntary agreements pursuant to the
20  statute.  Once those all happen or are made, you can't unring
21  that bell and so --
22        THE COURT:  Let me just press you on that as far as
23  let's say it's not enjoined and there are agreements that
24  your -- the publishers enter into with libraries and then later
25  its declared unconstitutional.  Isn't there an economist who

1  could calculate what the damages are to your client or to the
2  publisher who was forced to comply with the Act?
3          MR. ZEBRAK:  Well, the short answer is no, Your Honor.
4          THE COURT:  Why not?
5          MR. ZEBRAK:  And at best, at best partially.  And, you
6  know, let me explain what I mean by that.  Now, of course one
7  can look at the number of distributions of copyrighted work
8  that happened under a library license.  But the world and the
9  complex balancing of marketplaces is forever changed upon a
10  statute like this artificially changing how the author and the
11  publisher go about commercializing the copyrighted work during
12  the term of protection because there -- you know, so first of
13  all their exclusive rights can't be put back to the position
14  they were in the first place.

15          And, you know, one may not be able to measure how the
16  distributions that occurred through the library market would
17  have led to sales of X versus Y in the commercial sort of eBook
18  retail market or what other creative derivative works could
19  have been sparked from it.  For example a leading movie or who
20  knows what.

21          Point is, Your Honor, there are these incredibly, you
22  know, incredibly complex author-specific, work-specific,
23  timing-specific decisions to be made about, you know, about the
24  release of books in the same way that there are about the
25  release of movies and whether to release it in month X versus

1 | month Y and whether to release it just on Netflix or in three
2 | other places.
3 |         And so, Your Honor, to try and reconstruct that world
4 | is at best something one can do partially.  But the other
5 | reason, you know, I think that bears mentioning here is that
6 | it's not just a straight numbers calculation.  Congress has
7 | decided on federal copyright policy.  You can't unring how the
8 | State has recalibrated that if the statute stays in place.  And
9 | I don't -- I began with the idea that this is the definition of
10 | a preempted statute.  And when you see what the statute does in
11 | terms of reshaping Congress' balancing within the context of
12 | this statute, I still think that's incredibly clear and that,
13 | you know, the idea here is that, you know, apart from even --
14 | apart from even economic partially recalculating what sales may
15 | have been, you know, Your Honor, what happens if a copyright
16 | holder doesn't believe that the work that the author has
17 | sacrificed years writing and that publisher has invested in and
18 | is ready to, you know, has a whole plan on how to bring it to
19 | the marketplace, what if they don't think because they offer a
20 | eBook license for a consumer or, quite frankly, at that point
21 | they might even still be offering one to a library but limited
22 | numbers, who knows what; but the point is what if what the
23 | State thinks is reasonable is inconsistent with what the
24 | publisher and the author thinks is reasonable for that author
25 | and that work for the moment in time?  Should the publisher and

 1   the author have to acquiesce to the Maryland statute only to

 2   later find out that the statute is, as we believe is

 3   overwhelmingly clear now, is unlawful.

 4          And if they do choose to exercise the rights that

 5   Congress very clearly gave them, these exclusive rights -- and

 6   it didn't say you have an exclusive right, except as if a

 7   library wants it under terms that a state thinks is reasonable,

 8   you know, if the publisher and author thinks in that situation

 9   that they need to exercise it a certain way, and they think the

10   statute is going to be declared unlawful, they then risk civil

11   liability and even jail time, Your Honor, for that life's work

12   being pursued in the manner that they're entitled to pursue

13   according to the rights that Congress granted them.

14          So, you know, Your Honor, these, I think, both go to

15   whether you look at it in terms of Supremacy Clause

16   constitutional violation of the Supremacy Clause or just the

17   overarching importance of irreparable harm routinely.

18          And I know the factors still require looking at if

19   irreparable harm is there but it's -- it's very common that

20   when a copyright holder's exclusive right is not being

21   respected, where you've shown that that's likely the case as a

22   matter of law that this element falls into place in many

23   instances like this one where the right is not being respected,

24   and for the reasons I've described you can't -- you can't put

25   the situation back to whole with just money damages.

1      And there's still more on irreparable harm, Your
2  Honor, but I'll pause on those.
3      **THE COURT:**  All right.  If you have more on
4  irreparable harm, let me know.  I'm ready to move on as far as
5  my questions go, but is there anything else you would like to
6  add?
7      **MR. ZEBRAK:**  Your Honor, I think we can move on.
8      **THE COURT:**  Let me ask you one question, Mr. Zebrak,
9  about the public interest.  The State points out in their brief
10 that the public interest would be served by allowing the law to
11 go forward to widen or expand eBook access to the citizens of
12 Maryland, in particular people who can't see very well, elderly
13 people who can't make trips to the library who want access to
14 the most up-to-date books online.
15      Is that a factor I should consider and, if so, how
16 does it weigh against the public interest you assert, which I
17 think is the public's interest in protecting the copyright
18 holder's rights and the good that that ultimately generates for
19 a literate society?
20      **MR. ZEBRAK:**  Yes, Your Honor.  Thank you.  So in this
21 area, Your Honor, it gets back in many ways to what we've just
22 been talking about, about the copyright statute being an
23 incredibly carefully-examined, continually looked at, and
24 already modernized statute by Congress that carefully
25 calibrates and balances all of these decisions.  Whether it be

1   about the scope of the exclusive right or exceptions and

2   limitations to it, whether it be a statutory license, like the

3   example I gave for musical works, or the scope of the First

4   Sale exhaustion principles, or whether it be for libraries in

5   108, or whether it be for exceptions to copyright for providing

6   access for those with print disability needs.  Congress

7   calibrates all of this, Your Honor, and has done so in all of

8   these areas already, Your Honor.

9          And, you know, the State -- and, you know, Your Honor,

10  is, you know, digital lending through libraries is thriving.

11  You know, the State put this in terms of an access issue.

12  There's not a problem with access to literary works in digital

13  format today, Your Honor.  Whether through the library or

14  through a commercial eBook purchase, someone with an Amazon

15  Kindle or some other device is obtaining a copy of that book

16  either on a temporary or a permanent basis.

17         Now, the question is are they getting it through the

18  library for let's say a period of 14 days, or are they getting

19  it on a longer period because they bought it for personal use

20  individually?  So there's not an access issue.

21         You know, actually sales of -- excuse me -- the

22  library lending has exploded while actually the commercial

23  retail eBook market's been going down.

24         And the point here is that Congress has already

25  calibrated these issues and, you know, in terms of libraries'

88

1    interests, libraries' interests in providing access to the

2    public has already been calibrated by Congress when it decided

3    the scope of the exclusive rights, when it also discussed and

4    examined the scope of the First Sale exhaustion principles,

5    excluding whether or not to the extend it to digital

6    disseminations, when it decided the 108 principles for

7    libraries and whether or not to extend them.  And Congress did

8    examine whether to update or change those beyond what they are

9    now.

10           Congress has also looked at issues regarding the, you

11   know, issues relating to the provisional books to those that

12   have reading limitations.  So this has already been -- to use

13   sort of a -- kind of a more relatable way to put it, it's

14   already been baked into the cake of how Congress views that

15   entire quilt of how to balance it all.

16           And the Supreme Court when it thinks about the public

17   interest and public welfare has already said that the exclusive

18   rights are the means by which to advance creation and

19   dissemination to redound to the public welfare.  We've cited

20   that case in the papers and it's been cited many times since

21   then, Your Honor.

22           The point is that the economic incentives for the

23   publishers and the authors they work with, to make the

24   calibrated marketplace decisions they need to make between

25   these channels and timing and pricing, those go right at the

1   heart of our economic incentives that the Supreme Court and

2   Congress have recognized advances the public welfare.

3          So there's not -- there's not -- I think there's a

4   false dichotomy or false perception that it's somehow --

5   there's a tension here.  There's not --

6          THE COURT:  I understand your point.  That to the

7   extent the issues the State raises are valid, they've already

8   been considered by Congress.

9          MR. ZEBRAK:  Yes, Your Honor.  And, you know, there's

10  abundant case law saying that, you know, the public interest,

11  you know, the State doesn't have a legitimate interest in

12  maintaining an invalid statute.

13         THE COURT:  Yes.

14         MR. ZEBRAK:  Likewise, the State is not harmed by an

15  invalid statute as we believe this clearly is in being

16  enjoined.  And, likewise, the State doesn't have legitimate

17  interest in fixing what it deems to be recalibrations that

18  should be made to copyright law.  All of those public equities

19  and public interest and balancing of equities go to why it

20  should be enjoined.

21         I just don't think that this is an access issue as I

22  said.  Libraries have plenty of access now.  It's a matter of

23  whether the State is going to be the one to tell us how to

24  exercise and readjust what Congress has said.

25         THE COURT:  All right.  Mr. Zebrak, is there anything

```
1   else from your perspective?  I'm ready to turn to

2   Mr. Fitzgerald.

3           MR. ZEBRAK:  I might have something afterwards, Your

4   Honor.

5           THE COURT:  I'll give you the last word.  It's your

6   motion.

7           Ms. Thomas, are you good for a little bit longer or do

8   you need a 10-minute break?  I see you're saying you're good.

9           Okay, Mr. Fitzgerald, I'd like to focus on irreparable

10  harm.

11          MR. FITZGERALD:  Yes, Your Honor.  I apologize it took

12  me a second to get off mute.

13          THE COURT:  Why isn't there irreparable harm here for

14  all the reasons Mr. Zebrak said?  How can -- if this statute is

15  not enjoined and publishers are forced to comply with it and in

16  seven months it turns out or a year that in fact it was

17  unlawful, how do you propose at the end of the case that we

18  calculate their damages?

19          MR. FITZGERALD:  So the issue as to irreparable harm,

20  and the reason why the Association hasn't met its burden of

21  proof on that element, is because the assertion of harm is

22  truly theoretical.  Theoretical harm is generally insufficient

23  in the preliminary injunction context.

24          THE COURT:  How is it theoretical?  There's a statute

25  on the books that says if they don't comply with it they could
```

have civil penalties, they could have an injunction brought against them by the Attorney General of Maryland, they could in extreme circumstances face criminal penalties.  I mean, it's -- someone could bring an enforcement action tomorrow morning. How is it theoretical?

MR. FITZGERALD:  Certainly that's the case.  So I guess two -- one critical *caveat* at the outset.  An enforcement action would only rise if there is a claim that a -- and it would only be substantiated -- those civil and criminal penalties, for which there are many due process protections afforded in the law, would only come to fruition if a publisher either, A) refused to license their product to public libraries explicitly while licensing it to the Maryland public or, B) licensed that product to public libraries under demonstrably unfair terms.  Both of those practices would be inconsistent with copyright.

I want to be clear here that, you know, we heard a lot from the Association's argument that this is a -- I think the language was a misapprehension of the marketplace, a misapplication of unfairness, that it's not a problem of access.  Make no mistake, this isn't hypothetical.  In 2019 there was an embargo against libraries.  Amazon had a refusal to deal with which was reversed once this legislation was passed.

The Association's unspoken argument is that they have

1    the right to exclude libraries while licensing to the rest of

2    the public at large.  That is not consistent with the balance

3    interest of the Copyright Act as set forth by *Abend*, as set

4    forth by the legislative history of the Copyright Act of

5    1976 --

6            THE COURT:  Mr. Fitzgerald, what is your support for

7    that?  The Copyright Act says that exclusive rights vis-a-vis

8    the public.  The library includes the public.  I don't see any

9    basis in the statute or in law to give libraries a special pass

10   and say that if publishers distribute their copyrighted works

11   to Don Q. Public they then have to distribute it to libraries?

12           MR. FITZGERALD:  To be clear for the Court, this isn't

13   explicit authority, but you read the intent of Congress in

14   passing the most recent iteration of the Copyright Act.

15           THE COURT:  Okay.

16           MR. FITZGERALD:  With regard to public broadcasting,

17   they did not address the issue of public libraries and

18   presumably because this issue of non -- you know -- and this

19   was something I found shocking in the Association's argument --

20   that the Court in *Orson* was contemplating the digital

21   revolution with regard to eBooks.  That could never -- this

22   future, I mean -- I remember growing up and memorizing all of

23   my friends' phone numbers and all of my neighbors' phone

24   numbers which I don't think our current generation does

25   anymore.  The technological revolution that we had in the last

1    20 years could not be remotely contemplated back then.

2            So you read into congressional intent, at least the

3    most recent iteration of the Copyright Act, and when dealing

4    with noncommercial entities, Governmental entities like public

5    broadcasting, Congress wanted authors and publishers to make

6    sure that they negotiated with public broadcasting networks for

7    reasonable compensation and under reasonable safeguards for

8    authors' right --

9            **THE COURT:**  I understand.  Mr. Fitzgerald, I'm sorry,

10   I'm just going to cut you off.

11           **MR. FITZGERALD:**  Sure.

12           **THE COURT:**  I really do understand your argument.  I

13   think we talked about it earlier.  I want to focus on

14   irreparable harm.  It was your position that these are

15   theoretical damages.  I responded and said there could be

16   enforcement actions.  But let's set aside the enforcement

17   actions.

18           I think the damages here would be -- I think they

19   would be partially calculable but there are other repercussions

20   in the marketplace for publishers and authors if they are

21   forced to engage with the libraries on the terms the state of

22   Maryland is requiring.

23           How are those -- how can we quantify those at the end

24   of the day and it's almost like putting the Genie back in the

25   bottle.

1          **MR. FITZGERALD:**  The calculation of damages -- I mean,

2     it would to an extent be some somewhat of crystal ball gazing I

3     suppose in this hypothetical scenario, as to what the value --

4     what the value of the work would have been but for the

5     reasonable negotiation.

6          But to be clear here the Maryland Act only requires

7     reasonable terms for the license.  There's nothing specific in

8     the Maryland Act.  The key point --

9          **THE COURT:**  Actually, hold on.  The Maryland Act does

10    talk about terms and one of the terms -- some are favorable I

11    would say to the publishers, but another one, C, gives the

12    libraries the right to buy as many licenses as they want.

13         **MR. FITZGERALD:**  As would any -- again, any individual

14    has the right if -- and this -- I understand that there's an

15    issue of, let's say, sharing accounts and that sort of thing.

16    Let's put that aside for a moment.

17         If an individual household wanted to buy or license

18    five eBooks, they have the ability to do so.  There's no

19    limitation on an individual's right, as far as I'm aware, to

20    license as many copies of an electronic literary product as

21    they wish, why are libraries any different?

22         Why would -- the question the Court should be

23    considering is why does the Copyright Act permit publishers to

24    specifically exclude libraries and say you are not entitled to

25    have as many copies of this work as you wish because we want to

 1   license to the public.  And the real answer to that question is
 2   because it hurts their bottom line and that's not consistent
 3   with the public interest nor the balance of equities.

 4          It is true that this statute does prejudice publishers
 5   seeking to license on unfair terms or to embargo, as they've
 6   done in the past, but that is consistent with copyright and,
 7   moreover, I -- I guess to bring it full circle.  We've heard
 8   the argument from the Association their reliance on *Orson* and
 9   the argument for irreparable harm, they did parallels to
10   movies.  They keep going back to the examples of movies.  There
11   is no movie service that provides works to the public like a
12   library.  There's nothing like a library.  It's a Governmental
13   entity created for a public good.

14       So it's, you know -- and I guess this also ties into one
15   last point I do want to make.  There was questioning with
16   regard to the death knell -- the argument I made about the
17   death knell of library with regard to, you know -- and I guess
18   the defense from the Association was, you know, this isn't the
19   death knell of library lending, digital lending is off the
20   charts.  Of course it is, right.  Taxpayers are footing the
21   bill.  Libraries will always do whatever they can to get these
22   products, but it doesn't mean that the market is balanced.

23       Saying that libraries are accessing these products does
24   not equate to publishers are licensing on fair terms or are not
25   embargoing libraries.  They are.  It doesn't mean that this

1  market practice is sustainable which is the ill the Maryland

2  Act seeks to cure.  It was a powerful enough market ill that

3  the General Assembly in passing the Maryland Act acted

4  unanimously.  And in an era where bipartisanship can be few or

5  far between I think that's a testament to how apparent the

6  market inequity really is.

7       So the irreparable harm here, it's, again, the reason I

8  said it was a theoretical argument to answer the Court's

9  question is because the harm that they're asserting is the

10 ability to, like I said, to distribute to the public at large

11 and to exclude Maryland libraries or to do so under unfair

12 terms.  That is not protected by copyright and in that way it

13 is a purely theoretical harm.

14      THE COURT:  All right.  Is there anything else,

15 Mr. Fitzgerald, before I turn to Mr. Zebrak for the last word

16 and we adjourn?

17      MR. FITZGERALD:  Your Honor, since I talked about

18 irreparable harm, I do want to talk about the public

19 interest --

20      THE COURT:  Absolutely, yes.

21      MR. FITZGERALD:  -- and the balance of equities.  Even

22 if the Court has found the Association has met their burden as

23 to the likelihood of success on the merits and the irreparable

24 harm, the Association has absolutely failed to show that the

25 balance of equities tips its favor and the injunction is in the

1  public interest.  Those two factors again, as I said in my

2  opening, do merge when the Government is the opposing party.

3  But this is an issue, really, of equity and fairness.

4        The Maryland Act ensures equitable access to

5  electronic literary products for library lending and in doing

6  so it is critical for fulfilling the purpose of libraries and

7  realizing the public benefit they bestow.

8        Enjoining the Maryland Act would perpetuate an

9  inequitable *status quo* that we have seen publishers exploit for

10 several decades, you know, in the absence of congressional

11 action.  We have seen embargoes.  We have seen prohibited

12 pricings.  And it -- the *status quo* has become imbalanced as

13 applied to electronic literary products.  It has upset more

14 than a century old tradition of library access and

15 understandably, but wrongly, it does so to improve the

16 publisher's bottom line.

17        What this injunction would do is it would allow

18 publishers to continue to engage in discriminatory pricing at

19 the expense of taxpayers, and even worse what it would do is it

20 would rubber stamp denial of electronic literary products to

21 libraries and their patrons while offering to the public at

22 large.

23        **THE COURT:**  Wait, isn't that a little extreme?  I

24 mean, libraries -- I know I borrowed eBooks from my library.

25 They're available.  They're not always easy to get.  There can

1  be delays, but you just said block access to eBooks by library
2  users, right?

3          MR. FITZGERALD:  Right.  So we've had -- the fact that
4  we've had embargoes within the last couple of years by
5  McMillan, for example, the fact that Amazon had refused a deal
6  until this legislation was passed.  We've seen if you give an
7  inch, they will take a mile.  That they are perfectly content
8  to seek an unfair price or to limit libraries' access to these
9  books if it suits their myriad marketing decisions, their
10  myriad licensing decisions.

11          What this injunction would do is it would say to
12  publishers go ahead, feel free to license to the public as a
13  whole, take advantage of every Maryland citizen who has the
14  financial ability to purchase one of these electronic literary
15  products and feel free to exclude public libraries from that
16  licensing solely to -- because, I assume, one library user
17  accessing it for free could mean -- because there is overlap in
18  the markets -- could mean one person who might otherwise pay
19  for the product.

20          The critical issue is that the imbalance that has
21  developed between libraries and publishers and the void of
22  congressional action on this issue is neither reasonable nor is
23  it sustainable for the public libraries in Maryland or the tax
24  paying public.  And that's true now more than ever due to
25  increased demand in light of both the digital revolution and

1   the COVID-19 pandemic.

2          You know, the Association's reply, and I think they

3   even said it in their argument just now "Oh, well eBooks are on

4   the decline."  That's a skewed statistic.

5          EBooks, the profits -- I guess the snapshot that they

6   cited that they put out every year from AAP indicated there

7   was -- it was a 10 or 11 percent increase in eBooks in calendar

8   year 2020 and then they say "Oh, well it decreased about

9   4 percent last year."  The key is since the COVID-19 pandemic

10  eBook use has increased relatively where it was before which

11  makes sense because we're all social distancing.

12         But I want the Court, when considering the balance of

13  equities and the public interest, I would simply ask the Court

14  to remember this isn't a case of constitutional rights under

15  the Fourth Amendment.  This is a balancing where on one side of

16  the scales rests publisher's profits, and on the other side of

17  the scale rests public library's goal of providing the

18  literature and information to all Marylanders, many of whom do

19  not have the means to access these important works in the

20  commercial marketplace.  Both the public interest and the

21  balance of equities in this case weigh heavily in favor of the

22  latter.

23         If I can have the Court's brief indulgence -- unless

24  the Court has questions.

25         One final point in closing.  I would ask the Court, as

1  I know it will, to look to the legislative history and the

2  affidavits that we filed to, you know, as evidence of the

3  unfair discrimination against libraries and how these practices

4  have affected them, these unfair market practices.

5          But at the outset of this hearing the Association said

6  that they're seeking to defend the Copyright Act, and they --

7  they talked about the Copyright Act in that opening as

8  carefully balanced.  They are not defending a carefully

9  balanced Copyright Act.  They are seeking to expand the

10  Copyright Act.  There was a balance for more than a century of

11  library lending of literary works and in a vacuum of 20 years

12  of the digital revolution publishers have exploited that in the

13  resulting imbalance.  And this suit attempts to be the final,

14  you know, to finally cement that imbalance, to write it into

15  law and prevent Maryland's attempt to even the scales.

16          It's -- the Association has absolutely failed to

17  demonstrate these four factors and any one of those factors as

18  the Court is aware is fatal to their motion.  Accordingly, they

19  have not justified their preliminary injunction and we are

20  asking the Court to deny.

21          I'll take any questions the Court has for me.

22          **THE COURT:**  Thank you very much, Mr. Fizgerald.

23          Mr. Zebrak, I'll hear from you if you have anything

24  else.  It's now 2:06.  We've talked a long time about very

25  important issues.  If there's anything that hasn't been said I

 1   am happy to hear from you.  You're on mute.

 2          **MR. ZEBRAK:**  Your Honor, with the Court's indulgence I

 3   can make all the points in less than two minutes.  And I hope

 4   I'm not repeating anything, but I think these are all four

 5   quick points that bear emphasis.

 6          Number one, the State keeps referring to

 7   discriminatory pricing.  The State is only making that argument

 8   through the lens of comparing apples to oranges of personal use

 9   license versus dissemination license.  They're not the same.

10   And it's this repeated refrain of mixing different types of

11   licenses and jumping across different formats.  Congress

12   carefully balanced formats in the Copyright Act, users, rights

13   holders, all these different exceptions and limitations.  It's

14   all baked into the careful quilt that Congress has enacted.

15          The State has referred to enforcing what it deems to

16   be the proper balance and taking congressional intent and

17   advancing that.  That's the State's perception of how it would

18   like to recalibrate that balance and it's well understood that

19   you don't even need to look to the congressional intent when

20   the statute text is clear.  And, you know, what the statute

21   does and doesn't do is very clear, Your Honor, and this is not

22   by accident that the statute and its exceptions and limitations

23   are carefully calibrated and balanced at the way they are.

24          Congress has studied all these issues and still

25   studies them all the time.  It's not as if Congress doesn't

1   look at this stuff.  It does.  This is just Maryland

2   substituting its judgment.

3          The final two points is that the State, in its

4   presentation today, has sort of denigrated the notion of

5   seeking a profit or economic incentives as almost something

6   untoward.  I respectfully must pushback on that, Your Honor,

7   because that's what the Supreme Court and Congress understand

8   is the reason for granting exclusive rights.  And it's, you

9   know, the copyright law celebrates that motive and that

10  economic incentive.  It's what leads people to author and write

11  works in some ways.  It's what allows people to obtain the

12  return that Congress, in shaping the Copyright Act, has allowed

13  them to obtain.  There aren't not to be a denigration of

14  seeking a return.  You know, I've already cited one case for

15  that.  The other one I'd like to point the Court toward, Your

16  Honor, is *Harper & Row v. Nation Enterprises* where, you know,

17  there the Supreme Court soundly rejected the idea that even

18  though, you know, dissemination of course can be beneficial

19  because people get to read works that just saying we're going

20  to just do everything just for dissemination and look at that

21  in a vacuum that that's not how it works.  There wouldn't then

22  be those very works and amazing authorship that you want to,

23  you know, that you want to incentivize in the first place.

24          So I think that was the third point.

25          And the fourth and final point I'd like to make, Your

```
 1  Honor, gets back to irreparable harm.  We've cited in our
 2  papers, I believe, cases -- and if need be we can cite more --
 3  where courts, including the Fourth Circuit, routinely strike
 4  down state statutes that overreach into an area that under the
 5  Supremacy Clause is regulated by federal law.  And, you know,
 6  when that happens that is irreparable harm, and there's no
 7  interest in having it stand, and that I think is what I'd like
 8  to close with, unless the Court has any questions.
 9          THE COURT:  Okay.  Thank you very much.  Thank you for
10  your excellent briefing and your excellent argument today.
11          It's my intention to issue my decision on this soon.
12  I can't tell you exactly when, but understand the importance of
13  this, and I understand these issues affect a lot of people, and
14  I will not be sitting on this idly.  I promise you that.  All
15  right.
16          Is there anything else we can address before we
17  adjourn today, Mr. Zebrak?
18          MR. ZEBRAK:  No, Your Honor.
19          THE COURT:  Mr. Fitzgerald?
20          MR. FITZGERALD:  No, Your Honor.  Thank you very much.
21          THE COURT:  All right.  Thank you all.  Have a good
22  day everyone.
23          THE CLERK:  This court is now adjourned.
24      (Hearing concluded at 2:11 p.m.)
25
```

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

1   CERTIFICATE OF OFFICIAL REPORTER

2

3

4       I, Ronda J. Thomas, Registered Merit Reporter, Certified

5   Realtime Reporter, in and for the United States District Court

6   for the District of Maryland, do hereby certify, pursuant to 28

7   U.S.C. § 753, that the foregoing is a true and correct

8   transcript of the stenographically-reported proceedings held in

9   the above-entitled matter and the transcript page format is in

10  conformance with the regulations of the Judicial Conference of

11  the United States.

12                          Dated this **14th** day of **February** 2022.

13

14

15  _____

16                          Ronda J. Thomas, RMR, CRR
                            Federal Official Reporter

17

18

19

20

21

22

23

24

25

**MR. FITZGERALD: [60]**   2/19
11/8 11/17 11/23 12/1 16/24
17/8 18/5 19/3 19/24 20/21
22/8 23/8 24/12 24/15 24/20
25/12 25/19 26/7 27/1 27/19
28/4 28/21 29/9 29/20 30/2
30/25 31/19 32/5 32/8 33/24
36/1 37/16 37/21 40/14 40/18
41/12 41/16 41/25 43/13
43/18 44/9 44/12 47/1 48/25
50/5 50/21 52/10 90/11 90/19
91/6 92/12 92/16 93/11 94/1
94/13 96/17 96/21 98/3
103/20

**MR. ZEBRAK: [30]**   2/11 4/22
5/8 5/11 5/19 11/4 53/10
53/18 53/20 54/19 62/10
62/19 65/18 65/21 66/4 66/11
67/23 70/14 74/8 79/2 80/25
83/3 83/5 86/7 86/20 89/9
89/14 90/3 101/2 103/18

**THE CLERK: [5]**   2/3 4/2
52/13 52/15 103/23

**THE COURT: [94]**   2/2 2/17
3/1 4/4 5/5 5/10 5/13 10/22
11/5 11/14 11/18 11/25 16/3
17/6 17/24 18/17 19/20 20/15
21/19 23/7 24/6 24/14 24/19
24/21 25/13 26/1 26/25 27/13
27/23 28/18 29/2 29/17 29/24
30/24 31/7 31/22 32/7 33/12
35/25 37/3 37/20 40/8 40/15
41/9 41/13 41/23 43/5 43/15
44/7 44/10 46/16 48/7 48/11
50/4 50/8 52/3 52/12 52/16
53/14 53/19 54/18 62/3 62/17
65/10 65/20 66/3 66/10 67/20
70/13 74/6 78/10 80/14 82/22
83/4 86/3 86/8 89/6 89/13
89/25 90/5 90/13 90/24 92/6
92/15 93/9 93/12 94/9 96/14
96/20 97/23 100/22 103/9
103/19 103/21

**'**
**'40s [1]**   71/23
**'70s [1]**   17/25
**'76 [3]**   68/23 71/14 71/20

**1**
**10 [3]**   63/25 67/3 99/7
**10 percent [1]**   64/12
**10-minute [2]**   52/7 90/8
**100 [2]**   39/11 67/3
**101 [1]**   1/24
**106 [1]**   34/11
**108 [13]**   8/9 14/9 37/25
40/10 40/18 40/23 41/2 41/8
58/6 58/7 58/11 87/5 88/6

**109 [2]**   14/10 38/6
**11 percent [1]**   99/7
**1100 [1]**   44/23
**1122 [1]**   44/23
**115 [1]**   60/1
**11:02 [1]**   1/7
**12:22 [1]**   52/9
**12:40 [1]**   52/9
**13 [3]**   3/11 28/24 29/21
**14 [1]**   87/18
**14th [1]**   104/12
**15 [1]**   28/1
**15-minute [1]**   52/8
**17 [1]**   3/12
**19 [2]**   99/1 99/9
**1940s [1]**   71/21
**1976 [11]**   22/17 39/15 54/14
54/24 55/4 57/5 68/17 68/22
71/6 81/7 92/5
**1998 [3]**   57/19 69/3 73/3
**1999 [2]**   23/21 72/25
**1:21-cv-03133-DLB [1]**   1/5
**1st [2]**   27/15 28/11

**2**
**20 [5]**   32/20 38/14 52/6 93/1
100/11
**2001 [1]**   32/15
**2019 [2]**   45/3 91/21
**2020 [1]**   99/8
**2021 [1]**   78/19
**2022 [5]**   1/7 27/15 27/22
28/11 104/12
**21-cv-03133-DLB [1]**   2/6
**21201 [1]**   1/24
**21st [1]**   27/22
**228 [1]**   45/16
**229 [1]**   45/16
**23 [1]**   33/15
**23-701 [1]**   7/14
**23-702 [3]**   16/9 19/16 34/24
**28 [1]**   104/6
**2:06 [1]**   100/24
**2:11 [1]**   103/24

**3**
**301 [3]**   74/10 75/4 76/1

**4**
**4 percent [1]**   99/9
**42nd [1]**   50/14
**4th [1]**   1/24

**5**
**5 percent [1]**   35/12

**6**
**614 [1]**   44/23

**7**
**701 [1]**   7/14

**702 [5]**   7/14 16/9 19/16
34/24 40/25
**753 [1]**   104/7

**A**
**a.m [1]**   1/7
**AAP [3]**   5/24 6/2 99/6
**Abend [7]**   21/6 36/17 43/22
45/11 45/16 46/15 92/3
**abide [1]**   67/5
**ability [9]**   15/14 40/5 45/23
47/12 50/6 68/4 94/18 96/10
98/14
**able [7]**   4/5 4/8 47/20 53/11
59/3 76/15 83/15
**about [90]**   5/20 6/19 6/24
7/7 7/7 7/9 8/8 8/11 8/23
8/24 10/20 10/24 11/3 11/19
14/12 15/12 17/11 20/5 20/24
23/5 23/17 27/6 29/10 31/24
33/9 36/7 37/18 40/8 41/13
43/2 43/12 43/15 43/21 46/22
47/7 52/5 52/9 54/4 56/17
56/17 58/6 58/25 59/2 59/5
59/6 60/16 61/5 61/10 61/24
62/14 65/10 65/12 68/10 69/8
69/13 69/15 69/16 69/16
69/17 70/4 71/16 72/13 72/14
72/15 72/16 74/4 75/2 75/3
75/21 76/16 78/4 78/20 80/15
83/11 83/23 83/23 83/24 86/9
86/22 86/22 87/1 88/16 93/13
94/10 95/16 96/17 96/18 99/8
100/7 100/24
**above [4]**   1/8 57/24 58/3
104/9
**above-entitled [2]**   1/8 104/9
**absence [5]**   12/12 13/1 79/7
81/8 97/10
**absolute [1]**   74/23
**absolutely [5]**   53/20 62/16
96/20 96/24 100/16
**abundant [1]**   89/10
**abusive [1]**   29/23
**accept [2]**   26/3 64/20
**acceptable [1]**   72/20
**access [39]**   13/9 13/21 15/14
15/19 16/15 24/3 25/7 29/6
29/8 30/9 30/11 30/13 30/14
31/20 38/23 40/4 45/21 46/1
51/16 59/2 59/3 59/3 69/20
75/18 86/11 86/13 87/6 87/11
87/12 87/20 88/1 89/21 89/22
91/21 97/4 97/14 98/1 98/8
99/19
**accessibility [1]**   24/9
**accessing [2]**   95/23 98/17
**accident [2]**   78/4 101/22
**acclaimed [1]**   6/1
**accomplished [1]**   17/17

**A**

accomplishment [1]   65/15
according [3]   9/21 17/3 85/13
accordingly [2]   33/25 100/18
account [2]   42/9 42/25
accounts [1]   94/15
accurate [1]   59/18
achieve [3]   9/7 49/5 67/9
achieving [2]   39/23 54/5
acknowledged [2]   59/1 62/11
acknowledging [1]   48/12
acquiesce [2]   67/11 85/1
acquiesces [1]   82/5
acquire [3]   6/22 38/2 40/22
across [6]   54/16 55/18 62/20 69/19 72/3 101/11
act [132]
Act's [4]   20/9 30/17 30/18 40/2
acted [4]   31/23 32/24 33/10 96/3
acting [1]   78/1
action [10]   1/4 28/23 29/16 34/15 80/2 80/2 91/4 91/8 97/11 98/22
actions [2]   93/16 93/17
activity [1]   17/11
actors [2]   23/16 42/21
acts [2]   55/16 55/16
actualization [1]   15/16
actually [14]   9/23 11/7 18/18 27/9 39/14 44/3 55/10 61/15 62/12 67/6 81/9 87/21 87/22 94/9
add [2]   30/2 86/6
additional [3]   23/4 27/6 49/7
address [9]   41/10 42/1 46/17 53/22 56/18 66/2 73/21 92/17 103/16
addressing [1]   37/16
adequate [2]   23/23 43/4
adjourn [2]   96/16 103/17
adjourned [1]   103/23
adjust [2]   5/8 58/11
advance [4]   5/14 8/17 40/2 88/18
advances [1]   89/2
advancing [2]   68/24 101/11
advantage [1]   98/13
advent [2]   32/17 73/1
advertise [1]   64/9
advertising [3]   64/8 72/11 75/8
advertisings [1]   66/23
advocates [1]   55/7
affect [1]   103/13
affected [3]   15/18 15/18

affidavits [2]   80/16 100/2
afford [6]   30/3 40/4 47/22 47/25 48/1 51/17
afforded [6]   14/6 37/18 37/23 42/24 79/16 91/11
afoot [1]   72/2
after [9]   27/22 29/3 48/24 50/14 52/16 59/16 60/5 60/12 68/8
afterwards [1]   90/3
again [40]   10/22 14/15 17/14 18/13 20/9 25/23 28/15 30/7 30/20 31/19 32/25 34/11 35/19 36/15 36/16 39/13 40/18 41/16 42/10 42/22 43/18 45/9 45/14 49/1 57/15 60/22 63/5 63/22 65/7 68/5 69/8 69/8 69/9 71/20 72/11 72/17 82/10 94/13 96/7 97/1
against [14]   14/25 15/1 17/20 17/22 19/18 28/12 34/17 35/3 38/13 42/10 86/16 91/2 91/22 100/3
age [5]   32/4 57/12 57/20 73/1 73/4
agency [1]   32/24
ago [1]   15/2
agree [5]   26/8 33/14 41/9 41/18 70/24
agreed [1]   26/5
agreements [5]   82/6 82/14 82/16 82/19 82/23
ahead [2]   4/2 98/12
aided [1]   1/21
alienated [2]   35/13 35/16
aligned [3]   24/4 42/14 43/20
alive [1]   35/22
all [61]   3/5 4/5 4/9 6/11 7/2 11/5 18/4 20/12 21/8 24/22 24/24 28/15 30/15 36/21 54/4 54/6 56/20 59/14 60/11 62/11 63/7 63/22 64/3 64/18 65/8 65/18 70/12 71/4 72/17 72/25 77/12 77/25 78/7 79/16 80/19 82/2 82/11 82/20 83/13 86/3 86/25 87/7 87/7 88/15 89/18 89/25 90/14 92/22 92/23 96/14 99/11 99/18 101/3 101/4 101/13 101/14 101/24 101/25 103/14 103/21 103/21
allegation [2]   71/25 72/1
allegations [1]   80/21
alleged [1]   80/23
alleging [1]   13/2
Allied [43]   20/24 21/20 21/20 23/5 23/11 33/13 40/9 41/14 41/16 41/17 41/20 41/24 42/1 42/3 42/9 42/16

43/17 43/18 43/20 44/3 44/13 44/16 44/17 44/21 48/18 49/2 49/4 49/7 49/10 49/12 49/22 55/3 70/10 70/15 70/23 70/23 71/1 71/4 71/14 71/20 72/7 72/8 72/14
allow [5]   6/16 30/9 30/11 39/2 97/17
allowed [2]   38/10 102/12
allowing [4]   30/14 40/19 48/19 86/10
allows [4]   37/25 40/21 40/23 102/11
almost [3]   57/23 93/24 102/5
along [2]   3/9 16/6
already [18]   3/22 8/10 12/5 35/4 43/2 49/11 49/12 50/3 73/4 86/24 87/8 87/24 88/2 88/12 88/14 88/17 89/7 102/14
also [26]   1/16 3/1 3/21 9/16 16/12 23/14 25/3 28/5 30/20 35/8 38/14 44/22 46/10 47/15 56/4 58/21 65/5 65/24 69/13 73/17 76/6 76/11 78/18 88/3 88/10 95/14
alternatively [1]   71/10
although [6]   4/7 10/24 14/19 21/21 47/8 48/4
always [6]   32/18 38/4 58/2 63/1 95/21 97/25
am [5]   2/21 10/24 27/1 50/20 101/1
AMALFARD [2]   1/18 3/2
amazing [1]   102/22
Amazon [5]   46/19 65/1 87/14 91/22 98/5
amend [1]   57/6
amended [2]   32/3 57/5
Amendment [3]   78/22 79/15 99/15
America's [2]   6/7 68/24
AMERICAN [6]   1/3 1/17 1/17 2/6 2/13 5/23
amounts [3]   64/2 65/5 77/24
analyses [1]   74/13
analysis [11]   23/11 23/23 24/10 34/1 41/19 41/23 42/22 65/14 65/25 75/12 78/12
analytically [1]   52/1
analyzing [1]   66/7
another [3]   34/5 44/17 94/11
answer [11]   28/15 40/7 53/12 53/23 65/22 66/11 79/2 81/1 83/3 95/1 96/8
anticipate [1]   12/16
antitrust [2]   71/22 71/25
any [37]   6/10 12/15 19/1 27/1 27/3 27/4 27/6 27/8 27/9 27/16 28/10 35/24 38/7

## A

**any... [24]**   40/7 41/1 48/11 53/8 60/16 61/23 62/2 62/6 63/15 67/22 70/7 70/19 71/9 73/19 74/4 78/16 79/4 92/8 94/13 94/13 94/21 100/17 100/21 103/8
**anybody [1]**   37/15
**anymore [2]**   20/19 92/25
**anyone [4]**   20/18 22/2 45/25 82/10
**anything [11]**   4/20 11/1 11/6 62/2 86/5 89/25 96/14 100/23 100/25 101/4 103/16
**apart [3]**   80/23 84/13 84/14
**apologize [4]**   5/14 43/14 44/9 90/11
**apparent [7]**   7/16 7/20 10/11 34/4 35/2 36/3 96/5
**appear [1]**   54/20
**apples [3]**   60/13 61/1 101/8
**applicable [1]**   40/9
**applied [1]**   97/13
**applies [2]**   27/20 73/9
**apply [12]**   18/23 19/1 20/9 22/7 26/2 27/16 28/5 41/14 74/12 77/14 81/1 82/13
**applying [1]**   57/9
**appreciate [3]**   4/13 5/9 5/12
**approach [3]**   34/4 34/7 57/7
**appropriately [1]**   31/24
**arbitrarily [3]**   36/18 39/10 45/13
**archive [1]**   40/24
**are [145]**
**area [18]**   32/19 50/16 54/11 55/13 60/21 64/3 68/15 70/14 71/1 71/2 71/8 74/19 79/14 79/24 80/7 80/20 86/21 103/4
**areas [1]**   87/8
**aren't [5]**   18/4 46/18 50/9 70/25 102/13
**argue [2]**   23/10 51/18
**argued [1]**   25/14
**arguendo [1]**   28/22
**arguing [2]**   57/23 65/17
**argument [31]**   11/10 12/23 14/21 16/25 18/18 24/13 30/5 33/22 34/20 35/8 37/3 39/3 41/1 41/5 41/7 51/9 51/22 62/6 65/11 65/12 91/18 91/25 92/19 93/12 95/8 95/9 95/16 96/8 99/3 101/7 103/10
**arguments [3]**   17/1 39/14 69/12
**arise [1]**   79/15
**arises [1]**   28/23
**around [3]**   19/2 19/4 58/19
**arrangement [1]**   50/23

**arrangements [2]**   22/19 39/19
**Article [3]**   28/25 29/22 34/24
**artificially [1]**   83/10
**artist [17]**   23/6 41/24 42/1 42/3 42/9 43/17 43/19 43/20 44/3 44/13 44/22 46/2 49/2 49/4 49/7 49/11 49/22
**artist's [4]**   13/20 38/22 45/19 45/22
**artists [12]**   20/24 23/11 35/12 35/13 41/17 41/18 41/20 42/16 44/16 44/17 49/12 76/18
**as [154]**
**as it [1]**   41/4
**aside [3]**   49/2 93/16 94/16
**ask [17]**   3/19 5/17 11/2 15/3 15/6 15/23 24/23 28/19 42/17 52/19 62/1 65/10 67/21 74/24 86/8 99/13 99/25
**asked [4]**   27/2 32/9 53/25 77/6
**asking [2]**   53/6 100/20
**aspect [1]**   73/12
**Assembly [1]**   96/3
**assert [1]**   86/16
**asserting [1]**   96/9
**assertion [1]**   90/21
**Assistant [1]**   2/20
**assistive [1]**   79/5
**association [26]**   1/3 2/6 2/13 5/23 5/24 12/7 12/16 12/18 12/24 20/22 21/4 22/8 27/25 34/21 35/7 36/10 41/2 45/11 49/9 90/20 95/8 95/18 96/22 96/24 100/5 100/16
**Association's [12]**   12/9 12/14 14/13 16/25 23/10 27/5 39/3 51/22 91/18 91/25 92/19 99/2
**Associative [1]**   44/22
**assume [1]**   98/16
**assuming [1]**   28/22
**astounded [1]**   58/22
**attack [1]**   59/11
**attempt [2]**   30/17 100/15
**attempted [1]**   7/22
**attempting [6]**   54/15 56/22 68/7 68/21 69/4 69/5
**attempts [1]**   100/13
**attention [2]**   15/6 15/23
**Attorney [5]**   2/20 2/22 12/4 47/5 91/2
**audio [4]**   9/10 57/2 81/6 82/18
**author [12]**   31/15 55/22 63/20 64/13 83/10 83/22 84/16 84/24 84/24 85/1 85/8 102/10

**author-specific [1]**   83/22
**authority [17]**   7/10 21/3 23/23 24/6 33/11 36/15 43/4 43/23 44/19 44/25 45/8 49/23 57/16 61/25 62/6 80/9 92/13
**authors [12]**   6/9 6/20 22/18 39/18 40/3 56/3 56/6 67/8 82/6 88/23 93/5 93/20
**authors' [5]**   8/25 9/18 22/21 39/22 93/8
**authorship [1]**   102/22
**available [5]**   20/2 20/10 28/8 31/11 97/25
**availing [2]**   19/7 26/11
**avoid [1]**   82/16
**aware [6]**   12/5 27/1 27/8 74/9 94/19 100/18
**awareness [1]**   15/16
**away [6]**   39/8 54/24 55/1 81/19 81/24 82/1

## B

**back [18]**   7/6 7/16 52/16 53/21 54/4 56/24 62/22 68/22 77/20 82/14 82/17 83/13 85/25 86/21 93/1 93/24 95/10 103/1
**backdrop [3]**   7/4 42/22 49/19
**bad [1]**   69/15
**baked [2]**   88/14 101/14
**balance [34]**   12/12 13/6 13/19 13/21 13/22 14/16 15/7 31/4 38/22 38/23 45/6 45/19 45/20 46/3 46/4 54/5 54/5 54/6 55/9 69/5 69/6 70/2 70/6 76/4 88/15 92/2 95/3 96/21 96/25 99/12 99/21 100/10 101/16 101/18
**balanced [13]**   6/13 8/4 24/5 30/18 42/15 54/5 62/23 78/7 95/22 100/8 100/9 101/12 101/23
**balances [2]**   77/12 86/25
**balancing [13]**   6/12 23/24 43/2 55/18 59/6 59/14 68/7 68/8 77/16 83/9 84/11 89/19 99/15
**ball [1]**   94/2
**Baltimore [3]**   1/6 1/24 78/20
**banc [1]**   78/19
**bargaining [3]**   13/16 38/19 49/5
**Barnes [1]**   46/20
**based [4]**   47/21 51/18 62/2 82/8
**basic [1]**   40/24
**basically [2]**   50/17 73/3
**basis [2]**   87/16 92/9
**be [120]**
**bear [1]**   101/5

**B**

**bears [3]**   14/4 23/4 84/5
**Beautiful [1]**   78/18
**because [61]**   4/8 12/25 13/7
  13/22 17/15 17/25 18/24 24/7
  27/12 28/7 30/6 31/19 32/13
  34/12 36/2 37/21 38/10 39/11
  40/5 42/11 42/20 43/21 45/21
  46/7 46/10 49/9 49/23 50/17
  51/13 53/15 56/21 59/23
  61/24 63/10 67/5 68/23 70/4
  70/24 73/6 74/16 76/5 77/13
  80/1 80/4 81/11 81/13 81/16
  82/13 83/12 84/19 87/19
  90/21 92/18 94/25 95/2 96/9
  98/16 98/17 99/11 102/7
  102/19
**become [2]**   10/11 97/12
**becomes [2]**   35/2 64/23
**been [34]**   7/6 18/12 23/20
  26/25 27/4 28/6 32/5 32/19
  35/4 38/4 40/20 41/1 41/21
  43/2 52/6 55/6 57/5 58/2
  60/5 68/19 68/24 81/6 81/25
  83/19 84/15 86/22 87/23 88/2
  88/12 88/14 88/20 89/8 94/4
  100/25
**before [32]**   1/9 2/5 2/8 3/3
  3/19 8/3 12/20 19/20 21/2
  24/19 24/22 28/10 29/1 29/24
  29/25 34/1 35/6 37/16 39/14
  47/5 47/7 55/4 57/21 68/22
  70/16 71/4 75/3 80/2 80/17
  96/15 99/10 103/16
**began [1]**   84/9
**beginning [1]**   16/17
**behalf [4]**   1/11 1/13 2/20
  47/10
**being [20]**   4/7 17/13 37/6
  54/1 54/1 54/9 59/3 60/23
  67/11 72/20 75/20 81/17
  81/19 81/24 82/14 85/12
  85/20 85/23 86/22 89/15
**believe [10]**   32/15 72/16
  73/23 73/24 74/14 78/3 84/16
  85/2 89/15 103/2
**bell [1]**   82/21
**bend [1]**   67/12
**beneficial [3]**   14/20 14/23
  102/18
**beneficiary [1]**   77/24
**benefit [2]**   45/24 97/7
**benefits [1]**   19/9
**best [7]**   15/16 47/11 56/3
  67/13 83/5 83/5 84/4
**best-selling [1]**   56/3
**bestow [1]**   97/7
**better [2]**   37/13 48/9
**between [12]**   7/6 23/24 31/4

  36/3 43/8 65/18 65/21 69/23
  70/10 88/24 96/5 98/21
**beyond [5]**   30/13 34/13 76/20
  79/3 88/8
**bidding [2]**   48/19 72/16
**big [1]**   7/1
**biggest [1]**   6/5
**bill [1]**   95/21
**binding [2]**   21/3 36/15
**bipartisanship [1]**   96/4
**bit [7]**   7/6 23/5 37/18 44/7
  44/18 82/3 90/7
**blanket [1]**   29/15
**blind [2]**   48/19 72/16
**block [1]**   98/1
**blockbuster [1]**   64/25
**blown [1]**   4/23
**blurred [1]**   65/23
**blurry [2]**   65/19 65/22
**BOARDMAN [2]**   1/9 2/5
**body [1]**   63/19
**book [17]**   10/4 10/4 17/23
  28/10 31/14 31/16 38/7 38/11
  50/5 55/24 56/5 57/2 61/14
  61/16 64/15 81/6 87/15
**books [16]**   6/10 6/10 9/10
  22/20 39/20 53/1 56/2 56/4
  63/12 65/3 82/18 83/24 86/14
  88/11 90/25 98/9
**bookstores [1]**   6/25
**borders [1]**   55/18
**borrowed [1]**   97/24
**both [33]**   3/18 4/18 5/15 6/3
  7/20 16/3 23/15 30/3 31/2
  32/11 33/18 33/23 36/4 36/8
  36/9 41/16 42/19 42/23 43/7
  48/2 63/19 65/13 65/16 66/2
  66/15 66/16 69/9 74/15 77/20
  85/14 91/15 98/25 99/20
**bottle [1]**   93/25
**bottom [5]**   15/9 15/13 46/13
  95/2 97/16
**bought [1]**   87/19
**bounce [1]**   13/14
**boundaries [3]**   18/25 19/1
  65/24
**box [1]**   7/1
**brass [2]**   25/20 50/19
**break [4]**   52/7 52/8 52/16
  90/8
**breath [2]**   23/10 23/12
**BRIAN [4]**   1/5 2/7 2/20 12/3
**brick [1]**   6/24
**brief [12]**   5/1 5/2 11/24
  21/6 33/25 52/14 52/16 71/15
  71/17 79/4 86/9 99/23
**briefing [6]**   3/9 59/21 61/12
  78/16 79/5 103/10
**briefly [2]**   5/20 74/5
**bring [4]**   68/22 84/18 91/4

  95/7
**broad [1]**   22/6
**broadcasting [4]**   39/18 92/16
  93/5 93/6
**broaden [3]**   21/12 21/13
  36/25
**broader [1]**   76/7
**broadly [2]**   74/16 79/9
**brought [1]**   91/1
**bunch [1]**   57/17
**burden [7]**   12/9 12/17 12/25
  13/5 27/5 90/20 96/22
**business [1]**   7/1
**buy [7]**   31/12 31/14 31/17
  46/19 61/16 94/12 94/17
**buys [1]**   17/7

**C**

**cake [1]**   88/14
**calculable [1]**   93/19
**calculate [2]**   83/1 90/18
**calculation [2]**   84/6 94/1
**calendar [1]**   99/7
**calibrate [1]**   67/13
**calibrated [6]**   58/4 69/11
  87/25 88/2 88/24 101/23
**calibrates [2]**   86/25 87/7
**calibrating [3]**   56/9 56/23
  57/11
**calibration [3]**   58/4 58/10
  58/20
**California [3]**   35/9 76/23
  76/24
**call [4]**   2/2 7/23 21/21 70/3
**called [1]**   60/1
**calls [1]**   69/5
**came [4]**   4/8 47/5 47/8 71/6
**can [53]**   4/2 4/4 4/9 5/5 5/6
  5/7 5/8 10/7 11/21 13/23
  14/10 14/20 19/11 20/17 21/9
  21/9 21/10 24/21 26/3 30/7
  30/11 30/21 30/22 31/14
  31/17 33/7 38/24 41/9 44/7
  45/12 45/14 59/15 60/7 64/4
  64/7 66/23 68/13 72/11 72/11
  75/8 83/7 84/4 86/7 90/14
  93/23 95/21 96/4 97/25 99/23
  101/3 102/18 103/2 103/16
**can't [35]**   5/9 5/16 40/4
  46/17 47/25 48/1 48/14 50/18
  51/11 51/17 62/5 64/1 64/5
  64/10 64/17 68/13 70/6 70/17
  71/8 73/6 73/18 74/12 74/21
  76/3 82/12 82/14 82/17 82/20
  83/13 84/7 85/24 85/24 86/12
  86/13 103/12
**cannot [11]**   13/22 21/12 22/9
  22/10 30/23 31/20 36/24
  38/23 39/10 51/12 54/10
**Canons [1]**   17/4

**C**

capital [2]   13/16 38/19
care [1]   31/24
careful [2]   63/18 101/14
carefully [13]   6/13 8/4 57/6
 57/11 57/22 62/23 69/1 86/23
 86/24 100/8 100/8 101/12
 101/23
carefully-balanced [1]   8/4
carefully-examined [1]   86/23
case [74]   2/2 3/6 7/7 7/9
 12/2 12/22 13/11 14/6 15/9
 20/23 20/24 21/6 21/20 21/22
 23/16 23/19 26/15 26/23
 34/11 35/5 35/7 35/8 35/9
 35/21 39/17 42/11 43/19
 44/22 45/8 45/9 45/10 45/11
 45/11 45/16 46/10 46/15
 47/10 49/1 49/17 50/10 50/11
 50/21 51/3 52/2 55/3 56/13
 57/21 64/22 70/24 71/1 71/2
 71/17 71/18 71/21 71/21
 71/22 72/20 73/12 74/24 75/2
 75/16 76/13 76/25 78/14
 78/16 78/24 85/21 88/20
 89/10 90/17 91/6 99/14 99/21
 102/14
cases [28]   33/18 36/16 40/9
 41/14 42/4 42/23 55/4 70/16
 70/25 71/6 71/14 72/23 75/19
 78/16 79/3 79/12 79/18 80/6
 80/17 80/22 81/1 81/3 81/10
 81/12 81/15 81/22 82/13
 103/2
cast [1]   76/7
caught [1]   14/13
caused [1]   68/20
caution [1]   42/10
caveat [1]   91/7
CD [1]   10/4
ceded [1]   67/24
celebrates [1]   102/9
cement [1]   100/14
century [8]   14/2 14/15 26/13
 39/4 46/5 46/8 97/14 100/10
CEO [2]   1/17 2/15
certain [13]   25/9 26/4 31/15
 43/8 43/9 48/20 48/23 57/13
 60/6 60/7 63/24 79/12 85/9
certainly [15]   4/16 4/18
 11/8 12/23 16/6 19/11 21/9
 27/6 27/11 27/20 28/16 31/1
 32/5 51/12 91/6
CERTIFICATE [1]   103/25
Certified [1]   104/4
certify [1]   104/6
challenges [1]   7/10
challenging [2]   7/13 24/22
change [4]   58/7 68/18 68/19

88/8
changed [1]   83/9
changes [2]   7/2 34/14
changing [1]   83/10
channels [1]   88/25
charge [1]   47/21
charts [2]   59/1 95/20
cheaper [1]   61/15
checkouts [1]   61/14
cherished [1]   68/25
choice [1]   59/9
choose [3]   19/11 22/10 85/4
chooses [2]   38/8 49/10
choosing [2]   58/11 58/12
chose [1]   60/20
chosen [2]   69/9 76/12
circle [1]   95/7
circuit [17]   20/25 21/1
 41/18 41/20 41/21 42/5 42/13
 43/11 50/16 65/9 75/1 75/13
 75/16 75/24 77/1 78/19 103/3
circumstance [2]   49/17 73/8
circumstances [4]   12/9 26/4
 48/20 91/3
cite [6]   25/14 71/16 78/13
 78/18 80/17 103/2
cited [10]   21/6 56/13 74/25
 78/17 79/4 84/19 88/20 99/6
 102/14 103/1
citing [1]   71/21
citizen [1]   98/13
citizens [1]   86/11
City [1]   78/20
civil [10]   1/4 2/6 10/17
 67/6 67/10 80/3 82/16 85/10
 91/1 91/9
claim [3]   34/13 34/16 91/8
clarify [2]   36/17 36/19
class [3]   26/24 50/25 51/12
classes [1]   51/25
clause [20]   8/1 8/19 19/15
 34/23 54/13 74/17 78/15
 78/17 78/25 79/8 79/12 79/13
 79/20 80/5 80/8 80/8 80/24
 85/15 85/16 103/5
clear [22]   4/25 14/12 19/17
 21/4 27/5 34/3 34/11 36/2
 36/16 41/17 46/10 50/2 56/21
 74/11 75/14 84/12 85/3 91/17
 92/12 94/6 101/20 101/21
clearer [1]   60/21
clearly [4]   61/20 75/24 85/5
 89/15
CLERK [1]   1/18
client [3]   47/11 47/11 83/1
clients [1]   47/15
close [11]   15/6 15/23 35/7
 35/21 74/25 74/25 76/13
 76/25 77/3 77/18 103/8
closer [2]   5/6 21/21

closest [2]   47/3 47/5
closing [1]   99/25
cloth [2]   10/6 67/19
clouded [1]   77/11
Code [2]   7/14 16/9
codified [1]   38/5
colleagues [2]   2/21 48/8
collecting [1]   14/8
come [9]   3/15 19/25 19/25
 37/15 59/10 60/19 62/20
 81/20 91/11
comes [6]   2/8 29/3 31/16
 54/16 56/11 61/4
comfortable [1]   4/6
comfortably [2]   65/25 66/6
command [3]   25/8 25/9 25/10
comment [2]   37/11 48/14
commercial [13]   15/20 23/15
 24/1 27/2 28/24 29/22 42/20
 47/14 49/21 83/17 87/14
 87/22 99/20
commercialized [1]   81/6
commercializing [1]   83/11
commit [1]   64/9
commodities [1]   56/2
common [1]   85/19
commonplace [1]   72/3
communities [2]   6/7 6/9
compared [2]   49/17 72/9
comparing [2]   24/1 101/8
comparison [2]   60/13 61/1
compel [3]   17/15 53/6 53/7
compelled [2]   37/6 50/18
compelling [7]   22/1 24/4
 24/7 24/8 49/18 64/7 73/23
compels [1]   69/21
compensation [3]   22/20 39/21
 93/7
competition [1]   63/11
complaint [3]   3/6 3/9 29/21
completely [3]   22/13 49/16
 49/19
complex [8]   6/12 6/17 8/4
 8/10 23/24 43/1 83/9 83/22
compliance [5]   8/20 36/4
 36/7 36/9 36/11
complicated [1]   63/10
complications [1]   23/20
comply [7]   18/21 18/21 66/15
 82/15 83/2 90/15 90/25
complying [1]   65/12
comport [1]   30/18
compulsory [2]   59/21 60/19
compulsory [2]   59/21 60/19
computer [2]   1/21 75/17
Computer-aided [1]   1/21
computers [1]   75/18
concede [1]   80/6
conceded [2]   14/5 67/20
concept [1]   76/17
concluded [3]   66/5 77/1

**C**

**concluded... [1]**  103/24
**conclusion [1]**  17/15
**condition [1]**  25/9
**conditions [1]**  38/7
**conference [2]**  5/1 104/10
**confers [1]**  34/10
**conflict [26]**  10/19 24/11
24/17 33/20 35/7 35/23 36/2
41/7 65/11 65/13 65/21 66/1
66/6 66/13 67/4 67/15 68/6
68/9 70/11 70/14 70/17 73/15
74/4 74/12 74/15 77/20
**conflicted [1]**  35/14
**conflicting [1]**  35/20
**conflicts [1]**  7/9
**conformance [1]**  104/10
**confused [1]**  44/18
**confusion [2]**  67/23 68/20
**Congress [105]**
**Congress' [24]**  7/10 8/1 8/17
9/1 10/12 13/15 22/24 38/17
57/15 58/3 58/20 59/6 59/12
61/25 67/14 68/4 68/17 74/23
77/16 79/21 79/24 80/9 81/20
84/11
**congressional [7]**  6/12 39/23
93/2 97/10 98/22 101/16
101/19
**consider [6]**  6/21 15/4 19/14
24/7 34/22 86/15
**consideration [1]**  46/11
**considered [5]**  3/5 8/13
32/15 32/22 89/8
**considering [5]**  15/3 17/10
22/16 94/23 99/12
**consistent [12]**  26/12 26/14
31/21 42/12 43/21 43/22
49/25 51/9 51/10 92/2 95/2
95/6
**constantly [1]**  7/1
**Constitution [4]**  8/2 54/12
80/8 80/11
**constitutional [6]**  78/21
79/14 79/16 80/7 85/16 99/14
**construction [1]**  17/15
**construed [1]**  18/10
**consumer [3]**  63/12 67/1
84/20
**consumers [1]**  63/12
**contained [1]**  34/10
**contemplate [2]**  42/23 57/1
**contemplated [6]**  22/17 23/21
30/4 30/16 46/14 93/1
**contemplating [1]**  92/20
**contend [1]**  21/22
**content [4]**  6/11 21/10 26/17
98/7
**context [9]**  7/2 17/9 45/12

45/14 70/11 79/17 81/11
84/11 90/23
**continually [2]**  28/8 86/23
**continue [4]**  20/20 24/24
40/24 97/18
**continuing [3]**  28/7 28/11
76/20
**contours [3]**  35/10 70/20
73/10
**contract [6]**  26/1 26/3 26/5
26/9 26/10 56/7
**contracting [1]**  6/24
**contrary [6]**  18/11 42/4 46/7
62/12 67/22 81/19
**control [6]**  13/20 38/23
45/19 45/22 46/2 73/25
**controls [2]**  9/10 9/16
**controversial [3]**  59/23
60/15 62/20
**conversation [1]**  5/16
**converts [1]**  9/18
**copies [8]**  35/13 38/1 38/2
40/16 40/20 57/10 94/20
94/25
**copy [6]**  35/17 38/7 38/16
63/25 67/2 87/15
**copying [1]**  75/21
**copyright [212]**
**copyrighted [12]**  19/9 36/14
40/1 43/24 44/20 45/1 56/1
64/8 76/18 83/7 83/11 92/10
**copyrighting [1]**  9/25
**copyrights [2]**  9/7 67/9
**core [2]**  75/20 77/21
**corners [3]**  7/20 72/4 74/20
**Corp [1]**  44/22
**Corporation [3]**  21/7 36/17
43/22
**correct [17]**  25/11 25/12
26/7 27/18 28/3 28/4 29/9
30/2 31/19 41/11 41/12 53/12
53/20 58/1 60/25 80/19 104/7
**cost [1]**  38/14
**could [25]**  2/2 3/25 7/2 9/25
23/20 38/20 43/10 43/10
43/13 47/4 57/17 61/15 70/9
74/3 83/1 83/18 90/25 91/1
91/2 91/4 92/21 93/1 93/15
98/17 98/18
**couldn't [1]**  60/20
**counsel [6]**  1/17 2/10 2/16
2/22 4/6 47/21
**country [2]**  23/18 55/19
**couple [3]**  14/12 15/2 98/4
**course [15]**  3/7 3/13 6/14
11/4 16/10 27/17 46/22 61/13
64/1 66/22 69/2 79/4 83/6
95/20 102/18
**court [75]**  1/1 2/3 2/6 2/8
3/21 3/25 4/8 4/8 11/9 11/9

11/11 11/23 12/2 12/5 12/20
13/13 14/16 14/17 15/3 15/6
15/23 15/25 21/2 21/3 22/16
23/8 26/15 32/8 32/21 34/7
35/1 35/23 36/15 39/14 41/24
42/10 42/17 43/11 43/13 44/8
44/19 45/9 45/10 49/23 52/13
52/15 54/11 56/12 65/9 70/10
71/17 71/18 71/22 72/18
75/18 79/5 88/16 89/1 92/12
92/20 94/22 96/22 99/12
99/13 99/24 99/25 100/18
100/20 100/21 102/7 102/15
102/17 103/8 103/23 104/5
**court's [11]**  16/2 17/9 26/22
28/15 37/17 41/19 42/9 48/3
96/8 99/23 101/2
**courts [3]**  73/2 76/6 103/3
**cover [1]**  11/2
**covered [5]**  11/2 28/13 32/23
62/2 76/12
**COVID [2]**  99/1 99/9
**COVID-19 [2]**  99/1 99/9
**create [3]**  32/11 33/1 55/23
**created [2]**  8/3 95/13
**creates [1]**  73/21
**creation [2]**  6/20 88/18
**creative [5]**  6/7 13/17 68/24
68/25 83/18
**creator [1]**  63/16
**creators [1]**  13/17
**crime [1]**  75/17
**criminal [8]**  10/17 27/10
47/21 67/6 80/3 82/17 91/3
91/9
**critical [23]**  12/17 12/21
13/4 13/8 14/7 14/18 15/15
18/13 19/6 19/10 19/14 21/5
25/25 32/13 32/18 37/24 42/8
46/3 48/25 49/13 91/7 97/6
98/20
**critically [1]**  17/2
**cross [1]**  27/10
**CRR [2]**  1/23 104/16
**crystal [1]**  94/2
**cultural [1]**  32/1
**cure [2]**  19/18 96/2
**current [2]**  41/9 92/24
**cut [2]**  10/25 93/10
**cutting [1]**  25/20
**cv [2]**  1/5 2/6

**D**

**D.C [1]**  78/14
**daily [1]**  6/17
**damaged [2]**  38/2 40/21
**damages [6]**  83/1 85/25 90/18
93/15 93/18 94/1
**date [3]**  30/23 31/10 86/14
**Dated [1]**  104/12

**D**

**day [9]**  50/14 55/25 64/15 65/4 80/13 82/4 93/24 103/22 104/12
**days [2]**  30/10 87/18
**de [3]**  76/17 76/24 77/5
**deal [8]**  28/16 28/18 30/20 33/16 43/6 45/1 91/23 98/5
**dealing [3]**  39/16 42/20 43/23 44/20 50/23 93/3
**deals [3]**  30/7 50/21 50/22
**dealt [3]**  33/15 78/22 81/12
**death [7]**  39/3 58/22 58/23 61/5 95/16 95/17 95/19
**debate [2]**  6/14 61/17
**DEBORAH [2]**  1/9 2/4
**decades [5]**  10/11 23/11 23/14 49/3 97/10
**deceptive [2]**  29/23 72/1
**decide [10]**  8/2 23/24 31/22 36/13 55/20 57/16 62/25 63/22 63/23 82/7
**decided [13]**  23/22 37/13 47/19 47/23 48/21 59/17 60/18 70/8 76/22 77/4 84/7 88/2 88/6
**decides [2]**  20/10 54/3
**decision [12]**  6/18 8/1 20/7 21/24 23/13 43/22 48/22 48/24 50/17 64/13 75/14 103/11
**decision-making [1]**  8/1
**decisions [13]**  6/24 23/15 42/13 42/19 49/20 59/12 63/18 77/25 83/23 86/25 88/24 98/9 98/10
**declarations [1]**  55/8
**declared [2]**  82/25 85/10
**decline [1]**  99/4
**declined [1]**  32/12
**decreased [1]**  99/8
**deemed [4]**  7/11 21/15 37/1 69/9
**deems [3]**  58/9 89/17 101/15
**defamation [3]**  64/8 72/12 75/8
**defamatory [1]**  64/9
**defend [2]**  7/22 100/6
**Defendant [9]**  1/5 1/13 2/18 3/8 3/23 4/15 7/7 7/21 12/3
**Defendants [1]**  3/11
**defender [5]**  47/6 47/7 47/12 47/18 48/7
**defending [1]**  100/8
**defense [1]**  95/18
**defined [2]**  17/2 17/3
**definitely [2]**  11/1 28/18
**definition [4]**  7/15 10/15 79/25 84/9

**delays [1]**  98/1
**deliberately [1]**  8/16
**delve [1]**  11/21
**delving [2]**  5/3 10/23
**demand [1]**  98/25
**demonstrably [1]**  91/14
**demonstrate [3]**  12/10 12/14 100/17
**demonstrates [2]**  30/17 50/6
**demonstratively [1]**  14/1
**denial [1]**  97/20
**denigrated [1]**  102/4
**denigration [1]**  102/13
**deny [1]**  100/20
**Department [1]**  2/23
**depending [1]**  61/14
**deprives [2]**  45/23 46/2
**derivative [1]**  83/18
**described [2]**  69/17 85/24
**designed [3]**  14/22 19/18 35/2
**desirable [2]**  21/15 37/2
**details [2]**  5/3 30/6
**determination [4]**  28/21 29/1 29/11 67/14
**determined [4]**  8/16 56/10 57/9 77/7
**determines [1]**  28/20
**developed [1]**  98/21
**device [1]**  87/15
**dichotomy [1]**  89/4
**dictate [1]**  73/18
**dictating [1]**  59/7
**did [10]**  8/17 32/20 33/16 42/9 54/24 65/12 72/9 88/7 92/17 95/9
**didn't [12]**  54/20 57/1 57/10 57/10 60/25 66/8 71/16 77/3 77/7 77/17 78/15 85/6
**difference [1]**  49/11
**differences [1]**  69/18
**different [36]**  14/22 21/20 23/16 23/22 33/16 34/15 34/19 35/4 42/21 46/18 46/20 46/25 47/1 47/13 48/3 48/5 48/12 48/17 52/1 52/24 52/25 60/12 61/7 61/7 61/8 61/9 63/14 71/7 72/12 72/21 76/5 80/20 94/21 101/10 101/11 101/13
**digital [35]**  10/13 23/19 23/25 32/4 32/11 32/17 33/1 35/22 38/14 57/1 57/2 57/10 57/12 57/18 57/20 58/13 58/24 59/1 69/3 69/6 69/7 69/19 73/1 73/2 73/3 73/4 77/14 78/5 87/10 87/12 88/5 92/20 95/19 98/25 100/12
**direct [2]**  10/19 70/17
**directly [14]**  8/25 15/18

24/4 33/13 33/15 35/2 35/14 37/16 43/6 50/9 53/12 65/8 67/15 81/1
**disabilities [1]**  59/5
**disability [1]**  87/6
**disagree [3]**  24/7 32/2 43/5
**discretion [6]**  9/3 56/10 59/8 62/14 63/7 71/19
**discriminate [1]**  39/10
**discriminating [3]**  17/20 17/22 28/12
**discrimination [3]**  14/25 38/13 100/3
**discriminatory [3]**  45/4 97/18 101/7
**discuss [3]**  14/10 14/20 16/7
**discussed [4]**  14/17 75/19 80/16 88/3
**discussing [2]**  33/13 43/2
**discussion [7]**  3/17 22/6 52/18 52/20 56/16 56/24 62/4
**dismiss [7]**  3/9 3/11 3/12 3/14 3/15 9/22 71/16
**dispose [1]**  50/10
**dispute [1]**  58/25
**disseminating [2]**  23/18 51/14
**dissemination [5]**  40/1 88/19 101/9 102/18 102/20
**disseminations [3]**  58/14 77/14 88/6
**dissimilar [1]**  23/12
**distancing [1]**  99/11
**distinct [2]**  32/23 33/9
**distinction [1]**  70/9
**distinctions [1]**  48/17
**distinguish [2]**  42/2 49/10
**distinguishable [3]**  35/9 42/20 71/2
**distinguishing [2]**  49/14 72/20
**distribute [28]**  25/16 25/18 36/13 37/1 38/1 40/19 48/21 48/24 50/15 50/15 50/17 50/18 51/4 51/4 51/7 51/11 61/6 62/25 63/1 63/1 67/1 67/1 67/17 69/24 69/24 92/11 92/11 96/10
**distributed [3]**  21/18 60/6 60/12
**distributes [2]**  9/24 71/11
**distributing [2]**  36/14 51/6
**distribution [32]**  8/6 9/13 9/15 9/24 20/20 21/14 21/23 21/24 33/2 33/16 35/11 36/25 40/16 41/10 44/22 48/19 48/22 49/13 50/12 59/16 59/17 60/12 64/11 71/10 72/19 73/9 73/10 73/17 73/25 77/3 77/23 77/24

**D**

**distributions [9]** 10/8 72/15
73/7 76/19 77/18 82/5 82/17
83/7 83/16
**distributor [1]** 48/21
**DISTRICT [8]** 1/1 1/1 2/3 2/4
41/24 78/13 104/5 104/6
**divert [1]** 57/13
**divest [1]** 39/9
**division [2]** 1/2 27/3
**DLB [2]** 1/5 2/6
**do [102]** 4/2 4/4 4/5 4/20
4/23 9/11 9/20 11/6 12/3
14/23 15/1 15/10 16/5 18/18
19/11 19/11 19/21 21/12
21/13 23/4 24/6 24/19 26/21
26/22 28/16 30/2 33/11 37/13
37/17 40/5 40/12 41/14 45/8
45/19 46/7 47/8 47/9 48/4
49/25 51/12 52/3 52/8 53/5
53/11 53/21 55/1 55/19 55/23
56/19 57/7 57/10 58/18 58/19
59/17 60/2 60/18 60/20 63/14
63/22 64/10 64/12 64/15 66/4
67/2 68/7 68/22 70/8 70/10
71/7 74/1 74/1 74/3 77/6
78/3 78/24 79/4 79/13 79/15
80/14 80/17 81/7 82/7 82/11
82/11 84/4 85/4 90/7 90/17
93/12 94/18 95/15 95/21
96/11 96/18 97/2 97/17 97/19
98/11 99/18 101/21 102/20
104/6
**doctrine [18]** 8/13 10/2 14/4
14/11 14/19 14/21 26/14
32/11 33/1 35/14 35/21 35/22
38/5 38/9 39/5 43/1 46/8
74/22
**doctrines [2]** 74/14 74/15
**does [51]** 6/13 7/24 8/24 9/8
9/17 11/20 16/3 16/22 17/6
18/2 19/22 20/3 20/4 20/5
20/6 20/23 21/16 22/6 23/18
23/23 24/10 26/16 27/16
30/20 33/1 33/4 33/5 34/3
34/12 41/2 41/25 42/1 46/4
52/23 53/2 58/16 59/19 60/14
60/15 75/15 75/25 84/10
86/16 92/24 94/9 94/23 95/4
95/23 97/15 101/21 102/1
**doesn't [30]** 19/1 31/17
40/24 41/10 41/14 42/2 42/23
42/25 43/1 43/4 45/25 49/22
50/8 50/9 53/4 53/5 55/10
58/8 62/7 71/1 71/18 74/12
82/10 84/16 89/11 89/16
95/22 95/25 101/21 101/25
**doing [15]** 4/17 9/16 14/1
32/13 55/23 55/24 64/6 68/10

68/12 68/14 69/4 73/13 73/21
81/7 97/5
**Don [1]** 92/11
**don't [48]** 4/16 11/10 11/11
20/15 20/18 20/19 22/3 22/4
24/7 26/1 26/20 26/20 27/9
29/3 29/19 32/2 37/11 41/1
41/8 43/5 43/6 44/10 49/25
51/21 52/3 53/16 53/24 54/16
56/18 62/24 64/21 67/2 67/3
67/22 71/4 73/22 73/24 77/14
78/16 79/3 80/21 84/9 84/19
89/21 90/25 92/8 92/24
101/19
**done [8]** 50/7 56/23 58/6
59/25 60/9 72/10 87/7 95/6
**donors [1]** 38/11
**doubled [1]** 58/16
**doubly [1]** 5/12
**doubt [1]** 28/19
**down [10]** 23/5 27/13 27/24
29/16 34/1 44/7 44/19 58/17
87/23 103/4
**downward [1]** 45/6
**draw [1]** 47/4
**drawing [1]** 47/4
**driven [1]** 68/5
**droit [3]** 76/17 76/24 77/5
**dual [2]** 54/23 68/20
**dubbed [1]** 7/18
**DUDDERAR [2]** 1/15 2/23
**due [5]** 16/25 18/18 28/25
91/10 98/24
**during [11]** 11/9 12/23 13/13
21/8 36/21 55/25 59/13 67/9
73/25 74/1 83/11

**E**

**each [2]** 74/14 82/4
**earlier [1]** 93/13
**easier [1]** 3/24
**easily [1]** 71/2
**easy [1]** 97/25
**eBook [14]** 17/21 22/2 28/1
46/19 46/24 57/2 81/5 81/6
83/17 84/20 86/11 87/14
87/23 99/10
**eBook/audio [1]** 81/6
**eBooks [18]** 9/9 18/1 23/25
24/9 33/17 37/5 41/10 46/22
48/16 52/25 53/8 92/21 94/18
97/24 98/1 99/3 99/5 99/7
**ECF [3]** 3/7 3/11 3/12
**ECF-13 [1]** 3/11
**ECF-17 [1]** 3/12
**ECF-4 [1]** 3/7
**ECF10 [1]** 3/10
**echoed [1]** 42/3
**economic [7]** 38/10 59/12
84/14 88/22 89/1 102/5

102/10
**economics [1]** 52/23
**economies [1]** 68/24
**economist [1]** 82/25
**Education [4]** 2/23 7/14
16/10 34/24
**educational [1]** 6/2
**effect [9]** 9/12 14/23 18/10
18/19 27/15 38/9 49/2 57/19
76/3
**effectively [1]** 35/12
**effects [1]** 14/20
**either [18]** 9/9 18/20 24/10
29/14 29/24 36/4 40/16 42/11
43/16 43/19 49/17 49/20
49/21 71/12 74/22 82/15
87/16 91/12
**elderly [1]** 86/12
**Eldridge [1]** 56/13
**elected [1]** 49/12
**electronic [25]** 13/10 13/25
16/12 16/13 16/16 16/19
16/23 18/2 19/23 25/2 25/4
25/7 27/21 30/22 31/9 31/10
33/7 35/20 37/9 39/1 94/20
97/5 97/13 97/20 98/14
**element [6]** 15/24 34/12
34/13 34/17 85/22 90/21
**elements [1]** 15/24
**elephant [1]** 28/17
**eliminate [1]** 68/19
**ELLIOTT [2]** 1/14 2/22
**else [10]** 20/18 22/2 53/9
56/21 65/2 86/5 90/1 96/14
100/24 103/16
**elucidates [1]** 17/19
**embargo [3]** 45/3 91/22 95/5
**embargoes [3]** 14/25 97/11
98/4
**embargoing [1]** 95/25
**emphasis [1]** 101/5
**emphasize [1]** 5/22
**en [1]** 78/18
**enable [4]** 16/14 25/6 29/5
29/7
**enact [5]** 76/12 76/21 77/5
77/8 77/17
**enacted [5]** 7/21 76/11 76/23
77/7 101/14
**enacting [2]** 8/15 39/25
**enacts [1]** 76/10
**encourage [2]** 4/9 11/9
**end [9]** 11/1 29/11 48/4
54/18 57/12 58/19 62/4 90/17
93/23
**end-run [2]** 57/12 58/19
**ends [2]** 17/16 33/3
**enforced [1]** 26/25
**enforcement [9]** 27/1 27/4
27/6 27/8 28/23 91/4 91/7

**E**

enforcement... **[2]** 93/16 93/16

enforcing **[3]** 71/9 77/22 101/15

engage **[7]** 22/1 25/10 25/17 25/20 63/17 93/21 97/18

engaged **[1]** 22/6

engaging **[1]** 38/12

enjoined **[4]** 82/23 89/16 89/20 90/15

Enjoining **[1]** 97/8

enjoinment **[1]** 15/18

enjoy **[1]** 23/1

enjoying **[1]** 19/8

enjoyment **[1]** 70/18

enough **[1]** 96/2

enshrined **[2]** 54/12 80/10

ensure **[2]** 6/5 39/19

ensured **[2]** 22/19 38/10

ensures **[1]** 97/4

ensuring **[1]** 35/13

enter **[6]** 26/5 26/8 26/10 37/6 82/16 82/24

entering **[1]** 8/19

Enterprises **[1]** 102/16

entire **[1]** 88/15

entirely **[3]** 23/16 33/16 42/21

entities **[7]** 22/18 22/25 39/17 47/14 52/1 93/4 93/4

entitled **[8]** 1/8 55/22 64/14 76/18 77/23 85/12 94/24 104/9

entitlement **[1]** 57/25

entitles **[1]** 38/6

entity **[7]** 22/23 26/24 51/4 62/15 62/15 63/16 95/13

enumerated **[1]** 62/8

equate **[1]** 95/24

equitable **[2]** 59/3 97/4

equities **[9]** 13/6 15/7 89/18 89/19 95/3 96/21 96/25 99/13 99/21

equity **[2]** 12/12 97/3

equivalency **[1]** 34/12

equivalent **[4]** 34/10 75/5 75/7 76/2

era **[4]** 35/22 38/14 69/6 96/4

especially **[1]** 10/13

ESQUIRE **[6]** 1/12 1/12 1/14 1/14 1/15 1/15

essence **[1]** 77/22

essentially **[2]** 59/24 76/20

established **[4]** 43/24 44/21 45/1 77/3

even **[29]** 9/12 10/17 18/23 23/20 31/17 33/15 41/2 42/12

49/3 50/8 59/16 61/9 61/11 62/17 64/16 66/4 67/1 69/16 71/10 84/13 84/14 84/21 85/11 96/21 97/19 99/3 100/15 101/19 102/17

event **[2]** 48/11 61/23

ever **[2]** 39/2 98/24

ever-increasing **[1]** 39/2

every **[6]** 4/24 6/18 56/18 63/16 98/13 99/6

everybody **[1]** 51/1

everyone **[3]** 51/5 51/6 103/22

everything **[2]** 58/17 102/20

evidence **[1]** 100/2

evident **[1]** 79/21

exactly **[5]** 11/19 23/3 60/8 64/6 103/12

exaggerate **[1]** 7/14

examine **[1]** 88/8

examined **[2]** 86/23 88/4

example **[8]** 59/25 60/21 61/12 62/21 71/20 83/19 87/3 98/5

examples **[3]** 57/4 57/18 95/10

exceedingly **[4]** 59/19 59/20 60/15 73/20

excellent **[3]** 52/18 103/10 103/10

except **[4]** 51/6 60/9 63/1 85/6

exceptions **[9]** 8/7 8/9 62/24 63/3 66/20 87/1 87/5 101/13 101/22

exclude **[14]** 21/11 26/10 26/17 26/23 36/23 39/10 45/13 50/25 51/12 62/5 92/1 94/24 96/11 98/15

excluded **[1]** 40/4

excluding **[2]** 51/24 88/5

exclusive **[50]** 6/16 6/19 6/22 7/11 7/24 8/5 8/25 9/4 9/12 9/14 9/19 10/7 10/18 20/8 20/16 34/25 40/11 41/6 41/6 50/12 50/22 50/25 51/1 51/3 51/19 56/10 56/11 59/8 59/12 62/7 62/24 62/25 63/3 63/21 63/23 66/18 67/4 68/13 81/17 81/18 82/13 83/13 85/5 85/6 85/20 87/1 88/3 88/17 92/7 102/8

exclusively **[4]** 68/15 74/19 79/24 80/10

exclusives **[1]** 81/24

excuse **[7]** 18/15 30/23 33/6 42/19 53/7 54/15 87/21

execute **[1]** 68/13

exercise **[17]** 9/3 9/4 9/14 10/9 36/12 36/23 56/11 59/8

66/19 66/22 66/24 69/22 71/19 82/1 85/4 85/9 89/24

exercised **[1]** 70/5

exercises **[1]** 10/6

exercising **[6]** 6/19 10/18 21/11 44/1 44/5 44/14

exhaustion **[7]** 8/12 10/2 57/8 58/13 77/13 87/4 88/4

exhibit **[1]** 52/22

exhibits **[2]** 3/7 3/10

exist **[2]** 34/13 40/24

existed **[2]** 46/4 69/6

existence **[1]** 74/11

existing **[1]** 35/11

exists **[5]** 58/7 58/7 59/25 81/16 81/23

expand **[4]** 58/11 82/3 86/11 100/9

expense **[1]** 97/19

experience **[1]** 12/6

expert **[1]** 55/14

explain **[3]** 54/2 81/2 83/6

explaining **[1]** 73/10

explains **[1]** 45/16

explicit **[1]** 92/13

explicitly **[4]** 17/3 20/3 22/11 91/13

exploded **[1]** 87/22

exploit **[4]** 36/18 45/13 45/14 97/9

exploited **[1]** 100/12

exploiting **[1]** 19/9

express **[23]** 18/12 24/11 24/16 33/20 33/22 33/25 34/8 34/9 34/20 35/6 35/24 41/5 65/22 66/7 66/8 70/11 70/12 74/5 74/9 74/11 74/16 74/24 77/19

expressly **[2]** 18/11 60/18

extend **[3]** 58/13 88/5 88/7

extensive **[3]** 6/14 55/14 71/5

extent **[8]** 3/16 40/9 46/12 59/15 67/21 73/19 89/7 94/2

extolled **[1]** 23/13

extra **[3]** 34/12 34/13 34/17

extraordinary **[2]** 12/8 13/3

extraterritorial **[3]** 18/10 18/14 18/15

extreme **[2]** 91/3 97/23

extremely **[1]** 60/14

**F**

F.Supp **[1]** 44/23

face **[3]** 15/12 80/3 91/3

fact **[9]** 12/21 19/6 19/10 49/16 50/6 58/17 90/16 98/3 98/5

factor **[2]** 49/14 86/15

factored **[1]** 8/10

## F

**factors [9]**  12/15 15/3 15/10 15/10 78/12 85/18 97/1 100/17 100/17

**facts [3]**  42/8 50/9 50/11

**factual [1]**  73/8

**fail [3]**  12/16 12/24 13/5

**failed [2]**  96/24 100/16

**fails [1]**  34/22

**failure [3]**  12/14 27/20 46/7

**fair [7]**  13/17 38/20 45/18 46/15 49/5 65/20 95/24

**fairness [1]**  97/3

**falling [1]**  45/24

**falls [2]**  64/3 85/22

**false [6]**  64/7 66/23 72/11 75/8 89/4 89/4

**falsely [1]**  64/9

**familiar [1]**  3/24

**fancy [1]**  50/12

**far [6]**  43/9 43/10 82/22 86/4 94/19 96/5

**fatal [2]**  12/15 100/18

**favor [6]**  12/12 13/6 45/22 46/1 96/25 99/21

**favorable [1]**  94/10

**February [2]**  1/7 104/12

**federal [25]**  1/23 3/21 7/19 8/4 10/12 32/11 32/23 32/24 33/10 35/10 43/25 44/13 54/23 57/14 60/1 60/4 60/10 66/16 74/16 74/17 74/18 82/8 84/7 103/5 104/16

**federally [2]**  36/12 70/18

**federally-granted [1]**  70/18

**feel [2]**  98/12 98/15

**fettered [1]**  66/19

**few [5]**  3/3 5/21 71/3 75/2 96/4

**fiction [2]**  6/1 6/1

**figure [1]**  63/18

**file [2]**  29/16 29/20

**filed [2]**  3/8 100/2

**filings [1]**  3/5

**film [8]**  21/7 21/23 36/17 43/22 44/22 48/21 48/22 50/15

**films [2]**  33/16 48/19

**final [5]**  70/16 99/25 100/13 102/3 102/25

**finally [1]**  100/14

**financial [1]**  98/14

**find [4]**  24/23 43/10 43/10 85/2

**finding [1]**  75/19

**finds [1]**  29/14

**fine [2]**  70/13 74/6

**firm [1]**  2/12

**first [57]**  2/15 4/14 8/13 10/2 12/18 12/20 13/22 14/3 14/10 14/19 14/21 16/17 20/3 21/2 26/14 32/11 32/14 33/1 35/14 35/21 38/5 38/9 38/18 39/5 42/7 43/1 44/18 45/17 46/8 49/24 50/12 50/14 50/22 51/4 51/10 51/19 53/23 57/8 58/12 60/6 60/11 62/10 62/13 64/25 65/18 66/16 68/14 71/4 72/25 76/20 77/13 78/13 83/12 83/14 87/3 88/4 102/23

**first-run [1]**  50/12

**fit [6]**  7/11 45/20 58/9 65/25 66/6 69/9

**FITZGERALD [21]**  1/14 2/20 4/1 11/6 12/3 16/5 16/8 16/17 33/19 44/7 52/17 52/21 62/3 62/11 67/20 90/2 90/9 92/6 93/9 96/15 103/19

**five [2]**  47/7 94/18

**fix [1]**  32/6

**fixing [1]**  89/17

**Fizgerald [1]**  100/22

**flatly [1]**  45/3

**flip [1]**  51/5

**Floor [1]**  1/24

**flourishing [2]**  69/19 69/19

**focus [7]**  3/13 16/17 19/21 29/3 65/13 90/9 93/13

**focuses [1]**  34/23

**focusing [3]**  28/19 37/4 78/24

**fold [2]**  62/10 79/3

**folks [4]**  59/4 64/19 65/3 80/3

**follow [2]**  16/6 67/5

**followed [1]**  43/16

**follows [1]**  33/10

**footing [1]**  95/20

**forbid [1]**  17/19

**force [1]**  10/8

**forced [4]**  73/7 83/2 90/15 93/21

**forces [2]**  9/14 46/6

**forcing [5]**  26/4 50/10 72/14 73/9 73/16

**foreclose [1]**  31/20

**foreclosed [1]**  23/1

**forecloses [1]**  27/11

**foregoing [1]**  104/7

**forest [2]**  34/21 45/24

**forever [1]**  83/9

**forgive [1]**  27/23

**form [1]**  57/2

**formality [1]**  3/21

**format [3]**  81/6 87/13 104/9

**formats [3]**  57/3 101/11 101/12

**former [3]**  36/7 48/7 48/8

**forth [8]**  7/6 7/17 53/21 54/4 56/24 72/5 92/3 92/4

**forward [4]**  53/22 56/16 76/4 86/11

**found [3]**  75/18 92/19 96/22

**foundational [1]**  68/18

**four [7]**  7/20 23/11 49/3 72/4 74/20 100/17 101/4

**four-decades-old [1]**  23/11

**fourth [10]**  65/9 75/13 75/16 75/24 78/19 78/22 79/15 99/15 102/25 103/3

**Fox [3]**  21/7 36/17 43/22

**framework [5]**  6/6 6/12 8/4 8/10 72/5

**frankly [8]**  7/15 11/18 55/6 56/15 58/21 68/2 69/16 84/20

**fraud [2]**  64/9 72/1

**free [8]**  24/2 26/21 32/19 40/16 59/24 98/12 98/15 98/17

**French [2]**  76/15 76/17

**friends' [1]**  92/23

**front [2]**  16/6 71/5

**frontal [1]**  59/11

**FROSH [4]**  1/5 2/7 2/21 12/4

**fruition [1]**  91/11

**frustrating [1]**  39/24

**fulfill [1]**  67/8

**fulfilling [1]**  97/6

**full [3]**  4/23 70/17 95/7

**full-blown [1]**  4/23

**fully [3]**  35/13 54/11 72/4

**function [3]**  47/3 47/24 51/15

**functioning [1]**  32/1

**functions [2]**  47/9 48/2

**fundamental [4]**  31/6 44/24 47/19 48/16

**fundamentally [6]**  14/22 68/3 68/9 70/2 70/7 70/21

**further [2]**  30/17 70/20

**furthering [1]**  40/1

**future [1]**  92/22

## G

**gain [1]**  46/12

**gains [1]**  63/20

**game [1]**  7/2

**games [1]**  63/13

**gamut [1]**  56/4

**garner [3]**  13/17 38/20 45/18

**gave [4]**  4/23 48/8 85/5 87/3

**gazing [1]**  94/2

**general [12]**  1/17 2/16 2/20 2/22 12/4 13/12 15/25 17/12 18/3 18/24 91/2 96/3

**General's [1]**  47/5

**generally [3]**  18/9 34/4 90/22

**generates [1]**  86/18

## G

**generation [1]**   92/24
**Genie [1]**   93/24
**geographic [1]**   50/16
**get [14]**   3/3 3/19 4/14 4/18
24/22 35/6 46/16 61/6 75/3
77/20 90/12 95/21 97/25
102/19
**gets [7]**   17/24 28/25 32/25
69/25 69/25 86/21 103/1
**getting [4]**   33/13 64/12
87/17 87/18
**Gideon [1]**   47/19
**give [11]**   7/11 11/15 11/23
23/8 26/16 36/25 38/19 39/8
90/5 92/9 98/6
**given [5]**   9/5 14/7 31/24
37/24 69/17
**gives [4]**   15/25 63/3 66/18
94/11
**giving [1]**   35/11
**glad [1]**   44/18
**go [17]**   4/2 6/18 7/22 12/23
29/16 34/1 57/17 64/17 65/4
79/10 83/11 85/14 86/5 86/11
88/25 89/19 98/12
**goal [1]**   99/17
**goes [2]**   56/20 65/2
**going [30]**   3/16 4/3 5/8 5/13
12/24 23/5 24/13 24/24 27/10
27/13 29/11 41/15 46/16
47/24 48/21 49/8 51/4 51/11
52/6 52/19 56/18 57/7 59/10
69/13 85/10 87/23 89/23
93/10 95/10 102/19
**gone [1]**   40/21
**good [17]**   2/2 2/11 2/17 2/19
2/25 3/1 15/25 33/12 52/12
52/18 69/15 71/20 86/18 90/7
90/8 95/13 103/21
**got [5]**   4/17 16/6 37/15
44/17 52/9
**gouging [1]**   14/24
**governed [1]**   28/24
**government [9]**   15/11 47/3
47/18 48/2 57/14 59/23 60/4
60/4 97/2
**governmental [5]**   47/23 51/15
51/25 93/4 95/12
**governs [1]**   76/9
**grant [15]**   9/13 9/13 9/15
13/15 21/14 38/18 59/9 60/19
62/14 63/7 63/8 63/23 63/24
64/10 82/7
**granted [5]**   12/8 62/23 70/18
81/19 85/13
**granting [3]**   45/17 56/10
102/8
**grayer [1]**   51/8

**great [5]**   52/10 53/19 54/18
69/14 69/14
**greater [2]**   13/9 46/14
**grounds [1]**   66/2
**groups [1]**   57/13
**growing [1]**   92/22
**guarantees [1]**   48/20
**guess [14]**   4/6 11/14 24/12
28/7 37/3 40/18 41/17 42/17
48/5 91/7 95/7 95/14 95/17
99/5
**guidance [2]**   43/12 55/14
**guide [1]**   50/10
**guided [1]**   14/17
**guiding [1]**   43/7

## H

**had [11]**   4/25 5/1 23/13
50/11 71/6 81/5 91/22 92/25
98/3 98/4 98/5
**hadn't [1]**   49/13
**handle [1]**   32/17
**happen [2]**   61/22 82/20
**happened [2]**   54/14 83/8
**happening [10]**   55/10 57/12
58/24 62/12 62/21 63/5 64/16
72/21 81/13 82/18
**happens [5]**   20/11 29/17
79/23 84/15 103/6
**happy [11]**   4/14 10/22 11/10
16/2 33/19 33/22 40/7 41/13
79/4 79/9 101/1
**hard [4]**   25/16 44/8 52/25
53/14
**harder [1]**   53/16
**harm [43]**   12/11 13/1 13/2
15/12 27/12 46/17 52/4 74/7
78/11 78/15 78/17 78/21 79/1
79/6 79/9 79/12 79/19 79/23
79/25 80/12 80/18 80/23
81/16 81/22 82/2 85/17 85/19
86/1 86/4 90/10 90/13 90/19
90/21 90/22 93/14 95/9 96/7
96/9 96/13 96/18 96/24 103/1
103/6
**harmed [1]**   89/14
**harms [2]**   78/22 80/15
**Harper [1]**   102/16
**Harry [2]**   31/14 31/16
**HART [2]**   1/17 2/16
**has [105]**
**has already [1]**   49/11
**hasn't [3]**   67/22 90/20
100/25
**have [121]**
**haven't [4]**   3/22 11/2 62/6
81/6
**having [11]**   18/10 25/16
30/13 31/20 44/8 47/21 53/14
53/16 66/11 68/15 103/7

**he [1]**   67/22
**head [1]**   41/22
**healthy [1]**   32/1
**hear [13]**   4/15 5/6 5/9 5/18
10/22 11/21 33/19 33/22
41/13 45/25 80/14 100/23
101/1
**heard [5]**   58/22 62/6 65/24
91/17 95/7
**hearing [11]**   1/9 2/9 3/4 4/3
12/10 13/13 53/14 53/17
57/22 100/5 103/24
**hearings [2]**   6/15 55/14
**heart [2]**   77/20 89/1
**heavily [6]**   42/11 43/17
43/19 45/22 46/1 99/21
**HEIDI [2]**   1/15 2/23
**held [2]**   32/21 104/8
**help [2]**   37/21 46/17
**helpful [3]**   4/12 24/15 72/8
**helping [1]**   15/15
**her [1]**   52/8
**here [52]**   3/3 7/5 7/17 13/2
15/8 17/24 18/12 19/10 19/14
21/25 23/3 30/3 32/18 34/17
37/14 40/9 40/13 44/24 45/2
46/3 46/18 48/25 52/24 57/12
59/6 59/25 60/9 61/17 61/19
66/25 67/7 68/7 69/21 71/24
72/2 72/6 73/13 73/22 77/21
78/7 81/7 82/3 82/12 84/5
84/13 87/24 89/5 90/13 91/17
93/18 94/6 96/7
**hereby [1]**   104/6
**hidden [1]**   58/17
**higher [2]**   20/8 61/10
**highest [1]**   15/16
**highly [1]**   23/13
**him [1]**   67/21
**his [3]**   3/2 14/5 62/4
**historical [2]**   14/15 15/4
**history [12]**   17/18 21/5
22/10 22/22 25/14 26/15
39/15 42/11 42/14 52/23 92/4
100/1
**hit [1]**   70/16
**hoarding [2]**   21/8 36/21
**hold [1]**   94/9
**holder [20]**   9/23 21/16 30/15
30/19 31/5 35/15 42/15 45/12
50/23 59/13 62/4 62/14 62/16
63/6 63/6 71/18 81/19 82/4
82/5 84/16
**holder's [4]**   33/2 81/17
85/20 86/18
**holders [8]**   7/12 9/5 20/15
22/17 26/16 70/6 73/6 101/13
**holders' [1]**   81/24
**holding [2]**   34/6 51/10
**holdings [1]**   50/5

**H**

**honor [101]**   2/11 2/19 4/2
4/22 4/25 5/19 9/25 11/4
11/8 12/14 19/1 20/21 24/12
33/24 36/1 52/10 53/10 53/20
53/23 53/24 53/25 54/15
55/16 56/14 56/18 57/3 57/19
58/1 58/23 59/7 59/23 60/2
60/9 60/13 60/18 60/25 61/12
61/17 62/1 62/16 62/19 63/9
64/19 65/3 65/24 67/7 67/18
67/23 68/6 68/12 68/14 70/4
70/10 70/14 70/24 71/25 72/2
72/14 72/16 72/24 72/25 74/3
74/4 74/8 74/9 74/9 74/24
74/25 76/14 77/15 79/2 79/21
80/25 81/3 81/10 83/3 83/21
84/3 84/15 85/11 85/14 86/2
86/7 86/20 86/21 87/7 87/8
87/9 87/13 88/21 89/9 90/4
90/11 96/17 101/2 101/21
102/6 102/16 103/1 103/18
103/20

**Honor's [3]**   53/12 65/23
66/12

**HONORABLE [2]**   1/9 2/4

**hope [1]**   101/3

**hour [2]**   43/3 52/6

**household [1]**   94/17

**how [49]**   6/18 7/21 7/21 8/10
9/3 11/20 18/2 22/6 31/12
31/25 32/16 40/12 52/9 52/25
53/3 54/1 55/21 56/11 57/7
58/4 61/14 64/13 66/19 66/22
67/13 68/13 69/19 71/19
80/22 82/2 82/6 83/10 83/15
84/7 84/18 86/15 88/14 88/15
89/23 90/14 90/17 90/24 91/5
93/23 93/23 96/5 100/3
101/17 102/21

**however [1]**   54/8

**hundred [2]**   31/17 31/18

**hurts [3]**   42/18 42/18 95/2

**hypothetical [4]**   37/11 62/20
91/21 94/3

**I**

**I'd [23]**   4/8 5/9 5/21 11/7
11/18 11/23 15/3 15/5 15/23
16/5 16/7 42/17 54/2 63/9
65/22 70/10 74/3 74/6 75/3
90/9 102/15 102/25 103/7

**I'll [17]**   5/21 11/2 11/21
12/23 20/5 27/6 33/24 36/7
53/12 53/18 75/2 79/9 81/2
86/2 90/5 100/21 100/23

**I'm [51]**   3/16 3/23 4/6 4/14
5/8 5/15 5/18 7/14 8/9 9/21
10/22 11/10 11/14 11/14 16/2
16/9 18/21 20/23 25/16 27/13

27/24 32/8 33/19 33/21 33/22
37/3 37/10 37/22 40/7 40/10
41/13 43/13 44/18 46/21
48/13 49/8 49/12 52/18 52/19
53/16 54/15 56/17 61/18
72/18 80/19 86/4 90/1 93/9
93/10 94/19 101/4

**I've [10]**   3/6 4/17 16/6 42/6
45/17 52/9 62/2 69/17 85/24
102/14

**idea [8]**   10/6 31/12 59/15
69/22 73/1 84/9 84/13 102/17

**identify [1]**   3/25

**idly [1]**   103/14

**ill [2]**   96/1 96/2

**illegal [1]**   78/19

**imagines [1]**   48/15

**imbalance [3]**   98/20 100/13
100/14

**imbalanced [1]**   97/12

**imbalancing [1]**   45/6

**immediate [1]**   79/7

**immediately [2]**   23/12 64/16

**impactful [1]**   64/23

**implementing [1]**   8/18

**importance [3]**   22/17 85/17
103/12

**important [14]**   11/1 15/19
26/21 26/24 29/4 31/25 45/10
58/2 63/9 63/21 71/1 80/11
99/19 100/25

**importantly [1]**   69/10

**impose [1]**   38/8

**impossibility [2]**   65/12
66/15

**impossible [2]**   36/5 36/12

**impression [3]**   12/20 21/2
42/7

**improve [1]**   97/15

**inability [1]**   47/22

**inaccessible [2]**   31/15 38/3

**inappropriate [1]**   76/22

**inasmuch [2]**   41/4 47/9

**INC [2]**   1/3 2/7

**incentive [1]**   102/10

**incentives [4]**   59/13 88/22
89/1 102/5

**incentivize [1]**   102/23

**inch [1]**   98/7

**incidental [1]**   72/9

**include [5]**   8/8 30/7 30/21
31/8 77/4

**included [1]**   61/12

**includes [3]**   8/5 19/4 92/8

**including [3]**   8/14 56/13
103/3

**inconsistency [2]**   34/2 36/3

**inconsistent [6]**   22/13 39/11
41/4 70/22 84/23 91/15

**incorporate [1]**   32/4

**incorrect [1]**   41/20

**incorrectly [1]**   36/10

**increase [1]**   99/7

**increased [2]**   98/25 99/10

**increasing [3]**   24/9 39/2
50/5

**incredibly [8]**   6/17 59/22
59/22 80/11 83/21 83/22
84/12 86/23

**indeed [2]**   79/14 81/11

**indicated [4]**   14/13 32/16
75/14 99/6

**indicates [1]**   21/7

**indicating [2]**   27/4 77/23

**indifferent [1]**   32/12

**individual [5]**   29/20 61/3
61/15 94/13 94/17

**individual's [2]**   61/4 94/19

**individually [1]**   87/20

**individuals [4]**   15/17 59/4
59/5 79/17

**indulgence [2]**   99/23 101/2

**industries [3]**   6/11 6/16
72/4

**industry [6]**   5/25 6/21 23/16
42/21 43/20 63/15

**inequitable [4]**   44/2 44/6
44/15 97/9

**inequity [2]**   53/2 96/6

**information [4]**   15/22 27/3
27/6 99/12

**informed [1]**   55/7

**infringement [12]**   34/14
34/16 34/19 35/5 80/20 80/21
81/11 81/13 81/15 81/16
81/23 81/25

**initial [4]**   22/6 25/13 29/13
59/9

**injunction [19]**   3/5 3/14 5/3
12/7 12/13 13/2 13/7 15/25
18/19 27/10 78/12 79/7 80/1
90/23 91/1 96/25 97/17 98/11
100/19

**inner [1]**   40/21

**innovative [1]**   7/1

**input [2]**   6/15 55/15

**instance [2]**   46/19 57/8
71/12 75/18

**instances [5]**   32/9 59/20
73/21 81/14 85/23

**instead [2]**   33/4 34/22

**insufficient [2]**   13/3 90/22

**intact [2]**   21/4 36/16

**intend [1]**   54/16

**intent [12]**   13/15 18/11
18/12 22/24 38/17 39/18
39/23 75/5 92/13 93/2 101/16
101/19

**intention [2]**   67/21 103/11

**intentioned [1]**   54/8

**I**

inter [1]  38/3
inter-library [1]  38/3
interactive [1]  5/14
interest [34]  12/13 13/7
 15/7 24/4 24/5 24/7 24/8
 30/18 35/16 42/15 49/18
 49/21 53/4 54/8 54/9 58/8
 63/12 71/7 86/9 86/10 86/16
 86/17 88/17 89/10 89/11
 89/17 89/19 92/3 95/3 96/19
 97/1 99/13 99/20 103/7
interested [3]  33/21 55/9
 61/21
interesting [2]  49/3 62/6
interests [3]  47/13 88/1
 88/1
interfering [1]  60/21
interloper [1]  81/20
intern [1]  3/1
internationally [1]  55/19
internet [1]  18/25
Interpretation [1]  17/4
interpreted [1]  74/16
interrupting [2]  5/15 11/11
intervention [1]  59/24
introduction [1]  16/4
intrude [1]  8/24
intruded [1]  81/21
intrudes [1]  59/11
intrusions [1]  64/20
inure [1]  59/13
invalid [3]  80/13 89/12
 89/15
invest [2]  5/25 6/16
invested [1]  84/17
investment [1]  55/22
invoke [1]  20/20
involuntary [1]  82/19
involve [4]  23/15 54/6 64/21
 80/19
involved [1]  35/9
involving [3]  78/19 80/18
 80/18
invulnerable [1]  21/17
ironic [1]  68/23
irreconcilable [1]  67/4
irrelevant [1]  61/24
irreparable [37]  12/11 13/1
 46/17 52/4 74/7 78/11 78/15
 78/17 78/21 79/1 79/6 79/9
 79/11 79/19 79/22 79/25
 80/12 80/15 80/18 80/23
 81/16 81/22 82/2 85/17 85/19
 86/1 86/4 90/9 90/13 90/19
 93/14 95/9 96/7 96/18 96/23
 103/1 103/6
is [459]
isn't [13]  17/21 19/17 21/1

31/22 46/20 46/25 82/25
 90/13 91/21 92/12 95/18
 97/23 99/14
issue [39]  12/19 12/20 17/10
 18/14 18/16 19/17 20/4 20/7
 23/3 26/22 32/10 32/12 32/15
 33/9 34/2 34/8 37/7 42/6
 44/24 49/4 49/19 51/8 52/6
 59/2 69/20 72/14 76/25 79/8
 87/11 87/20 89/21 90/19
 92/17 92/18 94/15 97/3 98/20
 98/22 103/11
issues [24]  3/15 7/19 10/24
 18/17 23/24 24/16 24/23
 28/25 43/2 52/5 56/16 64/17
 73/20 75/17 76/5 78/8 80/12
 87/25 88/10 88/11 89/7
 100/25 101/24 103/13
it [348]
it's [145]
iteration [3]  39/16 92/14
 93/3
its [48]  2/15 6/5 6/6 8/14
 8/18 10/19 12/12 37/9 44/1
 44/5 44/14 50/19 54/10 56/16
 56/22 58/19 59/8 59/8 61/21
 64/4 65/7 67/12 68/3 68/3
 68/4 68/10 69/10 71/15 74/23
 75/5 75/14 76/8 76/23 77/10
 77/11 77/20 77/21 78/8 79/23
 80/5 82/12 82/18 82/25 90/20
 96/25 101/22 102/2 102/3
itself [4]  30/5 42/12 59/12
 75/4

**J**

J.K [1]  31/14
jail [2]  67/11 85/11
January [5]  27/15 27/17
 27/22 28/1 28/11
January 15 [1]  28/1
January 1st [2]  27/15 28/11
January 21st [1]  27/22
job [3]  47/4 48/14 55/25
jobs [1]  56/5
joined [1]  2/21
judge [2]  29/25 38/5
judge-made [1]  38/5
judgment [13]  29/25 54/6
 54/7 54/10 56/22 65/8 68/4
 68/10 70/4 79/23 80/5 82/12
 102/2
judgments [1]  67/13
Judicial [1]  104/10
jump [1]  70/15
jumping [1]  101/11
juncture [1]  27/11
jurisprudence [1]  10/12
jury [1]  29/25
just [74]  3/3 3/6 4/23 5/2

5/2 5/5 5/20 6/21 7/4 9/25
 10/5 10/18 11/23 12/2 12/5
 15/4 16/21 23/8 27/23 28/19
 30/2 32/2 33/13 34/8 37/4
 37/17 41/17 42/18 46/25 49/5
 50/2 50/17 51/21 53/21 53/25
 54/20 55/21 56/15 59/9 59/17
 62/2 63/25 64/15 65/7 67/18
 67/21 69/10 70/7 72/17 72/20
 73/9 73/16 75/3 75/23 75/25
 76/10 78/8 78/24 79/7 79/17
 82/22 84/1 84/6 85/16 85/25
 86/21 89/21 93/10 98/1 99/3
 102/1 102/19 102/20 102/20
justification [1]  51/23
justified [1]  100/19
justify [1]  13/3

**K**

keep [1]  95/10
keeps [2]  35/22 101/6
key [6]  12/20 13/12 73/12
 73/12 94/8 99/9
kind [11]  6/18 20/25 24/15
 24/16 27/9 44/24 51/5 55/2
 60/16 73/3 88/13
Kindle [1]  87/15
knee [1]  67/12
knell [7]  39/3 58/23 58/23
 61/5 95/16 95/17 95/19
know [122]
knowledge [3]  23/18 27/19
 51/14
knows [2]  83/20 84/22

**L**

label [1]  75/25
laid [1]  24/16
land [2]  74/18 79/22
landscape [1]  23/22
language [10]  9/21 14/22
 17/8 17/19 25/14 25/23 31/2
 40/13 40/14 91/19
large [16]  6/3 13/24 22/11
 26/12 30/19 38/25 42/16
 50/24 51/5 51/6 51/11 51/14
 51/23 92/2 96/10 97/22
largely [1]  55/4
larger [1]  63/19
last [11]  15/24 35/6 38/14
 45/9 47/4 90/5 92/25 95/15
 96/15 98/4 99/9
later [7]  5/17 14/10 14/20
 27/17 65/2 82/24 85/2
latter [4]  24/4 47/2 65/13
 99/22
Laughter [2]  11/13 48/10
law [60]  1/18 2/12 6/4 7/13
 7/16 10/16 10/16 22/10 23/12
 26/2 26/15 28/24 29/22 32/12

**L**

**law... [46]**   33/10 34/10 34/11 34/13 34/15 39/7 42/3 42/11 45/8 46/10 49/2 49/4 50/1 50/14 51/9 56/17 57/20 57/24 60/1 65/9 65/9 65/14 66/15 66/16 68/3 73/14 74/10 74/17 74/19 76/18 77/12 77/12 77/15 77/15 79/22 79/22 82/8 85/22 86/10 89/10 89/18 91/11 92/9 100/15 102/9 103/5
**laws [19]**   13/12 14/23 35/11 36/4 36/8 55/1 56/9 56/23 58/4 58/10 69/2 69/10 69/10 74/17 74/18 75/5 75/17 76/1 81/8
**lawyer [3]**   47/6 47/9 47/24
**lawyering [1]**   52/18
**lawyers [3]**   5/15 47/13 48/9
**lead [1]**   26/4
**Leaders [1]**   78/18
**leading [1]**   83/19
**leads [1]**   102/10
**leaned [1]**   43/16
**least [1]**   93/2
**leave [4]**   9/24 32/14 32/16 32/20
**leaves [1]**   67/18
**led [1]**   83/17
**left [1]**   52/22
**legal [3]**   33/11 47/21 49/23
**legality [1]**   37/11
**legislate [1]**   7/19
**legislates [2]**   17/10 55/13
**legislation [5]**   10/12 18/13 61/22 91/23 98/6
**legislative [9]**   17/16 17/18 18/11 22/22 25/14 39/15 52/23 92/4 100/1
**legislature [2]**   17/10 72/2
**legislatures [1]**   57/14
**legitimate [2]**   89/11 89/16
**lend [1]**   38/7
**lending [19]**   6/25 14/2 14/11 26/13 38/4 39/4 39/12 42/25 46/8 58/25 59/1 69/19 78/6 87/10 87/22 95/19 95/19 97/5 100/11
**lends [2]**   35/15 46/22
**lens [4]**   12/1 13/11 66/1 101/8
**less [2]**   33/21 101/3
**let [16]**   3/19 5/9 5/19 7/7 20/3 28/19 53/23 62/1 65/10 66/11 68/5 70/23 82/22 83/6 86/4 86/8
**let's [23]**   4/14 16/17 19/20 20/17 24/24 25/20 28/9 40/8

43/12 43/15 45/7 52/8 63/25 64/24 65/1 66/25 78/10 78/10 82/23 87/18 93/16 94/15 94/16
**level [5]**   10/7 60/10 60/10 68/15 73/18
**liability [4]**   10/17 67/11 80/3 85/11
**libraries [127]**
**libraries' [4]**   24/2 87/25 88/1 98/8
**library [53]**   14/2 14/11 16/15 25/6 26/13 29/5 30/9 30/11 30/22 31/1 31/9 31/12 35/18 38/3 38/4 38/6 39/4 39/12 40/21 42/25 46/8 46/22 47/2 48/15 53/7 55/7 64/11 67/2 69/13 69/25 78/2 78/3 78/5 82/19 83/8 83/16 84/21 85/7 86/13 87/13 87/18 87/22 92/8 95/12 95/12 95/17 95/19 97/5 97/14 97/24 98/1 98/16 100/11
**library's [1]**   99/17
**license [74]**   6/22 9/9 9/13 9/15 13/23 13/25 16/12 16/13 16/18 16/23 17/7 18/2 19/23 20/7 20/8 20/10 20/13 22/12 25/1 25/4 25/10 25/15 27/25 29/12 29/15 30/13 31/8 33/7 36/18 37/5 37/8 37/9 38/24 39/1 40/5 49/24 50/22 50/24 51/1 51/2 51/3 51/19 53/7 59/10 59/21 59/22 60/1 60/8 60/17 60/20 61/3 61/6 61/13 61/16 62/15 63/7 63/8 63/24 63/25 69/23 69/23 69/25 83/8 84/20 87/2 91/12 94/7 94/17 94/20 95/1 95/5 98/12 101/9 101/9
**licensed [5]**   22/2 27/21 28/6 28/7 91/14
**licenses [19]**   20/10 20/19 30/22 31/9 31/11 31/12 31/13 31/17 61/7 61/15 62/21 63/5 64/11 64/16 69/18 73/21 82/19 94/12 101/11
**licensing [20]**   9/20 18/6 19/13 21/10 22/19 26/18 27/16 28/9 35/19 36/23 39/19 48/4 50/2 51/20 51/23 91/13 92/1 95/24 98/10 98/16
**life's [1]**   85/11
**lifeblood [2]**   14/11 38/4
**light [1]**   98/25
**like [51]**   3/25 4/16 4/20 5/2 5/21 11/2 11/6 11/7 11/18 11/23 16/5 16/7 37/8 38/11 43/7 43/10 49/5 52/7 52/19 54/2 55/9 56/2 63/9 65/13

65/22 66/1 67/3 69/7 70/10 73/11 74/3 74/6 75/3 75/8 75/19 81/4 81/14 83/10 85/23 86/5 87/2 90/9 93/4 93/24 95/11 95/12 96/10 101/18 102/15 102/25 103/7
**likelihood [4]**   12/18 33/20 52/5 96/23
**likely [4]**   12/10 12/11 66/5 85/21
**likewise [3]**   45/25 89/14 89/16
**limit [3]**   8/14 31/13 98/8
**limitation [6]**   30/8 30/10 30/21 30/25 31/8 94/19
**limitations [9]**   8/7 8/9 66/20 73/19 76/11 87/2 88/12 101/13 101/22
**limited [8]**   9/5 12/9 55/17 56/7 72/22 73/16 82/14 84/21
**limitless [1]**   65/5
**limits [2]**   41/6 70/19
**line [4]**   15/9 46/13 95/2 97/16
**lines [3]**   15/13 65/18 65/21
**list [3]**   4/18 57/17 79/3
**listening [1]**   27/7
**litany [1]**   79/10
**literal [1]**   48/1
**literally [1]**   10/16
**literary [37]**   9/9 13/10 13/25 14/8 15/15 16/12 16/13 16/16 16/19 16/23 18/3 19/23 24/3 25/2 25/4 25/7 27/21 30/22 31/9 31/10 31/21 33/7 35/20 37/9 39/1 39/4 48/4 60/17 64/21 81/5 87/12 94/20 97/5 97/13 97/20 98/14 100/11
**literate [3]**   32/1 32/1 86/19
**literature [2]**   15/21 99/18
**litigate [1]**   47/10
**litigation [2]**   29/24 49/19
**little [13]**   5/6 10/20 21/21 23/5 37/18 44/10 44/18 54/16 75/12 76/15 82/3 90/7 97/23
**lives [1]**   17/6
**loans [2]**   38/3 40/22
**locking [1]**   19/15
**Lombard [1]**   1/24
**long [6]**   6/17 38/15 52/17 60/7 63/20 100/24
**long-term [2]**   6/17 63/20
**longer [4]**   80/1 80/13 87/19 90/7
**look [18]**   32/10 53/22 58/24 63/13 66/15 73/10 74/22 74/25 75/13 75/15 75/24 77/19 83/7 85/15 100/1 101/19 102/1 102/20

**L**

**looked [3]**  76/21 86/23 88/10
**looking [6]**  17/16 40/10
52/22 52/22 75/17 85/18
**loophole [1]**  77/15
**lose [2]**  65/23 65/24
**loses [1]**  34/21
**losses [1]**  52/24
**lost [1]**  74/8
**lot [8]**  8/22 30/3 30/7 53/21
56/15 63/11 91/17 103/13
**loud [1]**  5/7 53/15 54/16
**loudly [1]**  54/16
**love [1]**  69/13
**lower [1]**  41/19
**LYNAE [2]**  1/15 2/24

**M**

**made [21]**  4/25 15/6 21/24
28/21 31/11 34/20 38/5 44/3
44/21 48/22 48/24 60/7 61/20
67/19 71/16 73/24 75/14
82/20 83/23 89/18 95/16
**main [1]**  54/25
**maintained [2]**  13/23 38/24
**maintaining [1]**  89/12
**make [39]**  5/2 6/7 6/17 6/23
10/23 20/1 20/1 20/10 21/16
25/19 25/22 25/23 26/2 40/3
45/25 46/6 46/9 47/13 47/24
49/12 50/17 51/16 57/10
58/15 61/1 64/13 67/24 70/17
73/7 76/15 78/3 86/13 88/23
88/24 91/21 93/5 95/15 101/3
102/25
**makes [14]**  10/5 19/16 21/3
21/20 34/11 34/15 34/18 36/4
36/11 36/15 46/10 63/18 71/5
99/11
**making [8]**  8/1 8/20 29/11
35/8 37/22 61/18 66/14 101/7
**mandating [1]**  60/11
**mandatory [1]**  25/3
**manifesting [1]**  75/5
**manner [5]**  21/15 21/17 37/1
61/19 85/12
**many [24]**  3/17 3/24 6/14
6/14 7/18 15/17 31/12 52/19
57/4 57/5 61/14 63/11 79/13
79/14 79/17 81/12 85/22
86/21 88/20 91/10 94/12
94/20 94/25 99/18
**map [1]**  24/24
**MARIA [2]**  1/17 2/15
**market [29]**  33/17 37/12
43/23 44/1 44/5 44/15 44/20
44/25 45/5 45/6 45/7 46/18
46/21 46/21 46/25 47/2 48/15
48/15 59/24 60/12 73/2 78/5
83/16 83/18 95/22 96/1 96/2

96/6 100/4
**market's [1]**  87/23
**marketed [1]**  21/18
**marketing [1]**  98/9
**marketplace [19]**  6/24 15/20
26/20 32/14 32/16 32/19
55/11 56/17 61/18 61/20
61/24 62/13 63/18 68/5 84/19
88/24 91/19 93/20 99/20
**marketplaces [2]**  63/10 83/9
**markets [9]**  10/5 38/11 46/18
47/2 48/3 48/12 48/17 70/6
98/18
**MARYLAND [129]**
**Maryland's [2]**  81/7 100/15
**Marylander [1]**  17/6
**Marylanders [3]**  15/22 18/7
99/18
**materials [1]**  59/3
**matter [12]**  1/8 2/5 2/8 12/6
32/23 37/7 43/24 44/20 45/1
85/22 89/22 104/9
**matters [1]**  6/4
**MATTHEW [2]**  1/12 2/14
**maximize [2]**  46/13 47/17
**may [21]**  3/15 4/11 12/2 23/6
24/12 26/4 29/20 30/9 31/8
31/9 32/22 39/13 41/20 41/21
54/8 62/19 67/24 76/3 82/6
83/15 84/14
**maybe [4]**  50/10 51/7 53/15
56/5
**McMillan [1]**  98/5
**me [47]**  2/13 3/19 3/24 4/12
5/9 5/9 5/11 5/19 7/7 11/11
14/13 16/6 18/15 18/22 20/3
27/23 28/19 29/4 30/23 33/6
37/7 42/19 44/19 48/16 50/10
53/2 53/7 53/23 53/25 54/15
56/19 62/1 65/10 66/11 68/6
70/23 71/5 76/15 80/19 80/22
82/22 83/6 86/4 86/8 87/21
90/12 100/21
**mean [21]**  16/22 17/2 17/6
19/22 28/22 29/9 51/1 54/2
55/7 66/17 71/1 74/12 83/6
91/3 92/22 94/1 95/22 95/25
97/24 98/17 98/18
**means [12]**  15/19 18/24 19/25
36/19 36/20 36/22 45/15
48/13 51/20 59/4 88/18 99/19
**measure [2]**  71/9 83/15
**measures [1]**  30/12
**meat [1]**  41/23
**Mechanical [1]**  60/1
**media [1]**  63/14
**meet [3]**  12/17 12/25 13/5
**members [4]**  5/25 6/3 24/3
27/24
**memorizing [1]**  92/22

**mentioned [4]**  8/3 71/4 73/20
75/7
**mentioning [2]**  14/4 84/5
**merge [2]**  15/10 97/2
**Merit [1]**  104/4
**merits [4]**  12/11 12/19 52/6
96/23
**met [3]**  25/9 90/20 96/22
**microphone [1]**  5/6
**middle [1]**  56/6
**midway [1]**  11/10
**might [6]**  10/23 31/12 43/11
84/21 90/3 98/18
**mile [1]**  98/7
**Millennium [3]**  57/18 69/3
73/3
**mimmick [1]**  3/21
**mimmicking [1]**  4/8
**minute [5]**  52/7 52/8 64/22
75/2 90/8
**minutes [2]**  52/6 101/3
**Miramax [1]**  50/11
**misapplication [1]**  91/20
**misapprehended [1]**  68/3
**misapprehension [3]**  67/17
68/5 91/19
**misperception [3]**  60/23
69/18 77/11
**missed [1]**  11/1
**missing [3]**  38/2 40/21 50/20
**mission [2]**  13/8 24/2
**misstatement [1]**  66/9
**mistake [5]**  58/15 61/1 67/24
78/4 91/21
**mistakes [1]**  61/20
**mixing [1]**  101/10
**models [1]**  7/2
**modernized [2]**  69/2 86/24
**moment [6]**  6/22 63/9 72/13
79/8 84/25 94/16
**money [1]**  85/25
**monies [1]**  19/8
**month [3]**  65/1 83/25 84/1
**months [1]**  90/16
**more [38]**  8/8 10/1 10/20
14/2 14/15 20/24 23/14 26/12
26/21 26/22 29/10 33/25 37/5
39/3 41/3 42/14 43/16 43/19
43/20 44/10 53/16 54/19
54/23 64/10 64/20 65/25 66/6
75/12 79/9 80/15 81/3 86/1
86/3 88/13 97/13 98/24
100/10 103/2
**more about [1]**  10/20
**moreover [4]**  45/16 49/17
50/2 95/7
**morning [7]**  2/2 2/11 2/17
2/19 2/25 3/1 91/4
**mortar [1]**  6/24
**most [13]**  6/1 13/4 21/15

**M**

**most...** **[10]**  37/1 39/15 43/9 43/11 45/10 51/24 51/25 86/14 92/14 93/3
**mostly** **[1]**  62/12
**motion** **[14]**  3/4 3/7 3/8 3/11 3/12 3/13 3/14 3/15 3/16 9/22 12/15 71/15 90/6 100/18
**motions** **[2]**  1/9 2/9
**motive** **[1]**  102/9
**move** **[6]**  19/20 52/4 70/12 78/11 86/4 86/7
**moved** **[1]**  3/8
**movie** **[6]**  24/1 63/17 64/25 64/25 83/19 95/11
**movies** **[4]**  6/10 83/25 95/10 95/10
**moving** **[2]**  35/23 67/25
**Mr** **[6]**  44/7 52/17 90/9 92/6 93/9 100/22
**Mr.** **[32]**  4/1 4/1 4/20 5/18 10/22 11/6 14/4 16/5 16/5 16/8 16/17 33/19 52/5 52/9 52/17 52/21 53/15 62/3 62/11 65/10 67/20 78/13 80/14 86/8 89/25 90/2 90/14 96/15 96/15 100/23 103/17 103/19
**Mr. Fitzgerald** **[13]**  4/1 11/6 16/5 16/8 16/17 33/19 52/21 62/3 62/11 67/20 90/2 96/15 103/19
**Mr. Zebrak** **[19]**  4/1 4/20 5/18 10/22 14/4 16/5 52/5 52/9 52/17 53/15 65/10 78/13 80/14 86/8 89/25 90/14 96/15 100/23 103/17
**Ms** **[1]**  90/7
**Ms.** **[1]**  52/7
**Ms. Thomas** **[1]**  52/7
**much** **[18]**  3/20 3/25 4/12 27/24 42/18 53/11 55/21 61/15 64/12 64/13 65/21 73/1 77/16 78/16 81/13 100/22 103/9 103/20
**multiple** **[2]**  46/24 68/11
**musical** **[3]**  60/2 60/5 87/3
**must** **[19]**  19/25 19/25 20/1 25/22 25/23 25/24 29/7 37/10 50/15 59/8 63/1 65/4 69/22 70/5 73/7 73/10 73/14 82/1 102/6
**mute** **[2]**  90/12 101/1
**my** **[36]**  2/13 2/21 3/1 11/7 11/9 12/2 12/23 15/7 20/20 24/13 27/19 32/25 38/17 39/14 41/21 47/4 48/8 48/14 54/18 54/19 62/10 62/19 67/21 67/23 69/13 74/8 75/23 76/14 79/2 86/5 92/23 92/23

97/1 97/24 103/11 103/11
**myriad** **[3]**  6/23 98/9 98/10
**myself** **[2]**  24/23 46/17

**N**

**name** **[3]**  3/2 3/22 12/2
**names** **[1]**  3/24
**naming** **[1]**  33/13
**narrow** **[1]**  73/8
**nation** **[2]**  68/19 102/16
**national** **[2]**  8/16 55/1
**nature** **[2]**  28/7 34/14
**NAVEED** **[2]**  1/18 3/2
**necessarily** **[2]**  55/11 61/10
**necessary** **[2]**  13/16 38/19
**necessity** **[1]**  73/15
**need** **[14]**  13/20 31/5 38/23 45/20 45/21 46/1 53/11 64/15 74/16 85/9 88/24 90/8 101/19 103/2
**needs** **[5]**  32/3 32/3 57/25 80/13 87/6
**negotiated** **[1]**  93/6
**negotiating** **[2]**  20/1 72/15
**negotiation** **[3]**  22/22 39/21 94/5
**negotiations** **[4]**  22/1 25/11 25/17 25/20
**neighbors'** **[1]**  92/23
**neither** **[3]**  33/14 43/5 98/22
**Netflix** **[2]**  65/1 84/1
**networks** **[1]**  93/6
**never** **[2]**  35/13 92/21
**new** **[4]**  7/1 32/4 32/19 64/25
**newspapers** **[1]**  6/10
**next** **[1]**  19/20
**nice** **[1]**  4/10
**night** **[1]**  56/6
**Ninth** **[2]**  75/1 77/1
**no** **[26]**  1/4 18/1 18/11 18/25 31/12 31/13 35/25 36/2 47/20 58/15 58/25 61/1 64/24 67/24 71/25 72/1 74/6 78/3 80/1 83/3 91/21 94/18 95/11 103/6 103/18 103/20
**Noble** **[1]**  46/20
**nodding** **[1]**  52/8
**non** **[3]**  6/1 39/17 92/18
**non-fiction** **[1]**  6/1
**noncommercial** **[6]**  22/18 22/24 22/25 26/24 39/16 93/4
**none** **[1]**  6/8
**nonprofits** **[1]**  6/4
**Nope** **[1]**  20/19
**normal** **[1]**  54/19
**NORTHERN** **[1]**  1/2
**not** **[185]**
**notes** **[1]**  1/21
**nothing** **[12]**  21/5 21/7 23/17 36/16 36/20 36/22 43/24 44/4

**noting** **[1]**  23/4
**notion** **[3]**  78/25 80/22 102/4
**now** **[22]**  2/4 2/5 2/8 9/3 53/12 54/15 56/24 60/19 62/21 69/4 69/20 71/8 72/6 83/6 85/3 87/17 88/9 89/22 98/24 99/3 100/24 103/23
**nuance** **[1]**  4/24
**nuanced** **[1]**  75/12
**number** **[10]**  2/6 30/8 30/10 30/21 31/8 31/13 71/14 80/17 83/7 101/6
**numbers** **[4]**  84/6 84/22 92/23 92/24
**numerous** **[2]**  38/15 56/13

**O**

**OAG** **[1]**  47/8
**object** **[1]**  40/2
**objective** **[2]**  39/25 65/15
**objectives** **[9]**  8/18 9/1 10/13 10/19 54/25 68/17 70/17 74/20 81/20
**obligations** **[3]**  8/20 8/21 67/8
**obstacle** **[2]**  36/5 41/7 65/15
**obtain** **[3]**  6/19 102/11 102/13
**obtaining** **[1]**  87/15
**obvious** **[1]**  78/22
**obviously** **[2]**  16/20 47/15
**occurred** **[3]**  27/17 53/22 83/16
**occurring** **[1]**  79/18
**odds** **[1]**  70/7
**off** **[9]**  4/7 4/14 10/25 41/21 59/1 62/13 90/12 93/10 95/19
**offer** **[29]**  9/19 16/13 16/22 17/22 18/2 19/2 19/22 20/1 20/13 20/19 25/4 25/9 25/15 25/21 25/22 25/23 25/24 26/2 26/4 27/15 27/16 27/21 37/8 43/7 46/6 46/9 69/23 69/24 84/19
**offered** **[13]**  17/5 17/13 18/4 18/25 19/6 20/16 25/1 27/25 28/1 28/10 28/11 28/13 53/9
**offering** **[6]**  17/21 19/3 20/18 23/2 84/21 97/21
**offers** **[4]**  9/23 16/11 16/18 31/2
**office** **[8]**  2/21 27/2 32/10 47/5 55/15 66/5 66/8 77/6
**Official** **[3]**  1/23 104/1 104/16
**often** **[2]**  80/6 81/11
**Oh** **[2]**  99/3 99/8
**Ohio** **[1]**  48/22
**okay** **[21]**  2/17 3/1 4/4 4/14

**O**

**okay... [17]**   5/4 5/5 5/10 11/3 33/12 37/20 41/13 52/3 52/16 65/4 66/3 72/19 75/10 78/10 90/9 92/15 103/9
**old [6]**   23/11 23/14 33/15 49/3 56/25 97/14
**older [1]**   59/4
**once [26]**   6/22 9/20 9/20 9/23 10/6 10/7 20/11 20/16 21/23 22/2 25/1 26/2 26/19 31/19 35/15 48/22 53/9 66/25 67/17 67/17 69/24 71/11 74/1 74/1 82/20 91/23
**one [86]**   6/4 7/14 10/15 13/12 15/11 16/25 19/14 20/22 21/20 23/4 23/10 27/24 29/10 34/1 34/5 34/6 34/23 34/23 35/6 36/18 41/5 41/6 42/13 43/5 43/16 45/9 45/10 45/13 46/23 47/2 47/8 47/13 47/20 48/17 49/7 50/17 50/25 51/4 51/12 51/24 51/25 52/24 52/24 54/4 54/14 54/25 55/2 56/18 59/25 60/16 62/3 62/17 63/25 64/15 64/24 65/4 65/16 67/2 68/12 68/17 70/17 71/14 73/22 74/25 76/13 81/4 83/6 83/15 84/4 84/21 85/23 86/8 89/23 91/7 94/10 94/11 95/14 98/14 98/16 98/18 99/15 99/25 100/17 101/6 102/14 102/15
**one-time [1]**   46/23
**ongoing [1]**   63/18
**online [4]**   6/25 18/4 18/25 86/14
**only [21]**   9/5 9/19 14/1 17/10 22/13 26/8 26/9 29/14 44/21 49/10 66/19 67/5 67/7 72/2 81/23 85/1 91/8 91/9 91/11 94/6 101/7
**open [2]**   32/20 49/5
**opening [12]**   4/15 5/2 11/16 11/20 14/5 14/13 14/14 38/17 39/13 66/12 97/2 100/7
**OpenRisk [3]**   75/14 75/16 75/23
**operates [1]**   11/20
**operation [1]**   34/5
**opinion [2]**   41/24 78/19
**opinions [1]**   43/11
**OPPENHEIM [2]**   1/12 2/14
**Oppenheimer [1]**   2/12
**opportunity [4]**   4/25 11/15 53/10 53/22
**opposed [1]**   3/10
**opposing [2]**   15/11 97/2
**opposition [2]**   3/8 25/13

**option [1]**   9/6
**options [1]**   18/20
**oranges [2]**   60/13 61/1 101/8
**order [3]**   25/18 25/19 76/18
**ordering [1]**   25/17
**ordinarily [1]**   26/5
**Orson [41]**   20/23 20/24 23/6 23/14 23/16 23/19 23/22 24/2 33/14 33/15 40/8 41/14 41/21 41/25 42/8 42/9 42/10 49/10 49/11 49/13 49/22 50/21 51/3 51/10 51/18 51/19 51/22 52/2 57/21 64/6 70/10 70/15 70/23 72/9 72/22 72/23 72/25 73/5 73/23 92/20 95/8
**other [29]**   9/14 15/14 22/3 22/20 26/2 39/20 40/22 46/20 55/24 57/2 57/3 57/17 58/21 63/15 64/22 68/14 68/21 72/7 78/11 78/16 79/16 81/18 83/18 84/2 84/4 87/15 93/19 99/16 102/15
**others [7]**   21/11 26/17 30/14 36/23 50/15 50/18 73/13
**otherwise [3]**   11/21 38/2 98/18
**ought [1]**   67/25
**our [18]**   14/8 23/18 27/2 27/2 34/6 35/22 59/21 61/12 62/24 67/4 67/8 67/16 68/13 69/22 74/2 89/1 92/24 103/1
**out [18]**   22/21 24/16 28/5 28/23 29/12 31/16 37/14 39/20 43/11 45/12 63/18 70/25 72/16 75/23 85/2 86/9 90/16 99/6
**output [1]**   6/7
**outright [1]**   61/16
**outset [3]**   20/6 91/7 100/5
**over [8]**   6/13 24/24 32/20 38/13 39/11 46/5 61/13 69/2
**overarching [2]**   68/17 85/17
**overhaul [1]**   73/4
**overlap [3]**   18/17 24/23 98/17
**overlapping [1]**   48/5
**overreach [1]**   103/4
**overwhelmingly [2]**   49/18 85/3
**own [4]**   12/6 76/5 76/23 78/8
**owner [5]**   10/3 10/6 38/19 46/11 59/8
**owners [1]**   34/25
**owns [1]**   38/7

**P**

**p.m [1]**   103/24
**page [3]**   45/16 74/8 104/9
**Page 228 [1]**   45/16
**paid [1]**   48/9

**PALLANTE [2]**   1/17 2/15
**pandemic [2]**   99/1 99/9
**paper [2]**   65/1 80/16
**papers [6]**   5/1 16/20 21/22 67/25 88/20 103/2
**parallel [2]**   47/4 47/6
**parallels [2]**   43/8 95/9
**part [3]**   16/18 16/24 22/22
**partially [4]**   83/5 84/4 84/14 93/19
**particular [14]**   6/4 10/3 16/9 19/15 26/23 33/2 35/17 40/13 50/25 51/12 51/24 63/19 71/15 86/12
**particularly [3]**   15/5 55/3 62/7
**parties [4]**   29/3 29/9 29/11 55/9
**partisans [2]**   55/8 55/12
**partner [2]**   2/14 76/14
**partners [2]**   78/2 78/3
**party [1]**   15/11 29/14 97/2
**pass [1]**   92/9
**passed [6]**   13/22 17/25 57/4 57/18 91/24 98/6
**passing [5]**   13/18 17/17 38/21 92/14 96/3
**passioned [1]**   69/12
**past [2]**   32/20 95/6
**patrons [3]**   50/25 61/7 97/21
**patrons while [1]**   97/21
**pause [2]**   62/1 86/2
**pay [3]**   15/6 15/23 98/18
**paying [2]**   61/10 98/24
**payment [3]**   60/7 77/4 77/17
**penalties [4]**   67/6 91/1 91/3 91/10
**penalty [1]**   82/17
**pending [1]**   2/5
**people [10]**   4/10 5/11 46/22 59/2 86/12 86/13 102/10 102/11 102/19 103/13
**per [5]**   46/23 46/24 46/24 61/15 78/15
**perceived [2]**   54/1 55/5
**perceives [3]**   44/2 44/6 44/15
**percent [4]**   35/12 64/12 99/7 99/9
**perception [5]**   55/6 77/10 78/9 89/4 101/17
**perfectly [1]**   98/7
**performance [1]**   8/6
**performances [1]**   82/18
**perhaps [5]**   5/5 56/25 65/25 67/1 67/2
**period [2]**   87/18 87/19
**permanent [1]**   87/16
**permit [1]**   94/23
**permitted [1]**   32/21

# P

perpetual [4]   21/14 35/12 36/24 73/25
perpetuate [1]   97/8
person [6]   17/7 46/23 50/18 62/15 62/15 98/18
personal [3]   61/4 87/19 101/8
personally [1]   11/12
perspective [5]   23/9 41/17 79/12 79/13 90/1
persuasive [4]   23/13 23/15 42/19 49/20
Philadelphia [1]   50/13
phone [2]   92/23 92/23
photo [1]   40/16
phrase [2]   10/15 76/16
physical [2]   10/4 38/15
PI [1]   3/16
pick [1]   52/21
piece [2]   66/17 66/17
pincite [1]   44/23
place [13]   13/22 35/4 38/18 45/2 45/17 49/24 51/10 73/5 76/24 83/14 84/8 85/22 102/23
places [1]   84/2
plain [2]   17/8 17/18
Plaintiff [13]   1/4 1/11 2/10 2/12 2/15 3/10 3/23 4/15 5/20 7/6 29/17 42/19 49/22
Plaintiff's [5]   3/4 3/7 18/20 25/23 27/25
Plaintiffs [2]   21/22 22/1
plan [1]   84/18
play [2]   24/10 63/13
playing [1]   28/5
pleadings [2]   12/6 32/9
pleasant [1]   53/16
please [4]   5/18 12/2 23/7 70/9
plenty [1]   89/22
poems [2]   22/20 39/20
point [73]   14/18 15/6 16/1 17/24 20/8 20/12 20/17 23/4 24/6 27/9 27/12 29/10 31/3 32/18 32/25 33/15 35/6 37/22 39/6 41/3 43/6 44/3 44/4 44/21 45/9 45/12 45/17 48/25 49/4 49/7 49/9 51/19 52/3 52/21 53/24 59/6 60/13 60/16 61/17 61/18 63/6 65/20 66/25 67/3 69/8 69/21 70/16 72/22 73/13 73/24 75/23 75/23 76/8 77/21 78/7 80/7 81/15 81/22 81/23 82/3 82/11 83/21 84/20 84/22 87/24 88/22 89/6 94/8 95/15 99/25 102/15 102/24 102/25

pointed [1]   72/16
points [7]   19/14 53/23 73/18 86/9 101/3 101/5 102/3
police [3]   44/1 44/5 44/14
policy [10]   6/4 8/5 8/17 54/3 55/18 57/13 67/13 74/20 80/11 84/7
POLK [2]   1/15 2/24
position [4]   19/21 34/6 83/13 93/14
positions [1]   68/1
possibility [1]   27/11
possible [2]   3/20 36/10
potentially [1]   67/11
Potter [2]   31/14 31/16
powerful [3]   75/1 76/14 96/2
powers [3]   44/1 44/5 44/14
practical [2]   38/9 80/15
practice [4]   29/23 35/3 72/15 96/1
practices [16]   19/18 33/5 34/18 43/23 44/20 44/25 45/4 45/7 72/1 72/3 72/6 75/9 75/10 91/15 100/3 100/4
pre [4]   69/6 71/6 71/14 71/20
pre '76 [1]   71/20
pre-1976 [1]   71/6
pre-digital [1]   69/6
precedent [4]   9/18 14/14 14/16 25/9
preceding [1]   23/12
preclude [2]   20/4 20/5
precluded [2]   19/12 47/20
precludes [1]   20/3
predating [1]   42/12
preempt [1]   40/25
preempted [17]   10/16 24/18 34/6 36/2 39/24 56/21 65/8 66/5 68/6 68/9 73/15 75/6 77/1 77/2 77/18 81/8 84/10
preemption [46]   12/19 12/21 23/23 24/10 24/17 24/17 28/17 33/13 33/20 33/21 33/22 33/25 34/1 34/3 34/8 34/9 34/20 35/6 35/23 35/24 41/5 41/7 42/22 65/11 65/14 65/22 65/25 66/1 66/6 66/7 66/8 66/13 70/11 70/15 73/15 74/5 74/5 74/10 74/11 74/12 74/24 75/4 76/7 77/19 77/20 81/9
preemptive [1]   7/15
preempts [1]   74/14
preface [1]   37/17
prejudice [1]   95/4
preliminary [11]   3/4 3/14 5/3 12/7 12/16 13/1 15/24 18/19 78/12 90/23 100/19
present [3]   1/16 35/22 76/16

presentation [3]   4/23 57/23 102/4
preservation [2]   38/1 40/20
presiding [1]   2/5
press [1]   82/22
presumably [1]   92/18
prevalence [1]   39/2
prevent [6]   4/17 14/24 14/24 14/25 30/12 100/15
prevented [1]   38/12
preventing [1]   48/19
preventing blind [1]   48/19
prevents [3]   21/7 36/20 36/22
previously [1]   28/6
price [16]   13/17 14/24 20/8 30/1 37/5 38/13 38/20 45/4 45/18 46/15 55/21 61/10 67/3 73/18 77/23 98/8
prices [3]   46/12 61/9 65/5
pricing [5]   63/8 69/18 88/25 97/18 101/7
pricings [1]   97/12
primarily [2]   20/25 30/4
primary [2]   40/2 42/17
Principal [1]   2/22
principles [19]   8/12 10/3 17/14 26/1 33/18 42/3 43/8 57/9 57/9 58/13 73/15 74/17 74/23 77/14 81/1 81/15 87/4 88/4 88/6
print [2]   38/7 87/6
priorities [2]   6/5 78/9
private [5]   22/22 39/20 47/6 47/9 47/13
privileged [1]   51/13
problem [5]   32/6 71/25 72/1 87/12 91/20
proceed [1]   5/21
proceeded [1]   61/19
proceeding [1]   3/20
proceedings [1]   104/8
process [5]   7/25 16/25 18/18 28/25 91/10
product [30]   16/12 16/13 16/16 16/19 16/23 17/13 18/3 19/23 20/1 21/16 22/9 22/12 25/2 25/5 25/7 25/22 26/18 26/19 26/24 27/21 30/10 30/11 30/22 31/9 31/10 50/24 91/12 91/14 94/20 98/19
products [19]   13/23 17/5 18/6 18/7 19/10 22/11 23/2 28/6 28/8 33/8 35/20 37/9 38/24 95/22 95/23 97/5 97/13 97/20 98/15
profit [2]   46/13 102/5
profitability [1]   46/14
profits [6]   6/3 15/13 19/9 47/17 99/5 99/16

**P**

prohibited [2]   75/21 97/11
prohibits [4]   43/25 44/4
44/14 64/1
projection [1]   54/20
promise [2]   11/12 103/14
prong [1]   34/9
prongs [1]   78/11
proof [1]   90/21
proper [4]   34/4 54/6 70/1
101/16
properly [2]   24/5 69/11
property [3]   21/12 26/17
36/24
propose [1]   90/17
proposition [1]   78/14
prosecution [1]   80/4
protected [11]   14/3 22/25
26/13 36/12 39/5 39/12 42/25
51/25 51/25 73/14 96/12
protecting [2]   14/8 86/17
protection [7]   27/3 30/12
31/1 35/18 59/14 76/8 83/12
protections [13]   14/6 14/10
22/14 23/1 30/3 30/8 30/15
31/2 37/18 37/23 42/24 58/5
91/10
provide [12]   4/16 13/16
16/15 23/23 24/2 25/6 29/5
29/7 43/4 43/4 43/12 49/22
provides [3]   13/9 40/11
95/11
providing [8]   13/15 15/21
38/18 48/1 48/5 87/5 88/1
99/17
province [1]   77/25
provision [4]   74/12 74/20
75/4 76/7
provisional [1]   88/11
provisions [2]   20/9 75/19
public [148]
public's [6]   13/20 15/14
31/5 38/23 45/20 45/21 46/1
86/17
publish [1]   6/1
published [1]   60/6
publisher [23]   16/1 16/18
17/21 18/2 20/9 25/1 25/3
29/18 31/17 31/20 45/3 48/14
55/21 61/3 63/17 64/14 83/2
83/11 84/17 84/24 84/25 85/8
91/11
publisher's [3]   27/20 97/16
99/16
publishers [58]   1/3 1/17
1/17 2/7 2/13 5/23 6/10 6/22
9/3 9/9 9/12 9/15 10/17
13/23 15/1 17/19 19/25 20/15
21/8 22/19 23/2 23/25 25/8

26/9 30/4 30/8 33/5 36/12
36/20 37/8 38/12 38/24 39/8
39/19 40/5 46/6 49/23 53/3
53/7 56/6 67/8 78/1 82/6
82/24 88/23 90/15 92/10 93/5
93/20 94/11 94/23 95/4 95/24
97/9 97/18 98/12 98/21
100/12
publishers' [6]   7/24 8/25
9/18 15/12 15/13 15/13
publishing [4]   5/25 6/9 6/21
63/15
purchase [4]   30/23 31/10
87/14 98/14
purely [2]   27/12 96/13
purpose [5]   2/8 13/19 15/4
17/16 97/6
purposes [1]   36/6
pursuant [4]   28/22 82/18
82/19 104/6
pursue [1]   85/12
pursued [1]   85/12
pushback [1]   102/6
put [15]   3/22 21/16 30/25
31/13 56/15 66/20 67/11
75/25 76/24 83/13 85/24
87/11 88/13 94/16 99/6
puts [2]   70/20 76/4
putting [3]   26/19 37/14
93/24

**Q**

qualitative [1]   34/15
qualitatively [2]   34/18 35/4
qualms [1]   15/12
quantification [1]   71/5
quantify [1]   93/23
question [18]   18/19 21/19
32/22 37/6 37/17 43/14 48/3
53/12 53/25 65/23 66/12
78/13 79/3 86/8 87/17 94/22
95/1 96/9
questioning [1]   95/15
questions [18]   3/18 4/18
10/24 11/7 11/9 16/2 24/23
28/15 35/24 40/7 52/20 62/2
64/24 74/4 86/5 99/24 100/21
103/8
queue [1]   4/22
quick [2]   49/1 101/5
quickly [1]   34/8
quilt [2]   88/15 101/14
quintessential [5]   47/3
47/19 47/23 48/2 51/15
quite [8]   5/14 7/15 55/5
56/15 58/21 68/2 69/16 84/20
quo [3]   80/1 97/9 97/12
quote [6]   44/12 44/16 44/17
44/23 45/14 46/21

**R**

radio [1]   22/24
raises [2]   49/9 89/7
raising [1]   75/23
rare [5]   59/20 59/22 60/15
73/20 81/14
rather [3]   34/5 35/20 66/7
rationale [1]   32/13
reach [1]   18/22
reaction [1]   58/18
read [10]   3/6 16/7 17/9
18/23 32/8 63/12 69/1 92/13
93/2 102/19
readers [1]   68/25
readily [2]   34/3 36/3
readily-apparent [1]   36/3
reading [6]   12/6 16/9 19/16
39/19 45/14 88/12
readjust [1]   89/24
reads [1]   35/1
ready [4]   5/18 84/18 86/4
90/1
real [2]   13/11 95/1
realize [1]   15/15
realizing [1]   97/7
really [46]   4/7 6/6 6/8 7/18
7/24 8/22 8/24 9/17 9/17
10/10 10/11 10/25 14/11
15/13 20/25 21/1 21/13 29/3
30/3 34/8 37/11 39/6 41/19
42/4 42/4 45/15 45/23 46/3
49/1 49/22 54/15 58/22 62/7
66/12 72/8 72/15 72/17 72/24
73/6 73/12 75/1 75/13 77/9
93/12 96/6 97/3
Realtime [1]   104/5
reason [17]   12/24 13/4 13/21
26/7 26/8 26/9 43/18 43/20
49/21 64/19 65/3 72/7 81/3
84/5 90/20 96/7 102/8
reasonability [1]   28/20
reasonable [41]   16/14 20/2
20/14 22/20 22/21 25/5 25/10
25/17 25/24 26/2 28/2 29/2
29/4 29/10 29/13 29/18 29/19
30/16 30/21 31/2 35/19 37/10
37/13 39/21 39/21 46/10 53/8
54/5 55/20 55/21 57/17 65/6
82/9 84/23 84/24 85/7 93/7
93/7 94/5 94/7 98/22
reasonable safeguards [1]
93/7
reasonableness [2]   30/1 37/4
reasonably [1]   78/2
reasoning [7]   50/8 50/9 64/6
72/24 73/5 73/9 73/16
reasons [13]   4/11 10/15
12/17 17/14 55/2 71/3 73/23
75/2 76/13 79/8 79/10 85/24

**R**

reasons... [1]  90/14
recalculating [1]  84/14
recalibrate [2]  57/25 101/18
recalibrated [1]  84/8
recalibrating [1]  58/9
recalibrations [1]  89/17
recast [1]  72/3
receive [1]  76/19
received [1]  27/3
receives [2]  55/14 55/15
recent [3]  39/16 92/14 93/3
recently [2]  15/1 39/14
recess [2]  52/13 52/14
recited [1]  44/18
recognized [3]  55/16 75/24
89/2
reconcilable [1]  12/22
reconcile [1]  34/4
reconstruct [1]  84/3
record [5]  2/10 3/6 4/6 12/2
16/7
recorded [1]  60/3
records [1]  40/17
recoupe [1]  64/14
recoupment [1]  55/21
rectify [3]  44/1 44/5 44/15
redound [1]  88/19
redounds [1]  56/12
Reduced [1]  50/19
reenforces [1]  81/9
refer [1]  5/24
reference [1]  71/16
referred [5]  8/12 59/20
59/21 68/18 101/15
referring [1]  101/6
reflect [1]  55/10
reflecting [1]  56/25
reflects [2]  55/6 55/11
refrain [5]  20/20 21/9 21/10
36/13 101/10
refraining [1]  36/22
refusal [2]  29/15 91/22
refuse [4]  22/11 36/18 38/25
40/5
refused [3]  49/24 91/12 98/5
refusing [2]  13/24 17/22
regard [25]  6/8 12/19 12/21
12/21 14/23 15/10 16/25
19/24 22/15 33/25 34/2 42/8
42/15 45/5 47/17 48/6 49/7
51/13 51/22 53/23 55/16
92/16 92/21 95/16 95/17
regarding [2]  35/19 88/10
Registered [1]  104/4
regulate [21]  10/8 17/5
32/19 37/12 43/23 44/19
44/25 45/7 59/10 59/16 64/2
64/5 64/7 64/17 66/23 71/8

71/12 72/11 72/12 77/10 80/9
regulated [7]  48/23 64/5
72/8 75/10 75/17 75/20 103/5
regulates [7]  33/5 41/5 64/4
71/8 71/13 79/25 80/10
regulating [13]  19/12 21/23
21/25 35/19 53/4 71/7 71/12
72/19 73/14 74/19 76/2 76/9
77/23
regulation [14]  19/17 21/17
26/21 34/17 37/4 48/18 48/24
49/4 54/24 55/2 67/12 68/15
68/20 81/5
regulations [2]  32/21 104/10
regulatory [1]  18/9
reissuing [1]  22/19
reject [1]  66/8
rejected [1]  102/17
relatable [1]  88/13
relate [5]  3/15 3/16 18/18
33/17 64/22
related [4]  10/12 14/16
59/14 66/22
relates [6]  22/23 32/22 33/6
33/6 40/20 40/25
relating [3]  14/7 37/24
88/11
relationship [1]  56/7
relatively [1]  99/10
release [4]  83/24 83/25
83/25 84/1
released [1]  64/15
relevant [2]  3/5 43/11
reliance [1]  95/8
relied [1]  43/19
relief [2]  12/16 13/3
relies [5]  34/12 35/7 55/4
60/22 71/14
reluctant [2]  10/25 11/11
rely [4]  6/11 20/25 55/3
72/23
relying [5]  20/23 42/10
42/23 45/11 71/20
remedy [3]  12/8 12/8 35/2
remember [4]  13/13 42/8
92/22 99/14
remotely [2]  23/20 93/1
renders [1]  36/5
repeat [1]  43/13
repeated [1]  101/10
repeatedly [1]  67/25
repeating [1]  101/4
repercussions [1]  93/19
replace [2]  38/2 40/20
replied [2]  3/10 3/11
reply [4]  9/22 23/10 71/15
99/2
reported [2]  1/22 104/8
reporter [7]  1/23 3/25 44/8
104/1 104/4 104/5 104/16

represent [5]  12/3 47/11
47/15 47/25 59/23
representatives [1]  2/14
represents [1]  6/3
reproduce [2]  38/1 40/19
reproduction [2]  8/6 40/15
require [1]  85/18
required [2]  20/12 34/14
requires [4]  9/8 25/21 46/9
94/6
requiring [4]  39/7 39/8 53/8
93/22
Resale [1]  35/9
reserved [2]  60/22 68/15
reshape [1]  7/24
reshaped [2]  35/10 74/21
reshaping [2]  57/20 84/11
resolution [1]  23/19
respect [7]  60/5 60/17 69/14
69/14 72/19 72/21 75/9
respected [3]  81/17 85/21
85/23
respectfully [1]  102/6
respecting [1]  59/6
respects [1]  43/9
respond [1]  53/21
responded [1]  93/15
response [2]  62/9 62/10
responsibilities [1]  8/18
responsibility [1]  9/7
rest [1]  92/1
restore [3]  31/4 69/5 69/5
restores [1]  46/4
restrict [1]  20/6
rests [6]  15/11 15/14 15/21
58/21 99/16 99/17
result [4]  23/19 39/3 78/21
78/23
resulting [1]  100/13
resume [1]  52/9
resumes [1]  52/15
retail [2]  83/18 87/23
retailers [1]  6/25
retroactive [2]  27/17 27/19
return [3]  64/13 102/12
102/14
returned [1]  46/23
revenue [1]  76/20
reversed [1]  91/23
review [2]  5/1 34/2
revise [2]  69/9 82/15
revolution [5]  23/25 92/21
92/25 98/25 100/12
reward [1]  46/11
rewrites [1]  70/2
right [79]  4/5 9/13 9/19
10/7 11/5 11/21 13/20 20/16
20/18 20/20 20/22 21/4 21/11
21/15 26/17 26/20 26/21
26/22 30/24 32/7 33/2 35/11

**R**

**right... [57]**   36/13 36/16
36/17 36/19 36/25 37/1 38/22
45/15 45/19 45/22 47/19
48/25 49/25 50/4 50/22 54/5
57/3 59/8 59/12 61/23 62/16
62/25 63/23 64/8 67/3 67/4
67/10 69/2 69/11 70/12 72/19
73/14 73/25 77/3 78/21 81/17
81/18 81/21 82/7 85/6 85/20
85/23 86/3 87/1 88/25 89/25
92/1 93/8 94/12 94/14 94/19
95/20 96/14 98/2 98/3 103/15
103/21
**rights [62]**   6/16 6/19 7/11
7/25 8/5 8/7 8/25 9/4 9/4
9/5 9/14 9/19 10/9 10/18
22/21 34/10 34/25 36/23 39/9
39/22 40/11 40/15 40/24 41/6
41/6 46/2 56/10 56/11 62/8
62/24 62/24 63/3 63/21 66/18
66/18 66/24 67/16 68/13
69/22 70/5 70/6 70/18 70/19
70/19 71/19 79/14 79/16
81/24 82/1 82/7 82/14 83/13
85/4 85/5 85/13 86/18 88/3
88/18 92/7 99/14 101/12
102/8
**rise [1]**   91/8
**risk [3]**   67/6 67/10 85/10
**risks [1]**   82/16
**RMR [2]**   1/23 104/16
**road [3]**   23/5 27/10 27/13
**roadmap [2]**   11/24 15/7
**robust [1]**   31/25
**role [6]**   8/11 14/7 23/17
24/10 37/24 51/13
**Ronda [3]**   1/23 104/4 104/16
**room [1]**   28/17
**routinely [2]**   85/17 103/3
**Row [1]**   102/16
**Rowling [1]**   31/14
**royalty [5]**   35/10 35/12
76/19 77/4 77/17
**rubber [1]**   97/20
**rubric [1]**   66/7
**rude [1]**   5/15
**rule [1]**   38/5
**rules [1]**   24/16
**run [8]**   50/12 50/14 50/22
51/19 56/4 57/12 58/19 64/25
**rushed [1]**   61/19

**S**

**sacrificed [1]**   84/17
**safeguards [3]**   22/21 39/22
93/7
**said [36]**   9/23 35/15 37/8
37/25 38/17 39/13 39/13 42/6
43/15 45/7 45/18 50/14 50/16
54/4 54/12 56/12 60/5 62/3
66/11 71/17 72/18 73/6 75/10
76/6 88/17 89/22 89/24 90/14
93/15 96/8 96/10 97/1 98/1
99/3 100/5 100/25
**sale [24]**   8/13 9/20 10/2
14/3 14/11 14/19 14/21 26/14
32/11 33/1 35/14 35/21 38/5
38/9 39/5 41/10 43/1 46/8
57/8 58/12 76/20 77/13 87/4
88/4
**sales [3]**   83/17 84/14 87/21
**salient [1]**   26/22
**same [22]**   3/9 14/20 14/23
22/12 25/4 25/15 25/21 30/23
31/10 42/2 47/8 47/12 47/25
48/4 50/9 50/16 69/23 77/21
81/15 82/13 83/24 101/9
**saw [1]**   55/7
**say [35]**   5/13 11/6 16/20
18/3 20/4 20/17 20/19 25/20
28/9 30/4 46/24 48/7 49/11
49/23 50/25 51/11 51/18
52/19 62/25 63/25 64/24 65/1
65/4 65/24 66/25 78/12 82/23
85/6 87/18 92/10 94/11 94/15
94/24 98/11 99/8
**saying [14]**   5/20 11/15 37/10
39/10 41/18 51/18 71/11
72/18 73/17 76/1 89/10 90/8
95/23 102/19
**says [16]**   16/10 16/18 16/21
23/16 25/3 29/2 31/7 44/13
46/15 63/2 64/1 70/1 71/18
75/16 90/25 92/7
**scale [2]**   15/21 99/17
**scales [2]**   99/16 100/15
**scenario [2]**   72/17 94/3
**schemes [1]**   34/5
**SCHOEN [2]**   1/14 2/22
**scholarly [1]**   6/2
**schools [1]**   7/1
**scope [8]**   8/14 58/6 58/7
60/8 87/1 87/3 88/3 88/4
**scopes [1]**   61/8
**scores [2]**   70/25 70/25
**SCOTT [3]**   1/12 2/11 12/3
**se [1]**   78/15
**SEAN [2]**   1/14 2/19
**search [1]**   79/15
**searches [1]**   78/23
**second [7]**   6/8 12/24 34/9
44/4 62/17 66/17 90/12
**secondary [2]**   38/11 46/11
**secondhand [1]**   38/11
**section [15]**   14/9 14/10
16/11 34/11 37/25 38/6 40/10
40/12 40/16 40/18 40/23
40/25 41/2 74/10 76/1
**Section 106 [1]**   34/11

**Section 108 [6]**   14/9 37/25
40/10 40/18 40/23 41/2
**Section 109 [1]**   14/10
**Section 23-702 [1]**   40/25
**Section 301 [2]**   74/10 76/1
**secure [1]**   46/13
**see [16]**   3/2 4/8 4/10 5/8
31/14 45/20 52/8 55/9 67/22
78/15 78/16 79/18 84/10
86/12 90/8 92/8
**seeing [2]**   45/5 61/22
**seek [3]**   13/7 46/12 98/8
**seeking [8]**   17/4 26/10 50/24
95/5 100/6 100/9 102/5
102/14
**seeks [4]**   7/19 36/18 45/13
96/2
**seem [4]**   33/18 52/23 53/2
65/11
**seemed [2]**   57/23 65/13
**seems [11]**   20/4 21/25 24/8
31/13 31/15 32/2 37/5 37/12
43/6 48/16 50/19
**seen [8]**   15/1 38/13 45/3
45/4 97/9 97/11 97/11 98/6
**sees [3]**   77/10 77/11 77/13
**segment [2]**   32/23 32/24
**segue [1]**   33/12
**seizures [2]**   78/23 79/15
**self [3]**   15/16 15/16 79/21
**self-actualization [1]**   15/16
**self-awareness [1]**   15/16
**self-evident [1]**   79/21
**sell [5]**   22/4 22/9 22/10
22/11 31/18
**sellers [1]**   38/12
**selling [3]**   18/5 22/5 56/3
**sells [2]**   10/3 61/3
**sense [6]**   10/23 57/10 62/21
63/19 79/21 99/11
**sentence [1]**   34/23
**separable [2]**   32/22 33/9
**separate [4]**   22/23 45/8
49/19 74/13
**series [1]**   75/19
**serve [3]**   14/7 37/24 47/12
**served [1]**   86/10
**serves [1]**   49/18
**service [2]**   48/8 95/11
**session [2]**   2/4 52/15
**set [8]**   29/18 37/21 40/9
62/23 72/5 92/3 92/3 93/16
**setting [2]**   77/24 80/23
**seven [1]**   90/16
**several [5]**   14/9 42/6 45/18
79/8 97/10
**shadow [3]**   7/18 70/3 76/6
**shall [6]**   16/12 25/3 25/4
25/15 25/15 25/21
**shaped [1]**   70/19

**S**

shaping [2]  70/20 102/12
sharing [1]  94/15
shocking [2]  61/9 92/19
short [3]  6/18 63/20 83/3
short-term [2]  6/18 63/20
should [14]  14/17 19/11 34/7
 43/16 43/17 46/24 47/20
 73/16 78/12 84/25 86/15
 89/18 89/20 94/22
shouting [1]  54/21
show [2]  21/2 96/24
shown [5]  12/18 12/25 13/5
 13/6 85/21
shows [1]  22/24
shy [2]  11/11 11/14
side [8]  15/11 15/14 15/20
 26/3 51/5 55/24 99/15 99/16
sides [3]  3/18 4/18 31/3
sight [3]  34/21 65/23 65/24
significance [1]  15/5
similar [2]  50/19 82/16
simpler [1]  32/6
simply [3]  21/16 41/18 99/13
simultaneously [1]  30/9
since [5]  3/19 57/5 88/20
 96/17 99/3
single [2]  8/16 55/17
sit [1]  5/5
sitting [2]  21/1 103/14
situation [6]  28/5 44/1 44/5
 44/15 85/8 85/25
Sixth [2]  41/18 41/19
skewed [1]  99/4
slow [1]  44/7
slowed [1]  44/19
slowly [1]  44/11
small [2]  6/3 51/20
smaller [1]  50/13
smarter [1]  76/15
snapshot [1]  99/5
so [154]
social [2]  63/13 99/11
society [2]  32/1 86/19
sold [1]  74/1
sole [1]  57/16
solely [5]  34/23 60/21 61/25
 77/25 98/16
some [26]  3/14 6/1 23/8 28/7
 42/2 43/7 43/12 46/20 52/3
 52/19 53/22 55/24 56/2 56/3
 56/4 56/24 57/24 64/19 65/3
 73/24 76/15 81/20 87/15 94/2
 94/10 102/11
somebody [1]  56/5
somehow [1]  89/4
someone [8]  25/17 30/12
 37/12 53/9 59/17 71/11 87/14
 91/4

something [18]  6/13 10/25
 32/2 37/8 47/18 59/19 60/1
 60/14 67/1 67/17 72/8 75/7
 75/8 76/9 84/4 90/3 92/19
 102/5
somewhat [4]  65/19 65/22
 68/23 94/2
somewhere [1]  65/2
songs [1]  60/3
soon [1]  103/11
sorry [4]  43/13 49/12 74/8
 93/9
sort [8]  4/15 4/23 7/4 81/5
 83/17 88/13 94/15 102/4
Sotheby's [5]  35/8 75/1
 76/13 76/25 77/18
sought [2]  12/7 21/4
sound [3]  33/18 45/25 76/15
soundly [1]  102/17
sounds [3]  43/10 52/10 54/18
sparingly [1]  12/8
sparked [1]  83/19
speak [8]  5/12 23/19 42/2
 53/11 53/18 54/15 66/13 70/9
speaking [1]  79/7
speaks [2]  66/16 76/15
special [11]  8/8 14/6 22/14
 23/1 23/17 26/23 37/23 57/24
 58/5 58/18 92/9
specific [7]  14/9 40/14 77/5
 83/22 83/22 83/23 94/7
specifically [4]  13/24 38/25
 41/2 94/24
specified [1]  30/13
spend [1]  63/9
spirited [1]  3/17
split [3]  20/25 21/1 42/5
spot [2]  72/24 73/5
spreading [1]  38/14
square [2]  40/12 62/7
squarely [1]  82/13
staggering [1]  67/7
stake [1]  8/22
stakeholder [2]  6/15 55/15
stamp [1]  97/20
stand [3]  75/9 76/3 103/7
standard [1]  34/2
stands [6]  41/7 41/10 52/13
 65/14 80/13 82/4
start [11]  4/21 5/19 7/7
 10/23 11/7 11/7 11/18 26/19
 36/7 70/23 74/7
started [3]  3/3 3/19 4/14
starting [3]  2/10 16/1 53/24
state [129]
state's [14]  42/4 44/25 55/6
 55/6 55/17 57/22 58/25 59/10
 69/12 70/4 71/12 71/15 78/8
 101/17
stated [2]  18/11 18/12

statement [5]  4/16 5/2 11/16
 11/20 62/19
states [14]  1/1 2/3 32/18
 43/23 44/19 54/22 68/21 71/6
 71/8 72/11 76/3 81/6 104/5
 104/11
statistic [1]  99/4
statue [3]  17/9 37/12 66/21
status [4]  5/1 80/1 97/9
 97/12
statute [91]  7/9 8/15 8/23
 8/24 8/24 9/8 9/14 10/10
 10/19 11/19 16/6 16/21 17/3
 18/20 18/21 18/22 18/23
 19/16 22/6 24/21 24/25 25/2
 26/25 27/2 27/15 28/3 28/20
 28/23 29/2 29/22 30/5 30/6
 30/16 31/2 32/23 33/4 35/1
 35/18 43/7 53/5 56/20 56/25
 56/25 57/5 58/16 63/2 63/3
 64/1 65/9 66/5 67/5 67/6
 69/21 71/11 72/10 72/12
 72/22 74/15 74/19 74/23 75/4
 75/15 75/21 75/25 76/12
 76/23 80/13 81/14 81/25 82/4
 82/15 82/20 83/10 84/8 84/10
 84/10 84/12 85/1 85/2 85/10
 86/22 86/24 89/12 89/15
 90/14 90/24 92/9 95/4 101/20
 101/20 101/22
statutes [5]  18/9 54/22
 75/22 76/10 103/4
statutory [8]  11/21 17/4
 17/15 34/5 59/20 60/17 73/21
 87/2
stay [1]  68/6
stays [2]  60/8 84/8
stenographically [1]  104/8
stenographically-reported [1]
 104/8
stenotype [1]  1/21
step [2]  45/7 62/2
stepped [1]  48/23
steps [1]  70/20
stick [1]  24/21
still [15]  19/6 19/7 19/8
 21/4 22/24 36/16 47/10 47/11
 49/2 58/3 84/12 84/21 85/18
 86/1 101/24
stop [5]  5/11 5/17 20/18
 22/5 81/23
stores [1]  7/1
straight [1]  84/6
stream [3]  76/20 77/4 77/17
Street [1]  1/24
strike [1]  103/3
strong [1]  30/5
Struggle [1]  78/18
studied [1]  101/24
studies [4]  55/14 57/6 58/6

**S**

studies... [1]   101/25
studio [1]   63/17
study [2]   77/5 77/6
stuff [2]   37/14 102/1
subclass [1]   51/24
subject [4]   16/10 43/24
 44/20 45/1
submitted [1]   80/16
subsection [7]   19/16 28/22
 30/6 30/7 30/20 31/7 34/23
Subsections [1]   16/11
subsequent [3]   10/8 76/19
 77/17
subset [1]   51/20
substantiated [1]   91/9
substitute [4]   54/10 56/22
 68/4 82/12
substituted [2]   80/5 82/8
substitutes [2]   67/12 70/4
substituting [5]   65/7 68/10
 78/8 79/23 102/2
Subtitle [2]   28/24 29/21
succeed [1]   12/10
success [4]   12/19 33/20 52/5
 96/23
successful [1]   68/24
such [7]   8/5 18/11 26/23
 53/15 62/5 66/22 75/8
suffer [2]   12/11 13/1
suggesting [1]   48/13
suggests [1]   36/11
suit [1]   100/13
suite [3]   76/17 76/24 77/5
suits [1]   98/9
summary [1]   29/25
super [1]   63/9
superficially [1]   64/20
supersede [1]   82/6
supplant [1]   7/25
supplemental [1]   79/5
support [10]   3/19 9/22 47/16
 67/22 78/3 78/25 80/16 80/22
 82/11 92/6
supporting [1]   78/2
supports [1]   13/8
suppose [2]   28/4 94/3
supremacy [14]   74/17 78/15
 78/17 78/25 79/8 79/12 79/13
 79/20 80/4 80/7 80/24 85/15
 85/16 103/5
supreme [17]   14/15 21/3
 26/15 32/21 36/15 45/10
 54/11 56/12 65/9 71/17 71/18
 71/22 79/22 88/16 89/1 102/7
 102/17
sure [18]   3/16 4/4 8/8 8/20
 11/17 20/23 24/20 32/8 40/3
 40/8 44/9 44/12 47/24 49/8

51/16 52/18 93/6 93/11
surveillance [1]   78/20
sustainability [1]   38/10
sustainable [2]   96/1 98/23
swath [1]   62/5
swaths [1]   48/5
swoop [1]   57/25
swooping [1]   58/8
system [2]   54/23 68/20

**T**

table [2]   20/1 37/22
tacks [2]   25/20 50/19
take [12]   11/10 11/12 16/2
 24/24 34/7 58/12 74/25 82/14
 82/17 98/7 98/13 100/21
takeaway [1]   42/17
taken [3]   81/19 81/20 81/24
takes [2]   55/22 81/25
taking [5]   4/22 35/4 45/2
 62/22 101/16
talents [1]   40/3
talk [13]   8/7 20/5 20/23
 23/5 40/8 43/12 43/15 52/4
 72/13 75/2 75/3 94/10 96/18
talked [6]   31/23 52/17 93/13
 96/17 100/7 100/24
talking [7]   5/12 5/17 11/19
 17/11 46/21 61/5 86/22
talks [4]   43/21 61/9 71/16
 78/20
target [2]   18/13 68/1
tax [1]   98/23
taxpayers [2]   95/20 97/19
technological [2]   30/12
 92/25
technology [2]   32/17 39/2
tell [5]   5/16 33/21 80/22
 89/23 103/12
telling [4]   5/11 68/12 81/9
 82/1
tells [2]   69/22 69/24
temporary [1]   87/16
tension [1]   89/5
term [14]   6/17 6/18 9/5 9/6
 21/8 36/21 55/20 59/13 60/25
 63/20 63/20 67/9 74/2 83/12
terms [75]   8/23 9/11 9/16
 10/9 10/20 14/1 16/14 19/13
 20/3 20/14 21/23 25/5 25/10
 25/18 28/2 28/20 29/3 29/5
 29/7 29/10 29/12 29/13 29/15
 29/18 30/7 30/16 30/21 31/7
 33/6 33/7 35/19 37/10 37/14
 46/10 48/18 48/23 53/8 53/8
 53/25 55/5 56/7 58/5 58/9
 59/3 59/7 59/11 59/16 60/7
 61/8 62/13 63/8 66/19 70/1
 70/5 70/23 71/12 72/7 77/25
 79/6 79/11 79/19 81/10 84/11

85/7 85/15 87/11 87/25 91/15
 93/21 94/7 94/10 94/10 95/5
 95/24 96/12
TERRY [2]   1/17 2/16
test [2]   34/9 34/12
testament [1]   96/5
text [4]   7/20 11/19 11/22
 101/20
textbooks [1]   56/3
than [26]   14/2 14/15 21/20
 21/21 23/14 26/12 34/5 34/19
 35/20 39/4 48/9 49/20 52/1
 52/25 54/19 61/16 66/7 71/7
 72/21 75/12 76/7 80/13 97/14
 98/24 100/10 101/3
thank [24]   4/12 5/19 11/4
 11/5 11/25 16/3 33/24 35/25
 36/1 48/11 52/10 53/10 53/19
 54/19 78/10 79/2 80/14 80/25
 86/20 100/22 103/9 103/9
 103/20 103/21
that [617]
That'll [1]   74/6
that's [94]   3/10 4/7 4/12
 5/4 6/12 7/4 7/20 10/4 10/18
 21/13 22/22 23/2 23/14 25/3
 25/24 26/7 31/3 31/21 33/12
 34/6 37/7 39/6 39/24 40/17
 41/15 43/7 44/24 45/2 46/4
 46/14 46/15 47/23 48/17
 48/20 49/25 51/1 51/7 51/9
 51/22 53/19 54/24 55/19 57/3
 57/11 57/15 57/19 58/1 58/5
 59/11 59/17 60/8 61/1 61/4
 61/9 61/10 62/11 62/13 63/2
 63/9 63/21 64/5 64/6 64/21
 67/19 68/13 70/3 70/13 70/21
 70/21 71/24 72/6 72/17 73/22
 73/22 75/4 75/7 76/9 77/9
 77/14 77/16 79/17 79/17 79/21
 79/25 81/12 84/12 85/21 91/6
 95/2 96/5 98/24 99/4 101/17
 102/7 102/21
theater [3]   24/1 50/12 50/13
theaters [1]   65/2
their [85]   3/12 5/25 9/9
 9/20 9/22 9/22 9/24 10/7
 10/9 10/18 12/25 13/5 13/6
 15/15 15/16 18/6 18/6 19/9
 21/6 21/8 21/11 21/11 21/22
 22/4 22/4 22/9 22/10 22/20
 23/2 23/17 26/17 26/19 26/24
 35/13 35/15 35/16 35/16
 36/12 36/14 36/21 36/23
 39/18 39/19 40/5 40/23 41/3
 41/4 41/7 45/12 45/19 46/2
 46/7 46/13 47/17 47/21 48/21
 50/6 51/13 55/22 63/19 67/24
 68/1 71/17 71/19 72/24 76/5
 76/19 78/2 78/3 78/12 82/7

**T**

**their...** **[14]**   83/13 86/9
90/18 91/12 92/10 95/2 95/8
96/22 97/21 98/9 98/9 99/3
100/18 100/9 101/25
**them** **[39]**   9/11 10/8 11/10
15/15 28/13 36/22 37/2 38/1
39/8 40/21 43/8 43/12 43/15
46/9 48/2 50/11 51/17 56/3
56/4 56/7 56/11 56/18 61/8
63/16 66/19 66/22 76/5 79/13
79/15 80/19 82/1 82/7 85/5
85/13 88/7 91/2 100/4 101/25
102/13
**themselves** **[9]**   19/7 21/10
21/14 26/11 26/18 37/1 39/9
47/16 66/24
**then** **[42]**   3/11 5/21 6/17
6/23 9/20 11/3 19/20 20/5
20/19 25/2 26/1 26/2 28/11
29/20 29/24 40/8 46/23 50/18
51/4 51/6 51/21 55/16 57/5
59/10 60/3 60/6 65/1 65/2
65/2 70/12 70/20 74/6 76/23
80/3 82/5 82/24 85/10 88/21
92/11 93/1 99/8 102/21
**theoretical** **[11]**   13/2 15/12
27/12 28/5 90/22 90/22 90/24
91/5 93/15 96/8 96/13
**theory** **[1]**   29/16
**there** **[72]**   4/10 7/8 10/2
14/2 14/15 15/9 17/25 24/8
29/14 29/16 37/14 42/13 43/8
43/11 44/12 46/18 46/20
46/21 48/12 48/18 48/18
48/24 50/14 52/23 53/2 53/11
53/25 56/24 60/4 61/14 62/1
62/1 63/3 64/13 69/7 69/7
70/25 70/25 73/8 73/19 75/16
76/8 76/14 77/5 78/21 79/18
81/3 82/23 82/25 83/12 83/21
83/24 85/19 86/5 89/25 90/13
91/8 91/10 91/22 93/15 93/19
95/10 95/15 96/14 97/25
98/17 99/6 100/10 102/13
102/17 102/21 103/16
**there's** **[55]**   7/6 8/12 8/22
13/12 14/14 21/19 26/3 26/3
27/4 29/24 30/5 34/1 36/2
41/1 44/16 45/10 46/23 47/24
51/8 51/8 57/4 58/25 59/15
63/11 63/11 64/24 64/25
69/20 71/25 71/25 74/9 79/6
79/8 79/9 79/11 79/19 80/12
80/23 81/13 86/1 87/12 87/20
89/3 89/3 89/3 89/5 89/5
89/9 90/24 94/7 94/14 94/18
95/12 100/25 103/6
**thereby** **[1]**   35/12

**therefore** **[1]**   48/3
**these** **[58]**   6/15 13/25 15/14
15/17 18/17 18/24 20/2 23/15
24/22 28/8 31/21 42/19 45/7
48/1 49/23 51/16 52/5 56/1
56/2 56/23 59/22 62/21 63/5
63/21 64/4 64/16 64/17 64/20
70/25 78/8 79/16 79/17 80/11
81/8 81/9 81/10 81/12 82/13
83/21 85/5 85/14 86/25 87/8
87/25 88/25 93/14 95/21
95/23 98/8 98/14 99/19 100/3
100/4 100/17 101/4 101/13
101/24 103/13
**they** **[172]**
**they're** **[22]**   5/24 14/22 18/6
19/3 19/7 19/8 40/9 42/20
53/8 54/23 55/23 55/24 56/2
56/2 68/14 74/13 85/12 96/9
97/25 97/25 100/6 101/9
**they've** **[3]**   22/2 89/7 95/5
**thing** **[5]**   54/4 58/22 69/23
72/2 94/15
**things** **[11]**   3/3 5/21 14/12
20/22 52/19 54/14 55/23 62/3
63/14 64/4 76/11
**think** **[90]**   5/13 7/16 8/10
10/10 10/23 10/25 13/4 14/5
14/17 15/25 16/24 18/18
21/19 21/21 23/4 23/13 24/15
25/14 29/4 29/19 30/5 30/17
32/9 33/12 33/17 37/16 37/21
39/17 41/1 41/3 41/8 41/14
41/16 43/7 43/16 44/17 47/6
48/17 51/8 51/21 54/9 56/18
62/11 64/12 64/16 64/19
64/23 65/4 65/8 65/18 66/4
66/12 67/15 67/20 67/21
68/18 70/24 71/2 71/15 71/21
72/18 73/22 77/7 78/1 78/14
79/20 79/22 79/25 80/12
80/18 81/9 84/5 84/12 84/19
85/9 85/14 86/7 86/17 89/3
89/21 91/18 92/24 93/13
93/18 93/18 96/5 99/2 101/4
102/24 103/7
**thinks** **[9]**   29/18 54/9 65/5
82/9 84/23 84/24 85/7 85/8
88/16
**third** **[6]**   13/4 15/6 15/24
41/21 50/16 102/24
**this** **[168]**
**Thomas** **[5]**   1/23 52/7 90/7
104/4 104/16
**Thornburgh** **[1]**   44/23
**those** **[70]**   4/19 6/3 6/9 7/21
8/7 8/8 8/20 9/4 9/4 9/7
12/15 13/18 15/10 15/10
15/19 15/22 15/24 17/5 20/10
22/18 23/1 30/6 30/15 34/5

34/10 38/21 40/4 43/9 45/21
47/25 48/1 49/20 50/11 54/6
55/9 55/11 56/11 57/9 59/4
61/21 65/23 66/18 69/7 70/16
70/19 70/19 73/19 74/15 75/2
75/6 75/21 77/25 80/6 80/22
81/1 81/22 82/20 86/2 87/6
88/8 88/11 88/25 89/18 91/9
91/15 93/23 93/23 97/1
100/17 102/22
**though** **[8]**   9/12 24/21 28/19
49/3 64/16 66/4 71/10 102/18
**thought** **[3]**   41/20 60/16 69/8
**thousand** **[1]**   63/14
**threatens** **[1]**   10/17
**three** **[4]**   12/17 56/5 78/11
84/1
**threshold** **[3]**   21/19 37/6
37/7
**thriving** **[2]**   78/5 87/10
**through** **[20]**   4/24 7/22 11/10
13/11 34/21 38/3 40/3 57/17
59/1 69/3 74/22 76/4 77/19
79/10 83/16 87/10 87/13
87/14 87/17 101/8
**throughout** **[2]**   23/18 38/15
**ties** **[1]**   95/14
**time** **[20]**   7/3 19/1 25/16
28/10 30/13 32/14 44/8 46/23
52/17 53/14 53/17 68/22 69/6
71/6 73/5 82/11 84/25 85/11
100/24 101/25
**times** **[6]**   32/11 42/6 45/18
56/13 57/5 88/20
**timing** **[5]**   9/11 9/16 70/6
83/23 88/25
**timing-specific** **[1]**   83/23
**tips** **[2]**   12/12 96/25
**title** **[3]**   16/10 28/24 29/21
**today** **[25]**   2/13 3/13 3/17
5/13 7/17 7/22 7/22 23 8/8
10/11 12/7 13/5 15/4 27/14
58/8 58/24 67/24 69/7 71/7
71/24 76/16 81/4 87/13 102/4
103/10 103/17
**told** **[2]**   61/21 73/7
**tomorrow** **[1]**   91/4
**too** **[8]**   27/24 37/15 42/10
45/22 46/1 54/16 64/12 81/13
**took** **[2]**   27/15 90/11
**top** **[2]**   41/21 58/16
**toward** **[1]**   102/15
**trade** **[12]**   5/24 19/13 19/17
19/18 29/23 30/6 33/5 34/18
35/3 72/5 75/9 75/10
**tradition** **[1]**   97/14
**trajectory** **[1]**   45/6
**transaction** **[1]**   37/7
**transactions** **[1]**   55/17
**transcript** **[2]**   104/8 104/9

**T**

transcription [1]  1/21
transfer [1]  6/23
transmission [1]  57/1
transparency [1]  6/15
treasured [1]  14/8
treat [1]  58/5
treated [3]  53/3 54/1 60/23
treatment [2]  58/19 69/17
treats [1]  56/1
treaty [2]  8/19 8/21
tree [1]  45/24
trees [1]  34/21
tribunal [1]  29/1
tried [1]  27/2
triggered [2]  19/5 20/12
trips [1]  86/13
true [7]  22/8 49/8 61/11
 67/18 95/4 98/24 104/7
truly [3]  42/1 42/2 90/22
truth [1]  4/17
try [3]  3/20 33/24 84/3
trying [10]  5/15 18/21 21/13
 31/4 47/14 47/16 58/17 72/3
 77/9 81/7
turn [5]  4/9 36/24 74/5 90/1
 96/15
TURNER [1]  1/15
turns [1]  90/16
two [26]  2/14 15/10 15/10
 15/24 21/20 23/14 32/9 42/13
 43/9 43/10 46/18 47/12 52/24
 61/7 61/13 62/10 65/1 65/16
 65/19 70/16 74/14 79/3 91/7
 97/1 101/3 102/3
two-fold [2]  62/10 79/3
two-year [1]  61/13
type [1]  46/25
types [3]  47/2 57/3 101/10
typically [1]  63/5

**U**

U.S [4]  5/24 6/6 7/10 8/2
U.S.C [1]  104/7
ultimately [3]  29/10 49/20
 86/18
unambiguous [2]  57/15 58/15
unanimously [1]  96/4
unauthorized [1]  75/21
unavailing [1]  55/4
unaware [1]  76/16
unconstitutional [1]  82/25
under [40]  7/12 7/25 8/1
 8/12 8/18 9/1 9/19 10/18
 14/3 20/12 22/9 22/9 22/21
 26/13 31/7 37/4 38/7 39/5
 39/21 40/16 42/24 43/1 45/8
 46/8 46/9 52/1 67/16 70/2
 73/15 74/16 79/15 82/7 82/8
 83/8 85/7 91/14 93/7 96/11

99/14 103/4
underlies [1]  6/6
understand [18]  4/10 18/17
 18/22 19/21 27/23 31/23
 41/25 50/11 53/24 64/21
 66/10 89/6 93/9 93/12 94/14
 102/7 103/12 103/13
understandably [2]  61/7
 97/15
understanding [3]  25/16
 61/20 61/21
understood [2]  27/13 101/18
undisputed [1]  14/5
unfair [15]  14/1 19/18 29/23
 34/17 35/2 46/12 69/16 75/9
 75/10 91/15 95/5 96/11 98/8
 100/3 100/4
unfairly [1]  60/23
unfairness [7]  53/3 54/1
 55/5 77/10 77/11 77/13 91/20
unfettered [1]  71/19
unfortunately [2]  81/12
 81/13
unhappy [1]  50/13
uniform [1]  8/16
uniformity [2]  55/1 68/19
unique [2]  49/1 49/16
unit [1]  10/4
UNITED [5]  1/1 2/3 54/22
 104/5 104/11
university [1]  64/11
unknown [1]  73/2
unlawful [6]  72/5 78/23 80/2
 85/3 85/10 90/17
unless [7]  18/10 34/3 35/23
 67/10 74/4 99/23 103/8
unpublished [1]  40/17
unravels [1]  10/11
unreasonable [1]  29/15
unring [2]  82/20 84/7
unspoken [1]  91/25
until [2]  81/4 98/6
untoward [1]  102/6
up [10]  3/15 5/12 10/5 29/11
 48/4 52/21 53/18 67/19 86/14
 92/22
update [3]  58/7 69/10 88/8
updated [1]  69/1
upfront [1]  5/22
upon [4]  33/7 43/19 60/7
 83/9
upset [2]  76/3 97/13
upsets [1]  68/8
us [14]  4/23 10/23 24/24
 42/18 43/12 63/3 67/4 67/7
 68/12 68/22 69/22 69/22
 69/24 89/23
use [14]  13/18 30/11 38/21
 40/21 45/23 46/23 60/25 61/4
 61/8 71/6 87/19 88/12 99/10

101/8
used [3]  10/5 10/15 54/23
useful [1]  3/22
user [3]  30/11 60/7 98/16
users [7]  16/15 25/6 29/6
 29/8 30/9 98/2 101/12
uses [3]  38/15 46/24 60/6
using [4]  9/21 21/11 26/17
 36/24
Usually [1]  5/11
utility [1]  72/23

**V**

vacuum [2]  100/11 102/21
vagueness [1]  17/1
valid [2]  58/8 89/7
validated [1]  69/1
value [6]  9/7 13/17 38/20
 67/9 94/3 94/4
vastly [1]  23/22
vein [1]  47/16
vending [2]  21/9 36/22
versus [9]  33/14 45/20 46/21
 47/6 47/20 48/15 83/17 83/25
 101/9
very [31]  4/12 5/2 6/12 8/3
 8/15 8/24 50/19 52/12 52/18
 59/11 62/23 63/17 68/25 72/3
 72/9 72/9 72/20 72/22 72/25
 73/5 75/14 75/24 85/5 85/19
 86/12 100/22 100/24 101/21
 102/22 103/9 103/20
vestiges [1]  55/2
VIA [1]  1/9
viability [1]  6/5
viable [1]  38/16
video [4]  4/7 4/10 7/2 63/13
view [8]  12/1 13/11 42/4
 55/8 55/11 66/14 70/16 76/5
views [2]  64/4 88/14
violating [2]  78/20 79/20
violation [9]  28/2 29/21
 29/22 78/14 78/17 78/25 80/4
 80/23 85/16
violations [1]  80/7
violative [1]  34/24
virtually [1]  3/20
virtue [1]  52/25
vis [2]  92/7 92/7
voice [1]  53/15
void [2]  17/1 98/21
vs [1]  1/4

**W**

Wainwright [1]  47/20
wait [2]  46/16 97/23
walking [1]  4/24
want [48]  3/20 4/16 4/18
 5/16 11/8 11/10 11/15 11/15
 13/13 14/12 19/21 20/19 22/3

```
W

want... [35]   22/4 28/15
28/16 28/18 30/2 31/17 37/11
37/17 52/4 52/4 52/20 52/21
54/20 57/13 63/2 63/12 63/13
63/13 64/10 64/12 67/2 67/10
68/25 80/14 82/10 86/13
91/17 93/13 94/12 94/25
95/15 96/18 99/12 102/22
102/23
wanted [4]   32/14 32/16 93/5
94/17
wanting [2]   24/23 58/18
wants [4]   56/19 69/25 71/11
85/7
warrant [1]   34/3
warranted [1]   73/22
was [86]   13/22 16/24 17/25
18/14 21/23 21/24 22/16
23/13 23/22 28/10 32/12
32/15 32/15 32/19 35/21
38/18 39/17 44/3 46/16 47/7
48/8 48/18 48/22 48/24 48/24
49/5 50/13 50/14 51/3 51/20
54/4 54/20 56/24 57/19 57/20
57/23 58/21 58/22 60/25 62/4
65/13 66/5 66/8 67/21 71/20
71/21 71/22 72/8 72/15 72/17
72/25 73/2 73/3 73/4 73/8
75/16 75/20 76/15 76/16
76/25 76/25 77/1 77/2 77/5
77/6 77/18 80/2 83/2 90/16
91/19 91/22 91/23 91/23
92/19 92/20 93/14 95/15
95/18 96/2 96/8 98/6 99/7
99/7 99/10 100/10 102/24
wasn't [3]   4/4 72/14 77/2
watering [1]   27/24
way [17]   6/18 47/12 47/25
49/10 67/5 67/7 68/12 68/14
68/14 69/11 77/16 78/5 83/24
85/9 88/13 96/12 101/23
ways [5]   7/18 13/8 68/11
86/21 102/11
we [77]   3/3 3/3 3/19 3/19
4/8 4/24 5/1 5/23 7/4 7/16
11/2 11/21 19/21 20/24 24/14
24/19 24/21 24/22 25/19 27/3
27/8 34/1 35/6 41/9 41/18
50/25 51/1 52/3 53/21 56/13
59/21 61/12 63/22 64/1 64/22
66/25 67/2 67/3 67/10 67/17
68/13 69/22 70/3 71/24 72/6
72/23 73/24 74/1 74/1 74/1
74/25 78/1 80/17 80/21 81/4
82/11 82/11 82/15 82/16 85/2
86/7 89/15 90/17 91/17 92/25
93/13 93/23 94/25 96/16 97/9
97/11 97/11 100/2 100/19
```

```
103/2 103/16 103/16
we'll [8]   7/22 7/23 8/7
20/23 27/7 51/7 52/9 72/13
we're [25]   3/16 7/5 7/13
8/20 17/11 17/15 17/24 19/15
21/1 23/5 24/13 27/9 32/4
42/23 47/24 51/3 51/6 51/11
51/20 52/16 53/14 79/4 80/20
99/11 102/19
we've [16]   7/18 15/1 38/13
43/2 47/23 52/6 60/12 79/4
86/21 88/19 95/7 98/3 98/4
98/6 100/24 103/1
website [1]   46/20
weigh [3]   43/1 86/16 99/21
weighing [3]   42/9 45/21 46/1
welfare [5]   40/2 56/12 88/17
88/19 89/2
well [32]   2/14 2/15 4/22
7/21 8/6 8/19 9/1 12/5 14/17
19/20 20/14 21/6 29/2 43/24
44/21 45/1 48/13 49/23 54/8
59/5 60/8 62/19 64/10 69/10
74/1 79/12 80/25 83/3 86/12
99/3 99/8 101/18
well-intentioned [1]   54/8
went [1]   57/19
were [13]   4/8 4/24 15/21
18/1 18/23 41/15 48/21 55/1
55/8 57/24 69/11 71/21 83/14
weren't [1]   69/7
what [124]
what's [13]   8/12 23/3 34/14
45/2 55/10 55/20 55/20 57/12
57/16 58/24 62/12 64/5 72/21
whatever [4]   54/8 54/9 82/9
95/21
when [62]   6/19 7/16 10/3
15/3 15/11 17/9 17/11 17/25
19/15 20/9 22/16 24/1 25/19
29/14 29/15 35/1 37/12 44/18
46/19 48/20 49/17 50/25
55/13 55/23 55/23 57/19
58/22 58/24 60/15 60/20 61/3
61/5 61/6 62/17 63/8 64/20
64/24 70/5 71/6 73/7 73/18
74/18 76/8 76/16 77/19 79/19
79/23 80/13 81/23 82/1 84/10
85/20 88/2 88/3 88/6 88/16
93/3 97/2 99/12 101/19 103/6
103/12
where [26]   8/9 13/23 21/1
32/9 33/1 34/13 38/24 40/1
41/15 46/22 51/5 58/22 69/6
69/9 69/10 71/24 77/23 80/21
81/12 85/21 85/23 96/4 99/10
99/15 102/16 103/3
whereas [2]   72/23 75/21
whether [46]   6/9 20/7 20/7
20/8 32/10 34/9 36/13 57/2
```

```
57/6 57/6 58/6 58/10 58/12
59/5 59/9 60/16 61/23 62/13
62/14 63/7 63/15 63/16 63/23
63/24 65/14 66/14 70/15
70/16 71/9 74/15 74/22 76/21
77/22 81/25 83/25 84/1 85/15
86/25 87/2 87/4 87/5 87/13
88/5 88/7 88/8 89/23
which [50]   6/6 6/18 7/23 9/4
10/9 12/1 13/11 14/24 16/18
18/19 20/4 20/24 21/17 21/21
22/5 23/24 30/5 30/16 33/7
33/9 33/14 35/15 38/6 40/10
49/3 52/22 58/11 59/7 60/2
64/1 64/7 64/7 65/14 65/16
67/7 68/23 73/3 75/1 76/17
76/17 76/18 77/21 79/17
86/16 88/18 91/10 91/23
92/24 96/1 99/10
while [14]   4/3 13/24 26/11
38/14 49/8 55/24 67/23 70/24
73/8 80/6 87/22 91/13 92/1
97/21
who [29]   3/22 5/20 6/3 7/4
15/17 15/21 16/11 16/18
16/22 17/6 17/7 28/20 36/18
40/4 47/25 55/7 56/5 62/25
76/14 77/23 82/25 83/2 83/19
84/22 86/12 86/13 86/13
98/13 98/18
whole [11]   10/6 19/16 24/13
31/3 34/22 35/1 57/17 67/19
84/18 85/25 98/13
whom [4]   63/8 70/5 73/18
99/18
why [51]   7/5 10/4 12/23
17/24 22/5 24/17 25/13 25/16
26/1 26/8 26/9 30/5 31/22
31/23 39/24 41/14 41/14
43/15 43/17 44/10 49/21 50/8
50/9 52/3 53/4 53/5 56/20
61/13 63/21 64/21 68/6 68/9
70/3 70/21 72/7 73/23 76/13
77/18 79/6 79/9 79/11 79/18
79/19 81/2 83/4 89/19 90/13
90/20 94/21 94/22 94/23
wide [1]   40/1
widen [1]   86/11
will [17]   5/13 7/16 10/11
12/16 12/25 13/5 33/21 37/21
47/9 47/10 47/11 47/12 61/8
95/21 98/7 100/1 103/14
willing [1]   64/20
wing [1]   76/8
wish [2]   94/21 94/25
within [9]   50/16 60/8 64/3
66/1 72/4 74/10 77/25 84/11
98/4
without [6]   5/3 28/19 45/24
59/4 61/19 80/1
```

**W**

won't [2]   4/23 5/17
word [8]   5/20 8/23 13/12
 13/13 25/3 58/22 90/5 96/15
words [3]   22/3 54/6 81/18
work [33]   6/20 9/20 9/24
 13/20 20/7 20/10 29/12 31/5
 35/15 36/19 37/13 38/15
 38/16 40/17 45/13 45/18
 45/19 45/22 45/23 48/4 55/23
 63/19 63/25 64/8 83/7 83/11
 83/22 84/16 84/25 85/11
 88/23 94/4 94/25
work-specific [1]   83/22
worked [2]   22/21 39/20
working [2]   47/15 56/5
works [57]   6/2 6/2 6/20 9/9
 13/10 13/17 13/18 13/25 14/8
 15/15 15/20 21/8 22/20 24/3
 31/21 35/14 36/14 36/21 38/3
 38/21 39/1 39/4 39/8 39/20
 40/1 40/4 40/22 45/21 46/15
 48/1 51/16 56/1 57/1 57/3
 60/2 60/5 60/17 63/16 63/20
 64/21 64/22 68/25 69/7 76/18
 76/19 81/5 83/18 87/3 87/12
 92/10 95/11 99/19 100/11
 102/11 102/19 102/21 102/22
world [12]   6/2 6/8 9/25
 10/14 13/23 19/2 19/4 38/24
 50/24 67/18 83/8 84/3
worse [1]   97/19
would [75]   3/21 3/24 4/9
 4/10 4/16 4/20 5/2 11/2
 12/15 15/18 15/19 16/14 18/7
 18/22 19/1 19/5 22/5 24/15
 25/6 26/5 26/8 26/9 28/2
 28/4 28/5 28/13 28/21 28/23
 29/4 29/5 29/16 29/16 30/4
 32/5 37/10 39/2 42/10 45/9
 46/7 48/7 52/7 52/19 53/13
 55/9 61/16 66/1 67/10 70/12
 76/22 78/21 79/5 83/16 86/5
 86/10 91/8 91/9 91/11 91/15
 93/18 93/19 94/2 94/4 94/11
 94/13 94/22 97/8 97/17 97/17
 97/19 97/20 98/11 98/11
 99/13 99/25 101/17
wouldn't [3]   37/3 51/7
 102/21
wrestle [1]   42/1
write [3]   55/24 100/14
 102/10
writing [2]   56/5 84/17
written [2]   22/14 60/2
wrong [7]   10/1 56/16 56/16
 56/17 56/20 61/23 80/19
wrongly [1]   97/15

**Y**

Yeah [1]   11/14
year [6]   57/21 61/13 90/16
 99/6 99/8 99/9
years [12]   6/14 15/2 32/20
 33/15 38/14 39/11 47/7 69/2
 84/17 93/1 98/4 100/11
yes [13]   19/5 20/21 46/6
 46/9 49/8 53/11 74/8 80/25
 86/20 89/9 89/13 90/11 96/20
yet [2]   61/4 65/3
you [282]
you'd [3]   4/5 5/9 11/6
You'll [1]   3/2
you're [11]   3/23 4/6 24/1
 25/17 37/4 37/14 53/20 64/12
 90/8 90/8 101/1
you've [6]   4/25 31/23 37/15
 53/9 80/15 85/21
your [128]
yours [1]   53/16
yourself [1]   3/25

**Z**

ZEBRAK [22]   1/12 2/11 2/12
 4/1 4/20 5/18 10/22 14/4
 16/5 52/5 52/9 52/17 53/15
 65/10 78/13 80/14 86/8 89/25
 90/14 96/15 100/23 103/17
zero [2]   9/17 14/14
ZOOM [1]   1/9